IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1094C
(Judge Block)

EL PASO MERCHANT ENERGY PETROLEUM COMPANY et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS AND SUPPLEMENTAL APPENDIX

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

STEVEN J. GILLINGHAM
Senior Trial Counsel
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 616-2311
Facsimile: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

BERNARD A. DUVAL
Counsel
Defense Energy Support Center
Fort Belvoir, VA 22060
HOWARD M. KAUFER
Assistant Counsel
Office of General Counsel
Defense Energy Support Center
Fort Belvoir, VA 22060

November 14, 2005

## TABLE OF CONTENTS

**PAGE(S)**

DEFENDANT'S MOTION TO DISMISS THE COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. El Paso's Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. DESC's Small Business Set-Aside Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I. Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II. DESC's EPA Clauses Are Authorized By FAR 16.203-1 . . . . . . . . . . . . . . . . . . . . . 11

A. EPA Clauses Need Not Be Based Upon Plaintiffs' Own Prices . . . . . . . . . . . . . . . 12

B. El Paso's Fair Market Value Allegations Do Not State A Cause Of Action . . . . 16

C. El Paso's FAR 15.802(b) Allegation Does Not State A Cause Of Action . . . . . . 16

D. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III. El Paso's Alternative Illegality Theories In Counts II-VI Must Be Dismissed . . . . . 20

A. Count II (Misrepresentation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B. Count III ("Breach of Contract") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C. Count IV ("Implied-In-Fact Contract") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

D. Count V ("Failure of Consideration and Frustration of Purpose") . . . . . . . . . . . . 22

E. Count VI ( Mistake) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1. Mutual Mistake . . . . . . . . . . 24

2. Unilateral Mistake . . . . . . . . . . 25

IV. Count VII (Takings Allegation) Fails To State A Claim . . . . . . . . . . 27

V. El Paso's Complaints Concerning DESC's Small Business Program Must Be Dismissed . . . . . . . . . . 29

A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint . . 29

B. DESC's Small Business Program Is Not Improper . . . . . . . . . . 31

# TABLE OF AUTHORITIES


Case Page(s)

Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . passim

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Atlas Corporation v. United States,
895 F.2d 745 (Fed. Cir. 1990), cert. denied, 498 U.S. 811 . . . . . . . . . . . . . . . . . . . . . . . . 24

Barrett Refining v. United States, 242 F.3d. 1055 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Bernaugh v. United States,
38 Fed. Cl. 538 (1997), aff'd, 168 F.3d 1319 (Fed. Cir. 1998) (table) . . . . . . . . . . . . . . . 28

Brookhard v. Janis, 384 U.S. 1 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

DGS Contract Services, Inc. v. United States, 43 Fed. Cl. 227 (1999) . . . . . . . . . . . . . . . . . . . . 32

Dairyland Power Cooperative v. United States, 16 F.3d 1197 (Fed. Cir. 1994) . . . . . . . . . . . . . 24

Dale Ingram, Inc. v. United States, 201 Ct. Cl. 475 F.2d 1177 (1973) . . . . . . . . . . . . . . . . . . . . 26

Durable Metals Prods., Inc. v. United States, 27 Fed. Cl. 472 (1983) . . . . . . . . . . . . . . . . . . . . . 20

Dynalectron Corp. v. United States, 4 Cl. Ct. 424, 428 (1984), aff'd, 758 F.2d 665 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

E. Walters & Co., Inc. v. United States, 217 Ct. C 576 F.2d 362 (1978) . . . . . . . . . . . . . . passim

Eastport Steamship Corp. v. United States, 178 Ct. C 372 F.2d 1002 (1967) . . . . . . . . . . . . . . . 30

Everett Plywood Corp. v. United States, 227 Ct. Cl. 651 F.2d 723 (1981) . . . . . . . . . . . . . . . . . 23

Far West Fed. Bank v. OTS, 19 F.3d 1358 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Florida Rock Indus. Inc. v. United States, 791 F.2d 893 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . 27

Fraass Surgical Mfg. Co., Inc. v. United States, 215 Ct. C 571 F.2d 34 (1978) . . . . . . . . . . . . . 27

Freightliner Corp. v. Caldera, 225 F.3d 1361 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Glopak Corporation v. United States, 12 Cl. Ct. 96,102 (1987), aff'd, 851 F.2d 334 (1988) . . . 27

Gould, Inc. v. United States, 935 F.2d 1271 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Gratz v. United States, 25 Cl. Ct. 411, 420, aff'd, 985 F.2d 583 (Fed. Cir. 1992) . . . . . . . . 28, 29

Gregory Lumber Co. v. United States, 11 Cl. Ct. 489 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Hermes v. United States, 58 Fed. Cl. 409 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060 (Fed. Cir. 2001) . . . . . 28

Hume v. United States, 21 Ct. Cl. 328, 330 (1886), aff'd., 132 U.S. 406 (1889) . . . . . . . . . . . . 27

Inupiat Community of the Arctic Slope v. United States,
230 Ct. C 680 F.2d 122 cert. denied, 459 U.S. 969 (1982) . . . . . . . . . . . . . . . . . . . . . . . . 30

J&E Salvage v. v. United States, 37 Fed. Cl. 256 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

John Massman Contracting Co., v. United States, 23 Cl. Ct. 24, 32 (1991) . . . . . . . . . . . . . . . 221

LaBarge Prods., Inc. v. West, 46 F.3d 1547 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682 (1949) . . . . . . . . . . . . . . . . . . . 28

LeBlanc v. United States, 50 F.3d 1025 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Liebherr Crane Corp. v. United States, 810 F.2d 1153 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . 26

Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146 . . . . . . . . . . . . . . . . . . . . . . . . 36

MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992) . . . . . . . . . . . . . passim

Montana v. United States, 124 F.3d 1269 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Morrison-Knudsen Co. v. United States, 170 Ct. Cl. 712 (1965) . . . . . . . . . . . . . . . . . . . . . . . . 21

Mullenberg v. United States, 857 F.2d 770 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Perpetual Financial Corp. v. United States, 61 Fed.Cl. 126, 138 (2004) . . . . . . . . . . . . . . . . . . . 23

Reservation Ranch v. United States,
39 Fed. Cl. 696 (1997), aff'd, 217 F.3d 850 (Fed. Cir. 1999) (table) . . . . . . . . . . . . . . . . 34

Rochman v. United States, 27 Fed. Cl. 162 (1992) . . . . . . . . . . 11

Seaboard Lumber Co. v. United States, 903 F.2d 1560 (Fed. Cir. 1980) . . . . . . . . . . 34

Seaboard Lumber v. United States, 308 F.3d 1283 (Fed. Cir. 2002) . . . . . . . . . . 23

Sherwood v. Walker, 66 Mich. 568, 33 N.W. 919 (1887) . . . . . . . . . . 24

Short Bros., PLC v. United States, 65 Fed. Cl. 695 (2005) . . . . . . . . . . 17

Spalding & Sons, Inc. v. United States, 28 Fed. Cl. 242 (1993) . . . . . . . . . . 23

Sun Oil Co. v. United States,
215 Ct. Cl. 716, 769-70, 572 F.2d 786, 818 (1978) . . . . . . . . . . 28, 29

Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 10

Tabb Lakes, Ltd. v. United States, 10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . 27

Tesoro et al. v. United States, 405 F. 3d 1339 (Fed. Cir. 2005) . . . . . . . . . . passim

Tony Downs Foods Co. v. United States, 530 F.2d 367 (Ct. Cl. 1976) . . . . . . . . . . 26

Trauma Service Group v. United States, 104 F.3d 1321 (Fed. Cir. 1997) . . . . . . . . . . 22

United States v. Connolly,
16 F.2d 882 (Fed. Cir. 1983), cert. denied, 104 S. Ct. 1414 (1984) . . . . . . . . . . 30

United States v. Hamilton Enterprises, 711 F.2d 1038 (Fed. Cir. 1983) . . . . . . . . . . 25, 26

United States v. Mitchell, 445 U.S. at 538 . . . . . . . . . . 30

United States v. Sherwood, 312 U.S. 584 (1941) . . . . . . . . . . 29

United States v. Testan, 424 U.S. 392 (1976) . . . . . . . . . . 29, 30

Whittaker Electronic Systems v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) . . . . . . . . . . 34

**STATUTES and REGULATIONS**

10 U.S.C. § 2306(a) . . . . . . . . . . 10

10 U.S.C. §2323 . . . . . . . . . . 7

15 U.S.C. § 644 . . . . . . . . . . 7

15 U.S.C. § 772 . . . . . . . . . . 6

28 U.S.C. § 1491 . . . . . . . . . . 29

41 U.S.C. § 423 . . . . . . . . . . 31

FAR 15.402(a) . . . . . . . . . . passim

FAR 15.610 . . . . . . . . . . 31

FAR 16.203-1 . . . . . . . . . . passim

FAR § 15.802 . . . . . . . . . . passim

FAR 16.203-4 . . . . . . . . . . 12

FAR 15.804-3 . . . . . . . . . . passim

FAR 35.006(b) . . . . . . . . . . 20

FAR 16.103(a) . . . . . . . . . . 20

FAR 16.104 . . . . . . . . . . 20

FAR 52.219-7 . . . . . . . . . . 32

FAR 19.502-3(c) . . . . . . . . . . 32

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EL PASO MERCHANT ENERGY PETROLEUM COMPANY et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 02-1094C |
| | ) | (Judge Block) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

The United States respectfully requests that the Court dismiss paragraph 52 of the Second Amended Complaint ("Compl."), pursuant to RCFC 12(b)(1), and the remainder of the complaint, pursuant to RCFC 56(b). In the alternative, defendant respectfully requests that the Court dismiss the remainder of the complaint pursuant to RCFC 12(b)(6). In support of this motion, we rely upon the Second Amended Complaint, the following brief, the accompanying proposed findings of uncontroverted fact ("PFF"), the exhibits submitted in conjunction with our first motion for summary judgment, and the supplemental appendix attached to this brief. Supplemental Appendix (“SA”).

**STATEMENT OF THE ISSUES**

1. Whether the contracts at issue were illegal because their Economic Price Adjustment (“EPA”) clauses were based upon “indexes rather than on Plaintiffs’ own established fuel prices,” “were not market-based, were not designed or intended to used to set or adjust prices, and did not reflect at least the fair market value of military fuel,” as alleged in Count I of the Second Amended Complaint.

2. Whether the allegation contained in Count II that the “PMM [Petroleum Marketing Monthly] indexes were not designed or intended to be used to set or adjust prices and

which did not at reflect at least the fair market value of military fuel" states a claim upon which relief can be granted.

3. Whether the allegation contained in Count I that the EPA clauses violate FAR 15.402(a) states a claim upon which relief can be granted.

4. Whether if the answer to Issue 2 and 3 are in the negative, Counts II-VI, which state alternative theories of relief based upon the same allegations concerning the PMM and are labeled as "Breach of Contract," "Implied-In-Fact-Contract," "Failure of Consideration and Frustration of Purpose," and "Mistake," also should be dismissed for failing to state a claim upon which relief can be granted.

5. Whether the allegation contained in Count VII, that the contracts at issue effected a taking, states a claim upon which relief can be granted.

6. Whether this Court has jurisdiction to entertain the allegation contained in paragraph 52 that DESC violated "the equal protection component of the fifth amendment's due process clause by extending to minority-owned businesses bidding preferences."

7. Whether DESC used "prohibited auction techniques, whereby DESC awarded contracts to bidders that agreed to match other bidders' prices," and that it improperly solicited and awarded "portions of the procurements set aside for small businesses together with those for large businesses." Compl. ¶ 50-51.

8. If the answers to any of the above are in the affirmative, whether El Paso has waived any applicable benefit, or is estopped from litigating their applicability.

## STATEMENT OF THE CASE

I. Nature Of The Case

This case arises from 110 fuel supply contracts between various subsidiaries of El Paso

Corporation (collectively, "El Paso") and the Defense Energy Support Center ("DESC"). Compl. ¶ 5-6; 34-40.[1] El Paso complains that the EPA clauses contained in DESC fuel contracts were illegal and that DESC's fuel acquisition program was marred by various other improprieties. Thus, El Paso concludes, it is "entitled to recover based on the fair market value of the fuel it delivered to DESC." Compl. ¶ 55.

In an earlier phase of this litigation, we moved for summary judgment upon El Paso's allegation that the DESC clauses at issue violated the Federal Acquisition Regulation ("FAR") ("illegality argument"). We also demonstrated that El Paso had waived any right it might have had to EPA clauses other than the ones contained in its contracts, and was estopped from litigating the point. This case then was stayed pending the outcome of our virtually identical motion in Hermes v. United States, No. 02-1460 (Fed. Cl.). In that case, based upon the reasoning set forth in MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992), the Court rejected the conclusion that the EPA clause there was invalid, but held that the claims may have been waived and requested additional briefing on that topic. Hermes v. United States, 58 Fed. Cl. 3 (2003) ("Hermes I").In Hermes II (Hermes v. United States, 58 Fed. Cl. 409 (2003)), the Court held that the contractor had waived its claims, dismissed the FAR-based illegality claim, and certified the waiver and illegality issues for interlocutory appeal. The Federal Circuit accepted the interlocutory appeal and, in Tesoro et al. v. United States, 405 F. 3d 1339 (Fed. Cir. 2005), *petition for reh'g. en banc denied,* No. 04-5064 (Fed. Cir. Aug. 22, 2005) ("Tesoro"), held that DESC's PMM-based EPA clause was legal, and declined to reach the waiver issue.

[1] Until 1998, DESC was called the Defense Fuel Supply Center ("DFSC"). We use the current name.

Following a status conference concerning how to proceed in this case, the Court permitted El Paso to file an amended complaint and defendant to file this motion. El Paso has since filed its amended complaint, styled as "Second Amended Complaint," to include what we consider to be immaterial factual allegations concerning the PMM and to assert a cause of action pursuant to FAR 15.402(a) (contracting officer's duty to assure prices offered are fair and reasonable). See Compl. at ¶ 49.

**SUMMARY OF MATERIAL FACTS**

The evidence set forth in the accompanying proposed findings of uncontroverted fact are sufficient to establish the Government's right to a dismissal of the complaint. Generally, the proposed findings describe the market-based nature of the EPA clauses at issue, DESC's long, controversy-free use of those clauses, El Paso's failure to object to the use of, or application of, the clauses, until many years after performing them, and El Paso's long history and familiarity with these clauses. They also demonstrate that DESC's small business program is consistent with the FAR.

I. El Paso's Contracts

Plaintiffs (collectively, "El Paso") are affiliates of The Coastal Corporation ("Coastal"), and longtime Government contractors. PFF 1. Coastal was founded in 1955. Before its acquisition by El Paso Corporation, Coastal was a diversified energy holding company with subsidiary operations in natural gas gathering, marketing, processing, storage and transmission; petroleum and petrochemical refining, marketing and distribution and chemicals; gas and oil exploration and production; coal mining; and electricity. Exh. 3.[2] Coastal had $8.2 billion in

[2] "Exh." refers to the exhibits contained in the appendix to our December 10, 2002 cross-motion for summary judgment. "Pl. App." refers to pages of the appendix accompanying plaintiffs' October 30, 2002 motion for summary judgment.

operating revenues in 1999 and had approximately 483,000 barrels per day of petroleum refining capacity. Id. Plaintiff El Paso Merchant Energy – Petroleum Company is an affiliate of El Paso and was previously known as Coastal Refining and Marketing, Inc. Compl. ¶ 1.

Between 1982 and 1999, El Paso performed approximately 110 contracts (Compl. ¶¶ 35-40), and delivered more than five billion gallons of fuel, for total payments of approximately $3 billion. Compl. ¶ 9. The contracts contained DESC-drafted price adjustment clauses. Exh. 1 ¶ 11-15. In essence, for each petroleum product to be supplied, offerors proposed a "base price" per gallon, which the agency used for evaluation purposes. PFF 11, 12. Offerors also acknowledged a "reference price," which, since the early 1980s, has been taken from one of two widely-available petroleum price publications. PFF 11-12; Exh. 4 at 6-7 (next to last page). After award, the base price per gallon was periodically adjusted up or down, by the exact number of fractions of a cent that the published reference price had risen or fallen since the last adjustment. PFF 12. Thus, changes in the contract prices were linked to changes in the prices of similar products. Exh. 1 ¶ 6, 10; Exh. 2 ¶¶ 3-11.

DESC began using EPA clauses during the 1973 oil embargo. At that time, the agency allowed offerors to choose between basing price adjustments upon either published prices of refined products, or actual crude oil costs. DESC began using market-prices exclusively in the early 1980s, primarily because the prior practice made it difficult to compare offers for evaluation purposes. PFF 10, 18-25.

The contracts awarded to El Paso from 1986 to 1994, contained EPA clauses providing for price adjustments based upon monthly average sales prices of refined petroleum products, by region, as reported by the Department of Energy ("DOE"), Energy Information Administration, in its publication the Petroleum Marketing Monthly. PFF 14. The PMM is compiled from

transaction price reports that refiners, including El Paso, are required by law to submit to DOE monthly. PFF 14; 15 U.S.C. § 772.

Pursuant to the PMM-based EPA clause, suppliers' per-gallon prices were adjusted monthly. PFF 14. For example, for a 1993 contract, El Paso bid a base price of 58 to 59 cents per gallon for JP-4 (Exh. 8 at 2), tied to a PMM-based reference price, supplied by DESC, of 63.4220 cents per gallon for August 1992. Id. at 7. Assuming hypothetically that, for the first month in which El Paso delivered fuel, the reference price rose .10 cents higher, the contract price for that first month would have been the base price plus the same .10 cents per gallon.

In 1995, after the period at issue here, DESC adopted as its EPA escalator a widely-used industry publication, Platts Oilgram Price Report ("Platts"). PFF 16. DESC did so because, despite substantial advantages offered by the PMM, including the fact that it was a report of actual sale prices, the report of those prices was not available until three months after the sales took place. The EPA clauses, however, required monthly payments and, therefore, price adjustments. To accommodate this gap between the payment date and the availability of the data necessary to calculate the economic price adjustment applicable to those payments, DESC made an estimated interim payment and then reconciled the payment with the amount properly due when the applicable PMM sales data became available. PFF 15-16, 18-25; see, also Exh. 8 at 5. Thus, El Paso's suggestion that the change from PMM demonstrates that a PMM-based clause was illegal or not market-based is sheer hyperbole. See, e.g., Compl. ¶¶ 20, 22.

The EPA clause contained in others of El Paso's contracts at issue were based upon price changes in industry publications such as Platts, OPIS, Computer Petroleum Corporation, The Lundberg Report, or Oil Buyers Guide. Exh. 1 ¶¶ 14-15.

El Paso never objected to any version of the EPA clause, or to any of the dozens of price

adjustments made pursuant to the clauses. PFF 32. Indeed, it was not until El Paso submitted its first certified claim in 2000 – approximately 17 years after the first contract was awarded, and eight years after MAPCO, 27 Fed. Cl. 405, was decided – that El Paso alleged that the EPA clauses were illegal. Compl. 35-40; Exh.1.

II. DESC's Small Business Set-Aside Program

In accordance with 15 U.S.C. § 644 and FAR Part 19, DESC's Bulk Fuels Program solicitations included partial small business set-asides. Beginning in 1988, pursuant to 10 U.S.C. § 2323, DESC solicitations also included an evaluation preference of up to 10 per cent for small disadvantaged business concerns. DESC solicitation clauses I237.05, Notice of Evaluation Preference for Small Disadvantaged Business Concerns, and I237.06, Notice of Partial Small Business Set-Aside with Preferential Consideration for Small Disadvantaged Business Concerns, set forth the operation of these programs. PFF 30.

The clauses provided that the set-aside price would be the highest price the Government would pay for the non-set-aside portion of the fuel required for a location, and allowed negotiation with small business offerors to obtain that price. DESC did not provide small business concerns with either the identity or the prices of other offerors. Rather, the match price comprised the fuel price the Government would pay plus a figure for transportation costs to the destination for which the small business might offer. PFF 31.

## SUMMARY OF THE ARGUMENT

This case presents the incredible claim that a sophisticated oil contractor that performed over 100 DESC contracts over 17 years, without complaint, now is entitled to damages due to alleged defects in those contracts. Remarkably, El Paso does not even allege that it misunderstood the clauses at issue, or that the clauses did not operate as their plain language

suggests they would.

In Tesoro, 405 F.3d 1339, the Federal Circuit explicitly rejected El Paso's stubborn contention that the clauses were illegal because they were based upon "indexes rather than on Plaintiffs' own established fuel prices" or that DESC's PMM-based EPA clause is prohibited by the FAR. Tesoro also effectively disposes of El Paso's miscellaneous complaints concerning the EPA clauses. In Tesoro, the court held that, in order to pass muster under FAR 16.203-1, EPA clauses need be only be based upon "industry-based prices," which "may be established by references to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347. Yet, in the guise of various legal theories, El Paso contends that the EPA clauses are suspect because they were not "designed or intended" to set prices and did not "reflect at least the fair market value of military fuel." These allegations do not invoke any part of the legal test for EPA clauses and, therefore, fail to state a claim upon which relief can be granted. In fact, DESC's EPA clauses pass muster under Tesoro, because they are based upon "market sources."

El Paso's three categories of auxiliary complaints fare no better. The first category, comprising Counts II-VI, is a repackaging of the clause-illegality argument into various common law theories, "Breach of Contract," "Implied-In-Fact-Contract," "Failure of Consideration and Frustration of Purpose," and "Mistake." All are based upon the legally-unfounded premise that DESC owed a duty to El Paso to utilize price references that were "designed or intended to be used to set or adjust prices," that the references "reflect at least the fair market value of military fuel," and that DESC pay "fair market value." None is grounded in the language of El Paso's actual contracts or the Federal Circuit's standard for assessing the legality of EPA clauses. All are thinly-disguised, back-door attempts to alter the legal standard for EPA clauses, established and applied in Tesoro. Accordingly, none of these states a cause of action upon which relief

may be granted. To the extent they might, El Paso simply fails to demonstrate the elements of proof for those causes of action.

The second complaint category, Count VII, is El Paso's allegation that DESC's possession of the fuel purchased pursuant to the contracts at issue effected a taking. However, it is well-established that, when the Government action at issue is subject to a contract, no Fifth Amendment takings may lie. Accordingly, Count VII too should be dismissed.

The third category (contained in Count I) focuses upon a variety of alleged peccadillos concerning DESC's small business program -- that: (1) DESC's small business set-aside program violates the FAR's anti-auction provisions, and its prohibition against "awarding portions of the procurements set aside for small business together with those for large businesses"; and (2) DESC's small disadvantaged business program violates the equal protection component of the Fifth Amendment. It is not clear how these complaints affected El Paso or could support the wholesale contract repricing that El Paso seeks. In any event, this Court has no jurisdiction to address an equal protection claim and El Paso's vague allegations do not demonstrate that DESC's small business set-aside program violates the law.

Finally, even if El Paso's various allegations are not subject to dismissal for the reasons summarized above, we still are entitled to summary judgment, because, years ago, El Paso abandoned any rights the FAR, the Fifth Amendment, or small business regulations might have conferred. El Paso also forfeited any right it might have had to test those rights in litigation when it waited as many as 18 years to file the necessary claims. Indeed, in a case involving far less egregious circumstances, this Court has already held as much. Hermes II, 58 Fed. Cl. 409. Although the Hermes Court did not explicitly address El Paso's other causes of action, there is

no principled basis for treating them differently.[3]

## ARGUMENT

I. Standard of Review

Summary judgment is warranted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." RCFC 56(c); accord Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1999). A factual issue is material if it could affect the outcome of the case in light of the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute exists only if a reasonable trier of fact could find for the nonmoving party. Id. The movant need not “produce evidence” of the absence of factual disputes; it need only “point[] out” that the record does not support the other party's case. Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

We have moved to dismiss some counts of the Second Amended Complaint pursuant to RCFC 12(b)(6), which permits the dismissal of an allegation that fails to state a claim upon which relief may be granted. Dismissal upon this ground is appropriate whenever "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

[3] In our earlier motion for summary judgment, we demonstrated that, in order to maintain a cause of action against the Government, El Paso must allege and prove that it was injured, damaged, or harmed by the Government’s allegedly wrongful action and that El Paso had failed to do so. Def. MSJ at 42. We do not repeat that argument here, because the dismissal of the complaint we seek here would moot the argument. However, should the Court deny this motion, we respectfully request that the Court address that argument before permitting any further discovery. Our earlier motion for summary judgment also explained that, if El Paso could establish entitlement to recovery in quantum valebant, the Court should dismiss those portions of the complaint that rest upon the presumption that El Paso may disregard its original offer prices, as El Paso’s certified claims did. See Def. MSJ at 43. We do not repeat that position either. However, should the Court deny this motion, we respectfully request that that argument be considered before any discover concerning remedy is permitted.

entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

In making this determination, the Court must accept the factual allegations set forth in the complaint as true and "indulge in all reasonable inferences in favor of the nonmovant." Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).[4]

## II. DESC's EPA Clauses Are Authorized by FAR 16.203-1[5]

In Count I, El Paso presents several theories concerning the illegality of DESC's EPA clauses: (1) that the clauses were illegal because there were not based upon "Plaintiffs' own established fuel prices" (Compl. ¶ 47); (2) that the clauses were illegal because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 48); and (3) that the contracts were awarded in violation of FAR § 15.802(b) (currently codified at FAR 15.402(a)) (contracting officer's duty to review offers for price reasonableness). (Compl. ¶ 49)

As explained below, El Paso waived whatever benefits it imagines these regulations conferred and now, is estopped by its years of inaction from litigating those benefits. However, even if that is not so, El Paso is not entitled to relief, as these clauses are legal pursuant to Tesoro. Indeed, El Paso's allegations, which attempt to redefine the standard for EPA clauses, do not even state a claim upon which relief can be granted, because they invoke standards for illegality not found in the law.

[4] However, "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." Rochman v. United States, 27 Fed. Cl. 162, 168 (1992)(quoting 2A Jeremy C. Moore, Moore's Federal Practice, ¶ 12.07 [2.-5] (2d ed. 1992)).

[5] In our first motion for summary judgment, we explained that, although FAR 16.203-1 specifically authorized the clauses at issue, it was El Paso's burden to demonstrate that the clauses were prohibited, not our burden to demonstrate specific authority. See Def. MSJ at 30. We have not repeated the position here. However, should the Court determine that the clauses at issue are not specifically authorized, we respectfully request that it consider that position.

A. EPA Clauses Need Not Be Based Upon Plaintiffs' Own Prices

FAR 16.203-1 provides as follows:

> A fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies. Economic price adjustments are of three general types:
>
> (a) Adjustments based on established prices. These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items.
>
> (b) Adjustments based on actual costs of labor or material. These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.
>
> (c) Adjustments based on cost indexes of labor or material. These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

FAR Section 16.203-1(a) describes two sorts of "established prices" adjustments -- those based upon "published or otherwise established prices." Section 16.203-1 does not define those terms. However, FAR 16.203-4(a), and (b) ("Clauses"), which prescribe standardized clauses for "adjustments based on established prices," specifically refer to the use of established price indexes for supplies that have either established "catalog" or "market prices."

Since January 1997, FAR 16.203-4 has not explicitly defined the terms "catalog or market price."[6] However, its predecessor made clear that the terms "established catalog or market price" referred to the definitions found in FAR 15.804-3. The predecessor stated that, before using a "published or otherwise established price" EPA clause, the contracting officer must determine that "the requirement is for . . . .supplies that have an established catalog or

[6] This provision was deleted from the FAR effective January 2, 1997.

market price verified using the criteria in FAR 15.804-3" (emphasis added). Section 15.804-3 (c), in turn, defined "established catalog prices" as "prices (including discount prices) recorded in a catalog, price list, schedule, or other verifiable and established record that (A) are regularly maintained by the manufacturer or vendor; and (B) are published or otherwise available for customer inspection." FAR 15.804-3(c)(1) (1995). It defined "established market prices" as "current prices that (i) are established in the course of ordinary and usual trade between buyers and sellers free to bargain and (ii) can be substantiated by data from sources independent of the manufacturer or vendor." Id. § 15.804-3(c)(2) (emphasis added).

In Tesoro, the Federal Circuit, reviewing the PMM-based EPA clause at issue here, held that FAR 15.804-3 supplies the meaning for "established prices," which need not be, as El Paso asserts, the contractor's own prices:

> Although the term "established price" is not expressly defined in FAR § 16.203, the definition of the term in FAR § 15.804-3 is incorporated by reference. FAR § 15.804-3 defines "established prices" to include contractor-specified prices, namely "established catalog prices," and industry-based prices, namely "established market prices." As indicated by FAR § 16.203-2 and FAR § 15.804-3, the policy behind requiring use of "established prices" is to avoid contract subject to the operational whims of individual contractors.

Tesoro, 405 F.3d at 1347.

Rejecting the contractor's theory (El Paso's here), the court held explicitly that the theory that "FAR 16.203-3 requires that adjustments be based only on changes in the prices charged by individual contractors eviscerates the regulatory meaning of the term 'established prices' and the policy reasons for using it." Id. Summarizing, the court explained that: "According to the interplay of all four sections of FAR § 16.203, a 'contractor's established price' may be established by reference to either a catalog or market sources independent of the manufacturer or

vendor." Id. at 1347.

The court did not stop there, however. Instead, it explicitly considered whether DESC's PMM-based EPA clause was an "established prices" clause contemplated by FAR § 16.203-1 and held that it was – foreclosing this Court from considering the question anew. Indicating that it was indeed considering the legality of the PMM-based EPA clause, the court recited the PMM's various features as well as the parties' contentions concerning the effect of those features upon the viability of the PMM-based EPA clause. The court's specific recitations concerning the PMM included the following.

- The certified question for interlocutory review was "Did DESC establish the price of fuel in violation of law by employing economic price adjustment clauses indexed to PMM?" Tesoro, 405 U.S. at 1342 (emphasis added).

- "The reference prices to which the price adjustments were tied were drawn from market publications. Until June 23, 1994, DESC drew its EPA reference prices from the market publication known as the [PMM]." Id. at 1341.

- The PMM is published by DOE and is a "monthly average of sales figures for specified fuels for five fuel regions know as Petroleum Administration Defense Districts ('PADDS')." Id.

- "All refiners, including Tesoro and Hermes, are required by law to submit monthly sales data to the DOE, which then compiles the data to report the monthly average sales prices per PADD for various products." Id.

- The "complaints in both suits complained the DESC's actions were per se illegal because the PMM-based EPA clause was inconsistent with the applicable section of the FAR." Id. at 1342.

- The contractors argued that "DESC's use of an EPA clause tied particularly to the PMM does not comport with the express requirements of FAR § 16.203-3 . . . Relying in the language of MAPCO, Appellants claim that a PMM-based EPA clause fails to address either of the "mischiefs" specified in FAR § 16.203-3, because the PMM is an "amalgamation" of petroleum sales that does not reflect the product, the market, or the price for the military fuel Tesoro and Hermes supplied." Id. at 1348 (emphasis added).

- A review of the MAPCO analysis of the PMM itself, which was distinct from

> MAPCO's analysis of whether, in general, EPA clauses must be based upon the contractor's prices. See MAPCO, 27 Fed. Cl. at 410-11. The appellate court's review included MAPCO's dissection of the PMM, including the fact that it was an "amalgamation of the previous month's sales data" and, as such, did not comport with the dictionary definition of "established." The review also recited MAPCO's conclusion ("In sum, the index at issue is neither the contractor's, nor does it reflect an established price"), which underscored the fact that the appellate court and the MAPCO court considered the general question of whether an "established prices" EPA clause could be market based as well as whether DESC's PMM clause was an "established prices" clause. Id. at 1347.

Following this recitation, the court concluded, in unmistakable language, that the PMM-based EPA clause was, indeed, a permissible EPA clause:

> Because we conclude that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR, we do not reach the other issues raised in the certified questions . . . . Our holding that the use of the PMM-based EPA clause was authorized under the statute moots the issue of [waiver].
>
> * * *
>
> For the foregoing reasons, we hold that the Court of Federal Claims erred in holding that DESC's use of a PMM-based EPA clause was not authorized under the FAR.

Id. (emphasis added).

The appellate court's conclusion should have come as no surprise. The PMM is based upon sales data from a large number of refiners and sellers of petroleum products. It reports averages of the actual prices sellers have charged and buyers have paid for various petroleum products in different states and regions of the country. PFF 14. Because the prices are established in actual sales between a number of sellers and buyers, they clearly are "market prices," and satisfy the FAR 15.804-3 requirement that market prices be established in the ordinary course of business between buyers and sellers free to bargain.

The Platts Oilgram Price Report and the other DESC price references used in El Paso's contracts also are market-based publications and are widely used to adjust prices. PFF 13.

Accordingly, they easily pass muster under Tesoro's "market sources"/ "market-based" standard. El Paso's complaint does not assert otherwise. Indeed, El Paso's sole complaint concerning these publications is that: "[o]n information and belief, DESC also knew that some of the other indexes it used to set or adjust prices were not appropriate for these purposes." Compl. ¶ 29. We will allow El Paso to detail this complaint before addressing it further. For now, it suffices to say that this allegation appears to be of the same character as El Paso's alternative EPA clause illegality argument, i.e., that DESC had a greater obligation in drafting EPA clauses than that defined in Tesoro. We discuss that argument in the next section.

B. El Paso's Fair Market Value Allegations Do Not State A Cause of Action

The above analysis establishes that DESC's EPA clauses pass muster under Tesoro and, therefore, are legal. However, El Paso asserts that the clauses also may be considered illegal because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 48). But, we are aware of no legal basis for invalidating EPA clauses upon these grounds and the complaint identifies none. In short, El Paso's effort to levy yet further qualifications upon EPA clauses is rooted neither in El Paso's contract nor the applicable law concerning EPA clauses. Accordingly, we see no apparent ground upon which these allegations might state a claim.

C. El Paso's FAR 15.802(b) Allegation Does Not State A Cause of Action

In yet another effort to create an unfounded legal test for EPA clauses, El Paso asserts that the clauses were illegal because they somehow violated of FAR § 15.802(b) (currently codified at FAR 15.402(a)). As this Court has already held, that regulation does not create rights for contractors. In other words, a complaint rooted in this regulation fails to state a claim upon which relief can be granted.

FAR 15.402(a) provides that:

> Contracting officers must-
>
> (a) Purchase supplies and services from responsible sources at fair and reasonable prices. In establishing the reasonableness of the offered prices, the contracting officer must not obtain more information than is necessary. To the extent that cost or pricing data are not required by 15.403-4, the contracting officer must generally use the following order of preference in determining the type of information required:
>
> (1) No additional information from the offeror, if the price is based on adequate price competition, except as provided by 15.403-3(b).
>
> (2) Information other than cost or pricing data:
>
> (I) Information related to prices (e.g., established catalog or market prices or previous contract prices), relying first on information available within the Government; second, on information obtained from sources other than the offeror; and, if necessary, on information obtained from the offeror. When obtaining information from the offeror is necessary, unless an exception under 15.403-1(b)(1) or (2) applies, such information submitted by the offeror shall include, at a minimum, appropriate information on the prices at which the same or similar items have been sold previously, adequate for evaluating the reasonableness of the price.
>
> (ii) Cost information, that does not meet the definition of cost or pricing data at 2.101.
>
> (3) Cost or pricing data. The contracting officer should use every means available to ascertain whether a fair and reasonable price can be determined before requesting cost or pricing data. Contracting officers must not require unnecessarily the submission of cost or pricing data, because it leads to increased proposal preparation costs, generally extends acquisition lead time, and consumes additional contractor and Government resources.

We start with the proposition that not every regulation provides the contractor with an "enforceable interest." Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1381 (Fed. Cir. 2002) (AT&T V). And that is precisely where this Court started in Short Bros., PLC v. United

States, 65 Fed. Cl. 695, 764-65 (2005). In rejecting the very argument that El Paso advances here, the court explained:

> The FAR provisions cited by plaintiff purport to do no more than to provide internal government direction. For example, FAR § 15.802 (1993), entitled "Policy," only requires that the contracting officer "[p]urchase supplies and services from responsible sources at fair and reasonable prices [.]" FAR § 15.802(b) . . . It does not afford a judicial remedy."

Short Bros. is consistent with AT&T V and other cases that hold that contractors lack standing to bring suit based upon regulations issued for the Government's benefit. E.g., Freightliner Corp. v. Caldera, 225 F.3d 1361(Fed. Cir. 2000).

The decision also is consistent with the AT&T V court's analysis concerning whether a regulation might be said to confer an enforceable interest. In AT&T V, the court considered a contractor's allegation that, in selecting a fixed-price contract, the Navy had "violated a variety of procurement regulations and directives that guide a contracting officer's selection of contract type." 307 F.3d at 1379. Specifically, the contractor alleged, and there was no dispute, that Navy contracting officials had failed to obtain a statutorily-mandated departmental-level certification that would have permitted it to enter into the fixed-price shipbuilding contract at issue. But, the court refused to entertain the contractor's claim, finding no intent in the legislation to "make any provision for judicial enforcement" (id.) -- and this was so, despite the fact that passage of the statute was prompted by shipbuilding claims of the sort at issue. See Am. Tel. & Tel. Co. v. United States, 177 F.3d 1368, 1370-71 (Fed. Cir.1999) (en banc).

If the court could not find an enforceable interest for contractors in a statute, whose passage was motivated by their having to bear costs overruns, El Paso will be hard pressed to find one here. Indeed, the purpose of this regulation is not to protect contractors (other than

from needless demands for documents), but to protect the Government from prices that are "higher than warranted." All Phase Environmental, Inc., B-292-919.2, 2004 CPD ¶ 62, 2004 WL 437450 at 6. That purpose is evident, for example, in the regulation's warning against prices that include "contingency" amounts, i.e., amounts that would make a price "higher than warranted." Professors Nash and Cibinic agree, explaining that: "The primary focus of these requirements is to ensure that the Government does not pay unreasonably high prices," although they caution that "prices that are unreasonably low must also be dealt with before an award is made, because they could be evidence of mistake, non-responsibility, lack of understanding of the work, or a buy-in." Formation of Government Contracts (3rd Ed. 1998) at 1279.[7]

Indeed, if, as El Paso argues, the contracting officer's obligation to assess price reasonableness were actionable, contract pricing never would be binding, because contractors who failed to realize the *post hoc* demands of their owners or investors could occasion this Court's intervention with no more substantial an allegation than "our price was unfair!" That is precisely what plaintiffs seek to do here, insisting that they be paid what they call "fair market value," a term apparently to be defined by an expert at trial.

D. Conclusion

At bottom, El Paso's complaint concerns the type of market based clause selected. However, absent a prohibition, the agency had the discretion to select an appropriate clause. See AT&T V, 307 F.3d at 1378-80; accord 10 U.S.C. § 2306(a) (agency head generally "may enter into any kind of contract that he considers will promote the best interests of the United States"). Indeed, the FAR expressly affords the contracting officer latitude to use agency-prescribed EPA

[7] We are not aware of any allegation of pricing mistake, of the sort referred to in this treatise, here.

clauses when the standard FAR clauses are “inappropriate.” FAR 16.203-4 (a)(2), (b)(2), (c)(2), and (d)(2) (1995). See also FAR 35.006(b) ("Selecting the `appropriate contract type is the responsibility of the contracting officer.”); FAR 16.103(a) (“Selecting the contract type is generally a matter for negotiation and requires the exercise of sound judgment.”); FAR 16.104 (selection of contract type turns upon "many factors").

To borrow this Court’s phrase: “An important consideration is the prevailing view among courts that determinations in procurement matters should ordinarily be left to the discretion of administrative officials exercising procurement authority.” Durable Metals Prods., Inc. v. United States, 27 Fed. Cl. 472, 477 n.6, aff'd, 11 F.3d 1071 (Fed. Cir. 1993) (table). And, any doubt concerning the agency’s exercise of discretion in this case should be erased by the uncontroverted facts of this case: during 17 years of contract performance, El Paso did not complain once about its contracts’ formation or operation. PFF 32. That silence is telling. There simply is nothing inherently suspicious or illegal about DESC's fuel contracts. And, El Paso, which, as claimant must prove otherwise, has not done so.

III. El Paso’s Alternative Illegality Theories In Counts II-VI Must Be Dismissed

In addition to its core complaint, that the EPA clauses violate the FAR, El Paso presents several common-law theories of relief in Counts II-VI. These trojan horse allegations merely repackage the premise discussed in Sections II.B. and C., above: that EPA clauses must be “designed and intended,” and, in fact, provide for the payment of “fair market value.” As explained, however, this premise arises neither from El Paso’s contracts nor from the Federal Circuit’s announced standard for EPA clauses. As explained below, the premise gains no traction under its common law guise and, therefor, Counts II-VI also fail to state a claim.

A. Count II (Misrepresentation)

In sum, Count II alleges that DESC "misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value." Compl. ¶ 64. The apparent premise for this allegation is that "[i]n basing price adjustments on PMM, DESC represented and warranted that PMM accurately reflected at least the fair market value for fuel and that prices for military fuel were fair and reasonable." Compl. ¶ 16.

"Misrepresentation occurs when the government misleads a contractor by a negligently untrue representation of fact, or fails to disclose information it has a duty to disclose." John Massman Contracting Co., v. United States, 23 Cl. Ct. 24, 32 (1991) (citing Morrison-Knudsen Co. v. United States, 170 Ct. Cl. 712 (1965)). El Paso has not identified a fact that DESC had a duty to disclose or one that was material to its bargain. The essential terms of the DESC contracts are that El Paso would supply fuel at a given location and that DESC would pay El Paso according to a specified formula. El Paso has not alleged that any part of the contract was ambiguous, that DESC failed to honor the pricing clause, or that the clause failed to operate as described in the contract.

B. Count III ("Breach of Contract")

Count III is based upon the premise that "DESC's basing price adjustments and other indexes that were adequate to accomplish the stated purposes of its price adjustment clause to protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value was a material condition of the contracts upon which Plaintiffs reasonably relied in entering the contracts." Compl. ¶ 72. It makes similar allegations concerning the materiality of DESC basing price adjustments "on standards that were designed

or intended to be used to set of adjust prices," id. at ¶ 73, and DESC's "paying at least fair market value." Id. at ¶ 74. The short answer is that there is nothing in the contract that recites any such conditions. Accordingly, there is no basis for concluding that these were "material" conditions of the contracts or that the contract was breached, even assuming that these conditions never materialized.

C. Count IV ("Implied-In-Fact Contract")

Count IV alleges that DESC committed a "violation of law and regulation" in awarding and administering El Paso contracts. Compl. at ¶ 86. As we have explained, there has been no violation of law or regulation. Nonetheless, an "implied-in-fact contract cannot exist if an express contract already covers the same subject matter." Trauma Service Group v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997). Here, the alleged implied-in-fact contract concerns the same subject as that addressed directly by the contracts at issue, the price of fuel already bought and sold. Accordingly, if, according to the contracts, El Paso is entitled to additional compensation, contracts and contract principles will provide El Paso its remedy.[8]

D. Count V ("Failure of Consideration and Frustration of Purpose")

Count V also is based upon the triumvirate of premises discussed above, that DESC was required to: (1) base prices upon an index "adequate to "protect against market fluctuations and to ensure that the prices DESC paid for military fuel reflected at least fair market value;" (2) base prices upon an index "designed or intended to be used to set or adjust prices" and that did

[8] We understand that this allegation has not been plead as an independent ground for relief, but as an allegation of law concerning how a remedy might be obtained should the contract's express pricing clause be stricken as illegal. See Barrett Refining v. United States, 242 F.3d. 1055, 1060 (2001) (remedy for illegal pricing term is found in any implied contract concerning that term). However, as we have noted, these contracts are legal. Thus, this count adds no new allegations or necessary cause of action and should be dismissed.

"reflect at least fair market value;" (3) and pay "fair and reasonable prices" and "at least fair market value." Compl. at ¶ 102-4.

As we have explained, these allegations are not the proper basis for a contractually-based claim and pleading them as a breach-type claim does not increase their heft. Moreover, these theories are bases for avoiding performance – and not applicable here, because performance already has occurred. See, e.g., Everett Plywood Corp. v. United States, 227 Ct. Cl. 415, 423-24, 651 F.2d 723, 728-29 (1981) (frustration excuses performance); Far West Fed. Bank v. OTS, 119 F.3d 1358, 1364 (9th Cir. 1997)([f]rustration of purpose is an excuse for non-performance, not a cause of action (citing Restatement (Second) of Contracts sec. 265); Perpetual Financial Corp. v. United States, 61 Fed. Cl. 126, 138 (2004) (frustration of purpose count must be dismissed); Spalding & Sons, Inc. v. United States, 28 Fed. Cl. 242, 248-49 (1993) (frustration is a "rule respecting discharge," based on frustration of purpose, citing section 265 of the Restatement (Second) of Contracts).

But, even if the Court were to recognize frustration as an affirmative cause of action, they would fail. The Federal Circuit has held that, to excuse performance based upon frustration of purpose, a party must establish that: (1) a supervening event occurred; (2) the moving party did not bear the risk of the supervening event; and (3) the event rendered the value of performance worthless. Seaboard Lumber v. United States, 308 F.3d 1283, 1295 (Fed. Cir. 2002). El Paso simply has failed to allege such factors.

E. Count VI (Mistake)

In Count VI, El Paso argues that the same "no fair prices, no fair market value, no intent to track fair market value" litany presented in the other alternative counts entitles El Paso to reprice its DESC contracts. Compl. at ¶¶ 110-12. In Count VI, the litany is further fractured

into yet two more alternatives -- mutual mistake (Compl. ¶¶ 125-28) and unilateral mistake (Compl. ¶¶ 129-32). However because the litany (in addition to being untrue) has no legal significance, Count VI too must be dismissed.

1. Mutual Mistake

To establish mutual mistake so as to justify recision of a contract, a party must demonstrate that: (1) at the time of their agreement, both parties shared a mistaken belief "regarding a fact"; (2) that the mistaken belief "constituted a basic assumption underlying the contract"; (3) that the mistake "had a material effect on the bargain;" and (4) the claimant did not assume the risk of mistake. Dairyland Power Cooperative v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994); Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990).

The kind of "mistake" necessary to support reformation of a contract concerns a belief not in accord with the facts in existence at the time of contracting. Atlas Corp., 895 F.2d at 750 (rejecting claim of mutual mistake where fact had not come into existence at time of contracting).[9] Thus, the "mistake" alleged in a mistake of fact claim must concern an "existing fact," Dairyland Power Cooperative, 16 F.3d at 1202, and, therefore, "'[a] party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined [under the doctrine of mutual mistake of fact].'" Id. at 1203 (quoting Restatement (Second) of Contracts § 151 cmt. a (1981)). "Indeed, there is uniformity among the circuit courts of appeals and the commentators that mutual mistake of fact cannot lie against a future event." Id. (citing cases and treatises).

Here, El Paso's contention is that the PMM does not track fair market value. But, El

[9] The archetypal example is Sherwood v. Walker, 66 Mich. 568, 576, 33 N.W. 919 (1887). There, a seller was permitted to void his contract to sell a cow that the parties had supposed was barren, when, in fact, she was fertile, and of good breeding stock.

Paso offers no evidence concerning the elements of a mistake claim, including that both parties believed anything to the contrary of what occurred or that was a material part of their bargain. The best evidence of what the parties believed concerning the basic nature of their agreement is the plain language of the contract itself. Yet, El Paso has identified no ambiguity that might lead the parties to believe that the PMM or Platts was anything other than what they were: publications of certain price data. Moreover, the gravaman of El Paso's complaint is not that the parties failed to understand what Platts or PMM were, but that the payments they yielded were assailable, as a matter of law. However, in light of the Federal Circuit's decision in Tesoro, that is not the case. As a result, if there was any mistake, it was El Paso's legal conclusion at the time it filed its claim -- and not one concerning a fact "existing" at contract formation.

2. Unilateral Mistake

To succeed on a claim of unilateral mistake, a party must demonstrate:

> (1) mistake by one party, not bearing the risk of such mistake, as to a basic assumption on which he made the contract;
>
> (2) that has a material effect on the agreed exchange of performance; and
>
> (a) the effect of the mistake is such that enforcement of the contract would be unconscionable; or
>
> (B) the other party to the contract has reason to know of the mistake.

J&E Salvage v. v. United States, 37 Fed. Cl. 256, 265 (1997) (citing Restatement (Second) of Contracts § 153 (1981)).

A contract will not be reformed because of a unilateral mistake in a bid unless the contractor establishes that the mistake resulted from a clear cut clerical or arithmetical error, or a misreading of the specifications. United States v. Hamilton Enterprises, 711 F.2d 1038, 1046

(Fed. Cir. 1983); Dale Ingram, Inc. v. United States, 201 Ct. Cl. 56, 74, 475 F.2d 1177, 1186 (1973). But, an agreement cannot be revised to reflect a plaintiff's subjective understanding the defendant does not and should not know of. Id. Accordingly the doctrines of mistake of fact do not apply when the error made by one of the parties was based upon an erroneous prediction or judgment. Restatement (Second) of Contracts § 151a.

An actionable "mistake" is a discrepancy between an offeror's state of mind and his offer. Tony Downs Foods Co. v. United States, 209 Ct. Cl. 31, 530 F.2d 367, 372 (1976) (holding that "difficulty of performance or losses in carrying out a contract will not be treated as a basis for relief by the courts in the absence of special clause in the contract stipulations providing for such relief"). In Hamilton Enterprises, 711 F.2d at 1046, the court found no mistake because the contractor could not demonstrate that the price it bid was not "the price it intended to bid." Accord Liebherr Crane Corp. v. United States, 810 F.2d 1153, 1157 (Fed. Cir. 1987) ("there is no difference in this case between Liebherr's intended bid and the bid Liebherr actually submitted).

El Paso cannot make the necessary showing, because the vague allegations concerning the inappropriateness of the EPA clauses are, at best, legal characterizations of the clauses or of payment eventualities that postdated El Paso's offers (the payment, or not, of "fair market value) – and not true mistakes concerning what El Paso intended to bid. Indeed, if that were not true, we would expect to see allegations (and, ultimately, declarations) concerning the state of mind of El Paso contract pricing teams. Instead, we see El Paso's thinly-disguised, and now debunked, allegations of law concerning the legal nature of the EPA clauses - not concerning the factual circumstances of El Paso's offers.

The final test (the alternative second prong) of a unilateral mistake claim is that the

contract was unconscionable. J&E Salvage, 37 Fed. Cl. at 265. This jurisdiction has defined an unconscionable contract as one "which no man in his senses, not under delusion, would make on the one hand, and which no fair and honest man would accept on the other...." Hume v. United States, 21 Ct. Cl. 328, 330 (1886), aff'd., 132 U.S. 406 (1889); accord Fraass Surgical Mfg. Co., Inc. v. United States, 215 Ct. Cl. 820, 571 F.2d 34 (1978).

As this Court has explained:

> In analyzing the allegation of unconscionability the court should look for some type of oppression, unfair surprise and lack of consent at the time of entering into the contract. Gregory Lumber, 11 Cl.Ct. at 504 . . . . As pointed out in the Fraass decision . . . "discretion to deny enforcement to an unconscionable clause ... is not extended to permit courts to redistribute risks allocated by differences in bargaining power, but rather to prevent oppression and unfair surprise." Fraass, 215 Ct. Cl. at 830, 571 F.2d at 40.

Glopak Corporation v. United States, 12 Cl.Ct. 96, 102 (1987), aff'd. 851 F.2d 334, 338 (1988).

Here, nothing about the award was unconscionable. As many as eighteen years of El Paso silence tells us that.

## IV. Count VII (Takings Allegation) Fails To State A Claim

In yet another expression of El Paso's legal view of the EPA clauses, Count VII states: "With no fully supporting claim of right DESC took possession of and infringed upon Plaintiffs' property rights in and in relation to the fuel it delivered." Compl. at ¶ 137.[10] The Complaint further supposes that the fuel was taken "in conjunction with a violation of law and regulation."

[10] If by this, El Paso means that DESC took the fuel illegally, it has failed to state a claim under the Fifth Amendment, because, to maintain an action based upon a Fifth Amendment taking, plaintiff "must concede the validity of the government action which is the basis of the taking claim." Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993) (citing Florida Rock Indus. Inc. v. United States, 791 F.2d 893, 899 (Fed. Cir. 1986)). "The remedy for an unlawful seizure of property is in tort", which is beyond this Court's jurisdiction. American Commerce National Bank v. United States, 38 Fed. Cl. 271, 272-73 (1997).

Id. at ¶ 139. Although the Court possesses jurisdiction under the Tucker Act to entertain claims properly founded upon the Takings Clause of the Fifth Amendment, these allegations fail to state such a claim.

The Takings Clause mandates "just compensation" when the Federal Government appropriates private property for "public use." U.S. Const. amend V; Bernaugh v. United States, 38 Fed. Cl. 538, 542 (1997), aff'd., 168 F.3d 1319 (Fed. Cir. 1998) (table). Here, however, the Government did not "take" property. Rather, according to the complaint, the Government purchased fuel in alleged breach of a contract.[11] "This Court's predecessor has cautioned against commingling takings compensation and contract damages." Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001). As the court explained, "In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." Id. at 1070 (quoting Sun Oil Co. v. United States, 215 Ct. Cl. 716, 769-70, 572 F.2d 786, 818 (1978)). In other words, remedies for alleged infringement of rights established contractually generally lie in contract, not the Fifth Amendment, as it is the terms of the contract that govern the parties' respective rights and obligations. Sun Oil, 215 Ct. Cl. at 769-70, 572 F.2d at 818; accord Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 703 n.27 (1949) (if there is a contract remedy, party cannot pursue takings claim in this Court).

These decisions are consistent with the important distinction courts draw between the Government actions in its sovereign capacity and those undertaken in its proprietary capacity. "A taking can occur only when the Government acts in a sovereign capacity." Gratz v. United States, 25 Cl. Ct. 411, 420, aff'd, 985 F.2d 583 (Fed. Cir. 1992). By contrast, when the

---

[11] As the complaint describes it, "plaintiffs have property rights in and in relation to the fuel it delivered to DESC. In addition, Plaintiffs have property rights in relation to DESC's procurement of the fuel Plaintiffs delivered." Compl. at ¶ 136.

Government negotiates and enters into a contract with a private party, "this represents activity by [the Government] in a proprietary capacity." Id. (citing Sun Oil, 215 Ct. Cl. at 770, 572 F.2d at 818). As the Gratz court explained:

> This transaction is a classic illustration of the Government's acting in a proprietary capacity. Each side incurred rights and responsibilities. Plaintiffs' sole remedy is a breach of contract action.

Id. at 420.

Here, El Paso does not allege – and cannot – that DESC's alleged breach resulted in the taking of the contract itself, or its potential contractual remedies. Thus, its remedies, if any, are those provided by contract law – and not the Fifth Amendment.

## V. El Paso 's Complaints Concerning DESC's Small Business Program Must Be Dismissed

### A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint

In paragraph 52 of the Complaint, El Paso asserts that DESC's "minority owned business bidding preferences" violate the equal protection component of the Fifth Amendment. The Court lacks jurisdiction to entertain such a complaint.

This is a court of limited jurisdiction. Dynalectron Corp. v. United States, 4 Cl. Ct. 424, 428 (1984), aff'd, 758 F.2d 665 (Fed. Cir. 1984). Absent congressional consent to entertain a claim against the United States, the Court lacks authority to grant relief. United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941). The central provision granting consent to suit in this Court is the Tucker Act, 28 U.S.C. § 1491. Testan, 424 U.S. at 397.. It provides that an action may be maintained in this Court only if it is "founded either upon the Constitution or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491.

In other words, the Tucker Act itself does not create a substantive right of recovery against the United States. Testan, 424 U.S. at 398; Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599, 605-07, 372 F.2d 1002, 1007-09 (1967); United States v. Connolly, 716 F.2d 882, 885 (Fed. Cir. 1983) (en banc), cert. denied, 104 S. Ct. 1414 (1984). Accordingly, a claimant must identify a contract or some other provision of law that mandates compensation. United States v. Mitchell, 445 U.S. 535, 538 (1980).

The equal protection clause of the Fifth Amendment of the United States Constitution does not provide the requisite substantive right of recovery. Mullenberg v. United States, 857 F.2d 770, 773 (Fed. Cir. 1988); accord LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (no Tucker Act jurisdiction based on the equal protection clause); Inupiat Community of the Arctic Slope v. United States, 230 Ct. Cl. 647, 662, 680 F.2d 122, 132, cert. denied, 459 U.S. 969 (1982).

Here, El Paso asserts that DESCs' contract awards violate the "the equal protection component of the fifth amendment's due process clause by extending to minority-owned businesses bidding preferences that were not narrowly tailored to further a compelling governmental interest." Compl. at ¶ 52 (Count I). However, even if that were so, that has nothing to do with the contract claims before this Court, because those claims are based upon contracts actually awarded to El Paso – not contracts diverted to minority-owned businesses, rightly or wrongly. Accordingly, El Paso's complaint is nothing more than a facial attack upon the constitutionality of DESC's fuel acquisition program – and does not concern the administration of El Paso's contracts. As such, El Paso cannot be heard to complain that it is its contracts that support the Court's jurisdiction, and, therefore, its complaint concerning DESC's minority-owned business program must be dismissed.

B. DESC's Small Business Program Is Not Improper

In Count I, El Paso contends that DESC violated ("inter alia,") the "Office of Federal Procurement Policy Act ["OFPP Act"] and its implementing regulations (and, prior to its enactment, FAR § 15.610) by using prohibited auction techniques, whereby DESC awarded contracts to bidders that agreed to match other bidders' prices." Compl. § 50. El Paso also alleges that DESC violated the Defense Federal Acquisition Regulation Supplement, part 219 by "improperly soliciting and awarding portions of the procurement set aside for small business together with those for large businesses." Compl. § 51. Yet, as explained by the contracting officer, the DESC small business set-aside procedure is substantially similar to the one set forth in the FAR. SA 1-3; see also FAR 52.219-7; SA 10.

Apparently, El Paso is referring to DESC's small business set-aside program, which DESC effects by a technique known as the "match price method." Under this method, DESC informs small businesses of the price that the Government would otherwise pay for a particular fuel product (as the result of a pending solicitation), including, if applicable, the Government's cost for transporting that fuel from the refiner to the ultimate consumer. The small businesses are not informed of any refiner or wholesaler's actual bid prices or of their identities. PFF 31.

FAR 15.610, which was in effect in 1995, provided that:

> e) The following conduct may constitute prohibited conduct under section 27 of the Office of Federal Procurement Policy Act, as amended (41 U.S.C. 423), and Subpart 3.104 to which civil and criminal penalties and administrative remedies apply.
>
> (1) Technical transfusion (i.e., Government disclosure of technical information pertaining to a proposal that results in improvement of a competing proposal); or
>
> (2) Auction techniques, such as--

> (I) Indicating to an offeror a cost or price that it must meet to obtain further consideration;
>
> (ii) Advising an offeror of its price standing relative to another offeror (however, it is permissible to inform an offeror that its cost or price is considered by the Government to be too high or unrealistic); and
>
> (iii) Otherwise furnishing information about other offerors' prices.

This Court has defined an auction as "direct bidding of price between two competing offerors." DGS Contract Services, Inc. v. United States, 43 Fed. Cl. 227, 239 (1999). Yet, as the contracting officer has explained, these prohibited "auction techniques" simply were not a part of the DESC small business set-aside program. PFF 30-31. Under the match price program, there is no such bidding. Either the subcontractor meets the price or it does not. Id. Rather, DESC set-aside program, as evinced in the DESC set-aside clauses, followed the FAR provisions (FAR 52.219-7, and FAR 19.502-3(c)), which authorized this procedure. It is illogical to conclude, as plaintiff does, that the FAR prescribed small business procedures are inconsistent with the FAR provision regarding auctions. Notably, the Comptroller General has found that DESC's small business procedures are consistent with applicable procurement and small business laws and regulations. See 1988 WL 227932 (Comp.Gen.), B-230556, March 23, 1989.

El Paso's complaint that DESC violated DFARS part 219, by awarding the set aside and non-set aside portions "together" is mystifying. We cannot find the provision to which El Paso might be referring. The applicable FAR provision, 52.219-7 ("Notice of Partial Small Business Set-Aside") provides that:

> b) General.
>
> (1) A portion of this requirement, identified elsewhere in this

> solicitation, has been set aside for award to one or more small business concerns.
>
> (2) Offers on the non-set-aside portion will be evaluated first and award will be made on that portion in accordance with the provisions of this solicitation.
>
> (3) The set-aside portion will be awarded at the highest unit price(s) in the contract(s) for the non-set-aside portion, adjusted to reflect transportation and other costs appropriate for the selected contractor(s).
>
> (4) The contractor(s) for the set-aside portion will be selected from among the small business concerns that submitted responsive offers on the non-set-aside portion. Negotiations will be conducted with the concern that submitted the lowest responsive offer on the non-set-aside portion. If the negotiations are not successful or if only part of the set-aside portion is awarded to that concern, negotiations will be conducted with the concern that submitted the second-lowest responsive offer on the non-set-aside portion. This process will continue until a contract or contracts are awarded for the entire set-aside portion.

As explained by the contracting officer, that is what was done. SA 1-3. In any event, the complaint fails to demonstrate that DESC violated the FAR, and fails to demonstrate that El Paso was "harmed in [a] concrete way contemplated by the FAR . . . ." LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1556 (Fed. Cir. 1995) (contractor complaining of unauthorized disclosure of procurement information must demonstrate that it was harmed by the disclosure). Here, El Paso fails to demonstrate how DESC's handling of a set-aside program affected contracts it actually was awarded. Accordingly, El Paso would appear to have no claim.

VI. Waiver and Estoppel Bar El Paso's Claims

As explained above, neither the FAR nor any of the other plead small business statutes or regulations confer any unrealized right upon El Paso. However, even assuming that were not the case, we are entitled to summary judgment on all counts, because, long ago, El Paso waived

whatever rights it imagines the FAR and these small business statutes might have conferred upon it. Similarly, through its years of inaction, El Paso is estopped from pursuing any of these imagined rights in litigation.

Waiver has been defined as an "intentional relinquishment or abandonment of a known right or privilege." Hermes II at 409 (quoting Johnson v. Zerbst, 304 U.S. 458 (1938)); see also Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1563 (Fed. Cir. 1980) (citing Brookhard v. Janis, 384 U.S. 1, 4, 5 (1966)). Absent an affirmative congressional prohibition, a party may waive regulatory, statutory, and even constitutional rights. Reservation Ranch v. United States, 39 Fed. Cl. 696, 712 (1997), aff'd, 217 F.3d 850 (Fed. Cir. 1999) (table). As we explained in more detail in our first motion for summary judgment, this circuit has held that the defense of waiver is applicable against claims of illegality founded upon assertions that the Government has violated the Federal Acquisition Regulation. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978); Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997).

Here, El Paso performed 110 DESC contracts of the sort about which it now complains, over 18 years, and waited 18 years from its first contract to bring a complaint. In Hermes II, this Court held that a contractor that had performed only nine such contracts, over a seven year period, and waited fourteen years after entering its first PMM-based contract before bringing its complaint, had waived its right to complain that those contracts were illegal. Hermes II, 58 Fed. Cl. at 413.

In reaching its conclusion, the Court first considered whether the defense of waiver was available in this circuit, against a claim of illegality, observing that

> the Federal Circuit *seems* to be of two minds on this issue in that

> *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997); *E. Walters & Co., Inc. v. United States*, 217 Ct. Cl. 254, 576 F.2d 362 (1978) (per curiam), as well as *American Telephone and Telegraph Co. v. United States*, 307 F.3d 1374 (Fed. Cir. 2002) (*AT&T V*) may be cited for the very opposite of the *Beta/Chris Berg* line of cases, that is: the doctrine of waiver precludes a contract from challenging the validity of a contract under an unlawful regulation or other illegality where the contractor fails to raise the problem prior to execution or litigation.

Id. at 412.

The Court reconciled the apparent division of authority through what it found to be the "key factual distinction" between the two lines of cases cited – the distinction being that, where waiver was found, "the contractors either complained during contract formation or, at the very least, at an early stage in the history of the conflict." Id. at 413 (quoting Hermes I, 58 Fed. Cl. at 19). In Hermes, the Court noted, the contractor "astonishingly waited 14 years after entering the first [contract at issue] and eight years after entering the last [contract at issue] before litigating." Hermes II, 58 Fed. Cl. at 413.

Reasoning that the defense of waiver was available under the right circumstances, the Court proceeded to find that Hermes had in fact waived its claims because knowledge of its right under the law could be presumed, as knowledge of the law generally is, and that "intelligent waiver" could be discerned from Hermes' general sophistication and lengthy failure to signal its dissatisfaction whatsoever. Id. at 416-18. As the Court observed:

> It is almost universally conceded that "'wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse . . . . As a general proposition, one side cannot continue after a material breach by the other . . ., act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court.'"

Id. at 418 (citing Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26 (1972)).

The Court's conclusion in Hermes applies with equal force to El Paso, for it, too, is a sophisticated contractor (see PFF 1), with a long history with and, therefore, understanding of DESC contracts. Indeed, El Paso performed these contracts for nearly 20 years, did not complain about their award or administration, and did not even submit a claim until 2000 – approximately 17 years after the first contract was awarded, and eight years after MAPCO, 27 Fed. Cl. 405, was decided. That establishes beyond any doubt that El Paso relinquished its rights – and its doing so is not surprising. DESC's studies of the PMM and its various alternatives underscore that each price publication has its own features to recommend it. PFF 19-25. It is inconceivable that El Paso price experts would not have appreciated this as well, and would have fashioned El Paso's bids accordingly. Thus, it is neither inconceivable nor surprising that El Paso would elect to accept the clauses at issue, and waive any right it might have had to a different clause.

As explained in our original motion for summary judgment, estoppel also is applicable. Estoppel requires that the party asserting estoppel rely to its detriment upon its opponent's action or inaction. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978). Here, because of its superior knowledge of its own costs, its market options, and because of its extensive experience with the clauses at issue, El Paso was in the best position to assess the efficacy of the EPA clauses regarding its own situation. By adopting the EPA clauses in its offers with the text of the FAR available to it for consultation, El Paso signaled its intent to forego any benefits contained in the FAR. That El Paso continued to offer these clauses, coupled with its failure to protest clearly prejudiced the Government, because, as subsequent events

showed, the Government could have obtained a deviation. Either of these would have been a "relatively painless alternative" to the after-the-fact, competition-free, speculative recovery El Paso now seeks. Indeed, as did the contractor in Ling-Temco-Vought, El Paso has "in effect retained all options for itself . . . made its calculations entirely in its own favor, without proper consideration of the defendant's position," and violated the "basic principle calling for fair treatment of both parties." 201 Ct. Cl. at 148, 475 F.2d at 638.

The only question remaining is whether the causes of action not discussed in Hermes also are subject to waiver and estoppel. Generally speaking, we see no basis for distinguishing among the causes. Counts II-VI merely repackage El Paso's illegality claim. Given El Paso's long history with DESC's fuel acquisition program, its evident sophistication in these matters, and its long silence, there is nothing about Counts II-VI that suggests that waiver does not apply. The gravaman of these counts is that El Paso has been deprived of a contractually-based right. Yet, El Paso does not even allege that the contracts changed in any material fashion in El Paso's 20 years of performing them. Indeed, other than the development of legal theories, triggered largely by the 1992 MAPCO decision (as El Paso's claims make evident), nothing changed. Thus, any right (or cause of action) El Paso possessed and knew about when it began filing its claims in 2000, it also possessed and should have known about after the performance of its first contract.

**CONCLUSION**

For these reasons, defendant respectfully requests that the Court dismiss the Second Amended Complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Senior Trial Counsel
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

BERNARD A. DUVAL
Counsel

HOWARD M. KAUFER
Assistant Counsel
Office of General Counsel
Defense Energy Support Center
Ft. Belvoir, VA

November 14, 2005

CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2005, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Steven J. Gillingham

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EL PASO MERCHANT ENERGY-PETROLEUM COMPANY et. al., Plaintiffs, | ) | No. 02-1094C (Judge Block) |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | |

DECLARATION OF JOHN R. WALKER

1. My name is John R. Walker and I am a contracting officer with the Defense Energy Support Center (DESC). I have been with DESC since 1983, except for a period from 1987-1989, when I worked for the Naval Sea Systems Command. I have been a DESC contracting officer since 1989.

2. DESC or its predecessor, the Defense Fuel Supply Center (DFSC), awarded various affiliates of the Coastal Corporation (Coastal) a series of 110 contracts between 1981 and 1999 that are the subject of economic price adjustment (EPA) clause claims. The affiliates, longtime Government contractors, are Coastal Refining and Marketing, Inc., Coastal Aruba Refining Company, Coastal Eagle Point Oil Company, Pacific Refining Company, Belcher Oil Company, Coastal States Petroleum Company, Coastal Oil New York, Inc., Belcher New England, Inc., and The

Belcher Oil Company of New York, Inc. El Paso Merchant Energy-Petroleum Company subsequently acquired Coastal.

3. These contracts were awarded in two different DESC programs, domestic bulk fuels, and posts, camps, and stations. Most of the contracts were indefinite quantity-type contracts for one year and called for the delivery of large volumes of fuel.

4. Many of the solicitations for these contracts provided that a portion of the requirement was set aside for participation by small business concerns. A copy of a sample of the DESC clause implementing the partial small business set aside, I237.07, in the domestic bulk fuels program is included in Defendant's supplemental appendix immediately following this declaration at 4. Prior to 1988, similar clauses were included in DESC's solicitations. Beginning in 1988, many DESC solicitations included an evaluation preference of up to 10 percent for small disadvantaged business concerns, a copy of DESC clause I237.05, which implemented this preference in the domestic bulk fuels program, is included in Def. Supp. App. at 5. Beginning in 1988 many DESC solicitations also provided that a portion of the requirement was set aside for participation by small business concerns with preferential consideration for small disadvantaged business concerns. A copy of DESC clause

I237.06, implementing the small business set aside with preferential consideration for small disadvantaged businesses in the domestic bulk fuels program, is at Def. Supp. App. 6.

5. DESC's partial set aside clauses operated in substantially the same manner as the standard FAR and DFARS clauses for partial small business set asides. After offers were received under the solicitations they would be evaluated as if there were no set aside quantity. The set aside quantities would then be offered to small businesses based upon prices that DESC would otherwise pay under the solicitation had there been no set aside for supply of the location at which the set aside was placed, adjusted for transportation charges. In awarding the set aside quantities, the contracting officer would not furnish either the identity of the offeror, or the amount of the offered price that DESC would otherwise pay.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 14, 2005.

JOHN R. WALKER
Contracting Officer

The following clause applies only to other than DoD set-aside items.

1237.07 NOTICE OF PARTIAL SMALL BUSINESS SET-ASIDE (DFSC AUG 1984) (DEVIATION)

(a) Any offer imposing a minimum of the quantity which may be awarded, which is in excess of the non-set-aside quantity of the item or items involved, will not be considered.

(b) General Information.

(1) A portion of certain items of this procurement, as listed in the Schedule, has been set- aside for award to eligible small business concerns. The quantities indicated for such items in the Schedule include the set-aside portion. All offerors are urged to offer the maximum quantities they desire and are capable of delivering. A small business concern interested in receiving a set-aside contract should submit an offer in the same manner as though there were no set-aside. To be considered for the set-aside portion of this procurement, an offeror qualifying as a small business concern must offer on the non-set-aside and set-aside portions of the procurement. Separate offers should not be submitted on the non-set-aside and set-aside portions.

(2) The successful contractors for the set-aside portion will be determined in accordance with the procedures set forth below. The partial small business set-aside of the procurement is based on a determination by the Contracting Officer that it is in the interest of maintaining or mobilizing the nation's full production capacity, or in the interest of national defense programs, or in the interest of assuring that a fair portion of Government procurement is placed with small business concerns.

(3) The offeror must recognize that if it accepts a set-aside contract, its obligation is to furnish product which conforms with all small business requirements set forth herein.

(c) Award Procedure.

(1) All of the offers received under this solicitation will first be negotiated as to price and an evaluation will be made as though there were no set-aside. The price for the set-aside portion of this procurement will be negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there been no set-aside for supply of the location at which the set-aside is placed, adjusted for transportation charges and other factors. Awards to small business concerns whose offers are determined by this evaluation to be low for the set-aside portion of an item will be made as to such portion without further negotiation. Contracts for the remaining set-aside portions will be negotiated with those eligible small business concerns who have submitted a responsive offer on the various items for which a set-aside has been indicated.

(2) Negotiations for set-aside awards will commence with the small business concern that has submitted the lowest offer of product on the non-set-aside portion and that has remaining a quantity of product after the award pattern has been established for the set-aside portion. If the low small business concern on the item does not accept the set-aside quantity, the next low small business concern on the item will be given the same opportunity, continuing with the next low small business concern until all small business concerns have been contacted.

(3) For the purpose of negotiation, when an offer contains increments at different prices, each increment will be considered a separate offer. Negotiation will be limited to the quantity offered (except as provided in (4) below) and which is not acceptable under the provision of (1) above.

(4) After set-aside negotiations have been concluded, a final evaluation will be accomplished. All businesses, without regard to the size of the company, will be afforded an opportunity to compete for non-set- aside quantities. The Government reserves the right to make awards to the otherwise low offeror for all or any portion of the set-aside quantities, without regard to the size of the company, if eligible small business concerns do not offer a quantity of product sufficient to meet a set-aside or do not accept set-aside offers. The total quantity which will be awarded a small business concern on both the unreserved and reserved portions will not exceed the total quantity offered under this solicitation by such small business offer. However, if insufficient product is offered by small businesses to meet the quantity setaside for small business, the small business concerns with which negotiations have commenced may be given an opportunity to offer additional product.

(DFSC 52.219-9F07)

I251(F) ANTI-KICKBACK PROCEDURES (OCT 1988)

(a) Definitions.

"Kickback," as used in this clause, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

"Person," as used in this clause, means a corporation, partnership, business association of any kind, trust, joint-stock company, or individual.

"Prime Contract," as used in this clause, means a contract or contractual action entered into by the United States for the purpose of obtaining supplies, materials, equipment, or services of any kind.

"Prime Contractor," as used in this clause, means a person who has entered into a prime contract with the United States.

"Prime Contractor Employee," as used in this clause, means any officer, partner, employee, or agent of a prime Contractor.

"Subcontract," as used in this clause, means a contract or contractual action entered into by a prime Contractor or subcontractor for the purpose of obtaining supplies, materials, equipment, or services of any kind under a prime contract.

I211.200 ORDERING (APR 1984)

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders by the individuals or activities designated in the Schedule. Such orders may be issued from Date of Award through 30 September 1996.

(b) All delivery orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order and this contract, the contract shall control.

(c) If mailed, a delivery order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally or by written telecommunications only if authorized in the Schedule.

(FAR 52.216-18)

I211.02 ORDERING (CONT'D) (DFSC JAN 1991)

(d) For product funded and paid for by the Defense Logistics Agency, the Contractor will be furnished with a document entitled "Source Identification and Ordering Authorization." This document is for planning purposes only and does not constitute an order under the contract. This document will also indicate the activity(ies) authorized to place orders under this contract. This document does not in any manner modify or limit Contractor's obligation to deliver pursuant to properly placed orders as provided in the contract.

(DFSC 52.216-9F12)

I225 PAYMENTS (APR 1984)

The Government shall pay the Contractor, upon the submission of proper invoices or vouchers, the prices stipulated in this contract for supplies delivered and accepted or services rendered and accepted, less any deductions provided in this contract. Unless otherwise specified in this contract, payment shall be made on partial deliveries accepted by the Government if--

(a) The amount due on the deliveries warrants it; or

(b) The Contractor requests it and the amount due on the deliveries is at least $1,000 or 50 percent of the total contract price. (FAR 52.232-1)

I229 RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT (JUL 1985)

(a) Except as provided in (b) below, the Contractor shall not enter into any agreement with an actual or prospective subcontractor, nor otherwise act in any manner, which has or may have the effect of restricting sales by such subcontractors directly to the Government of any item or process (including computer software) made or furnished by the subcontractor under this contract or under any follow-on production contract.

(b) The prohibition in (a) above does not preclude the Contractor from asserting rights that are otherwise authorized by law or regulation.

(c) The Contractor agrees to incorporate the substance of this clause, including this paragraph (c), in all subcontracts under this contract. (FAR 52.203-6)

If this document contains partial small business set-aside items in the Schedule, the evaluation preference described in the following clause is not applicable to the non-set-aside portion of those items, or to the unreserved portion of items partially reserved for contracting with the SBA under the 8(a) program.

I237.05 NOTICE OF EVALUATION PREFERENCE FOR SMALL DISADVANTAGED BUSINESS CONCERNS (DFSC AUG 1994) (DEVIATION)

(a) DEFINITIONS. The term "small disadvantaged business (SDB) concern," as used in this clause, has the meaning set forth in the REPRESENTATIONS clause of this contract. SDB concerns must supply petroleum product from an SDB manufacturer, who complies with the petroleum products size standards at 13 CFR 121, to be eligible for the evaluation preference.

(b) EVALUATION PREFERENCE.

(1) After all other evaluation factors described in this solicitation are applied, offers will be evaluated by adding a factor of 10 percent to the price of all offers, except--

(i) Offers from SDB concerns that have not waived the preference;

(ii) Otherwise successful offers of eligible products under the Trade Agreements Act when the dollar threshold for application of the Act is exceeded.

(2) The 10 percent factor will be applied on a line item by line item basis or to any group of items on which award may be made. Other evaluation factors described in the solicitation will be applied before application of the 10 percent factor. However, in no event may award be made to an SDB concern at a price that exceeds fair market price (as determined under FAR 19.806-2) by more than 10 percent.

(c) WAIVER OF EVALUATION PREFERENCE.

An SDB may elect to waive the preference, in which case the 10 percent factor will be added to its offer for evaluation purposes.

[ ] Offeror elects to waive the preference in paragraph (b) above.

(DFSC 52.219-9F05)

The following clause applies to set-aside items.

1237.06 NOTICE OF PARTIAL SMALL BUSINESS SET-ASIDE WITH PREFERENTIAL CONSIDERATION FOR SMALL DISADVANTAGED BUSINESS CONCERNS (DFSC AUG 1994) (DEVIATION)

(a) DEFINITIONS.

"Small business concern," as used in this clause, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation.

"Small disadvantaged business (SDB) concern," as used in this clause, means a small business concern, owned and controlled by individuals who are both socially and economically disadvantaged, as defined by the Small Business Administration at 13 CFR Part 124, the majority of earnings of which directly accrue to such individuals. This term also means a small business concern owned and controlled by an economically disadvantaged Indian tribe or Native Hawaiian organization which meets the requirements of 13 CFR 124.112 or 13 CFR 124.113, respectively. In order to be eligible for preferential consideration set forth in paragraph (c) below, SDB concerns must supply product from an SDB manufacturer.

(b) GENERAL.

(1) A portion of certain items of this procurement, as listed in the Schedule, has been set aside for award to eligible small businesses, with preferential consideration for SDB concerns. The quantities indicated for such items in the Schedule include the set-aside portion. All offerors are urged to offer the maximum quantities they desire and are capable of delivering. Small business and SDB concerns interested in receiving a set-aside contract should submit an offer in the same manner as though there were no set-aside. Volumes offered by qualified small businesses or SDB concerns will be evaluated for the non-set-aside and set-aside portions of the procurement. Separate offers should not be submitted on the non-set-aside and set-aside portions.

(2) The partial small business set-aside of the procurement is based on a determination by the Contracting Officer that it is in the interest of maintaining or mobilizing the nation's full production capacity or in the interest of national defense programs, or in the interest of assuring that a fair portion of Government procurement is placed with small business concerns.

(3) All of the offers received under this solicitation will first be negotiated as to price and an evaluation will be made as though there were no set-aside.

(4) For the purposes of set-aside evaluation, when an offer contains increments at different prices, each increment will be considered a separate offer. Except as provided in paragraph (e) below, negotiations will be limited to the offered quantities not awarded under the provision of subparagraph (d)(2).

(c) SET-ASIDE AWARD PROCEDURE (Preferential Consideration for SDB Concerns).

(1) Offers from SDB and small business concerns will be evaluated with preferential consideration, as described below, given to eligible SDB concerns.

(2) Offers from SDB concerns will be reviewed first to determine if an award can be made to an SDB concern at its offered price, beginning with the SDB concern offering the lowest evaluated price for that item. Awards to SDB concerns on the set-aside portion of this procurement will be made at the price offered by the SDB concern if that evaluated price does not exceed the highest award price on the non-set-aside portion by more than 10 percent, as adjusted for transportation charges and other factors. If the SDB price exceeds the highest non-set-aside price by more than 10 percent, the SDB offer will be treated as a small business and the procedures set forth in (d) below will apply.

I237.06 (Cont'd)

(3) Any volumes remaining on the set-aside portion that are not awarded to the lowest priced eligible SDB concern under subparagraph (c)(2) will be awarded to any other SDBs eligible for award under the procedures set forth above, beginning with the SDB concern offering the next lowest price.

(d) SET-ASIDE AWARD PROCEDURE (Small Business Concerns).

(1) After evaluation and award to eligible SDB concerns, if any, negotiations will be conducted with small business concerns for any set-aside volumes not awarded to eligible SDB concerns under paragraph (c).

(2) The price for the small business set-aside portion will be negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there been no set-aside for supply of the location at which the set-aside is placed, adjusted for transportation charges and other factors. For the set-aside portion of an item not already awarded to SDB concerns, awards will be made to the small business concern whose offer is determined by this evaluation to be low without further negotiation. Contracts for the remaining set-aside portions will be negotiated with those eligible small business concerns who have submitted a responsive offer on the various items for which a set-aside has been established.

(3) Negotiations for small business set-aside awards will begin with the small business concern with the lowest evaluated price and a quantity of offered product remaining. If the low small business concern on the item does not offer to supply product at the set-aside price, the next low small business concern on the item will be given the same opportunity and continuing with the next low small business concern until all small business concerns have been contacted.

(e) After set-aside negotiations have been concluded, a final evaluation will be accomplished. All eligible offerors, without regard to the size of the company, will be afforded an opportunity to compete for more set-aside quantities. The Government reserves the right to make awards to the otherwise low offeror for all or any portion of the set-aside quantities, without regard to the size of the company, if eligible SDB or small business concerns do not offer a quantity of product sufficient to meet a set-aside requirement or do not offer to supply at the set-aside prices. The total quantity which will be awarded a small business or an SDB offeror on both the unreserved and reserved portions will not exceed the total quantity offered under this solicitation by such small business or SDB offerors. However, if insufficient product is offered by small business and SDB concerns to meet the quantity set-aside for small business, SDB and small business concerns with whom the Government has already commenced negotiations may be given an opportunity to offer additional product.

(f) Where the Trade Agreements Act applies to the non-set-aside portion, offers of eligible products will be treated as if they were qualifying country end products.

(g) TOKEN OFFERS.

The Government reserves the right to not consider token offers or offers designed to secure an unfair advantage over other offerors eligible for the set-aside portion.

(DFSC 52.219-9F06)

I251(F) ANTI-KICKBACK PROCEDURES (OCT 1988)

(a) Definitions.

"Kickback," as used in this clause, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

"Person," as used in this clause, means a corporation, partnership, business association of any kind, trust, joint-stock company, or individual.

"Prime Contract," as used in this clause, means a contract or contractual action entered into by the United States for the purpose of obtaining supplies, materials, equipment, or services of any kind.

"Prime Contractor," as used in this clause, means a person who has entered into a prime contract with the United States.

"Prime Contractor Employee," as used in this clause, means any officer, partner, employee, or agent of a prime Contractor.

"Subcontract," as used in this clause, means a contract or contractual action entered into by a prime Contractor or subcontractor for the purpose of obtaining supplies, materials, equipment, or services of any kind under a prime contract.

"Subcontractor," as used in this clause, (1) means any person, other than the prime Contractor, who offers to furnish or furnishes any supplies, materials, equipment, or services of any kind under a prime contract or a subcontract entered into in connection with such prime contract; and (2) includes any person who offers to furnish or furnishes general supplies to the prime Contractor or a higher tier subcontractor.

"Subcontractor Employee," as used in this clause, means any officer, partner, employee, or agent of a subcontractor.

(b) The Anti-Kickback Act of 1986 (41 U.S.C. 51-58) (the Act) prohibits any person from--

(1) Providing or attempting to provide or offering to provide any kickback;

(2) Soliciting, accepting, or attempting to accept any kickback; or

(3) Including, directly or indirectly, the amount of any kickback in the contract price charged by a prime Contractor to the United States or in the contract price charged by a subcontractor to a prime Contractor or higher tier subcontractor.

## 15.610 Written or oral discussion.

(a) The requirement in paragraph (b) of this section for written or oral discussion need not be applied in acquisitions--

(1) In which prices are fixed by law or regulation;

(2) Of the set-aside portion of a partial set-aside; or

(3) In which the solicitation notified all offerors that the Government intends to evaluate proposals and make award without discussion, unless the contracting officer determines that discussions (other than communications conducted for the purpose of minor clarification) are considered necessary (see 15.407 (d)(4)). Once the Government states its intent to award without discussion, the rationale for reversal of this decision shall be documented in the contract file.

(b) Except as provided in paragraph (a) of this section, the contracting officer shall conduct written or oral discussions with all responsible offerors who submit proposals within the competitive range. The content and extent of the discussions is a matter of the contracting officer's judgment, based on the particular facts of each acquisition (but see paragraphs (c) and (d) of this section).

(c) The contracting officer shall--

(1) Control all discussions;

(2) Advise the offeror of deficiencies in its proposal so that the offeror is given an opportunity to satisfy the Government's requirements;

(3) Attempt to resolve any uncertainties concerning the technical proposal and other terms and conditions of the proposal;

(4) Resolve any suspected mistakes by calling them to the offeror's attention as specifically as possible without disclosing information concerning other offerors' proposals or the evaluation process (see 15.607 and Part 24);

(5) Provide the offeror a reasonable opportunity to submit any cost or price, technical, or other revisions to its proposal that may result from the discussions; and

(6) Provide the offeror an opportunity to discuss past performance information obtained from references on which the offeror had not had a previous opportunity to comment. Names of individuals providing reference information about an offeror's past performance shall not be disclosed.

(d) The contracting officer and other Government personnel involved shall not engage in technical leveling (i.e., helping an offeror to bring its proposal up to the level of other proposals through successive rounds of discussion, such as by pointing out weaknesses resulting from the offeror's lack of diligence, competence, or inventiveness in preparing the proposal).

(e) The following conduct may constitute prohibited conduct under section 27 of the Office of Federal Procurement Policy Act, as amended (41 U.S.C. 423), and Subpart 3.104 to which civil and criminal penalties and administrative remedies apply.

(1) Technical transfusion (i.e., Government disclosure of technical information pertaining to a proposal

that results in improvement of a competing proposal); or

(2) Auction techniques, such as--

(i) Indicating to an offeror a cost or price that it must meet to obtain further consideration;

(ii) Advising an offeror of its price standing relative to another offeror (however, it is permissible to inform an offeror that its cost or price is considered by the Government to be too high or unrealistic); and

(iii) Otherwise furnishing information about other offerors' prices.

**52.219-7 Notice of Partial Small Business Set-Aside.**

As prescribed in 19.508(d), insert the following clause:

NOTICE OF PARTIAL SMALL BUSINESS SET-ASIDE (OCT 1995)

(a) *Definitions*.

"Small business concern", as used in this clause, means
a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation.

(b) *General*. (1) A portion of this requirement, identified elsewhere in this solicitation, has been set aside for award to one or more small business concerns.

(2) Offers on the non-set-aside portion will be evaluated first and award will be made on that portion in accordance with the provisions of this solicitation.

(3) The set-aside portion will be awarded at the highest unit price(s) in the contract(s) for the non-set-aside portion, adjusted to reflect transportation and other costs appropriate for the selected contractor(s).

(4) The contractor(s) for the set-aside portion will be selected from among the small business concerns that submitted responsive offers on the non-set-aside portion. Negotiations will be conducted with the concern that submitted the lowest responsive offer on the non-set-aside portion. If the negotiations are not successful or if only part of the set-aside portion is awarded to that concern, negotiations will be conducted with the concern that submitted the second-lowest responsive offer on the non-set-aside portion. This process will continue until a contract or contracts are awarded for the entire set-aside portion.

(5) The Government reserves the right to not consider token offers or offers designed to secure an unfair advantage over other offerors eligible for the set-aside

portion.

(c) *Agreement*. For the set-aside portion of the acquisition, a manufacturer or regular dealer submitting an offer in its own name agrees to furnish, in performing the contract, only end items manufactured or produced by small business concerns inside the United States, its territories and possessions, the Commonwealth of Puerto Rico, the Trust Territory of the Pacific Islands, or the District of Columbia. However, this requirement does not apply in connection with construction or service contracts.

(End of clause)

*Alternate I* (OCT 1995). When the acquisition is for a product in a class for which the Small Business Administration has determined that there are no small business manufacturers or processors in the Federal market in accordance with 19.502-2(c), delete paragraph (c).

**252.219-7006 Notice of Evaluation Preference for Small Disadvantaged Business Concerns.**
As prescribed in 219.7003, use the following clause:
**NOTICE OF EVALUATION PREFERENCE FOR SMALL DISADVANTAGED BUSINESS CONCERNS (JUN 1997)**

(a) **Definitions.**

"Historically black colleges and universities," as used in this clause, means institutions determined by the Secretary of Education to meet the requirements of 34 CFR Section 608.2. The term also means any nonprofit research institution that was an integral part of such a college or university before November 14, 1986.

"Minority institutions," as used in this clause, means institutions meeting the requirements of Section 1046(3) of the Higher Education Act of 1965 (20 U.S.C. 1135d-5(3)). The term also include Hispanic-serving institutions as defined in Section 316(b)(1) of such Act (20 U.S.C. 1059c(b)(1)).

"Small disadvantaged business concern," as used in this clause, means a small business concern, owned and controlled by individuals who are both socially and economically disadvantaged, as defined by the Small Business Administration at 13 CFR Part 124, the majority of earnings of whichdirectly accrue to such individuals. This term also means a small business concern owned and controlled by an economically disadvantaged Indian tribe or Native Hawaiian organization which meets the requirements of 13 CFR 124.112 or 13 CFR 124.113, respectively.

"United States," as used in this clause, means the United States, its territories and possessions, the Commonwealth of Puerto Rico, the U.S. Trust Territory of the Pacific Islands, or the District of Columbia.

(b) **Evaluation preference.**

(1) Offers will be evaluated by adding a factor of ten percent to the price of all offers, except --
(i) Offers from small disadvantaged business concerns, which have not waived the preference;
(ii) Offers from historically black colleges and universities or minority institutions, which have not waived the preference;
(iii) Otherwise successful offers of --

(A) Eligible products under the Trade Agreements Act when the dollar threshold for application of the Act is exceeded;

(B) Qualifying country end products (as defined in the Defense Federal Acquisition Regulation Supplement clause at 252.225-7001, Buy American Act and Balance of Payments Program); and

(iv) Offers where application of the factor would be inconsistent with a Memorandum of Understanding or other international agreement with a foreign government.
(2) The ten percent factor will be applied on a line item by line item basis or to any group of items on which award may be made. Other evaluation factors described in the solicitation will be applied before application of the ten percent factor. The ten percent factor will not be applied if using the preference would cause the contract award to be made at a price which exceeds the fair market price by more than ten percent.

(c) **Waiver of evaluation preference.**

A small disadvantaged business, historically black college or university, or minority institution offeror may elect to waive the preference, in which case the ten percent factor will be added to its offer for evaluation purposes. The agreements in paragraph (d) do not apply to offers which waive the preference.
_____ Offeror elects to waive the preference

(d) **Agreements.**

(1) A small disadvantaged business concern, historically black college or university, or minority institution offeror, which did not waive the preference, agrees that in performance of the contract, in the case of a contract for--
(i) Services, except construction, at least 50 percent of the cost of personnel for contract performance will be spent for employees of the concern.
(ii) Supplies, (other than procurement from a regular dealer in such supplies), at least 50 percent of the cost of manufacturing, excluding the cost of materials, will be performed by the concern.
(iii) General construction, at least 15 percent of the cost of the contract, excluding the cost of materials, will be performed by employees of the concern.
(iv) Construction by special trade contractors, at least 25 percent of the cost of the contract, excluding the cost of materials, will be performed by employees of the concern.

(2) A small disadvantaged business, historically black college or university, or minority institution regular dealer submitting an offer in its own name agrees to furnish in performing this contract only end items manufactured or produced in

the United States by small disadvantaged business concerns, historically black colleges or universities, or minority institutions.

(3) Upon request, a historically black college or university or minority institution offeror will provide the Contracting Officer evidence that it has been determined to be an HBCU or MI by the Secretary of Education.

(End of clause)

**252.219-7001 Notice of Partial Small Business Set-Aside with Preferential Consideration for Small Disadvantaged Business Concerns.**
As prescribed in 219.508(d), use the following clause:
**NOTICE OF PARTIAL SMALL BUSINESS SET-ASIDE WITH PREFERENTIAL CONSIDERATION FOR SMALL DISADVANTAGED BUSINESS CONCERNS (MAY 1995)**

(a) **Definitions.**

"Labor surplus area," as used in this clause, means a geographical area identified by the Department of Labor as an area of labor surplus.

"Labor surplus area concern," as used in this clause, means a concern that, together with its first tier subcontractors, will perform substantially in labor surplus areas.

"Perform substantially in labor surplus areas," as used in this clause, means that the costs incurred under the contract on account of manufacturing, production, and performance of services in labor surplus areas exceed 50 percent of the contract price.

"Small business concern," as used in this clause, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation.

"Small disadvantaged business concern," as used in this clause, means a small business concern, owned and controlled by individuals who are both socially and economically disadvantaged, as defined by the Small Business Administration at 13 CFR Part 124, the majority of earnings of which directly accrue to such individuals. This term also means a small business concern owned and controlled by an economically disadvantaged Indian tribe or Native Hawaiian organization which meets the requirements of 13 CFR 124.112 or 13 CFR 124.113, respectively.

"United States," as used in this clause, means the United States, its territories and possessions, the Commonwealth of Puerto Rico, the U.S. Trust Territory of the Pacific Islands, or the District of Columbia.

(b) **General.**

A portion of this requirement, identified elsewhere in this solicitation, has been set-aside for award to one or more small business concerns. After offers for the non-set-aside portion have been evaluated, negotiations will be conducted for the set-aside portion.

(1) Offers on the non-set-aside portion will be evaluated and award made in accordance with the other provisions of this solicitation.
(2) The set-aside portion will be negotiated, in accordance with this clause, with small business concerns which submitted offers on the non-set-aside portion.

(c) **Award of the set-aside portion.**

(1) Small business offerors on the non-set-aside portion will be selected for negotiation of the set-aside portion based on their standing -- first in terms of group and then in terms of lowest responsive offer on the non-set-aside portion.
(i) Group 1 - Small disadvantaged business concerns which are also labor surplus area concerns.
(ii) Group 2 - Small business concerns which are also labor surplus area concerns.
(iii) Group 3 - Other small disadvantaged business concerns.
(iv) Group 4 - Other small business concerns.
(2) The set-aside portion will be awarded at the highest unit price(s) in the contract(s) for the non-set-aside portion, adjusted to reflect transportation and other costs appropriate for the selected contractor(s), except --
(i) Award of the set-aside portion to a small disadvantaged business concern will be at the lower of --
(A) The price offered by the concern on the non-set-aside portion; or

(B) A price that does not exceed the award price on the non-set-aside portion by more than ten percent.

(ii) When award under the set-aside portion is to a concern offering a nonqualifying country end product and the highest unit price in the contract(s) is for a domestic or qualifying country end product, the set-aside price will be the higher of--

(A) The highest award price for a nonqualifying country end product under the nonset-aside; or
(B) A price which, when adjusted by the Buy American Act evaluation factor, would equal the highest unit price in the contract(s).

(iii) When award under the set-aside portion is to a concern offering a domestic end product and the highest unit price in the contract(s) is for a nonqualifying country end product which was evaluated using the Buy American Act evaluation factor, the set-aside price will be awarded at the evaluated price of the non-qualifying country.
(iv) When award under the set-aside portion is to a concern offering a domestic end product and the highest unit price in the contract(s) is for a

nonqualifying country end product which was evaluated without the Buy American Act factor--

(A) And award was made to a domestic or qualifying country offer at a price lower than the high contract price, the set-aside price will be the highest unit price in the contract(s).
(B) And award was not made to a domestic or qualifying country offer at a price lower than the high contract price, the set-aside price will be the lower of--
**(1)** The highest unit price under the contract(s) as adjusted by the Buy American Act evaluation factor; or
**(2)** The lowest offered price for a domestic or qualifying country end product which was not awarded under the nonset-aside.

(v) Where the Trade Agreements Act applies to the nonset-aside portion, offers of eligibleproducts will be treated as if they were qualifying country end products.
(vi) Discount terms used in evaluation of the highest non-set-aside award price will apply to the set-aside award price.
(3) If negotiations are not successful for any part of the set-aside portion, the set-aside will be dissolved for that part and the requirement will be resolicited.

(d) **Token offers.**

The Government reserves the right to not consider token offers or offers designed to secure an unfair advantage over other offerors eligible for the set-aside portion.

(e) **Eligibility for preference as a labor surplus area concern.**

Small business or small disadvantaged business offerors which claim preference for the set-aside portion as a labor surplus area concern, must list the labor surplus area location(s) of offeror or first tier subcontractors, which account for more than 50 percent of the contract price.

Name of Company:
Street Address:
City/County:
State:

(f) **Agreements.**

(1) If awarded a contract as a small disadvantaged business-labor surplus area concern or as a small business-labor surplus area concern, the offeror --

(i) Will perform the contract, or cause it to be performed, substantially in areas classified as labor surplus areas.
(ii) If the contract is in excess of $25,000, will submit a report to the Contracting Officer within 30 days after award that contains the following information--

(A) The dollar amount of the contract.
(B) Identification of each labor surplus area in which contract and subcontract performance is taking or will take place.
(C) The total costs incurred and to be incurred under the contract in each of the labor surplus areas by the contractor and first tier subcontractors.
(D) The total dollar amount attributable to performance in labor surplus areas.

(2) A manufacturer or regular dealer, which claims preference as a small disadvantaged business and submits an offer in its own name, agrees to furnish in performing this contract only end items manufactured or produced by small disadvantaged business concerns in the United States except, as provided in Section 8051 of Pub. L. 103-139,and Section 8012 of Pub. L. 103-335, for contracts awarded during fiscal year 1994,and 1995, a small disadvantaged business manufacturer or regular dealer owned by an Indian tribe, including an Alaska Native Corporation, agrees to furnish only end items manufactured or produced by small business concerns in the United States.

(End of clause)

DFSC-N (A. Harvey/46570/fk) 6 January 1986

SUBJECT: Recommendation to Change Base Reference Date for EPA References Tied to Petroleum Marketing Monthly (PMM)

TO: DFSC-PD

1. The current procedure of adjusting prices on the domestic bulk program has a major drawback. As currently worded, clause B19.33, Part A, (f) states:

> The term "base reference price" means the reference price that will be established when the Petroleum Marketing Monthly publication becomes available for the month prior to the month in which Best and Final offers are due. For example, if Best and Final offers are due in April, the base reference price would be based on the March data of the Petroleum Marketing Monthly's specified Sales Prices of Petroleum Products Tables which would generally be published in mid-June.

2. Since the Best and Final offers are submitted before the base reference is known, offerors must guess at the relationship between their offered price and the reference. In order to compensate for this unknown factor offerors must implicitly increase their price. Whether offerors would admit to this is an interesting question in light of the initial sentence in B19.33:

> The contractor represents that the unit prices set forth in this contract do not include any contingency allowance to cover the possibility of increases in the reference price(s) in the Contractor's bid or proposal.

3. Yet our analysis of the movement of the PMM as compared to other references as used for interim price adjustments indicates that the PMM may have moves as much as one or two cents per gallon out of step with such interim references. This situation is not only difficult for offerors, it provides potentially misleading indications for DFSC.

4. It is the recommendation of this office that the base reference date used on domestic bulk solicitations be changed so that offerors will know exactly the base reference price to which their best and final price is tied. Thus, the best and final offer price would be tied to a known final EPA reference and a known interim EPA reference. For example, if the best and final date were

SUBJECT: Recommendation to Change Base Reference Date for EPA References Tied to Petroleum Marketing Monthly (PMM)

November 15th, the final base EPA reference would be PMM for August and the interim base reference would be the publications(s) as stated in B19.33 Part C for the month of July.

CHRISTOPHER LEE
Director
Office of Market
Research & Analysis

DEFENSE LOGISTICS AGENCY

# Inter-Office Memorandum

IN REPLY REFER TO DFSC-N (L.Ervin/46570/me)

2 December 1987

SUBJECT: Economic Price Adjustment in the Domestic Bulk Program

TO: DFSC-D/DD

1. At the recent prenegotiation briefing for the current East/Gulf domestic bulk procurement, discussion among DFSC-D, -P, and -N concerned the means of price escalation used in the domestic programs. DFSC-N offered to provide DFSC-D with a copy of the decision package on this issue which was prepared last spring for General Griffith. The enclosed material includes the decision paper and related back-up material.

2. The decision problem concerns the use of an administratively cumbersome method of price adjustment which results in contractor complaints and problems in billing and payments by DFSC. The paper discussed four options, including keeping the then current interior/final adjustment system, modifying it to reduce offer price uncertainties, or moving to final-only escalators based on prices published in trade journals. The interested directorates, DFSC-C, -G, -N, and -P, unanimously recommended Option II, a modification of the then current system. General Griffith accepted Option II for use beginning with last summer's Inland/West procurement. At that time, he stated his desire that DFSC move eventually to trade journal-based escalation and asked that the interested directorates work together toward that end.

3. The original decison package included the decision paper and the back-up material at Tabs A through C. The research paper at Tab D was produced prior to the meeting with General Griffith and was discussed at that meeting.

Christopher Lee
CHRISTOPHER LEE
Director
Office of Market Research
and Analysis

cc: DFSC-C
DFSC-G
DFSC-P/PZ

3217

DLA FORM 111 JUL 82 PREVIOUS EDITION MAY BE USED UNTIL EXHAUSTED

U.S. G.P.O. 1986-491-133/52541

## Economic Price Adjustment in the Domestic Bulk Programs

**Issue** - Should the present two-step method of interim and final price adjustment (EPAs or escalators) for domestic bulk fuel contracts be changed to a one-step price adjustment based on current market price indications as published in trade journals? Or should the two-step method be modified to reduce bidder uncertainty with the present system?

**Background** The current system of price adjustment has been used since 1983. All offerors of product to DFSC are required to accept a method of price adjustment based on actual monthly sales price averages as published by the Department of Energy in the Petroleum Marketing Monthly (PMM). Because the PMM data is not published until the third month following the month for which the data is effective, interim billings are paid based on the movement of an interim escalator. The interim escalator is based on prices published in trade journals at the end of the month prior to delivery. Final adjustments in the billings are made according to differences between the interim and PMM (final) escalators when the PMM is published. When market prices vary greatly from month to month, as they have over the last two years, the final billing adjustments can be substantial. The two-step billing process is administratively cumbersome, and has resulted in a number of contractor complaints over the past 3 years (see Tab A). In the words of one contractor, pricing uncertainty is such that, "we never know if we have made or lost money when you (DFSC) lift a cargo."

Best I can see its going to be the same for [illegible]

**Discussion** There are nine criteria by which proposed escalation systems can be judged, 1) product; 2) geography; 3) timing; 4) timeliness; 5) commonality; 6) independence from contractor influence; 7) basis in actual sales; 8) market risk; and 9) simplicity. The PMM-based system and the alternative trade journal-based systems are evaluated below, according to the criteria.

The current PMM-based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk. Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals. By the criteria of product, geography, and commonality, there is no clear preference between the alternate systems.

Product - DFSC product prices should escalate with the prices of similar commercial fuels. Both the PMM and trade publications publish prices of the similar commercial products -mogas, jet kerosene, diesel fuels, residual fuels - which are used for bulk price escalation of JP-4, JP-5, and DFM prices. While neither the PMM nor the trade journals publish price data for naphtha-type jet fuel (Jet B or JP-4), escalators for this fuel are constructed by use of mogas and kerojet prices which represent the alternate use-value of the JP-4 blending components. A similar principle is used in the construction of prices and escalators for Navy Special Fuel Oil. Preference based on this criteria - none.

3218 8188

Geography - DFSC product prices should escalate with prices of fuels in the geographical area where the requirements are located. PMM data is published on both a statewide and regional (multistate) basis. Trade publication prices are published for most large cities in the United States. Preference: none.

Timing - DFSC prices should escalate concurrently with commercial prices, not with a lead or lag. This reduces the possibility that contractors will build a contingency premium into their prices. PMM prices are available on a monthly basis, while trade journal prices are published on a daily or weekly basis for most fuels. Given that actual market prices change almost continuously, it is preferable for escalators to change more frequently than on a monthly basis. Preference: trade journals, with weekly or daily price adjustment.

Timeliness - Escalator prices should be available to DFSC and the contractors on or immediately following their respective effective dates. PMM prices are published during the third month following the month of effectiveness. Trade journal prices become available within a day to a week following their effective dates. The long lag on PMM availability is the reason why an interim billing system is used which employs trade journals. Preference: trade journals.

Commonality - Proposed escalators should be acceptable to both DFSC and the contractors for use as references. The PMM system has been used successfully in domestic bulk for three years. DFSC has been successful in obtaining commonality based on trade journals in ground fuels procurements and in overseas bulk programs. Preference: none.

Independent of Contractors - Both the PMM and trade journals are independent of control by DFSC contractors. Given their informal method of conducting market surveys, trade publication prices may be influenced by the moves of large market players who may be DFSC contractors. Although this has not been a general problem in ground fuels procurements where trade journals are routinely used for price escalation, there have been situations where questions have been raised regarding independence of the contractor's control. Since this may be a more serious problem in the bulk program, where DFSC contractors may be large market players, any proposed trade publication escalation system would require careful review of the system's susceptibility to manipulation by prospective contractors.

Basis in Actual Sales - The PMM is based on a mandatory DOE survey of actual sales by refiners and gas plant operators. This survey is subject to DOE audit, although actual audits are rarely performed. Trade journal prices are generally based on seller quotations rather than actual sales because the latter are not generally available to informal, private canvassers. These price series are not auditable. However trade journal prices are closely reflective of actual sales, as these price

How do Commercial Buyers & Sellers do business? (what escalator?)

series are closely correlated with PMM prices over time, particularly if prices are adjusted on a weekly basis (see graphs at Tab B). Contractor complaints about the performance of trade journal escalators have been received in the ground fuels program. Although nearly all of these complaints are unfounded, several complaints have been justified and have required substitution of a replacement economic price adjustment reference. Because trade journal data is a less direct measure of actual market sales, complaints concerning trade journals are more difficult to analyze and defend. Preference: PMM.

Market Risk - DFSC contract prices are susceptible to market risk if they escalate on indices which do not correlate well with actual sales prices. PMM prices are actual sales price averages. Although they generally track sales data quite well, trade journals are more variable in quality, and occasionally are replaced in those programs in which they are used due to poor performance in reflecting market conditions. In ground fuel procurements, a poorly performing escalator can be readily replaced with a substitute from another publication for most fuels in most locations. This would be true for bulk mogas and diesel requirements as well. However, only one trade journal has published jet kerosene prices for the last several years (Platt's Oilgram). While these jet fuel series closely correlate with actual sales, there is, as yet, no substitute publication available should the Platt's data series be discontinued or should it fail to continue to track the market. This potential problem affects both JP-4 and JP-5 escalation in CONUS. Oil Price Information Service has recently begun to publish jet fuel prices, but the reliability of this source will not be established until 12 months of historical data have been accumulated. This will occur by April 1988 in several localities. Preference: PMM.

Another aspect of market risk with trade journals concerns the relative speed with which their prices reflect actual market price changes. Given that the journals generally survey seller quotations, or "postings", some asymmetrical behavior may be expected. Sellers tend to raise postings quickly when actual prices are rising, and to resist lowering postings when actual prices are falling. Sellers may also lower prices by granting hidden discounts off of stable postings. Thus, one would expect that the use of trade journal prices for escalation would cost DFSC money through relative "price stickiness" during periods of declining prices. An analysis of alternative bulk escalation systems by DFSC-N (see attached study at Tab C) found some evidence of this potential problem in the behavior of trade journal prices over the 1984-86 period (which included a major price drop). The analysis assumed that the choice of escalation system had no effect on the level of the initial offer prices. Overpayment due to lagged declines in postings were offset by underpayments due to lagged increases when prices were adjusted weekly. Some evidence of downside stickiness was found in the analysis of twice-monthly and monthly changes. In these cases, over payments would have exceeded under payments and would have resulted in greater expense to the government. Weekly price changes did not suffer from this problem, in general.

Simplicity - Any escalation system should be simple to explain to contractors and simple for DFSC to administer. The trade journal-based system is clearly simpler than the PMM system.

Cost to DFSC!

The issue of simplicity is important when the problem of bid preparation is considered. Domestic bulk offerors must submit best-and-final prices which are effective for the month prior to receipt of best-and-final offers. This raises two problems: price timing and margin uncertainty. In the first case, some offerors may bid based on current prices rather than prior-month prices (See study at Tab D). If current prices are lower than prior-month prices (as in July 1986), the offeror's bid will be lower than if it were properly prepared. If market and bid prices are much lower, a mistake-in-bid may eventually be claimed by the offeror. On the other hand, if current prices are higher than the prior-month prices (as in January 1987) this offeror's bid price may be higher than it otherwise would be. It may be so high that it is not in line for award. In fact, price reasonableness of offers may become a serious issue if current prices are higher than prior-month prices, because bid prices will be compared to prior-month market ranges. If such offers are awarded, the government will be paying higher prices than if a simplified one-step escalation system is used. A switch to weekly escalation based on trade journals would enable current prices rather than prior-month prices to be bid and evaluated, and would greatly reduce this preparation problem.

How does it weekly price cost to the people who order and pay bills?

The current method of escalation introduces another element of uncertainty into the bid preparation process. At the time of receipt of best-and-final offers, the offer price and the relationship (margin) between the interim escalator and the offer price is fixed. However, the margin between the offer price and the final escalator (PMM) is unknown and remains so for some two months following the receipt of best-and-finals. While the base value of the interim escalator is known, the relationship between the base values of the interim and final escalators is subject to statistical uncertainty. Because the margin between the offer price and the base final reference (PMM) determines the actual margin (and, thus, the actual price) for final billing purposes, offerors who are risk-averse may build a contingency premium into their offer price to protect themselves against uncertainty about the ultimate level of their margin. To the extent that offerors perceive this as a problem, the prices that the government pays for fuel will be higher than under a one-step escalation system based on trade journals. Recent experience and contractor comment suggest that both the margin problem and the bid preparation problem are real and significant.

What is cost of PMM in terms of manpower?

Another way of reducing the problem of bid preparation would be to have offerors bid with prices effective with the most recent PMM available. Offerors on the recent East and Gulf procurement would have made their bids (in January 1987) effective in

October 1986 rather than December 1986 as was done during that procurement. This would have had the effect of eliminating margin uncertainty. The process would still have been susceptible to the generally upward market price movement over that period. In this case, however, at least one company was able to agree to a price reduction (when requested by DFSC-P), after the December PMM became available, in part as a result of margin certainty with December pricing. On the previous Inland and West procurement, one company reduced its offered volume when the June PMM became available prior to time of award, and actual June price levels were found to have been higher than this company assumed when it prepared its bid. In this case, the latest PMM at the time of receipt of best and final offers contained April prices. Under a modified bid process, offerors would have made their best and final prices effective in April rather than in June. Several individuals and contractors have suggested that DFSC modify its current system in this manner. The experience with the recent bulk procurements and with an analagous situation several years ago in an overseas procurement suggest that this is a feasible improvement on the current escalation system.

Decision Options

Option I - Maintain current two-step method of domestic bulk price escalation.

Pro - This system is already in use and contractors are familiar with it. There is no market risk to continuation of its use. DFSC prices are adjusted according to the movement of actual monthly sales price averages.

Con - This system is complex and ~~administratively~~ cumbersome. There are 12 monthly escalations plus 12 monthly corrections. The problems associated with bid preparation probably result in additional expense to the U.S. Government. There will continue to be contractor complaints about the size of final payment adjustments. This system, by escalating on monthly averages, fails to reflect intramonthly price movements.

How much

Option II - Modify the current two-step escalation method so that offerors can establish their bid prices as effective with the month of the most recent PMM.

Pro - This system has the same advantages as Option I, and removes margin uncertainty from the offerors' bid preparation problem.

Con - This system has the same disadvantages as Option I, and forces the offeror to focus on a point two months further into the past when formulating the bid prices, thus possibly making the process even more susceptible to market price movement over the intervening period between the most recent PMM and the date of best and final offers.

Option III - Change to twice-monthly escalation using trade journals escalating with prices effective on the 1st and 15th of the month.

Pro - This system is administratively simpler than the current system (with 24 "final-only" escalations). There is no need for final billing adjustments. There is less need for contractors to build contingency premiums into their offer prices due to margin uncertainty.

Con - There is market risk associated with the move away from escalation on actual sales, particularly with respect to jet kerosene. Twice-monthly price changes do not track actual sales as well as weekly changes, so offerors may still add contingency premiums to their prices. There will likely be several contractor complaints each year about the short-term performance of these escalators.

Option IV - Change to weekly escalation using trade journals.

Pro - This system can be administered as easily as the identical system currently used in ground fuels. There is no need for final billing adjustments. The bid preparation problems would be virtually eliminated. Weekly price changes track actual sales better than monthly or twice-monthly price changes, because they better reflect the continuous nature of price movements in the marketplace. Thus there is even less need for contractors to build in contingency premiums as offer prices can be updated to the time of receipt of best-and-final offers.

Con - There is market risk associated with the move away from escalation on actual sales, particularly with respect to jet kerosene. There would be 52 price escalations per year, more than twice the number in Options I, II, and III. There will likely be several contractor complaints each year concerning the short term performance of these escalators.

Staff Recommendations:

Option II is favored by all of the interested directorates (DFSC-C, -G, -P, and -N). Should the implementation of Option II fail to alleviate the bidding difficulties, the issue can be revisited. In any event, the trade journal options do not appear to be truly viable before mid-1988 at the earliest.

UNITED STATES COURT OF FEDERAL CLAIMS

LA GLORIA OIL AND GAS COMPANY, :

Plaintiff, :

v. : No. 02-465C

THE UNITED STATES, : (Judge Hewitt)

Defendant. :

: Pages 1 - 59

\- - - - -

Deposition of Lawrence Ervin

Ft. Belvoir, Virginia

Monday, December 1, 2003

Reported by: Marian E. Cummings, Notary Public

Job No.: 156783

December 1, 2003

12:01 p.m.

Deposition of Lawrence Ervin, held the offices of:

Defense Energy Support Center

8725 John J. Kingman Road

Ft. Belvoir, Virginia 22060-6217

Pursuant to notice, before Marian E. Cummings, a Notary Public of the Commonwealth of Virginia.

APPEARANCES:

Mayer, Brown, Rowe & Maw
For the Plaintiff
1909 K Street, Northwest
Washington, D.C. 20006-1101
(202) 263-3208
BY: J. Keith Burt, Esq.
William L. Olsen, Esq.

United States Department of Justice
For the Defendant
Room 4050
1100 L Street, Northwest
Washington, D.C. 20530
(202) 616-2311
BY: Steve Gillingham, Esq.

Defense Energy Support Center

For the Defendant

Suite 1565

8725 John J. Kingman Road

Ft. Belvoir, Virginia 22060

(703) 767-5009

BY: Howard Kaufer, Esq.

Defense Supply Center

Richmond, Virginia

(804) 279-1423

BY: Donald Tracy, Esq.

CONTENTS

EXAMINATION OF LAWRENCE ERVIN PAGE
MR. BURT 6

-0-

EXHIBITS

ERVIN DEPOSITION EXHIBITS: PAGE:
(None)

-0-

PROCEEDINGS

Thereupon,

LAWRENCE ERVIN

the Witness, called for examination by counsel for the Plaintiff, and, after having been sworn by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. BURT:

Q Would you state your name for the record.

A Lawrence Calvin Ervin.

Q Mr. Ervin, what is your current position?

A I'm the chief of the market research office at the DECS.

Q And how long approximately have you held that position?

A Eight plus years.

Q And generally what are the responsibilities of that position?

A Well, overseeing an effort to -- we do interscreen, analyses of support of the procurement operations center, do support for price negotiation work in the pricing work done in contracting divisions.

There's a certain amount of affiliate work we do for contingency folks.

We actually manage the strategic petroleum program to the extent we're involved with the -- help the budget folks who work for the comptroller with their out year budget projections, price of oil in the future, forecasting, that sort of stuff. I think that I -- probably everything we do falls within that general description.

A The responses is often oral. And the document, it gets generated, provided to the person who asked it. We kind of rely heavily on the contract files to be the repository of that since it's, you know, sort of proprietary information.

Q The contract files meaning an office other than yours or is that a contract file in your office?

A No, we don't maintain contract files.

Q So when you provide some market analysis to the bulk fuels group in connection with their procurement and when that analysis is in writing do you keep a copy of what you give to the bulk fuels group?

A Well, I think the short answer to that is no and maybe something momentarily. Again, it would rely heavily on the contract file.

Q All right. Let's turn to page 6 of Plaintiff's Exhibit 2, request number 15 reads, "All documents relating to DESC's decision to use the PMM indexes, Platts, or OPIS as a basis for adjusting prices in its price adjustment clauses."

A Recollection was that '87 study which I believe you've been provided and a prior '84 study.

Q Can you generally describe those studies for me?

A '84, '87 I was involved in producing and we looked at comparing PMM versus Platts and OPIS and the issue of SC escalating on a different time frame and the documents looked at various things which are nice to have in an escalator. They track -- the '87 study wound up recommending making an adjustment to the PMM based status quo at the time.

The '84 study which I did not prepare, my understanding and recollection is that it's mainly, it deals mostly with the move from the ELS to PMM which was prior to 1985.

Q Where did you find those studies?

A Well, I didn't, I don't think I found the first one.

Q Okay.

A The '84 one, and '87 I had basically on my shelf.

Q Mr. Ervin, I believe that in approximately 1995 DESC switched from using Platts to using PMM as an escalator to using Platts; is that correct?

A Sometime back in there, yeah.

Q Do you know whether there was any sort of any studies or analysis of reports prepared by your office in connection with that change from using the PMM to using Platts?

A Well, there wasn't because I was sitting in a room when the decision happened and it was made in response to some pressure from headquarters to do things differently. So the analysis is based on, basically is the analysis in the '87 study. Some people who have read the '87 studies that they would draw different conclusions than what was presented at the end of the study, certainly a close call. Analysis would have supported that as well so it's really the '87 study which is the basis for that move. That and some pressure from headquarters to, you know, be doing things differently and doing things different in a visible fashion to hopefully over the course of time produce substantial cost savings to the taxpayer.