IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EL PASO MERCHANT ENERGY PETROLEUM COMPANY et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 02-1094C (Judge Block) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(1) of this Court's Rules, defendant, the United States, submits that the following facts pertinent to its cross-motion for summary judgment are undisputed.

The Parties

1. Plaintiffs (collectively, "El Paso") are affiliates of The Coastal Corporation ("Coastal"), and longtime Government contractors: Coastal Refining and Marketing, Inc., Coastal Aruba Refining Company, Coastal Eagle Point Oil Company, and Pacific Refining Company. Exh. 1 ("Walker Decl.") ¶ 2. Coastal was founded in 1955. Before its acquisition by plaintiff El Paso Corporation, Coastal was a diversified energy holding company with subsidiary operations in natural gas gathering, marketing, processing, storage and transmission; petroleum and petrochemical refining, marketing and distribution and chemicals; gas and oil exploration and production; coal mining; and electricity. Exh. 3.[1] Coastal had $8.2 billion in operating revenues in 1999 and had approximately 483,000 barrels per day of petroleum refining capacity. Id. Plaintiff El Paso Merchant Energy – Petroleum Company is an affiliate of El Paso and was

[1] "Exh." refers to the exhibits contained in the appendix to our December 10, 2002 cross-motion for summary judgment. "Pl. App." refers to pages of the appendix accompanying plaintiffs' October 30, 2002 motion for summary judgment. Supplemental Appendix ("SA") refers to the appendix to the brief filed with these findings.

previously known as Coastal Refining and Marketing, Inc. Second Amended Complaint ("Compl.") ¶ 1.

2. The Defense Energy Support Center ("DESC") is a field activity of the Defense Logistics Agency ("DLA"), a component of the Department of Defense ("DoD"). 48 C.F.R. ("DFARS") § 202.1. Among other things, DESC (formerly called the Defense Fuel Supply Center, or "DFSC") purchases refined fuels for the military worldwide. Compl. ¶¶ 8, 9.

3. Pursuant to its Bulk Fuels Program, DESC purchases hundreds of millions of gallons of various bulk fuel products, including jet fuel, gasoline, and diesel fuel, annually. Walker Decl. ¶¶ 5, 8. DESC solicits contracts for these fuels several times annually, and awards contracts to a number of companies each year, based upon the best prices to the Government. Id. ¶ 9. The contracts are typically indefinite quantity contracts with a term of approximately one year. Id. ¶ 5.

4. Pursuant to its Posts, Camps and Stations Program, DESC acquires millions of gallons of various ground fuels, including diesel fuels, heating oils, and gasoline, which are to be delivered directly to the various DOD posts, camps and stations. Walker Decl. ¶ 4. These products are used in various applications, such as heating, ground vehicles, and equipment. Id. Contracts in this program typically are awarded to petroleum dealers, not to refiners. Id.

The Contracts

5. El Paso participated in DESC's Bulk Fuels Program and Post, Camps, and Stations Program. Walker Decl. ¶¶ 2-3. Between 1982 and 1999, El Paso entered into approximately 110 DESC contracts. Compl. ¶¶ 9, 33-40.

6. JP-4, JP-5, and JP-8 are jet fuels. Walker Decl. ¶ 3. JP-4 is naphtha based and

was used primarily by the Air Force and the Army. Walker Decl. ¶ 3; Exh. 2, Schink Decl. ¶ 3. JP-5 and JP-8 are kerosene-based fuel similar in composition to commercial jet fuel (which is called "kerojet" or "Jet A"). Id. F-76 (also called "DFM") is similar to commercial diesel fuel, and is used by the Navy to propel ships. Id. FS-2 is a diesel fuel used for ground-based purposes. Id.

7. El Paso's bulk fuels contracts were competitively awarded through negotiated solicitations, pursuant to 48 C.F.R. ("FAR") part 15 ("Contracting by Negotiation"), and, beginning in 1996, FAR part 12 ("Acquisition of Commercial Items"). Walker Decl. ¶ 8. The ground fuels contracts were awarded pursuant to the sealed bid procedures of FAR part 14. Walker Decl. ¶ 8. The base prices in El Paso's contracts were determined reasonable based on adequate price competition or on established catalog or market prices of commercial items sold in substantial quantities to the general public. Walker Decl. ¶ 10.

8. The market values of crude oil and refined petroleum products change frequently. Schink Decl. ¶ 9. Because a single barrel of crude oil may be refined into many different commercial products, however, changes in the price of crude oil are not necessarily highly correlated with changes in the prices of refined products over the short term. Refining margins can also affect the correlation between prices of crude and refined products. Id. A barrel of crude oil constitutes the raw material for a wide variety of petroleum products sold in a multitude of competitive geographic and spot markets. Id. Prices in those markets are influenced by countless factors, including seasonal demand, which affect supply and demand for the individual refined products. Id. Therefore, over any given time period, changes in the market prices of some refined products, made from a portion of a barrel of crude oil, may not correlate, in either

direction or magnitude, with changes in the prices of crude, or of other products. Id.

9. Virtually all of DESC's fuel supply contracts are of the "fixed price with economic adjustment" variety, see FAR subpart 16.203, and, therefore, contain an economic price adjustment ("EPA") clause. Walker Decl. ¶ 6. DESC has used several versions of its principal agency-drafted clauses, B19.33, "Economic Price Adjustment - Published Market Price" for bulk fuels contracts, and B19.19, "Economic Price Adjustment (PC&S)" for ground fuels contracts. Id. ¶¶ 12,14.

## The EPA Clauses

10. DESC began using EPA clauses in 1973, in response to increases in crude oil costs experienced by suppliers as a result of the Arab oil embargo. At that time, the Government had imposed controls upon the price of crude oil. After the price restraints were lifted, DESC gave suppliers the option of selecting an EPA clause based either upon actual crude oil costs, or upon market prices for similar products. In 1981, having concluded that allowing that choice presented too many administrative problems, including difficulties in evaluating and comparing bids that used different EPA references, DESC began using market-based prices exclusively. DESC chose refined product market prices because those prices were believed to closely mirror changes in refiners' costs, over time, although a given price publication might not track costs over shorter periods. Exh. 1 ¶¶ 6-15; Exh. 2 ¶¶ 5-11.

11. DESC's EPA clauses listed prices for various refined products and regions, taken from a commercially available market price publications. Pl. App. 109-112 (parts A and D). For example, part D of EPA clause B19.33 provided a unique "reference price" (sometimes called a "base reference price") for each refined petroleum product sought in the RFP. Id.

12. All of the DESC solicitations at issue instructed offerors to propose a "base price" for each product offered. Walker Decl. ¶ 6. As Clause B19.33 explained, the successful offeror would be paid its base price plus a periodic adjustment, based upon changes experienced by the reference price during the term of the contract. Specifically, B.19.33 provided that “[t]he prices payable under this contract for listed items shall be the base [proposal] price for the listed item increased or decreased by the same number of cents, or fraction thereof, that the reference price increases or decreases per like unit of measure from the base reference price.” Exh. 6 (last page); Pl. App. 111 (part D ¶(c)). In short, the reference price was not the price the contractor received for fuel. Rather, the contractor received its offer price, adjusted monthly by the same penny for penny change (if any) experienced by the reference price.

13. Depending upon the product being sold, the EPA “base reference” prices in El Paso’s 1982-84 Bulk Fuels Program contracts were market prices published by the Bureau of Labor Statistics ("BLS"), the Oil Price Information Service ("OPIS"), Platts Oilgram Price Report ("Platts"), or the Oil Buyers Guide. Walker Decl. ¶ 11. The BLS index is widely used to adjust prices and is specifically sanctioned in the Department of Defense FAR Supplement for cost indexes. Id. The other three publications are commercial publications relied upon by industry to adjust petroleum prices. Id.; Schink Decl. ¶ 7.

14. The “base reference” prices in El Paso’s 1984-1994 Bulk Fuels Program contracts were market prices published by the Petroleum Marketing Monthly ("PMM"). Compl. ¶ 17; Walker Decl ¶ 12. The PMM, published by the Department of Energy (“DOE”), Energy Information Administration, is a compilation of transaction prices in domestic petroleum markets. Walker Decl. ¶ 12; Schink Decl. ¶ 5. All refiners are required by law to submit sales

data to DOE monthly. Id.; 15 U.S.C. § 772. DOE compiles the data and reports monthly average sales prices for various petroleum products, by region, in the PMM. Walker Decl. ¶ 12; Schink Decl. ¶ 5. Prices were adjusted monthly under the PMM EPA clause. Walker Decl. ¶ 12.

15. A significant feature of the PMM is the three-month lag time DOE requires to obtain the sales data for any particular month. Thus, for example, sales data for January are published in April, and data for February are published in May. Walker Decl. ¶ 12. This was significant in DESC's administration of the PMM-based EPA clauses, because B.19.33 provided for monthly adjustments. Id. To accommodate DOE's three-month lag, DESC made monthly adjustments on an interim basis, and then reconciled them when PMM data for that month were published. Id.

16. Beginning in 1995, the "base reference" price for El Paso's Bulk Fuels Program contracts were regional average prices reported in Platts. Walker Decl. ¶ 13; Schink Decl. ¶¶ 4, 6. Because Platts was published daily, DESC was able to adjust prices weekly, and, therefore, was able to discontinue the burdensome interim payment and reconciliation process required by the PMM-based EPA clause. Id.

17. The "base reference" price for El Paso's Posts, Camps, and Stations Program contracts were found in Platts, OPIS, Computer Petroleum Corporation, The Lundberg Report, or Oil Buyers Guide. Walker Decl. ¶ 14. DESC's principal EPA clause for that program was B19.19, "Economic Price Adjustment (PC&S)." Id. Like B19.33, this clause adjusted prices based on cent-for-cent changes in the reference publication, in this case an industry one. Id. at ¶¶ 14-15.

The Change From PMM

18. In January, 1986, DESC's Office of Market Research prepared a recommendation to change the procedure by which offers were submitted in DESC's solicitations for bulk fuels. SA 18. Due to the 3 month lag time for prices to be published in PMM, offerors were required to submit offers tied to a reference price that had not yet been published. See PFF 15; SA 18 ¶ 1. That is, the clause provided that the base reference price was the PMM price published for the month before the submission of best and final offers. Id. As the recommendation noted, "[s]ince the Best and Final offers are submitted before the base reference is known, offerors must guess at the relationship between the offered price and the reference." Id. at par. 2. The recommendation noted that "the movement of PMM compared to other references as used for interim price adjustments may have moves as much as one or two cents per gallon out of step with such interim references." Id. at par. 3. The recommendation noted that offerors might increase their price to compensate for the unknown factor of what the PMM reference price would be when it was eventually published and, therefore, recommended that the best and final price be tied to an already published final and interim reference price. "For example, if the best and final date were November 15th, the final base EPA reference price would be PMM for August and the interim base reference would be the publication(s) . . . for the month of July." SA 18-19.

19. In 1987, DESC's Office of Market Research and Analysis prepared a decision paper concerning the " . . .means of price escalation used in the domestic programs." SA 20 ¶ 1. The purpose of the decision paper was to decide whether the economic price adjustment clauses DESC was then using to adjust contract prices in long term contracts for the supply of domestic bulk fuels should be either modified to change the use of the unpublished PMM reference price,

or changed to use market prices published in Platts and other "trade journals" rather than prices in PMM. SA 21 ¶ 1 (Issue). The paper considered four options for adjusting long term contract prices in domestic bulk fuel contracts. SA 20 ¶ 2. The four options were: 1) to keep the price adjustment system then in use by DESC, 2) to modify the system then in use to " . . . reduce offer price uncertainties," 3) to adjust prices twice monthly using "trade journal" prices, and 4) to adjust prices weekly using "trade journal" prices. Id., at par 2; SA 25-26, Decision Options.

20. The decision paper included a detailed discussion of the options available to DESC to adjust contract prices. SA 21-25. In a paragraph entitled "Background," the paper described the economic price adjustment system that DESC had been using since 1983. SA 21, Background. The paper set forth nine criteria by which to judge proposed escalation systems, " . . . 1) product; 2) geography; 3) timing; 4) timeliness; 5) commonality; 6) independence from contractor influence; 7) basis in actual sales; 8) market risk; and 9) simplicity." Id. at Discussion. The paper then compared PMM prices to "trade journal" prices for using those nine criteria. SA 21-24.

21. The paper concluded that:

> [t]he current PMM based system is preferable by three criteria: independence from contractor influence, sales basis, and market risk. Three other criteria, simplicity, timing, and timeliness, favor the switch to trade journals by the criteria of product, geography, and commonality there is no clear alternate between the alternate systems.

SA 21 at Discussion.

22. The paper included a detailed analysis of each of the nine criteria and whether each favored the PMM, the trade journal prices, or neither. The paper found that the product criterion favored neither, because "[b]oth PMM and trade publications publish prices of similar

commercial products . . . ." SA 22. Regarding geography, the paper found that both PMM and trade publications prices were published in " . . . the geographical area where the requirements are located." SA 22. Regarding commonality, the paper found that either PMM or trade publications were acceptable to both DESC and contractors, based upon the fact that DESC had used PMM prices successfully in bulk fuels for three years and had used trade publication prices successfully in contracts for ground fuels and overseas bulk programs. Id.

23. The paper concluded that the contractor influence, contractor sales, and market risk factors favored PMM. The paper observed that, although both PMM and trade publications were independent of DESC contractors, trade publications might be influenced by the moves of large "market players" "given their informal method of conducting market surveys," whereas the PMM was a survey of actual sale prices. Id. Regarding market risk, the paper found that DESC ". . . contract prices are susceptible to market risk if they escalate on indices which do not correlate well with actual sales prices. PMM prices are actual sales price averages." SA 23. Trade publication prices were considered more " . . . variable in quality . . . ." Id. The study also found that trade publication prices were more susceptible to "price stickiness," and increased the market risk of higher prices during time periods of declining prices because sellers might be slow to lower posted prices. Id.

24. The paper concluded that the timing and timeliness criteria favored trade publication prices. As the paper explained, because trade publication prices were published on a daily or weekly basis rather than monthly, the timing of those prices would reduce the " . . . possibility that contractors will build a contingency premium into their price." SA 22. On the other hand, because PMM was published with a three month lag-time, it necessitated the use of

interim pricing and reconciliations, i.e., more adjustments. Id.

25. Finally, the paper set forth a summary of the "pros and cons" of the four alternatives. The paper concluded that the preferred option was to modify the existing use of PMM prices by using the latest published PMM price as the base reference price. That, the study reasoned, would eliminate "margin uncertainty" and allow bidders to base their offered prices on a known reference price. The paper pointed out that "[s]everal individuals and contractors have suggested that [DESC] modify its current system in this manner." SA 25. Starting in 1987, DESC began using this modified PMM-based adjustment, and continued to do so until 1995, when the use of trade publication prices began. See PFF 16. An example of the PMM adjustment clause in use between 1987 and 1993 is contained at Exhibit 9, page 3.

26. In September, 1994, DESC requested a one-time FAR deviation to authorize the use of price adjustment based on market prices published in Platts Oilgram and OPIS for that year's annual bulk fuels contract, in lieu of PMM prices. Pl. App. 223. In the request for a FAR deviation, DESC set forth reasons for switching from PMM prices to Platts prices. DESC stated that the PMM prices had been reliable, but that using Platts would provide several advantages. In addition to eliminating the need for two price adjustments, DESC stated, "commercial publications [such as Platts are] widely accepted by industry" and would be simpler to use. Pl. App. 225-226. See, also, Exhibit 14, at 3. DESC further noted that its Office of Market Research and Analysis had studied the proposed Platts-based clauses and found them to provide reliable bases for price adjustments. Pl. App. 226; see also Walker Decl. ¶ 20.

27. In May, 1995, DESC sought a Class Deviation and change to the Defense Logistics Agency Acquisition Regulation ("DLAR") that would explicitly authorize DESC to

base its EPA clauses upon "industry publications" (including Platts and OPIS). SA 14, p. 3. The bases for DESC's request for such permanent authorization were the same as set forth in its request for an individual deviation the previous fall. Id. at p. 3, ¶ III. B. DESC noted that "industry publications" were published more often and would eliminate the "need for double calculations or price adjustments, a significant savings to the government." Id. The deviation request noted that, due to the lag time between interim and final billing under PMM, "contractors likely build in a price cushion." The deviation also noted that the use of an "industry publication" was similar to the "way adjustments are done commercially in that commercial publications are widely accepted by industry." Id.

28. The DESC request also noted that "industry publications" had been used for DESC programs other than bulk fuels for years. Id. As it did in its earlier request, DESC stated that its "Office of Market Research and Analysis has studied the proposed EPA provisions and found them to be reliable for price adjustments." Id. The Office of Market Research and Analysis study to which both deviation requests referred was the 1987 study described in PFF 19-25. SA 35, l.29 - 36, l.19.

29. Thus, beginning in 1995, the "base reference" price for El Paso's Bulk Fuels Program contracts were regional average prices reported in Platts. Walker Decl. ¶ 13; Schink Decl. ¶¶ 4, 6. Because Platts was published daily, DESC was able to adjust prices weekly, and, therefore, was able to discontinue the burdensome interim payment and reconciliation process required by the PMM-based EPA clause. Id.

DESC's Small and Small Disadvantaged Business Program

30. In accordance with 15 U.S.C. § 644 and FAR Part 19, many of DESC's bulk fuels program solicitations included partial small business set-asides. SA 3-4. Beginning in 1988, pursuant to 10 U.S.C. § 2323, DESC solicitations also included an evaluation preference of up to 10 per cent for small disadvantaged business concerns. SA 5. DESC solicitation clauses I237.05, Notice of Evaluation Preference for Small Disadvantaged Business Concerns, and I237.06, Notice of Partial Small Business Set-Aside with Preferential Consideration for Small Disadvantaged Business Concerns, set forth the operation of these programs. SA 5-6.

31. The clauses provided that the set-aside price would be the highest price the Government would pay for the non-set-aside portion of the fuel required for a location, and allowed negotiation with small business offerors to obtain that price. DESC did not provide small business concerns with either the identity or the prices of other offerors. SA 3. The negotiated price DESC allowed small business concerns to match was comprised of the fuel price the Government would pay plus a figure for transportation costs to the destination. Id.

El Paso Claims

32. During performance of the contracts at issue here, El Paso never raised any question regarding the legality of the EPA clauses, and it never complained that it was not being paid fairly. Walker Decl. ¶ 16. Nor did El Paso never object to any of the thousands of monthly and weekly price adjustments made under the contracts' PMM-based and industry publication-based EPA clauses. Id.

33. El Paso submitted certified Contract Disputes Act claims regarding the 94 subject contracts on September 20, 2000, November 30, 2000, April 23, 2001, and July 6, 2001, and

June 25, 2002. Compl. ¶¶ 34-36. El Paso's principal contention was that the EPA clauses in its contracts were illegal, citing the MAPCO decision. E.g., Exh. 15 (claim under contract DLA600-89-D-0493). El Paso did not assert that the clauses were ambiguous, had failed to operate as expected, or that they had failed to protect El Paso from significant fluctuations in costs or prices. Id.

34. To price its claims, El Paso calculated the alleged "fair market value" of its delivered products by starting with a weighted average of average spot prices taken from Platts, and adding a "long-term contract premium," transportation costs, and a price for with contractually required additives. E.g., Exh. 15 (claim pp. 17-22.)

35. The contracting officer denied El Paso's claims in a final decision dated September 4, 2001. Exh. 16. The contracting officer concluded, among other things, that the EPA clauses were authorized and enforceable, reflected the parties agreement and resulted in the payment of market prices. Id. at 2-4.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Senior Trial Counsel
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

BERNARD A. DUVAL
Counsel

HOWARD M. KAUFER
Assistant Counsel
Office of General Counsel
Defense Energy Support Center
Ft. Belvoir, VA

November 14, 2005

CERTIFICATE OF FILING

I hereby certify that on November 14, 2005, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Steven J. Gillingham