IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EL PASO MERCHANT ENERGY-PETROLEUM COMPANY, and<br><br>COASTAL ARUBA REFINING COMPANY, N.V., and<br><br>COASTAL EAGLE POINT OIL COMPANY, and<br><br>PACIFIC REFINING COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 02-1094C<br>(Judge Block) |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT**

Plaintiffs, El Paso Merchant Energy-Petroleum Company, Coastal Aruba Refining Company, N.V., Coastal Eagle Point Oil Company and Pacific Refining Company (collectively "Coastal"), respectfully submit their Proposed Findings of Fact.

## I. THE PARTIES

1. DESC[1] is the principal purchaser of military fuel for the Department of Defense ("DOD"). It is the single largest purchaser of fuel in the world.[2] As relevant here, DESC

[1] DESC previously was known as the Defense Fuel Supply Center ("DFSC"). For simplicity, "DESC" is used throughout.

[2] *Dimensions, Defense Logistics Agency News Magazine* (1999 Almanac ed.), *available at* http//www.dla.mil/dimensions/almanac/desc.htm.

principally purchased unique types of military jet fuel and a unique military distillate. Second Amended Complaint at ¶ 9.[3]

2. Coastal was a supplier of military fuel to DESC. Coastal maintained long-term supply relationships with DESC and committed substantial, long-term capacity to refining military fuel. Second Amended Complaint at ¶ 9. DESC purchased military fuel from Coastal, as it did from essentially all military fuel suppliers, under long-term contracts typically lasting one year. Second Amended Complaint at ¶ 9; App. 664. During the period relevant here, Coastal and DESC entered approximately 103 contracts providing for the delivery of military fuel to locations throughout the United States. Second Amended Complaint ¶¶ 35-39.

## II. DESC'S MILITARY FUEL PRICES

3. DESC's military fuel contracts contained adjustable prices that permitted DESC to set military fuel prices each month during the contract term. App. 667.

4. As relevant to DESC's motion, DESC set fuel prices under its military fuel contracts using a compilation of petroleum sales data published by the Department of Energy ("DOE") known as the Petroleum Marketing Monthly ("PMM"). App. 669. The PMM reports a monthly average sales figure for specified fuels, such as jet fuel or diesel fuel, for five regions known as Petroleum Administration for Defense Districts ("PADDs"), although these PADDs do not correspond to any geographic market for fuel. *Barrett Ref. Corp. v. United States*, 42 Fed. Cl. 128, 130 n.6, 131 (1998), *aff'd in part and rev'd in part*, 242 F.3d 1055 (Fed. Cir. 2001); *Tesoro Hawaii Corp., et al. v. United States*, 58 Fed. Cl. 65, 67 n.4 (2003), *rev'd on other*

[3] Chevron Products Company, *Aviation Fuels Technical Review* 13 (2000) (military "maintain[s] separate specifications for jet fuel [because of] operational and logistical differences between the military and civilian systems and the additional demands high-performance jet fighter engines place on the fuel").

*grounds*, 405 F.3d 1339 (Fed. Cir. 2005). As the PMM moved upward or downward each month, DESC's fuel prices also moved upward or downward. App. 669.[4]

5. DESC's Deputy Director of Contracting, Edward Biddle, stated in a 1993 memorandum that the purpose of DESC's adjustable prices was to "ensure[] that the sale will be at the market price, which is a fair and reasonable price. Not only is the government protected, but *the contractor is protected by knowing that its price will always be related to the price it could obtain in the commercial marketplace.*" App. 4 (emphasis added). DESC's Director of the Office of Market Research and Analysis, Lawrence Ervin, testified similarly before this Court in 1998 that DESC used adjustable prices because: "[W]e wanted our prices to reflect, as closely as possible, market levels for the same or similar commercial fuels in the marketplace. . . . We wanted the price to go up and also down when the market prices of similar fuel went [up or] down." App. 14; *see also* App. 62 ("the EPA [economic price adjustment] reference selected is [intended to be] reflective of changes in commercial market prices"); App. 67 ("the EPA reference is designed to adjust the award price in concert with changes in going market price levels;" "the D[E]SC Office of Market Research and Analysis endeavors to select the reference that most accurately reflects movements of going market prices").

6. Consistent with this purpose, DESC's pricing clause is titled "Economic Price Adjustment – Published Market Price." App. 9. Among its various iterations over time, the clause states that "[t]he market price [used to set military fuel prices] is derived from quotes, assessments, or sales prices in the market place" and further provides that the index used to set prices shall be changed if "the Contracting Officer determines that the *market price* indicator

---

[4] The PMM is designed for Congressional use in developing broad energy policy. *Barrett*, 42 Fed. Cl. at 131.

consistently and substantially fails to reflect *market conditions*." App. 9 (emphasis added).[5] It is therefore unsurprising that in *Barrett Ref. Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001), the United States Court of Appeals for the Federal Circuit expressly found that DESC's adjustable pricing clause embodied a promise to "pay at least fair market value" for fuel. *Id*. at 1060.

## III. DESC'S CONFLICTING ASSESSMENTS OF ITS MILITARY FUEL PRICES

7. Outwardly, DESC maintained that the PMM was the "gold standard" for measuring fair market value. DESC wrote to its parent organization, the Defense Logistics Agency ("DLA"), that its PMM "references are virtually unimpeachable from an accuracy standpoint, since *they don't just 'track' the market – they are the market.*" App. 98 (emphasis added).[6] In response to a supplier's objection to the PMM, DESC similarly wrote that the PMM "consistently reflects actual market prices," App. 96, and to another objecting supplier DESC wrote that the PMM is "a reliable indicator of price movements in the petroleum products market." App. 91. As late as 1998, DESC's Mr. Ervin testified before this Court that the PMM is "the benchmark against which we . . . compare everything domestically." App. 29.

8. DESC's statements to DLA, its suppliers and this Court stand in stark contrast to DESC's expert economists' assessment of the PMM. In 1986, DESC's then-Director of the Office of Market Research and Analysis, Mr. Christopher Lee, undertook an assessment of the

---

[5] *See also* App. 87 (Mr. Ervin stating that, pursuant to DESC's pricing clause, "replacement of the escalation reference is called for if the reference 'consistently fails to reflect market value'"); App. 85 (Mr. Ervin stating that through its pricing clause "DESC assumes the risk of higher product prices").

[6] DESC's public espousal of the PMM is unsurprising, given DESC's acknowledgment that "DOE normally will work with us to see that our needs are satisfied as we are one of the primary users of PMM." App. 100.

PMM to compare its performance with commonly used commercial price references for fuel, such as Platts and OPIS (which DLA subsequently directed DESC to use in place of the PMM). Referring to Platts and OPIS as "other references,"[7] Mr. Lee, who holds a Doctorate in Economics[8] stated: "Yet our analysis of the movement of the PMM as compared to other references as used for interim price adjustments indicates that the PMM may have moves as much as *one or two cents per gallon out of step* with such interim references." App. 103 (emphasis added). In contrast, DESC required its suppliers to submit bids to the one ten-thousandth of a cent ($0.000001). App. 665.

9. In 1987, DESC's Office of Market Research and Analysis undertook another study "comparing PMM versus Platts and OPIS." App. 134. That study supported using the commercial price references Platts and OPIS to make price adjustments – not the PMM. App. 134. When DLA ultimately learned of DESC's 1987 study – albeit seven years later – DLA directed DESC to stop using the PMM to set prices and to use Platts and OPIS instead.

10. Mr. Ervin explains how DESC's 1987 study led to DLA's directive to stop using the PMM in 1994:

> I was sitting in a room when the decision happened and it was made in response to some pressure from headquarters to do things differently. So the analysis is based on, basically is the analysis in the '87 study. Some people who have read the '87 studies [stated] that they would draw different conclusions than what was presented at the end of the study, certainly a close call. Analysis

---

[7] In the 1986 assessment, Mr. Lee uses the phrase "other references as used for interim price adjustments." App. 103. DESC used its interim price adjustments to set prices on an interim basis at the time fuel was delivered. App. 120. DESC set final prices when the PMM was published three months after the fact. App 121. DESC's interim references, as identifed in its adjustable pricing clause, were Platts and OPIS. App. 120.

[8] App. 111.

> would have supported that as well so it's really the '87 study which is the basis for that move [in 1994 from PMM to Platts and OPIS].

App. 134.[9]

11. The 1987 study was written by the Office of Market Research and Analysis with the objective of justifying continued use of its "gold standard," the PMM. App. 595-602.[10] While the all-important statistical analysis behind the study has not yet been produced, the admissions against interest in the narrative of the study are compelling. DESC's expert economists admit that using Platts and OPIS to set prices instead of the PMM "would cost DESC money" and concede that "[t]here is market risk associated with the move away from escalation on actual sales [PMM] particularly with respect to jet kerosene [military jet fuel]." App. 599; App. 602. DESC's economists additionally recount in the 1987 study how its suppliers had complained that, as a result of DESC's use of the PMM to set prices after fuel is delivered, "'*we never know if we have made or lost money when you (D[E]SC) lift a cargo.*'" App. 597 (emphasis added); *see also* App. 595 (cover memorandum to the 1987 study stating with respect to the proposed change in using the PMM, "The issue has been raised several times in recent years, formally and informally, by contractors").

---

[9] DESC proffered Mr. Ervin as a witness in response to a Notice of Deposition served under Rule 30(b)(6) in *La Gloria Oil and Gas Co. v. United States*, No. 02-456C (Fed. Cl.). App. 141. The notice directed DESC to designate a witness to address the existence of documents requested in Plaintiff's requests for production of documents. App. 141. Because, pursuant to the terms of the notice, the deposition was limited to the existence of responsive documents, Plaintiff's ability to inquire into the substance of the conclusions of the documents was limited. App. 141. That inquiry must await further discovery.

[10] While this document is attached to DESC's motion, DESC does not specifically identify the document as the 1987 study referred to by Mr. Ervin in his deposition. Final confirmation of this fact awaits further discovery.

12. Once DLA directed DESC to stop using the PMM in 1994 and to set prices using Platts and OPIS instead, DESC made the extraordinary admission that prices previously set using the PMM so departed from market value that they were not even comparable to previously set prices based on Platts and OPIS. DESC stated: "Direct contract price comparisons *are not possible* due to the switch from the monthly interim-final (PMM) escalation method to a weekly market price escalation basis [using Platts and OPIS]." App. 144 (emphasis added).[11] DESC's admission is unsurprising, given that DESC had concluded elsewhere that changing from the PMM to commercial references, such as Platts and OPIS, "could significantly influence contract prices," App. 98, and further found, in response to a proposal from one of its largest suppliers to stop using the PMM, that its "PMM JP-5" jet fuel prices were ten cents a gallon higher, then ten cents lower, and yet again ten cents higher than Platts – all within the same year. App. 182.

## IV. <u>THE NON-NEGOTIABILITY OF DESC'S MILITARY FUEL PRICES</u>

13. Despite DESC's admission that "comparisons are not possible" between the prices it set using the PMM and those set using commercial market references such as Platts and OPIS, DESC had mandated that "[a]ll offerors are required to accept a method of price adjustment based on . . . the Petroleum Marketing Monthly (PMM)." App. 195; *see also* App. 199 (stating that DESC "would not consider" an offer unless objection to the PMM was withdrawn). As Mr. Ervin testified before this Court, DESC used its "leverage as a buyer" as the

[11] For each procurement, DESC prepares a "Price Analysis Memorandum" to determine its price objectives during contract negotiations. *See, e.g.,* App. 144, 150, 154, 157, 163. In determining its price objectives for the procurement, DESC typically considers, under the heading "Price History," the price it is paying under its current contracts. *See, e.g.,* App. 144, 151, 155, 157, 163, 167-68. However, as noted above, when DESC stopped using the PMM and switched to using Platts and OPIS instead, it stated that its usual practice of making price comparisons with its existing contracts was "not possible." App. 144.

sole purchaser of military fuel to "improve the competition" for DESC's business by requiring use of the PMM. App. 17.

14. Accordingly, even though suppliers objected to DESC's use of the PMM as "coerced," App. 201; App. 204, the use of the PMM to set prices was "nonnegotiable as a matter of policy." App. 205. DESC's procurement authorizations expressly stated under the heading "POTENTIAL PROBLEMS" that "common escalation [using the PMM] is non-negotiable." App. 206-278; *Navajo Ref. Co., L.P. v. United States*, 58 Fed. Cl. 200, 214 (2003) ("DESC explicitly stated in its pre-negotiation briefing memoranda that it deemed its price adjustment clause to be non-negotiable"); *see also Barrett Ref. Corp. v. United States*, 45 Fed. Cl. 166, 171 (1999) (supplier "had no control over use of PMM EPA clause, and indeed attempted, unsuccessfully, to persuade the agency not to use it"), *aff'd in part and rev'd in part*, 242 F.3d 1055 (Fed. Cir. 2001). Evidencing the futility of objecting to DESC's pricing clause, even after a supplier filed a claim in 1988 challenging DESC's use of the PMM, DESC continued to use the PMM for six more years, until it was directed to use Platts and OPIS instead. *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed. Cl. 205, 407 (1992).

## V. THE FAILURE OF DESC'S MILITARY FUEL PRICES TO REFLECT FAIR MARKET VALUE

15. While Coastal knew that DESC's use of its adjustable pricing clause and the PMM were non-negotiable, what Coastal did not know was that DOE had not designed the PMM to be used to set fuel prices or to reflect market value. As Dr. John Cook, Director of the Petroleum Marketing Division of the Department of Energy's Energy Information Administration (which publishes the PMM), has since testified and as this Court found: "[T]he PMM is not intended to be an index that is used for setting prices." *Barrett*, 42 Fed. Cl. at 131.

Thus, while "Coastal entered the fuel contracts intending that the prices it would receive would reflect fair market value[,]" Coastal could not have been more wrong. App. 662-63.

16. An assessment of the PMM as an established market price is set forth in the Expert Report of Joseph Kalt[12] and Peter Killen.[13] In the their report, Kalt and Killen conclude that DESC's "PMM-based adjustment clauses failed to provide an effective measure of established market prices or the fair market value of military fuels." App. 610.

17. The following chart, drawn from Kalt and Killen's report, dramatically illustrates the PMM's departure from the marketplace:

[12] Joseph Kalt is the Ford Foundation Professor of International Political Economy at the John F. Kennedy School of Government, Harvard University. App. 608-609.

[13] Peter Killen is a Senior Advisor in the Houston offices of the firm of Muse Stancil & Company, a global consulting firm specializing in the energy industry. He holds a B.S. in Chemical Engineering and is a Registered Professional Engineer. App. 609.

Figure 3

**PMM ADJUSTMENT FAILS TO TRACK THE MARKET:**

**DIFFERENCES BETWEEN MONTHLY CHANGES IN MARKET-BASED ESCALATOR AND PMM-BASED ESCALATOR ARE UNSTABLE IN MAGNITUDE AND DIRECTION**

**February 1983 - March 1995**




Sources: Platts Data; EIA Petroleum Marketing Monthly.

18. The chart illustrates how many cents per gallon the marketplace changed more or less than the PMM during the years DESC used the PMM. App. 632; App. 623[14] If the change

---

[14] As Kalt and Killen explain, it is the change in price levels of the PMM and the marketplace, rather than the absolute prices levels themselves, that are relevant here.

> It is important to note that the PMM is used by the DESC to index *changes* in price levels, rather than the price levels themselves. Because the difference between the price series is not constant—that is, the change in the levels from month to month is not the same—the use of the PMM-based escalator to index final contract prices will cause the prices paid under the DESC contracts to diverge from the prices that would have resulted from use of a market-based escalator.

(footnote continued)

in the PMM were tracking the change in the marketplace, the bars in the chart would be zero or nonexistent. Thus, as the chart shows, not only did the change in the PMM depart substantially from the change in marketplace, but also the PMM's relationship to the marketplace was fundamentally unstable, inasmuch as the change in the PMM substantially understated the change in the market one month and then substantially overstated the market change in the next. As Kalt and Killen explain: "The fact that we see significant bars, with values ranging from approximately -7 cents to approximately +13 cents, indicates that the relationship between the movement of the two series [the PMM and marketplace] is notably unstable." App. 623.

19. Equally compelling, Kalt and Killen explain that the PMM and the marketplace "frequently actually move in different directions [*e.g.*, the market goes up and the PMM goes down] in starkly erratic fashion." App 623. Kalt and Killen demonstrate that the PMM moved in the opposite direction of the marketplace on average "25 percent of the time," while, in each of the years 1987, 1988 and 1992, the PMM moved in the opposite direction of the marketplace 33 percent of the time. *Ibid.*

20. The next chart, again drawn from Kalt and Killen's report, illustrates on an annual basis how much the change in the PMM departed from the change in the marketplace:

---

App. 622 (emphasis original).

Figure 6
THE AVERAGE MONTHLY DIFFERENCE BETWEEN CHANGES IN MARKET-BASED AND PMM-BASED ESCALATORS OVER THE COURSE OF A CONTRACT IS HIGHLY UNSTABLE




*Note: Reference period for 1985 contract assumed to be the same as reference period for 1986 contract.

Sources: Platts Data; EIA Petroleum Marketing Monthly.

21. The height of the bars shows for each year how many cents per gallon, on average, the change in the PMM departed from the change in the marketplace. App. 635; App. 624-25. Thus, the height of the bars shows on average how many cents per gallon the change in DESC's price adjustments would have departed from the change in the marketplace. Once again, not only is the amount of the error significant (in 1986 *understating* the marketplace on average 4 cents a gallon) but both the amount and the direction of the error are erratic (in 1985 the PMM *overstated* the market by one cent a gallon). As Kalt and Killen explain: "[N]ot only did the PMM-based escalator consistently not only fail to represent changes in established market prices, but there was simply no consistency to either the magnitude or direction of the error itself." App. 624.

22. This erratic nature of the PMM is significant, because it made it essentially impossible for a bidder to correctly predict how the PMM would relate to the marketplace and, therefore, to bid in a way that would provide some meaningful protection from the PMM. As Kalt and Killen state:

> This [erratic nature of the PMM] is significant in that the uncertainty and unpredictability of how large and in what direction the PMM-based escalator would be anticipated to vary from changes in actual market value creates a situation in which bidders would find it extremely risky, if not impossible, to accurately anticipate the impact of the error relative to market value introduced by the use of a PMM-based escalator (see also discussion in the next section).
>
> In short, the fact that some years are up and some are down in Figure 6 in comparison to established market prices introduces contract price variation and volatility unrelated to actual changes in market prices in any one contract year. Refiners contracting to sell to the government were thus exposed to risks and movements in price that did not reflect market forces and were highly unpredictable from contract period to contract period. Even knowing, if one could, that last year the PMM-based escalator underperformed the market by some amount would provide no reliable mechanism for forecasting the PMM-based escalator's performance this year.

App. 624-25 (internal paragraph numbering omitted).

23. Kalt and Killen state that there are a number of reasons why the PMM does not reflect the marketplace. Among them, Kalt and Killen explain, "the PMM data were not designed or intended to be used as an index." App. 610. Kalt and Killen show that the PMM suffers from a statistical flaw known as an "index number problem." App. 615-17. This statistical flaw, Kalt and Killen state, results in the PMM erroneously reporting changing in the volume of fuel sold as changes in the price of fuel. Because of the PMM's index number problem, Kalt and Killen conclude:

> PMM data do not contain accurate information needed to understand how the prices of specific products, such as a particular

> grade of military jet fuel, may have changed over time. An index that relies on these data, such as the DESC's PMM-based escalator, is readily susceptible to situations in which the index reports a price increase (or decrease) even though the actual market value of the fuel has declined (or risen) in the marketplace.

App. 616.

24. Significantly, Kalt and Killen point out that, unlike DOE here, other federal agencies that publish indexes intended to be used as price indexes go to great lengths to ensure that the indexes do not suffer an index number problem. Kalt and Killen state:

> It is important to note here that statisticians at government agencies and in other organizations often go to great lengths to address the "index numbers" problem when constructing indices such as the Producer Price Index ("PPI") and the Consumer Price Index ("CPI"), which are used to reflect the underlying changes in price levels for specific products used by producers and consumers. Each of these indices is constructed using fixed weights from period to period such that short-term variation in the mix of products sold is not mistaken for actual changes in the levels of prices.

App. 616-17 (footnote omitted).

25. Beyond the PMM's index number problem, Kalt and Killen further conclude that DESC's PMM-based pricing clause failed to reflect the marketplace because "the formulas used by the government to create the index did not track changes in the value of the military jet fuel." App. 610. As Kalt and Killen explain, DESC simply used the wrong fuels, and thus the wrong PMM data, in its pricing clause. App. 618-20.

26. Thus, for the military jet fuel known as JP-4, DESC based price adjustments on the PMM data for unleaded gasoline and commercial jet fuel, weighted 70 percent and 30 percent, respectively. App. 618-19. However, this combination of unleaded gasoline and commercial jet fuel does not reflect the physical characteristics or market value of JP-4. Kalt and Killen state: "The DESC's simplistic use of a 70:30 ratio of gasoline and kerosene-type jet

fuel prices to proxy for JP-4 market prices is inappropriate for economic price adjustment purposes given the technical and economic considerations of how JP-4 and other refined products are actually produced." App. 619.

27. Kalt and Killen explain that a proper measure of the physical characteristics and market value of JP-4 should not be based on unleaded gasoline and commercial jet fuel but rather on a combination of naphtha and commercial jet fuel. App. 618-20. Notably, both this Court and the Federal Circuit in *Barrett* also concluded, over DESC's objection, that naphtha and not unleaded gasoline was the proper fuel to use for measuring the value of JP-4. *Barrett*, 242 F.3d at 1061 ("However, the government does not dispute the Court of Federal Claims' finding that the naphtha-based index 'provides data that more closely reflect the product [JP-4] Barrett was actually selling.'").

28. For these and other reasons, Kalt and Killen observe that commercial buyers and sellers do not use the PMM as a price index. Kalt and Killen conclude that the PMM simply does not pass the "market test:"

> Despite the DESC's assertion that the PMM is the best measure of changes in market value because it covers 100% of sales, it is telling that independent third-party buyers and sellers do not utilize the PMM data as a price index for their commercial Jet A contracts. This "market test" reinforces the conclusion that a PMM-based escalator of the type used by the DESC is simply not suited to represent actual movement of established market price for any fuel, much less military jet fuel. In fact, when commercial parties seek by contract to have contract prices track actual market conditions, it is common for them to utilize spot prices for fuels covered by the industry trade press as indexing devices.

App. 618 (footnote omitted).

## VI. DESC'S MINORITY PRICE PREFERENCES AND FUEL CONTRACT AUCTIONS

29. Beyond DESC's use of the PMM to set military fuel prices, DESC distorted the market price for fuel in two other ways. First, DESC provided a ten-percent price preference to minority-owned suppliers. Under this price preference, DESC awarded fuel contracts to minority-owned suppliers if their bids were within ten percent of that of the otherwise successful bidder. Def. Supp. App. 5-7; Second Amended Complaint at ¶ 32. In some years, more than twenty percent of the fuel offered (as a percent of that purchased) was subject to DESC's minority price preference. App. 279 (showing volumes offered by minority firms with the designation "SD" and total volume awarded in the procurement); App. 283 (same); Second Amended Complaint ¶ 32.

30. Second, DESC conducted an auction for fuel contracts, whereby DESC offered fuel contracts to suppliers that agreed to match the price, or adjusted price, of other bidders. Under this auction, DESC awarded contracts to small businesses willing to match the price, or adjusted price, offered by the otherwise successful bidder. Def. Supp. App. 5-7; Second Amended Complaint at ¶ 31. More than forty percent of the fuel DESC procured commonly was set aside for award to small businesses. App. 286; Second Amended Complaint ¶ 31. Both DESC's minority price preference and its auction, by their very nature, placed downward pressure on bid prices, as non-minority and non-small businesses were forced to compete on an uneven playing field. Second Amended Complaint ¶ 33.

## VII. WAIVER

31. Coastal entered the fuel contracts with the intent that the prices DESC set would reflect fair market value. App. 662-63.

32. DESC maintained that the way it set fuel prices was non-negotiable and that its fuel prices reflected fair market value throughout its contracts. In entering the fuel contracts, Coastal understood that it could not be a fuel supplier to DESC unless it accepted the way DESC set prices. Coastal continued to enter fuel contracts with DESC because Coastal sought to continue to be a supplier to DESC. App. 662-63.

33. By continuing to enter fuel contracts with DESC, Coastal did not intend that it would be paid less than the fair market value of fuel or at any time intend to relinquish the right to payment of fair market value. App. 662-63.

34. Coastal was not aware at the time it entered the fuel contracts that DESC awarded the contracts in violation of law. Coastal submitted claims under the fuel contracts beginning in 2000 when it first learned that remedies were available to permit payment of fair market value in accordance with Coastal's intent in entering the contracts. App. 662-63.

35. As Kalt and Killen explain in their Expert Report, while Coastal entered a large number of contracts with DESC, "Coastal had at most 11 annual observations (bids for DESC contracts from 1984 through 1994) from which to draw its inferences" about the PMM. App. 628. Eleven observations, Kalt and Killen explain, are not enough to determine a consistent bias in the PMM or assess how the PMM will perform during any specific contract period, particularly since the PMM's relationship to the marketplace was "neither stable nor predictable." App. 626.

36. Kalt and Killen provide the following example:

> For example, over a shorter period of time, a bidder might observe a number of periods in which the PMM-based escalator is biased in such a way that it tends to under-represent upward movements in prices. However, this pattern does not permit the conclusion that the bias will always be in this same direction or even in the same direction in the next round of contracting. In fact, it would not be

> unusual to observe repeated runs of results that do not fairly approximate the result expected over the long run even in any otherwise unbiased game.
>
> Consider, for example, a repeated coin flip. Assuming a fair coin, the expectation is that a flip would result in a heads result 50% of the time. And in fact, over a large number of samples, this is undoubtedly true. However, as is the case here, over a much smaller set of flips, it is quite possible to find repeated runs of heads in apparent defiance with statistical expectations. In fact, as we contemplated illustrating our point here, we performed this experiment and ended up with a repeated run of 8 heads in a row and 15 heads out of 20 coin flips. Although we did not expect the process of coin flipping to be biased, and there is no basis for presuming the coin we used was biased, we certainly found ourselves in a situation in the short run where, had we predicted 50% tails, we would have lost our "bet."

App. 627 (internal paragraph numbers omitted).

37. Thus, Kalt and Killen conclude with respect to the eleven bidding cycles Coastal confronted: "As described in the coin flip example above, over such a small data sample, it would be impossible to predict that the observed variation or bias reflects the true bias." App. 628. If Coastal could not predict "true bias," then it cannot be presumed here that Coastal intended to relinquish the right to payment of fair market value.

38. Furthermore, given the PMM's random variation with respect to the marketplace, a supplier might well be expected to "alternatively over- or under-predict the bias," thereby further complicating a supplier's assessment of the PMM's true bias. App. 628. As Kalt and Killen explain:

> The typical response of a bidder to the uncertainty around the bias introduced by the DESC's use of a PMM-based escalator would be to try to forecast this bias by reference to some set of historical prices. Assuming that the deviation of PMM-based escalators from actual market price escalators was a random walk, bidders might, for example, assume that the bias observed in past periods would be present in future periods. In the absence of any better information, this may be a reasonable assumption; however, this forecasting approach does not necessarily lead to consistent after-

> the-fact results due to the unstable nature of the bias introduced by the DESC's use of a PMM-based escalator. Using the past relationship between the PMM-based escalator and a market-based escalator to forecast the future relationship will alternatively over- or under-predict the bias. For example, when the bias is high in one year, the forecast bias for the next year is likely to be too high given the limited availability of data as to the "true" relationship.

*Ibid.*

39. Accordingly, Kalt and Killen reject DESC's assertion that, through entering a series of contracts with DESC, Coastal must be deemed to have intended to relinquish payment of fair market value. Kalt and Killen state: "Such assertions ignore that a company such as Coastal, based on the information available at the time that it bid, could not have understood that its bids would consistently receive less than fair market value." App. 625-26.

40. DESC threaten essentially the entire U.S. refining industry *in writing* with claims of *fraud* should refiners pursue the same claims the Federal Circuit upheld in *Barrett*. App. 563-94.

Respectfully submitted,

s/ J. Keith Burt
J. Keith Burt
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006
(202) 263-3208 (phone)
(202) 263-5208 (fax)

Attorneys for Plaintiffs,
El Paso Merchant Energy – Petroleum Co., Coastal Aruba Refining Company, N.V., Coastal Eagle Point Oil Company and Pacific Refining Company

*Of Counsel:*

Adrian L. Steel, Jr.
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006

John Loomis Shoemaker
El Paso Corporation
Suite 1839
1001 Louisiana Street
Houston, TX 77002

December 14, 2005