IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 02-1094C
(Judge Block)

EL PASO MERCHANT ENERGY PETROLEUM COMPANY et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT AND SECOND SUPPLEMENTAL APPENDIX

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Department of Justice
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

DONALD S. TRACY
Trial Attorney
Defense Supply Center Richmond
Richmond, VA 23297

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

February 27, 2006

## TABLE OF CONTENTS

PAGE(S)

FACTS . . . . . . . . 3

ARGUMENT . . . . . . . . 9

I. DESC's EPA Clauses Are Authorized by FAR 16.203-1 . . . . . . . . 9

A. EPA Clauses Need Not Be Based Upon Plaintiff's Own Prices . . . . . . . . 9

B. DESC's PMM-Based EPA Clause Is Legal . . . . . . . . 10

C. El Paso's FAR 15.802(b) Allegation Does Not State A Cause of Action . . . . . . . . 14

II. El Paso's Alternative Illegality Theories In Counts II-VI Must Be Dismissed . . . . . . . . 16

A. Count II (Misrepresentation) . . . . . . . . 16

B. Count III ("Breach of Contract") and Count IV ("Implied-In-Fact Contract") . . . . . . . . 17

C. Count V ("Failure of Consideration and Frustration of Purpose") . . . . . 18

D. Count VI (Mistake) . . . . . . . . 18

III. El Paso's Takings Claim Should Be Dismissed . . . . . . . . 19

IV. El Paso's Small Business Program Complaints Must Be Dismissed . . . . . . . . 21

A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint . . . . . . . . 21

B. DESC's Small Business Program Is Not Improper . . . . . . . . 23

V. Waiver and Estoppel Bar El Paso's Claims . . . . . . . . 25

A. Introduction . . . . . . . . 25

B. El Paso has Waived As A Matter Of Fact . . . . . . . . 27

C. El Paso has Waived Its Claims As A Matter Of Law . . . . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## SUPPLEMENTAL APPENDIX

Excerpt from deposition of John Cook, dated July 29, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Excerpt from deposition of Jacob Bournazian, dated December 3, 2003 . . . . . . . . . . . . . . . . . . . 7

Form EIA-782A ("Refiners'/Gas Plant Operators' Monthly Petroleum Product Sales Report . 9

A Comparison of Selected EIA-782 Data with Data From Other Sources, by
Jacob Bournazian . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Comptroller General Opinion re: DFSC Small Business Set-Aside Procurements . . . . . . . . . . . 35

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

American Telephone and Telegraph Co. v. United States,
307 F.3d 1374 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

American Telephone & Telegraph Co. v. United States,
177 F.3d 1368 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38

Armstrong v. United States, 364 U.S. 40 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Barrett Refining v. United States,
242 F.3d. 1055 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Barrett v. United States,
50 Fed. Cl. 567 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Beta Systems, Inc. v. United States,
838 F. 2d 1179 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Brooklyn Sav. Bank v. O'Neill,
324 U.S. 697 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Cessna Aircraft v. Dalton,
126 F.3d 1442 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Chris Berg, Inc. v. United States,
426 F. 2d 314 (Ct. Cl. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Clark v. United States,
95 U.S. 539 (1877) . . . . . . . . . . 27, 28

Coflexip & Servs., Inc. v. United States, 961 F. 2d 951, 952-953 (Fed. Cir. 1992) . . . . . . . . . . 22

Costanza Coal Min. Co. v. Weirton Steel Co.,
150 F.2d 929 (4th Cir. 1945) . . . . . . . . . . 39, 40

Dairyland Power Cooperative v. United States,
16 F.3d 1197 (Fed. Cir. 1994) . . . . . . . . . . 18

DGS Contract Services, Inc. v. United States, 43 Fed. Cl. 227, 239 (1999) . . . . . . . . . . 23

E. Walters & Co., Inc. v. United States,
217 Ct. Cl. 576 F.2d 362 (1978) . . . . . . . . . . passim

E. Walters & Co., Inc. v. United States,
576 F.2d 362 (Ct. Cl. 1978) . . . . . . . . . . passim

Federal Crop Ins. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . 39

Federal Elec. Corp. v. United States,
486 F.2d 1377 (Ct. Cl. 1973) . . . . . . . . . . 33

General Eng'g. & Mach. Works v. O'Keefe,
991 F. 2d 775 (Fed. Cir. 1993) . . . . . . . . . . 40

Gould v. United States, 67 F.3d 925 (Fed. Cir. 930 (Fed. Cir. 1995) . . . . . . . . . . 21, 22

Hartford Accident & Indem. Co. v. United States,
127 F. Supp. 565 (Ct. Cl. 1955) . . . . . . . . . . 35

Hermes v. United States,
58 Fed. Cl. 409 (2003) . . . . . . . . . . passim

Integrated Logistics Support Systems, Int'l v. United States, 42 Fed. Cl. 30 (1998) . . . . . . . . . . 20

LaBarge Prods., Inc. v. West,
46 F.3d 1547 (Fed. Cir. 1995) . . . . . . . . . . passim

La Van v. United States, 382 F.3d 1340, 1352 (Fed. Cir. 2004) . . . . . . . . . . 19

Ling-Temco-Vought, Inc. v. United States,
201 Ct. Cl. 135, 475 F.2d 630 (1973) . . . . . . . . . . passim

Louisville and Nashville R.R. Co. v. Cent. Iron and Coal Co.,
265 U.S. 59 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 39

MAPCO Alaska Petroleum, Inc. v. United States,
27 Fed. Cl. 405 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Millmaster Intl. Inc. v. United States,
427 F. 2d 811 (Cust. Ct. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc.,
473 U.S. 614 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Nautilus Shipping Corp. v. United States,
141 Ct. Cl. 391 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Northern Helex Co. v. United States,
197 Ct. Cl. 118, 125-26 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Osprey Pacific Corp. V. United States, 41 Fed. Cl. 250 (1998) . . . . . . . . . . . . . . . . . . . . . . . . 20

PCL Construction Services, Inc. v. United States,
41 Fed. Cl. 242, 252 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Pi Electronics Corp. V. United States, 55 Fed. Cl. 279 (2003) . . . . . . . . . . . . . . . . . . . . . . . . 20

Pittsburgh C.C. & St. L. Ry. Co. v. Fink,
250 U.S. 577 (1919) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 39

Rough Diamond Co. v. United States,
351 F.2d 636 (Ct. Cl. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Safeco Credit v. United States,
44 Fed. Cl. 406 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Shearson/American Express, Inc. v. McMahon,
482 U.S. 220 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Short Bros., PLC v. United States,
65 Fed. Cl. 695 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Shutte v. Thompson,
82 U.S. 151 (1872) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Sola Electric Co. v. Jefferson Electric Co.,

317 U.S. 173 (1942) . . . . . 39

Sprague Steamship Co. v. United States,
172 F. Supp 674 (Ct. Cl. 1959) . . . . . 30

Tesoro et al. v. United States,
405 F. 3d 1339 (Fed. Cir. 2005) . . . . . passim

Thomas v. United States,
125 Ct .Cl. 76, 80 (1953) . . . . . 31

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) . . . . . passim

Union Pacific Railroad Co. v. United States,
847 F.2d 1567 (Fed. Cir. 1988) . . . . . 35

United States v. Mezzanatto,
513 U.S. 196 (1995) . . . . . 31

United States v. Wurts, 303 U.S. 414, 415 (1937) . . . . . 19

Urban Data Sys., Inc. v. United States,
699 F.2d 1147 (Fed. Cir. 1983) . . . . . passim

Whittaker Electronic Systems v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) . . . . . passim

**STATUTES AND REGULATIONS**

15 U.S.C. § 644 . . . . . 25

15 U.S.C. § 772 . . . . . 13

41 U.S.C. § 423 . . . . . 23, 24

DAR § 1-1502(b) . . . . . 34

FAR § 15.402(a) . . . . . passim

FAR 15.404-1(b)(2)(I) . . . . . 15

FAR § 15.802(b) . . . . . passim

FAR § 15.804-3 . . . . . 13

FAR § 16.203-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

FAR § 16.203-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

FAR § 16.203-4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

FAR 52.219-7(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**MISCELLANEOUS**

Restatement (Second) of Contracts § 178 . . . . . . . . . . . . . . . . . . . . 32

Nash and Cibinic, Formation of Government Contracts (3rd Ed. 1998) . . . . . . . . . . 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| EL PASO MERCHANT ENERGY-<br>PETROLEUM COMPANY et al., | ) | |
| Plaintiffs, | ) | No. 02-1094C<br>(Judge Block) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THE COMPLAINT

In our moving brief, we demonstrated that Plaintiffs' complaint attempted to clone the cause of action at issue in MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992), which held that that DESC's jet-fuel contract price escalation Clause B19.33 was inconsistent with the Federal Acquisition Regulation ("FAR"). In Tesoro et al. v. United States, 405 F. 3d 1339 (Fed. Cir. 2005), *petition for reh'g. en banc denied*, No. 04-5064 (Fed. Cir. Aug. 22, 2005) ("Tesoro"), the court of appeals abrogated MAPCO, holding that B19.33 had been legal all along. The court explicitly rejected the contractors' contention, repeated here, that B19.33 was illegal because it was based upon "indexes rather than on Plaintiffs' own established fuel prices;" and because it used the Department of Energy's Petroleum Marketing Monthly ("PMM") as a price reference. As our moving brief explains, the standard Tesoro established for economic price adjustment ("EPA") clauses also effectively disposes of El Paso's miscellaneous complaints concerning the legality of its contracts' EPA clauses, because it makes clear that the various tests El Paso would have these clauses pass simply do not exist. In fact, the court held, in order to pass muster under FAR 16.203-1, EPA clauses need only rely upon "industry-based prices," which "may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347.

In response El Paso amended the complaint to assert that the contracting officer had an obligation to assure El Paso was paid "fair and reasonable prices, pursuant to FAR 15.802(b) (currently codified at FAR § 15.402(a))" (see Compl. ¶ 49); yet, still clung to allegations squarely rejected by Tesoro (that the escalation clause must be based upon El Paso's own prices) or those that invoke requirements found nowhere in the law (that EPA clauses must be "designed or intended" to set prices and "reflect at least the fair market value of military fuel"). As our motion explains, these allegations do not invoke a proper legal test for EPA clauses and, therefore, fail to state a claim upon which relief can be granted.

El Paso also clung to its common-law allegations which, although allegedly grounded in the parties' understandings and commitments, lack a factual basis -- one that might establish the essential unrequited promise or understanding that typically undergirds such allegations. Their deficiency is unsurprising, because, as our motion explains, they are but thinly-disguised restatements of the Count I complaints, which, in turn depend upon MAPCO for their vitality. Accordingly, with regard to these allegations too, there simply is no relevant fact that El Paso possessed or envisioned that can transform these counts into authentic common law claims.

We also explained that, regardless of the above, El Paso abandoned any rights the FAR might have conferred upon it, and El Paso forfeited any right it might have had to test those rights in litigation when it waited as many years as it did to file the necessary claims. In doing so, we relied upon this Court's decision in Hermes v. United States, 58 Fed. Cl. 409 (2003) ("Hermes II"), which held that the contractor that brought a suit identical to this one no longer could pursue its illegality-based claims. As we demonstrated, El Paso's rights with respect to its derivative claims are indistinguishable and also should be dismissed.

El Paso responds with a broadside attack upon the PMM itself, based upon incomplete

quotations, innuendo, and a report from its consultants quibbling with the use of the escalation clause that the parties agreed to use. Absent from the report's theoretical discussion is a report of actual harm *to El Paso* and an acknowledgment that the court of appeals has determined that the clause is *legal*, even if not to the liking of El Paso's pricing advisors. El Paso's efforts to resuscitate the complaint via common law complaints of mistake, misrepresentation, breach, frustration of purpose and the lack – premised on the very same lack of "fair market" element to its contracts, and absent traditional allegations of agreement-based, unrequited expectations – fare no better. That is so, because a cause of action that has, at its root, the existence of a right that does not exist (the right to an EPA clause based upon its own prices, or one based upon "fair market value") does not get stronger by adding further elements of proof. The other basis of El Paso's response is that it "requires discovery." As we explain in our separate response to Plaintiffs' RCFC 56(f) motion, El Paso's motion demonstrates that it "requires discovery" only to discover its own case and other matters that are untethered to legal causes of action. Accordingly, El Paso is not *entitled* to discovery and cannot plead lack of discovery to prevent the termination of this litigation.

## FACTS

El Paso continues to rely upon the same partial quotations and quaint charges of Government scheming pedaled in its opposition to our motion for partial summary judgment. To this, El Paso adds a consultants' opinion concerning the performance of the PMM, also built-upon unfounded premises, and a conclusory statement from one of plaintiffs' officials declaring that plaintiffs intended to receive legal prices and fair market value. See Compl. ¶¶ 20-25; Pl. Br. 5-8. In general, Plaintiffs' logic-bending story is that: DESC knew that its use of the PMM was corrupt; DESC had concluded that the price of fuel would, in the future, move in one

direction; the PMM and all of the references DESC used would report movement in the opposite direction; that movement always would favor DESC's customers; and, somehow, the fuel industry never would detect this or, upon learning it, would bid eagerly nonetheless.

Plaintiffs' story begins with the Energy Information Administration ("EIA"), the author of the PMM. Among Plaintiffs' favorite allegations and a pillar of its complaint is that the EIA has acknowledged that the PMM was not "intended to be an index that is used for setting prices." Pl. PFF 15. The implication is that the PMM is *unsuitable* or *illegal* for use as a price reference. What plaintiffs avoid quoting is the testimony of the EIA's Dr. Cook on *that* point, which was:

> We're not opposed to [the PMM] being used for that purpose. We don't, per se, collect the data and justify its collection with OMB for that specific use. We justify its collection on the basis of its general value in measuring actual average prices, wholesale and retail, for everything from crude oil from the wellhead to the pump for state energy offices or various federal agencies, and most especially for Congressional committees for analysis purposes, forecasting, market tracking, all those uses. It's, it's, it happens to be useful, according to oil companies and DFSC for indexing, as well, but we didn't specifically design it for that.

Second Supplemental Appendix ("SA2") (attached to this brief) at 5 (Tr. 632, l. 14).

El Paso also assert that the PMM is illegal because it suffers from an "index number problem." An index number problem refers to an "index" that contains two or more products whose relative prices or quantities are changing. The basis for this argument is El Paso's consultants' assertion that the PMM "uses current-period volume weights; that is, the reported sales prices are weighted by the actual sales volumes of different products and in different locations in each period." Pl. App. 614-15. They also assert that "the price data reported in the PMM often represent an aggregate of multiple different fuels sold across many locations." (Apparently, the consultants mean the product mix changes). However, as Mr. Bournazian

explained to plaintiffs' counsel, during a deposition in La Gloria v. United States, No. 02-465 (Fed. Cl.), the price data at issue is not an index, which is "a ratio of two numbers." SA2 8. Moreover, the article cited does not mix fuel products. It studies the different types of fuel separately, including "U.S. Kerosene-Type Jet Fuel." SA2 22-7. Indeed, as the contracting officer has explained "PMM price averages are based on petroleum product sales information reported to DOE and grouped by product, type of sale, states, and by geographic region." Def. Exh. 1 (Walker Decl. ¶ 12). The EIA Form 782A, which collects that information, confirms as much. SA2 9-20. It provides strict requirements that require the segregation of product sales reports. Thus, kerosene-based jet fuel is reported on one line of the form, while different types of gasoline and diesel fuels have their own lines.[1]

Another pillar of El Paso's argument is its allegation that DESC breached an obligation to the contractors by failing to disclose that it worked with DOE "to see that our needs were met." Pl. Br. at 37, n.36; see also Pl. Br. at 4, n.8. However, the document upon which the assertion relies, Pl. App. 100, is taken out of context. As plaintiffs' next document explains, DESC asked that EIA employ a "phased-in" approach to a new PMM format EIA was developing. DESC suggested that this could take the form of a dual reporting scheme in which EIA proceeded with its new method, but also included the old method until existing DESC contracts relying on the old method expired. Pl. App. 101-02. This hardly affected the contracts

---

[1] Thus, this reporting is different than that that might be encountered with a true "index," such as the Consumer Price Index, which is based upon a "market basket" of different items. See, generally, http://www.bls.gov/lpc/lprdho95.pdf (Bureau of Labor Statistics paper on the index number problem); http://www.imf.org/external/np/sta/tegppi/ch15.pdf (International Monetary Fund paper addressing the question of "How exactly should the microeconomic information involving possibly millions of prices and quantities be aggregated into a smaller number of price and quantity variables? This is the basic index number problem").

at issue or implicated a legal duty owing the Government's fuel suppliers.

Lacking any proof of the PMM's inherent illegality, El Paso asserts that DESC concluded as early as January, 1986, that PMM prices moved as much as one or two cents per gallon out of step with other market references, did not disclose this to its suppliers, and continued to use PMM prices despite this knowledge. Amend. Compl. at ¶¶ 20-21; Pl. Br. 5. But, that movement was well known by both parties, i.e., that various *interim* references (those used to provide a price adjustment while final PMM numbers for the month were being compiled by EIA), yielded *different* figures than the PMM and could over or under-predict the final price adjustment due. For that very reason, the contracts with PMM EPA clauses provided for final price adjustments, to be made when the applicable PMM prices were published. Such a two-step payment procedure would have been unnecessary if the references were identical. Thus, El Paso knew from its many interim and final payments that reference prices differed.[2] See PFF 15.[3]

Another pillar of the complaint is the assertion that DESC studies concluded that its use of the PMM was improper. We have described these in PFFs 18-25. For example, the complaint alleges that a 1987 DESC study concluded that " . . . PMM did not protect against market fluctuations and did not ensure that the prices DESC paid for military fuel under the long term

---

[2] Plaintiffs' attempt to infuse some significance to the difference between the PMM and other price references by asserting that DESC required its suppliers to submit bids to the one ten-thousandth of a cent. DESC did not "require" that offerors ". . . submit bids to sell military fuel to the one-ten-thousandth of a cent ($.000001)." Compl. ¶20; Pl. Br. 5. DESC only evaluated offers to that decimal place. Bidders were free to, and often did, submit bids to two decimal places, such as $.35, or .60, or .70 per gallon of fuel.

[3] Plaintiffs' "Statement of Genuine Issues" denies PFF 15, "pursuant to Rule 56(f)." El Paso cannot seriously claim a need for discovery regarding whether its contracts contained interim and final price adjustments. In fact, its own Appendix contains a contract specifying them, precisely as set forth in PFF 15. Pl. App. 668-69.

contracts reflected at least fair market value" and that "DESC did not disclose this 1987 study to its suppliers . . . ." Compl. ¶¶ 22, 23. See also Pl. Br. 5 (the "study supported using the commercial price references Platts and OPIS to make price adjustments-not the PMM"). In fact, the study found that the PMM was adequate for price adjustment purposes and, in some respects, superior to commercial trade publication prices. PFF 19-25. The study concluded that DESC should continue using PMM prices, but modify the system to use a published PMM reference price instead of an unpublished price. PFF 25.[4]

To avoid the 1987 study's actual conclusions, El Paso relies upon out of context quotations from the report. For example, El Paso cites a supplier's statement that "we never know if we have made or lost money when you (D[E]SC) lift a cargo." El Paso fails to explain that the comment concerned the interim-final price adjustment issue, not the use of PMM *per se*. See, SA 21, Background. Similarly, El Paso cites a DESC statement that use of trade journals "would cost DESC money" and that there would be "market risk" if adjustments were based on trade journal prices for "jet kerosene." But, the quotations were based upon flaws with the trade journals, not advantageous flaws in the PMM. The "market risk" stemmed from DESC's analysis that trade journals reported unrealistically high prices ("price stickiness") during periods of declining prices. PFF 23; SA 23. Another "market risk" noted was the availability of only a single trade journal reporting "jet kerosene" prices, and the risk that it might discontinue publication. PFF 19; SA 23.

[4] Plaintiffs' allegation that "DESC did not disclose this study to its suppliers" is undercut by the very evidence it offers on that point. See Pl. App. 596 (handwritten note on cover memorandum to "proposed final draft" shows that some suppliers were canvassed on the proposal to continue using PMM prices with an earlier base reference price. ("Option II industry survey-Barrett, Pride, Chevron, Dia. Sh.-great idea! Calcasieu-indifferent Sun, West. Pet, Gladieux, Peerless, AIRI-won't hurt-might help")).

Plaintiffs' reliance upon out-of-context statements from DESC documents also extend to a 1994 price analysis memorandum. As El Paso explains it, DESC admitted that its use of PMM prices had "distorted military fuel prices materially" and that " prices it had previously set using the PMM so departed from market value that they could not be compared to prices set based on Platts and OPIS." Compl. ¶ 25; Pl. Br. 7. In fact, these quotations concern the unremarkable proposition that it was not possible to directly compare prices between contracts where the price adjustment references differed, with one contract adjusted using monthly PMM prices and interim adjustments, and the other using weekly adjustments. App. 144.

To round out its conspiracy tale, El Paso alleges that "seven years later, in 1994, senior officials at DLA learned of DESC's 1987 study, and, upon review of the study, directed DESC to stop using PMM to set military fuel prices." Compl., ¶ 24. However, it was DESC, not senior DLA officials, which, in 1994, first sought a FAR deviation to begin using trade publication prices for price adjustments. PFF 26, 27. DESC did so, not because it had concluded that refiners were not receiving "fair market value," but upon some of the same criteria that had been set out in the 1987 study, including the elimination of the need for interim price adjustments, the wide acceptance of trade publication prices by industry, and the relative simplicity of the use of trade publication prices. PFF 27. The apparent basis for plaintiffs' theory is the deposition testimony of Lawrence Ervin that the change from PMM prices to trade journal prices "was made in response to some pressure from headquarters to do things differently." SA 36. However, as he explained, the basis was DLA's hope that changing from PMM prices to Platts would "produce substantial savings to the taxpayer." Id. El Paso cannot explain how DLA would expect to produce "substantial savings to the taxpayer" while at the same time eliminating the use of PMM that, according to El Paso, underpaid suppliers.

In addition to being untrue, the allegations added to this lawsuit through the second amended complaint add no legal weight to El Paso case. At best, they concern the relative merits of various price references - a discussion left to the realm of economists and fuel-industry analysts -- not the parties to a contract years after their contracts have been fully performed.[5]

## ARGUMENT

I. DESC's EPA Clauses Are Authorized by FAR 16.203-1

In Count I, El Paso asserts: (1) that the clauses were illegal because there were not based upon "Plaintiffs' own established fuel prices" (Compl. ¶ 47); (2) that the clauses were illegal because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 48); and (3) that the contracts were awarded in violation of FAR § 15.802(b) (currently codified at FAR 15.402(a)) (contracting officer's duty to review offers for price reasonableness) (Compl. ¶ 49).

A. EPA Clauses Need Not Be Based Upon Plaintiffs' Own Prices

As explained in our moving brief, the Tesoro, the court explicitly rejected El Paso's first argument, holding that the theory that "FAR 16.203-3 requires that adjustments be based only on changes in the prices charged by individual contractors eviscerates the regulatory meaning of the term 'established prices' and the policy reasons for using it." Id. Summarizing, the court explained that: "According to the interplay of all four sections of FAR § 16.203, a 'contractor's established price' may be established by reference to either a catalog or market sources independent of the manufacturer or vendor." Id. at 1347 (emphasis added).

---

[5] Notably, none of the additional evidence found in the second amended complaint concerns the contracts that contained price references other than the PMM. Accordingly, there is no basis for further proceedings concerning those contracts.

El Paso's only rebuttal to this point is its assertion that Tesoro was wrongfully decided, and that Barrett Refining v. United States, 242 F.3d. 1055, 1060 (2001), provides the proper rule of decision. Pl. Br. 20, n. 21. However, that argument was examined in Tesoro and rejected. Tesoro, 405 F. 3d 1345 (noting that the Barrett court was not presented with the issue of legality). Accordingly, that argument appears to have reached an end – at least in this Court.

B. DESC's PMM-Based EPA Clause Is Legal

In Tesoro, the court did not stop with the question of whether, in general, an EPA clause not based upon the contractor's own price would be illegal, because the argument presented to it (especially given reliance upon MAPCO) concerned the nature of the PMM. Accordingly, the court of appeals explicitly considered whether DESC's PMM-based EPA clause was an "established prices" clause and held that it was. Our moving brief quoted at length from Tesoro. It demonstrated that the court stated that it was considering the legality *of the PMM* (e.g., the certified question for interlocutory review was "Did DESC establish the price of fuel in violation of law by employing economic price adjustment clauses indexed to PMM?" (id. at 1342 (emphasis added)), and considered various of the factors cited by MAPCO, as the basis for *its* holding the PMM was not an "established prices" clause (e.g., that the PMM was an "amalgamation of the previous month's sales data" and, as such, did not comport with the dictionary definition of "established").

Summarizing the sweep of its review, the court of appeals concluded:

> Because we conclude that DESC's use of a market-based EPA clause tied to the PMM was authorized under the FAR, we do not reach the other issues raised in the certified questions . . . . Our holding that the use of the PMM-based EPA clause was authorized under the statute moots the issue [of waiver].

* * *

> For the foregoing reasons, we hold that the Court of Federal Claims erred in holding that DESC's use of a PMM-based EPA clause was not authorized under the FAR.

Id. at 1348-9 (emphasis added).[6]

In the trial-level decisions that led to Tesoro, the plaintiffs disagreed concerning whether the PMM could be considered an "established prices" clause, arguing that the PMM was only an amalgamation of prices, was not based upon actual sales of jet fuel, and so forth. See, e.g., MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992). Neither the various trial courts nor the court of appeals found a genuine issue that might have precluded a judgment in our favor. Nor did these courts posit that there was a further test of what it means to be "market-based." The plaintiffs in Tesoro certainly never suggested that the PMM or any of the various references were not market-based. Nor does the purpose of the EPA clauses themselves. As we have explained in earlier briefings, the FAR's bias is for competition. Nothing provides a less-assailable ground for competition than firm-fixed prices. To permit an exception – one that allows the winning bidder of a single, price-based competition to escape that price for subsequent sales, yet be the sole supplier for those subsequent lots – potentially eviscerates a competition-based system. Accordingly, to assure that prices remain tethered to the competition, the FAR requires that escalators be independent of the contractor's prices and be permitted only when the nature of the sale requires it (such as the sale of as volatile a commodity as fuel). As the court explained it, "the policy behind requiring use of 'established prices' is to avoid

[6] El Paso reads too much into the comment in our appellate brief that we did not consider the appellate court's review to be a "beauty contest" of individual price references. Indeed, we did not and do not here, because it is not for the courts to determine whether one EPA clause is better than another from a business, pricing or economic standpoint. That choice is the agency's and can be voided only upon a finding that it is illegal. In any event, our argument does not dictate how the court itself actually decided the appeal.

contracts subject to the operational whims of individual contractors." Tesoro, 405 F.3d at 1347.

Even if the court intended to effect a *sub silentio* remand on the question of whether the PMM was a market-based test, the FAR itself requires nothing more than the clause be "market-based" – not that it move with Platts or that it meet any particular standard of precision. Indeed, El Paso offers no new legal standard. Rather, it simply seeks to remove the unambiguous standard the parties agreed upon years ago.[7] And, rooted as it is in the *post hoc* arguments of economists and industry-watchers, El Paso's approach relegates the parties to observers, not makers, of their agreements. Nonetheless, the complaint asserts that the PMM clauses could not be legal, because they were "not market-based, were not designed or intended to be used to set or adjust prices, and did not reflect at least the fair market value of military fuel" (Compl. ¶ 48). As we noted in our moving brief, these standards cannot be found in the regulation or in Tesoro. Rather than defend the sufficiency of these proferred legal tests, El Paso relies upon the opinion offered by its consultants concerning an appropriate price reference. The difficulty with relying upon opinions, even if taken as fact, is that, absent a legally-cognizable cause of action, the facts are immaterial to a court of law. Here, the materiality of the report rests upon El Paso plumbing some depth in the simple regulatory requirement that an EPA clause be "market-based."

Plaintiffs' effort in that regard comes up empty, because Tesoro levied no greater standard than was sufficient to find that the PMM was market-based -- a finding it was able to make, based upon the simple facts before it. In our moving brief, we established that the PMM

---

[7] Plaintiffs' reference to Beta Systems, Inc. v. United States, 838 F.3d 1198 (Fed. Cir. 1988) does not supply that standard either. At issue there was a Defense Department FAR supplement not applicable here, which supplied specific criteria for cost index-type clauses. Indeed, the existence of such a detailed provision suggests that, if the agencies had wished to further regulate EPA clauses to the degree El Paso suggests, they would have done so. Where the regulating authorities having stayed their hand, the Courts should not be tempted to regulate.

was "market-based." Among other things, we included (as we have here) the statute that requires refiners and sellers of petroleum products to report actual sales data to DOE. 15 U.S.C. § 772. It is this data upon which the PMM is based. See Def. PFF 14. Because the prices are established in sales between fuel sellers and buyers, it surely can be said that the EPA clause was based upon market prices, and satisfy the FAR 15.804-3 requirement that market prices be established in the ordinary course of business between buyers and sellers free to bargain.

The premise of El Paso's consultants' report is that the base reference price must report the very same end products as those being sold. But, that is not required. FAR 16.203-1(a)(1) requires only that adjustments based upon established prices be "based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items." Thus, the prices of the precise end items need not be used. To the same effect, FAR 16.203-4(b) ("Adjustment based on established prices -- semistandard supplies") acknowledges that EPA clauses are appropriate for "semistandard" supplies, defined as those for which "the prices can be reasonably related to the prices of *nearly equivalent standard supplies* that have an established catalog or market price." Emphasis added. Thus, El Paso's insistence that the products sold (admittedly, different to a degree) need by tracked by the established prices of those products lacks merit. Here, for example, in the case of JP-4 fuels, Mr. Schink explained that JP-4 is a naphtha-based jet fuel. Def. Exh. 2 ¶ 3, 8. Because naphtha is not reported by PMM, the contract provided that the price of compositionally-related fuels would provide the benchmark for price adjustments. Because naptha is a component of gasoline that can be blended into JP-4, or can be further upgraded for inclusion into gasoline, it was selected

as the near equivalent.[8]

C. El Paso's FAR 15.802(b) Allegation Does Not State A Cause of Action

In our moving brief, we demonstrated that Plaintiffs' effort to root its core complaint in a violation of FAR § 15.802(b) (currently codified at FAR 15.402(a)), does not state a claim upon which relief can be granted, because it does not create an enforceable right for contractors.[9] See Short Bros., PLC v. United States, 65 Fed. Cl. 695, 764-65 (2005) ("The FAR provisions cited by plaintiffs purport to do no more than to provide internal government direction. For example, FAR § 15.802 (1993), entitled "Policy," only requires that the contracting officer "[p]urchase supplies and services from responsible sources at fair and reasonable prices [.]" FAR § 15.802(b) . . . It does not afford a judicial remedy").[10] We further explained that that provision was found in that part of the regulation that was concerned with obtaining adequate price competition, so

[8] El Paso's consultants' report also is flawed by its key conclusion (that PMM does not track "fair market value") is based solely upon the fact that PMM and Platts do not necessarily track each other. Yet, there is no requirement that they do. The report also is marred by statements for which there is no evidence, including the premise of its "index number" theory (as noted in our fact discussion) that the PMM mixes types of fuel. The report's assertion that the reference formula for JP-4 includes sales "destined to serve individual consumers at retail outlets" (Pl. App. 619) is similarly misleading. In fact, the formula included 16 percent of "unleaded regular gasoline all refiners sales *for resale*"(Pl. Exh. 9 at 5 (emphasis added)), which is tracked separately in the PMM from wholesale sales. SA2 10, 22, 25-6. The report's assertion that the PMM also does not report "military" jet fuel is of the same caliber. In fact, EIA captures data for "kerosene-type jet fuel," including JP-8. SA2 18 (item 13).

[9] FAR 15.402(a) provides that the contracting officer "must- (a) Purchase supplies and services from responsible sources at fair and reasonable prices."

[10] El Paso's effort to distinguish Short Bros. is limited to noting that it was not limited to the proposition for which we cite it, and that plaintiff sought a different contract type. Nonetheless, the holding we cited is correct, and the plaintiff in Short Brothers also sought money, as El Paso does here. El Paso seeks to distinguish All Phase Environmental, on the ground that the GAO did not, among other things, discuss the purpose of FAR 15.402. To the contrary, the GAO noted that the agency's concern was in not paying more than warranted.

that the Government was assured of paying a reasonable price.

To overcome our analysis, El Paso relies upon the regulation, the dictionary (definition of "fair"), and guidance to contracting officers and auditors found in the Armed Services Pricing Manual ("ASPM"), which suggests that a price should be fair to both sides. However, even if plaintiffs were entitled to bring a FAR 15.402-based claim to this Court, the complaint still fails to state a claim, because FAR 15.402 concerns *bid and award* prices – not *adjusted* prices, which are calculated during contract performance, based upon the movement of the EPA clause. Accordingly, the ASPM refers to "price" in the singular and to "current market conditions," not subsequent adjusted prices. As we have explained, the contractors set their offer prices and no contractor has suggested that their offer prices were unreasonable.

In any event, the ASPM guidance, the dictionary's definition of fairness, and Plaintiffs' other secondary references amount to nothing more than good advice for contracting officers interested in working with contented, motivated contractors, who are not looking for claims.[11] However, they do not establish the existence of an enforceable interest.

Moreover, to suggest that the FAR, which was issued against a backdrop of long-established principles of commercial law (including the principle of unilateral mistake, which the FAR addresses), intended to add a cause of action not rooted in mistake is as preposterous as it is illogical.[12] Indeed, if, as El Paso argues, the contracting officer's obligation to assess price

[11] Indeed, the declarations in the record submitted by the contracting officer, John Walker (Def. Exh. 1) and the DESC Price Analysis and Pre-negotiation Briefing Memoranda (Pl. App. 144-70, 206-78) explain how prices were determined fair and reasonable. The undisputed facts show that prices were determined fair and reasonable based upon competition. See FAR 15.404-1(b)(2)(i) ("normally, adequate price competition establishes price reasonableness").

[12] See Nash and Cibinic, Formation of Government Contracts (3rd Ed. 1998) at 1279 ("The primary focus of these requirements is to ensure that the Government does not pay

reasonableness were actionable, contract pricing never would be binding, because contractors who failed to realize the *post hoc* demands of their owners or investors could occasion this Court's intervention with no more substantial an allegation than "our price was unfair!" El Paso suggests that is not true, because courts routinely adjust prices. But, they do so upon discernible standards – not generalized claims of "unfairness," unrooted in recognized causes of action.[13]

II. <u>El Paso's Alternative Illegality Theories In Counts II-VI Must Be Dismissed</u>

A. <u>Count II (Misrepresentation)</u>

In our moving brief, we established that the misrepresentation count (DESC "misrepresented and otherwise failed to disclose that PMM and other indexes were not designed or intended to be used to set or adjust prices and did not reflect at least fair market value." (Compl. ¶ 64) should be dismissed, because there is no such applicable rule for EPA clauses. Plaintiffs' brief does not suggest one or that the Government actually misrepresented anything. Instead, El Paso asserts that, because the complaint *alleged* a "misrepresentation," for the purposes of our motion, it is an established fact. Pl. Br. 32. However, misrepresentation is an allegation of law, which we need not accept. In fact, the entire point of our motion is to challenge it. Accordingly, absent any material fact pertaining to an actual misrepresentation,

---

unreasonably high prices," although they caution that "prices that are unreasonably low must also be dealt with before an award is made, because they could be evidence of mistake, non-responsibility, lack of understanding of the work, or a buy-in"). The plaintiffs' own argument makes this connection, asserting that it is grounded in a misrepresentation. Pl. Br. 32-33.

[13] El Paso acknowledges that its claim cannot stand on FAR 15.402 alone, when it argues that it "the determination of price reasonableness was, in essence: that DESC knew that the PMM did not reflect the marketplace, [and] *misrepresented* what it knew for its own benefit." Pl. Br. 33 (emphasis added). In other words, as El Paso's misrepresentation count goes, so goes its FAR 15.402 count. As we have explained, El Paso has yet to put a fact in evidence that amounts to a misrepresentation or establishes its fanciful conspiracy theory.

that count now must be dismissed.

B. Count III ("Breach of Contract") and Count IV ("Implied-In-Fact Contract")

In our moving brief, we established that Plaintiffs' breach of contract count and implied-in-fact contract counts should be dismissed, because there is no ground for striking the parties' own unambiguous agreement. We also established that an "implied-in-fact contract cannot exist if an express contract already covers the same subject matter." Trauma Service Group v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997).

Other than asserting that the contract "expressly" requires the payment of "fair market value," El Paso cites no language to contradict the unambiguous language of the contract's pricing clause. Instead, El Paso attempts to oust that clause obliquely, reasoning that the *Spearin* doctrine (Government warrants that design specifications will yield satisfactory result) and principles of contract reformation somehow trump a contract's unambiguous language.[14] But, the plain language of the contract's pricing clause do not permit such machinations. We do not disagree that if, as a matter of law, the pricing clause were stricken, that reformation could be available. Nor do we disagree that any such remedy would include an examination of the parties' dealings to search for an implied, arrangement; but, until this contract is voided through some other cause of action, these counts unnecessarily bloat the complaint.

---

[14] El Paso alludes to the "implied" promise to pay fair market value found in Barrett, 242 F.3d 1060. Pl. Br. 34. However, in that case, the contract was assumed to be invalid, and the court was looking for evidence of an implied in fact contract. Here, should we reach such a remedy phase, we would expect the parties to adduce evidence concerning the fact of any such implied agreement. Absent agreement upon what "fair market value" means, it is unlikely the parties are in any position to agree upon what, specifically, that might be. Notably, the denouement of Barrett was the trial court's finding that, based upon the presumed implied-in-fact agreement, the Government overpaid for three of the four contracts at issue. Barrett v. United States, 50 Fed. Cl. 567, 569-70 (2001). We understand that El Paso would dispute that an agreement that would yield any such result exists.

C. Count V ("Failure of Consideration and Frustration of Purpose")

Count V presents a further unnecessary multiplication of the charges. El Paso seeks to avoid the dismissal of Count V, by asserting that the matter is not "ripe for decision," because "DESC offers no evidence" concerning the degree of frustration. Pl. Br. 41. However, it is El Paso that bears the burden of proof in advancing evidence of its purported frustration. Moreover, Plaintiffs' reply acknowledges that the count is grounded "on the voiding of DESC's pricing clause on the grounds of illegality." Pl. Br. 41. Accordingly, the dismissal of Plaintiffs' remaining illegality counts would result in the dismissal of this count (conversely, were it not to be dismissed, the frustration count would be superfluous) and, therefore, serves no purpose.

D. Count VI (Mistake)

In our moving brief, we demonstrated that Count VI must be dismissed for the same reason as the other alternative causes of action, and that El Paso failed to meet the basic elements of proof of a mistake claim, including that, at the time of their agreement, the parties shared a mistaken belief "regarding a fact" concerning a "basic assumption underlying the contract." See Dairyland Power Cooperative v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994).

The reply asserts that the complaint's focus in this Count is the purpose of the PMM and what it is intended to measure. Pl. Br. 42. But, Plaintiffs' reply fails to identify any belief that it held concerning the PMM – let alone one held by DESC. As we have explained, the PMM reports on actual sales data required to be reported by statute. El Paso itself was required to supply the information that was the basic ingredient of the PMM. El Paso has failed to show why the purpose of the PMM or why EIA collects PMM data is material to an unambiguous contract provision that was never alleged to operate or be administered or interpreted

improperly.[15] In sum, Plaintiffs' mistake pleading lacks a factual premise.

## III. El Paso's Takings Claim Should Be Dismissed

El Paso's extended response to our demonstration that it fails to state Fifth Amendment takings claim, Pl. Br. 44-50, confirms our central point: that El Paso cannot cite a single judicial decision holding that a compensable "taking" can occur when the Government acquires property from a willing seller, pursuant to a contract that is later (for purposes of argument) held to be "illegal" or void. This is hardly surprising, as such a rule would convert every "illegal contract" claim involving real or personal property into a takings claim. "El Paso alleges that the contracts were unlawful, and thus DESC physically possessed fuel to which it had no right." Id. at 48. This conclusion concerning the Governments "rights," however, does not follow from the premise of illegality. Indeed, under El Paso's logic, El Paso could be liable to a suit by the Government for funds paid to it by the Government (e.g., United States v. Wurts, 303 U.S. 414, 415 (1937)), because it would likewise be true that "El Paso possessed Government money [paid under the contract] to which it had no right."

In truth, of course, both parties rightfully took ownership of the consideration freely exchanged under the fuel supply contracts; both parties received exactly what they contracted for; and these voluntary transactions had none of the aspects of a physical or regulatory taking. In fact, a contract constitutes a right to payment of damages in the event of a failure of performance. As long as the right to such damages remains intact, as it does here, no takings has occurred. See, e.g., La Van v. United States, 382 F.3d 1340, 1352 (Fed. Cir. 2004).

---

[15] El Paso's reliance upon Beta Systems does not supply its missing factual ingredient. Not only are the facts of that case not suggested here by any evidence, that case involved a DFAR supplement and specific EPA clause criteria not applicable here.

El Paso's argument that its constitutional claim is "substantially identical" to that in Osprey Pacific Corp. V. United States, 41 Fed. Cl. 250 (1998), cannot bear scrutiny. Pl. Br. 45. Among other important distinctions, the plaintiff in Osprey was a mere third party to the contract under which the Government asserted ownership of the boat, and plaintiff did not willingly deliver its property to the Government for remuneration, as did El Paso. Nor is it true that "courts have consistently permitted [a] contractor to pursue takings claims in addition to breach of contract claims" when the contractor is dissatisfied with the price it received. Id. At 49.

In the first case cited by El Paso to support the latter assertion, Pi Electronics Corp. V. United States, 55 Fed. Cl. 279 (2003), the property right allegedly "taken," through disclosure, was a trade secret, which plaintiff did not agree to convey to the Government. Id. At 281-83. El Paso, by contrast, freely passed title to its fuel for consumption by the military. In Armstrong v. United States, 364 U.S. 40 (1960), also cited by El Paso, the plaintiffs were not Government "contractors," but subcontractors who asserted liens in the subject of the contract. Those plaintiffs were not attempting to convert contract claims into takings claims. In Scan-Tech Security v. United States, 46 Fed. Cl. 326 (2000), the Court held sensibly that "[i]f the express writings of the parties encompass[ed] the [Government's] right to possession" – as DESC's fuel contracts undeniably did – plaintiff's "takings claim should be dismissed" and replaced with contract claims. Id. At 332. Similarly, in Integrated Logistics Support Systems, Int'l v. United States, 42 Fed. Cl. 30 (1998), the Court could not "conclude that the contract conferred expressly upon defendant rights of possession, use, ownership, and alienation in the materials . . . ." Id. At 35. No such ambiguity exists in these fuel supply contracts.

El Paso was not coerced to bid for or perform these contracts, and the assertion that DESC "abrogated El Paso's rights" by awarding lucrative contracts to plaintiff in a proprietary

capacity refutes itself. Pl. Br. 45 n.39. No authority supports the argument that such free exchanges of a commodity for money in a competitive market can be recharacterized, years after the fact, as a compensable Fifth Amendment taking if the private seller can find some way to undo what both parties understood to be the contracts. Further, even assuming DESC's contracts were unauthorized, this would be true, as the Federal Circuit held in Barrett, only as to the pricing mechanism. The remainder of the agreements, including the Government's right to receive the fuel, would stand, or would, at a minimum, be "implied in fact" from the parties' conduct. Accordingly, there is no basis upon which to allege the fuel was "taken" for use by the sovereign within the meaning of the Constitution.

## IV. El Paso's Small Business Program Complaints Must Be Dismissed

### A. The Court Lacks Jurisdiction To Entertain The Fifth Amendment Complaint

In our moving brief, we demonstrated that this Court possesses no jurisdiction over claims based upon the Fifth Amendment's equal protection clause. El Paso claims to skirt that rule, because it has an "express contract" tainted by the award. Pl. Br. 51. But, here, El Paso has no award based upon any purported equal protection violation.[16] Moreover, the test is not whether a contractor has a contract, it is whether the contract "underlies its claim." Trauma Service Group, 104 F.3d at 1324. Here, El Paso's contract is, at best, incidental to its claim, which concerns the award of set-aside portions it presumably was not awarded. By contrast, the cases upon which El Paso relies, such as Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983), Gould v. United States, 67 F.3d 925 (Fed. Cir. 930 (Fed. Cir. 1995), and

[16] A further symptom of the sheer creativity of the complaint is El Paso failure to include any evidence that the premise of its argument has any basis in fact, such as a declaration or document explaining how the purported violation affected its contracts.

Trauma Service Group, concern claims that contract terms (including their proper interpretation in light of applicable statutes or regulations) were illegal or supported the requested relief. See, e.g., Trauma Services, 104 F.3d 1321, 1325 ("TSG contends the MOA is an express contract"); Gould, 67 F.3d at 929 ("The illegality in this case, if there is one, turns on questions of fact and the terms of the contract in dispute"); LaBarge Prods., Inc. v. West, 46 F.3d 1547 (Fed. Cir. 1995) (pricing provision formed in violation of an auction procedure was reviewable). Here, El Paso has failed to identify any of *its* contract terms that were written in violation of any statute or regulation.

El Paso also insists that the "Federal Circuit already has expressly held that there is Tucker Act jurisdiction over this precise type of claim." Pl. Br. 65 (citing Rothe Dev. Corp. v. United States Dep't of Defense, 262 F. 3d 1306 (Fed. Cir. 2001)). However, this is not a Rothe claim. Rothe was a disappointed bidder. It did not seek damages *arising from* a contract, nor did the court assert its jurisdiction on that basis. Rothe alleged that the application of a 10 percent evaluation preference to a small disadvantaged business bid deprived Rothe of obtaining a contract. Thus, it was upon its bid protest jurisdiction (then based upon the premise that, "[u]nder the Tucker Act an unsuccessful bidder can recover its bid preparation costs from the Government on the theory that failure to evaluate a 'bid honestly and fairly' breaches an implied-in-fact contract of fair dealing") that the court entertained the appeal. Rothe, at 1317 (citing Coflexip & Servs., Inc. v. United States, 961 F. 2d 951, 952-953 (Fed. Cir. 1992)). By contrast, El Paso's claim alleges that the Fifth Amendment (which, if anything, would have deprived El Paso of a contract) entitles El Paso to recover damages for supplies that it provided *pursuant to an express contract*. Pl. Br. 52 (the Fifth Amendment claim "relates to its express contracts with DESC"). Rothe provides no grounds for this Court's jurisdiction. El Paso's

claim also lacks a proven factual premise. Its stated premise is that the "contracts contained an illegal term that resulted in it receiving less than fair market value for the fuel it sold to DESC." Pl. Br. 65. However, El Paso identifies no term *of its contract* that violates the Fifth Amendment. That is not surprising, because the preference clause is inoperative in a contract awarded to a contractor, such as El Paso, that does not obtain the evaluation preference. For firms that actually obtain the preference, the relevant clause requires that the resultant contract be performed by a qualifying minority owned concern. See, e.g., SA 5 (I237.05(a))("SDB concerns must supply petroleum product from an SDB manufacturer, who complies with the petroleum product size standards at 13 CFR 121, to be eligible for the evaluation preference")).

B. DESC's Small Business Program Is Not Improper

Plaintiff argues that DESC's match price method for conducting partial small business set aside procurements violates the Office of Federal Procurement Policy ("OFPP") Act, 41 U.S.C. § 423, the FAR "prohibition" on auction techniques, and the FAR's method of awarding the set-aside portion of the procurement separately. Pl. Br. 53-58. We demonstrated in our moving brief that the DESC program follows published guidance, did not constitute a prohibited "auction," and had no effect upon El Paso.

An "auction" is the "direct bidding of price between two competing offerors." DGS Contract Services, Inc. v. United States, 43 Fed. Cl. 227, 239 (1999). The contracting officer's declaration explains that there is no such auctioning.[17] Rather, the small business offeror is given the opportunity to match the price the Government otherwise would pay, adjusted for the transportation cost the Government would incur. The offeror agrees to match or not. If it does,

[17] The declaration is supported by the relevant clauses at SA 4-17.

the offeror is awarded the set aside portion. The result it there is no back and forth between one offeror and another. If and when that ever occurred in a solicitation in which El Paso participated, that meant that El Paso would have been awarded no contract for that amount.

This method is consistent with the FAR and authorized agency clauses, which we have reproduced at SA 4-17, and is contemplated by 41 U.S.C. § 423 (b)(3), the initial version of which provided that information may be released to "a person authorized by the head of such agency or the contracting officer." 41 U.S.C. § 423 (b)(3). The statute was amended in 1996, but still authorizes release in accordance with "applicable agency . . .procedures." 41 U.S.C. § 423 (h)(1). As we explained, the Government's match price method of conducting partial small business set-aside negotiations follows authorized agency procedures and the FAR itself. Thus, for example, FAR 52.219-7(b)(3) provides that: "The set-aside portion will be awarded at the *highest unit price(s) in the contract(s) for the non-set-aside portion*, adjusted to reflect transportation and other costs appropriate for the selected contractor(s)." SA 10 (emphasis added). The clause further provides that "negotiations" will be conducted with the small business offerors to achieve this result. El Paso fails to explain how this clause would work unless the contracting officer were to disclose the match price. Similarly, the DESC clause I237.07 provides that "The price for the set-aside portion of this procurement will be negotiated by the Contracting Officer based upon prices the Government would otherwise pay under this solicitation had there been no set-aside for supply of the location at which the set-aside is placed, adjusted for transportation charges and other factors." SA 4.

In addition to its lacking any basis in fact (i.e, that there was any auction affecting any of its contracts) El Paso's argument is flawed by its premise that there is an outright ban on price disclosure. See Pl. Br. 55 (asserting that DESC's program violates FAR 15.610(d)(3) because it

"indicat[es] to an offeror a cost or price that it must meet to obtain further consideration" and "otherwise furnish[es] information about other offerors' prices"). First, the FAR disclosure prohibitions at issue concern "auctions." As we have shown, DESC's small-business program is not an auction. Second, as we have shown, the particular disclosures at issue are authorized. Third, there is no general ban on price disclosure. See MTB Group, Inc., B-295463, 2005 CPD 40 at 2 (neither the OFPP Act not the FAR contain an "absolute prohibition against disclosure of price information, and both make clear that prices can be disclosed under certain circumstances") (citing DGS Contract Services v. United States, 43 Fed. Cl. at 236).

Plaintiff also complains that DESC should award the set-aside procurement separately from the rest of the procurement. Pl. Br. 56-57. As we explained in our motion, the Comptroller General has found that DESC's procedures are consistent with applicable law and regulation. B-230556, March 23, 1989. SA2 35-36. In any event, El Paso has not shown how it might ground its generalized complaint concerning the conduct of procurements generally in a cause of action arising out of one of its *contracts*. Accordingly, it has failed to state a cause of action.[18]

V. Waiver and Estoppel Bar El Paso's Claims

A. Introduction

Our moving brief established that, even if the FAR were to confer some unrealized right,

---

[18] Its purported basis, that large business concerns "are forced to bid low enough that small businesses will not accept the resulting match price offered to them, thereupon the award remains with the large business as the otherwise successful offeror" (Pl. Br. 58) is illogical. Whether conducted separately or in the combined manner that DESC conducts its set-aside negotiations, the result is that small business concerns have an opportunity to match and obtain business that might have otherwise gone to a large business. That is the point of the Small Business Act, 15 U.S.C. § 644. In any event, plaintiff provides no evidence in support of its speculative argument and, therefore, the time has come for it to be dismissed.

El Paso elected to accept the pricing clause it did and, through years of inaction, now is estopped from pursuing any such imagined right in litigation. Our moving brief also demonstrated that Plaintiffs' alternate illegality arguments and the common law causes of action are based upon the same faulty premise, i.e., that the Government has a legal duty to use escalators based upon price references that are "intended or designed" to be used as prices references, and to ensure that contracts result in payments that the contractor is satisfied amount to"fair market value" rise or fall with Plaintiffs' illegality allegation.

In Hermes II, 58 Fed. Cl. 409, this Court held that the contractor's allegation that the PMM violated the FAR was waivable, and actually waived in that case. In reaching its decision, the Court found that the requisite "intelligent waiver" could be discerned from the contractor's general sophistication and lengthy failure to signal its dissatisfaction whatsoever. Id. at 416-18.

As the Court observed:

> It is almost universally conceded that "'wherever a contract not already fully performed is continued in spite of a known breach, the wronged party cannot avail himself of that excuse . . . . As a general proposition, one side cannot continue after a material breach by the other . . ., act as if the contract remains fully in force (although stopping performance would be fair and convenient), run up damages, and then go suddenly to court.'"

Id. at 418 (citing Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26 (1972)); see also Hermes II, 58 Fed. Cl. at 413 (a "key factual distinction" to be that El Paso "astonishingly waited 14 years after entering the first [contract at issue] and eight years after entering the last [contract at issue] before litigating").

As explained in our original motion for summary judgment, estoppel also is applicable. Estoppel requires that the party asserting estoppel rely to its detriment upon its opponent's action

or inaction. E.g., E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978). Here, because of its superior knowledge of its circumstances, and its extensive experience with the clauses at issue, El Paso was in the best position to assess the efficacy of the EPA clauses regarding its own situation (including any inherent uncertainty that might have existed). By adopting the EPA clauses in its offers with the text of the FAR available to it for consultation, El Paso signaled its intent to forego any benefits contained in the FAR. That El Paso continued to offer these clauses, coupled with its failure to protest clearly prejudiced the Government, because, as subsequent events showed, the Government could have obtained a deviation. Either of these would have been a "relatively painless alternative" to the after-the-fact, competition-free, speculative recovery El Paso now seeks. Indeed, as did the contractor in Ling-Temco-Vought, El Paso has "in effect retained all options for itself . . . made its calculations entirely in its own favor, without proper consideration of the defendant's position," and violated the "basic principle calling for fair treatment of both parties." 201 Ct. Cl. at 148, 475 F.2d at 638.

B. El Paso Has Waived As A Matter Of Fact

El Paso asserts that it cannot be considered to have waived its claims as a matter of fact upon various bases: (1) there is no factual basis for presuming an intentional relinquishment and the declaration of Plaintiffs' officer that it believed "DESC prices were legal," that "the prices set would reflect fair market value, and did not "relinquish its right to payment of fair market value" (citing App . 639); (2) that the waiver found in Hermes II was based upon a presumed knowledge of law; (3) El Paso had only 11 observations of the performance of the PMM clause; (4) the purchase is analogous to the purchase from a "monopolist;" (5) that "suppliers" objected to the PMM clause; and (6) that DESC knowingly concealed secret knowledge concerning the operation of the PMM and, therefore, has "unclean hands."

We have addressed these various allegations, above, and in our response to plaintiffs' proposed findings of fact. The essence of every element of Plaintiffs' case is a statement by one of its current officers that El Paso intended the contracts at issue to be "legal," and that it intended to receive "fair market value" and not to "relinquish its right to payment of fair market value." Essentially, El Paso has defined the problem away, by assuming that the contract is "illegal," that it has a "right" to receive "fair market value," that it did not receive "fair market value," and that, somehow DESC knew all this.[19] However, its declarations and appended documents fail to establish that. Moreover, the best evidence of plaintiffs' intent is its conduct in signing contracts without objection over many years. As the court stated in Safeco Credit v. United States, 44 Fed. Cl. 406, 420 (1999): "Plaintiff's allegation of its intent not to waive a claim when it signed the modifications is insufficient to raise a genuine issue of material fact so as to preclude summary judgment for the government."

El Paso attempts to avoid its inability to prove it was crippled by a lack of knowledge concerning the PMM with its consultants' report that attempts to "infer" a lack of knowledge. In the end, the report can conclude only that El Paso could not predict the PMM. But, as our motion explained, a lack of knowledge concerning the future is not the basis for avoiding one's contracts. Among other immaterial factors, the report dwells upon El Paso's limited "annual observations" of the PMM and the lack of evidence that El Paso intended to forego fair market value. But, El Paso had hundreds of relevant observations of the PMM, because prices were

---

[19] Thus, for example, after citing examples of DESC stating that PMM states the fair market value, El Paso asserts that such statements are "misrepresentations" that have been "unmasked." In fact, assertions concerning PMM and its relationship to the market place are established by the statute that requires fuel refiners report their actual sales prices to the EIA (PFF 14), DESC's study of the PMM (PFF 18-25), and DESC's consistent statement of its position through its vindication in Tesoro, 405 F. 3d 1339.

adjusted monthly for 10 years. Moreover, if El Paso's knowledge concerning the PMM was material, presumably, it would either have gathered that knowledge or determined that it was not material. But, what mystery there might be is belied by the fact that El Paso itself was required to make detailed reports to EIA for the preparation of the PMM.

El Paso also asserts that the contracting officer, John Walker, whose declaration establishes that El Paso did not object to the legality of the PMM did not explain his involvement with El Paso and failed to disclose that he was not employed by DESC for a portion of the time covered by his declaration. Pl. Br. 65. In fact, the declaration states that from 1987-89, Mr. Walker was employed by the Navy. SA 1. The declaration also explains the basis for Mr. Walker's knowledge, i.e., that he reviewed the contract files and saw no evidence that El Paso had objected to the EPA clause. And, in 1991 and 1993, he was the awarding contracting officer. Def. Exh. 8, 9; Pl. App. 644.[20] Incredibly, El Paso offers no evidence that it did object. Accordingly, it is undisputed that El Paso did not object.[21]

---

[20] In a footnote, El Paso declares it has established the "inaccuracy" of Mr. Walker's statement in a similar case, Calcasieu v. United States. Pl. Br. 65, n. 58. In fact, there is no apparent conflict in the document El Paso offers in opposition to Mr. Walker's statement. The document is a letter from DESC to Calcasieu, not a letter of complaint from Calcasieu. From the response, it appears that Calcasieu was not complaining about the accuracy of the PMM, but its ability to determine its offer price when the PMM was not yet available for the reference month. Pl. App. 96. DESC resolved this problem in 1987 when it changed the reference month. SA 20, 25.

[21] Instead, El Paso relies upon the allegation that DESC had received objections to PMM from "suppliers." "as early as 1984. Pl. Br. 66. El Paso also asserts that "every known objection was rejected out of hand." Id. In fact, what El Paso is referring to is the complaint of the plaintiffs in MAPCO, which asserted that the PMM was "non-indicative of our marketplace," and noted its unique situation, i.e., its location in Alaska and non-access to continental markets. Pl. App. 205. However, neither El Paso (nor any other contractor it has identified) has made any such objection or explained the relevance of MAPCO's situation to its own. The "rejection" to which El Paso refers is a DESC internal memorandum, explaining that its policy was to have common "EPA references." Pl. App. 205. The memorandum explained that the "[u]se of

Plaintiffs' most dramatic gloss is its "clean hands" conspiracy theory. As is the case throughout Plaintiffs' brief, Plaintiffs' recitation of the tale is marred by its failure to fully quote the evidence cited. Typical is its assertion that DESC "admits" using its "market leverage" as "the sole purchaser of military fuel" to "improve the competition" by making the EPA clause non-negotiable, citing among other documents, Pl. App. 17. Pl. Br. 56. Pl. App. 17 is an excerpt of the testimony of Lawrence Ervin, a DESC pricing official, from the Barrett trial. There, Mr. Ervin stated that, in the mid-1980s, as the market became a buyer's market, DESC used its leverage as a buyer to get contractors on a common escalator. As Mr. Ervin also explained, DESC wanted to be sure that it used a publication that reflected actual sales. Pl. App. 18. This is hardly a statement that DESC's use of the PMM was corrupt.[22]

C. El Paso Has Waived Its Claims As A Matter Of Law

El Paso argues that it may not be prevented from asserting its entitlement to a legal price, relying upon: (1) the principle that an illegality concerning the effectuation of a national purpose may not be waived (citing cases such as Pittsburgh C.C. & St. L. Ry. Co. v. Fink, 250 U.S. 577 (1919); Sprague Steamship Co. v. United States, 172 F.Supp 674 (Ct. Cl. 1959); Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983)); (2) cases holding that, where a rule is made for the protection of contractors, it may not be waived (Beta Sys., 838 F.3d 1185 and its

---

different escalation references in a competitive procurement renders meaningful price evaluation in a competitive procurement difficult, if not impossible," but that, "in the case of Alaska, the proposed common escalation reference may not be obtainable . . . [Thus,] [i]f the proposed EPA reference is rejected by all Alaska based offerors, a common EPA reference based on Alaska product postings will be appropriate." Pl. App. 205. In short, the problem was with the Alaskan market, a common reference was required for competition purposes, but that if that was not obtainable, DESC was prepared to accept something else. None of this pertains to plaintiffs.

[22] Plaintiffs' monopolist argument is similarly inapt - the Government is neither a monopolistic buyer or seller – and most assuredly did not set prices.

progeny, including Cessna Aircraft v. Dalton, 126 F.3d 1442 (Fed. Cir. 1997)); (3) that waiver not be invoked absent a statute limitations (citing Thomas v. United States, 125 Ct .Cl. 76, 80 (1953) and Louisville and Nashville R.R. Co. v. Cent. Iron and Coal Co.,265 U.S. 59, 65 (1924).

These are the same arguments that El Paso raised and were rejected in Hermes II. El Paso's central premise is that contractors may not waive clauses such as this one. But, it is well-established that public contractors may waive rights and benefits, and may be estopped from belatedly seeking to reassert them. E.g., Shutte v. Thompson, 82 U.S. 151 (1872). Even statutory benefits may be waived. United States v. Mezzanatto, 513 U.S. 196, 201 (1995) ("Rather than deeming waiver presumptively unavailable absent some sort of enabling clause, we instead have adhered to the opposite presumption."). Overcoming that presumption requires a showing, deducible from the text of a statute or legislative history, that Congress itself intended to preclude waiver. Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985); accord Rough Diamond Co. v. United States, 351 F.2d 636, 639 (Ct. Cl. 1965) ("the basic test in deciding whether a purchaser could recover would always be the particular Congressional will reflected in the particular piece of legislation under scrutiny"). The burden is on the party opposing waiver to show that Congress intended to preclude it. Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987).

To be sure, where Congress has clearly expressed broad public policy, courts are reluctant to permit the evisceration of that policy by the parties' consent. See Clark v. United States, 95 U.S. 539 (1877) (refusing to permit waiver of statute designed to "prevent and punish fraud" by requiring contract to be in writing); Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983) (statutory prohibition against cost-plus-percentage-of-cost contracts). But, a party does not thwart public policy by declining a benefit contained in a regulation or other

law. Brooklyn Sav. Bank v. O'Neill, 324 U.S. 697, 705 (1945); Millmaster Intl. Inc. v. United States, 427 F. 2d 811, 814 (Cust. Ct. 1970) (importers may waive benefits of Tariff Act, because waiver will not interfere with any "manifest statutory purpose").

Not every contracting irregularity, however, requires a contract's *post hoc* invalidation or reformation. In fact, the jurisprudence of this circuit is replete with references to contractor waivers, including Hermes II. E.g., American Telephone and Telegraph Co. v. United States, 307 F.3d 1374 (Fed. Cir. 2002) (AT&T V); Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997); E. Walters & Co., Inc. v. United States, 217 Ct. Cl. 254, 576 F.2d 362 (1978) (per curiam); Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 148, 149, 475 F.2d 630, 638 (1973). In order to determine whether waiver may be found, a case-by-case analysis is required. The Restatement (Second) of Contracts explains this analysis as follows:

> (1) . . . an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against enforcement of the term.
>
> (2) In weighing the interest in the enforcement of a term, account is taken of:
>
> (a) the parties' justified expectations,
> (b) any special public interest in the enforcement of the particular term.
>
> (3) In weighing a public policy against enforcement of a term, account is taken of
>
> (a) the strength of that policy as manifested by legislation [including regulations] or judicial decision,
> (b) the likelihood that refusal to enforce the term will further that policy,
> (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and
> (d) the directness of the connection between that misconduct and the term.

Restatement § 178.

Given the facts here – that there is no congressional statement of purpose; that the public is unaffected by Clause B19.33 (it cannot be shown to either over or understate prices, nor to dampen competition); that El Paso, an experienced refiner, bid with full awareness of the escalator; that El Paso never complained about B19.33; that it continued to bid on the contracts; and that El Paso did not submit a claim until one contractor prevailed upon a since-invalidated cause of action -- the analysis could not advance El Paso's case.

Where a rule affecting a contract's formation or administration is waivable, a contractor cannot simply continue contract performance, without protesting the breach, or it will be deemed to have waived. Ling-Temco-Vought, Inc. v. United States, 475 F.2d 630, 637 (Ct. Cl. 1973); accord Federal Elec. Corp. v. United States, 486 F.2d 1377 (Ct. Cl. 1973). E. Walters & Co., Inc. v. United States, 576 F.2d 362 (Ct. Cl. 1978), is the controlling application of this rule. There, a supplier claimed that the Government had violated a FAR predecessor (the ASPR) by exercising an option that, in effect, permitted the Government to procure additional fuses at a lower price than if it had purchased the entire amount in a single order.[23] The ASPR prohibited the Government from exercising an option when "the option quantities represent known requirements for which procurement funds are available," and the Government had just such a requirement. 576 F.2d at 365. Based upon the ASPR, Walters assumed that the option would not be exercised for the funded requirement. Later, Walters learned that its assumption was wrong, but it said nothing when the Government exercised the option. After delivery, Walters

[23] The price schedule included price ranges such that unit prices increased with order size. The solicitation specified, however, that the Government could order a base amount, then, at its option, purchase an additional 50 percent of the base amount at the base price.

submitted a claim seeking the higher price. The contracting officer and the board of contract appeals concluded that the claim was waived. Id. at 366.

On appeal, the court held that the option provision was "in direct conflict with" the ASPR, but that Walters consciously chose to "fully perform the contract as if there were contemporaneous agreement of the parties on the proper interpretation of the terms of he [solicitation]," and "the Government was prejudiced." Id. at 368. As the court explained it:

> [T]he doctrine of estoppel is also for application. Had plaintiff protested the use of the option provision at the time of award, defendant would have been in a position to either reaffirm its use of the option provision, in apparent disregard of the ASPR prohibition, with the further knowledge that it could later be faced with a claim for the [higher] price; or it could have elected instead, to award the non set-aside quantity in the next least expensive manner . . . . Plaintiff's silence deprived the Government of that relatively painless alternative.

Id.

Walters reflects well-established logic in this circuit. In Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997), for example, the contractor attempted to avoid the payment terms of an option it had performed, alleging the option was invoked in violation of DAR §1-1502(b)(ii). Although it assumed a regulatory violation, the court, following Walters, rejected the claim because the contractor substantially completed the contract before asserting its claim. This, the court held, "constituted a waiver of the grounds for rescinding or voiding the contract because of a violation of the regulation, even assuming the option clause indeed violated the regulation." 124 F.3d at 1446. A contractor cannot recover "where it fails to raise the problem prior to execution, or even prior to litigation . . . ." Id.

El Paso seeks to distinguish Whittaker, by arguing that the waived violation was not "inherent in the award of the contract." Pl. Br. 72. As the El Paso court explained, however,

both Whittaker and Walters involved violations of the FAR, every bit as inherent in the award as the provisions here. 58 Fed. Cl. at 15. Indeed, in AT&T V, 307 F.3d at 1381, the Court cited Whittaker and Walters for the proposition that a contractor's failure to "have raised the issues it now presents . . . at the time of contract negotiations" amounted to a waiver. But even if the exercise of the option in Whittaker (and not the award) were the proper focal point, the contractor's waiver occurred when it failed to protest before the option was exercised, a circumstance indistinguishable from what has occurred here, where plaintiff has failed to provide timely notice of the alleged illegality.

Similarly, in Union Pacific Railroad Co. v. United States, 847 F.2d 1567 (Fed. Cir. 1988), the court invoked equitable estoppel and refused to entertain a contractor's argument that longstanding contract provisions violated tax laws. The court explained that the railroad could have signed the contract under protest to preserve its claim. Id. at 1570. See also Hartford Accident & Indem. Co. v. United States, 127 F. Supp. 565, 567 (Ct. Cl. 1955) (surety that executed performance and payment bonds with knowledge of terms of Government contract was estopped to assert that contract was executed without authority); PCL Construction Services, Inc. v. United States, 41 Fed. Cl. 242, 252 (1998) (contractor waived objection to provision that "was apparent on the face of the solicitation").

In American Telephone & Telegraph Co. v. United States, 177 F.3d 1368 (Fed. Cir. 1999) (en banc) ("AT&T III"), Judge Plager's opinion (dissenting-in-part, concurring-in-part) explained the logic underlying the Walters approach. There, AT&T asserted that its contract was void *ab initio*, because the Navy failed to take the steps necessary to authorize its contract as a fixed-price contract. Id. at 1371. Thus, AT&T claimed, it was entitled to relief in *quantum merit*. The majority disagreed, explaining that the law does not favor invalidation of a fully-

performed contract, based upon governmental noncompliance with internal reporting procedures. Id. at 1375-76. Judge Plager would have held that the contract was invalid, but would have denied a remedy, because AT&T was aware of the missing authorization, and bid nonetheless.

In words firmly rooted in the logic of Walters that are applicable here, Judge Plager explained the reasoning behind waiver:

> AT&T has no rightful claim to another penny of public money. It agreed to build and sell a product to the Government for a fixed price. It performed its end of the deal, and delivered the goods. The Government likewise performed its part of the deal; it paid AT&T the agreed-upon price . . . .
>
> AT&T now seeks to take advantage of the fact that the deal it made with the Government did not result in an enforceable contract, which it likely knew (and certainly should have known) when it proposed to enter into the agreement. AT&T demands more money for which it has been fully paid to do. The answer to that facially nonsensical demand is, in a word, "no."

Id. at 1383-84.

Failing to show that a FAR 16.2 violation is not waivable, El Paso relies upon Chris Berg, Inc. v. United States, 426 F. 2d 314 (Ct. Cl. 1970), and its offspring, Beta Systems, Inc. v. United States, 838 F. 2d 1179 (Fed. Cir. 1988), LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1557 (Fed. Cir. 1995), and Cessna Aircraft Co. v. Dalton, 126 F.3d 1442 (Fed. Cir. 1997), in which it was said that a Government failure to follow regulations is remediable, and contractors are not bound by their estoppel, acquiescence or failure to protest.

These do not relieve El Paso of its analytical burden. First, the rule cited in Chris Berg was developed in a series of cases arising under the Merchant Ship Sales Act of 1946, a statute that the court held involved important public policy. Those cases, including Nautilus Shipping Corp. v. United States, 141 Ct. Cl. 391 (1958), and Rough Diamond, 351 F.2d 636, concerned

contracts for the sale of Government-owned vessels, by which ship purchasers contracted to pay higher prices than specified by the Act. In ordering refunds to the purchasers, the court held that the statute embodied a strong and clearly discernable congressional purpose. As the court summarized its rulings years later:

> The marine statutes, we thought, embodied the Congressional wish that the Government's surplus ships should be sold at prices, uniform for all purchasers, and ascertainable by mathematical application of the statutory formula, properly interpreted; this Congressional purpose was strong enough to override any general legal doctrine, applicable in other situations, but which, if applied in the instant situation, would result in different persons paying different prices for the same type of ship . . .

Rough Diamond, 351 F.2d at 639-40 (internal quotation marks omitted).

There is no legislative mandate regarding the EPA clauses at issue. It simply is not a matter of national consequence when a seller agrees to an escalation clause that serves the purpose of the regulatory provision at issue.

Second, Chris Berg and Beta involved Government overreaching in the face of timely protests by contractors who insisted that the law be observed. Chris Berg was a mistake-in-bid case, a unique species of cases. There, the question was how to treat a bid mistake, and the contractor insisted from the outset that the mistaken bid was its intended bid. In Beta Systems, there was similar overreaching, as the contractor protested, at the outset, the Government's refusal to write the contract as the contractor insisted the regulation required. Here, there is no question concerning the intent of plaintiffs' offers or satisfaction with its contracts.

Third, estoppel could not lie in these cases, as both contractors timely protested the clauses at issue. Thus, statements in those cases concerning the effect of a contractor's acquiescence or failure to protest is dicta.

Reliance upon LaBarge, 46 F.3d 1547, and Cessna, 126 F.3d 1442, also is inapt. In Cessna, waiver was not at issue, because the regulation was held not to confer a benefit upon the contractor. In LaBarge, 46 F.3d 1547, the Court was asked to determine whether a contractor, who alleged its bid was the product of an improper bid auction, had raised a contractual theory that satisfied the board's jurisdictional requirement. The Government asserted that the contractor had failed to do so, and that its allegations were of the kind "ordinarily made in pre-award bid protests, not after the award of contract." Id. at 1552. The Court responded by citing Chris Berg for the proposition that an unlawful contract may be the basis for a claim, even if accompanied by initial adherence to the unlawful contract. Id. However, on the merits, the Government argued that the contractor had waived any such cause of action. Id. at 1556. That argument, however, the Court specifically refused to entertain, inasmuch as it found no illegal auction or harm to the contractor. Id. Notably, the Court did not reject the argument out of hand, as being precluded by Chris Berg or its progeny. Thus, LaBarge cannot be cited as authority for a no waiver rule. Moreover, as the Hermes I Court noted, LaBarge complained in a bid protest and "did not significantly delay any legal challenge" to the Government's actions, as Plaintiff has here. 58 Fed. Cl. at 14.

El Paso's attempts to draw support from the statement in AT&T III, that, concerning unlawful contracts fully performed, "courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory." 177 F.3d at 1376. Although that may be true in general, it does not address whether a remedy may be barred if waived. In fact, even in the AT&T litigation, the lower court eventually adopted none of those alternatives and dismissed the case for lack of an enforceable claim.

El Paso also purports to have debunked the applicability of Federal Crop Ins. v. Merrill,

332 U.S. 380 (1947), one of the bases of the Hermes II decision, arguing that it cannot support plaintiffs' presumed knowledge of the law, because, under that reasoning, it also should be presumed to know it is entitled to receive a "legal" price, but could not have known that its contracts were illegal when signed. But, contractors are deemed to know the law. Federal Crop Ins., 332 U.S. 380. Here, El Paso waived its claims because it knew that the EPA clauses were in its contracts, and that the clauses were based upon the PMM.[24]

El Paso argues that Hermes II "proves too much" because a "contractor could never seek a remedy under an illegal contract." Pl. Br. 76. But, that does not follow logically from Hermes II at all. Its holding was that a contractor knowing of a legal deficiency in its contract may not sleep on its rights. Plaintiffs' reliance upon Sola Electric Co. v. Jefferson Electric Co.,317 U.S. 173 (1942), Pittsburgh Ry. Co., 250 U.S. 577, and Louisville and Nashville R.R. Co., U.S. 59, 65 (1924), Costanza Coal Min. Co. v. Weirton Steel Co., 150 F.2d 929 (4th Cir. 1945), cases where courts refused to apply waiver, do not apply because those cases concerned whether a particular law (national pricing schemes of great importance to the public) could be waived. Thus, the very element missing from El Paso's analysis here, (i.e., that the rule is a matter of important public policy) was the deciding factor in the holdings in those cases. See, e.g., Sola Electric, 317 U.S. at 177 ("Local rules of estoppel which would fasten upon the public as well as the petitioner the burden of an agreement in violation of the Sherman Act must yield to the Act's declaration that such agreements are unlawful, and to the public policy of the Act which in the public interest precludes the enforcement of such unlawful agreements." ); Costanza Coal, 150

[24] El Paso also appears to assume that waiver could not occur until a court interprets a regulation, arguing that it filed a claim as soon as it knew such lawsuits could be filed. But, if that were the rule, the doctrine of presumed knowledge of the law would be eviscerated. Hermes II, 58 Fed. Cl. at 416-17.

F.2d at 935 ("The purposes are stated in Sec. 1 of the Act wherein it is declared that regulation of the sale and distribution of bituminous coal is imperative for the protection of interstate commerce and such coal, and that existing practices of distribution and marketing thereof waste the resources of the nation and disorganize interstate commerce therein so that regulation of prices and unfair methods of competition are necessary").

Finally, El Paso argues that waiver should be precluded on the basis of the Christian doctrine. Pl. Br. 69-70. Christian does not apply to every regulatory provision, however – only those "mandatory clauses that express a significant or deeply ingrained strand of public procurement policy." General Eng'g. & Mach. Works v. O'Keefe, 991 F. 2d 775, 779 (Fed. Cir. 1993). Given the lack of evidence of the failed performance of, or congressional interest in, these clauses, no such strand has been identified or seems apparent.

**CONCLUSION**

For these reasons, defendant respectfully requests that the Court dismiss the Second Amended Complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director
Commercial Litigation Branch
Civil Division
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Department of Justice
Washington, D.C. 20530
Tele: (202) 616-2311
Fax: (202) 353-7988

OF COUNSEL:

DONALD S. TRACY
Trial Attorney
Defense Supply Center Richmond
Richmond, VA 23297

HOWARD M. KAUFER
Assistant Counsel
Office of Counsel
Defense Energy Support Center
Ft. Belvoir, VA

Attorneys for Defendant

February 27, 2006

CERTIFICATE OF FILING

I hereby certify that on February 27, 2006, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Steven J. Gillingham

# SECOND SUPPLEMENTAL APPENDIX

Page 506

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BARRETT REFINING CORPORATION, )
Plaintiff, )
v. ) No.: 96-15C
) 96-724C
THE UNITED STATES, ) 96-725C
) 96-726C
Defendant. ) 97-321C

*Courtroom 3*
National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Wednesday,
July 29, 1998

The parties met, pursuant to the notice of the Judge, at 9:07 a.m.

BEFORE: HON. ERIC G. BRUGGINK
Associate Judge

APPEARANCES:

For the Plaintiff:

JAMES D. BACHMAN, ESQ.
ALICE D'ONAFRIO
Doyle & Bachman
919 18th Street, N.W.
Washington, D.C. 20006
(202) 659-4240

JOHN A. BARRETT, JR.
President, Barrett Refining Corp.
1210 Gordon Cooper Drive
Shawnee, Oklahoma 74801

Page 507

*APPEARANCES: (continued)*

For the Defendant:

SHERRY L. FLOYD, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-8278

KAREN E. SCHOOLS, ESQ.
Defense Fuel Supply Center (DFSC-G)
8725 John J. Kingman Road, Suite 4950
Fort Belvoir, Virginia 22060-6222
(703) 767-5010

//
//
//
//
//
//
//
//

Page 508

CONTENTS

VOIR

| *WITNESSES:* | *DIRECT* | *CROSS* | *REDIRECT* | *RECROSS* | *DIRE* |
|---|---|---|---|---|---|
| For the Defendant: | | | | | |
| Robert Myrben | 514 | 524 | 531 | 532 | – |
| Henry Steven Prime | 533 | 556 | 564 | – | – |
| John Harold Ayers | 568 | 588 | – | – | – |
| Edith Duhaine | 589 | 614 | – | – | – |
| John S. Cook | 618 | 632 | – | – | – |
| Lawrence Calvin Ervin | 634 | 656 | 668 | 670 | – |
| George Roland Schink | 671 | – | – | – | – |

//
//
//
//

Page 509

*EXHIBITS*

PLAINTIFF'S

| EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| 226 | 561 | – | Bid evaluation model |

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

AFTERNOONSESSION
1:25 p.m.
THE CLERK: Court is back in session.
Whereupon,
EDITH DUHAINE
having been previously duly sworn, was recalled as a witness herein and was examined and testified further as follows:
THE COURT: All right, Mr. Bachman, are your ready to proceed?
MR. BACHMAN: Yes, Your Honor, I have no further questions of this witness.
THE COURT: All right.
Any redirect?
MS. SCHOOLS: No other questions, Your Honor.
THE COURT: Thank you very much. You may step down.
(Witness excused.)
THE COURT: Ready for your next witness?
MS. FLOYD: Yes, Your Honor. The Government calls Mr. John Cook as its next witness.
THE COURT: Mr. Cook, if you would raise your right hand.



Whereupon,
JOHN S. COOK
having been first duly sworn, was called as a witness herein and was examined and testified as follows:
THE COURT: Thank you. Have a seat.
DIRECT EXAMINATION
BY MS. FLOYD:
*Q Could you please state your full name for the record?*
A John S. Cook.
*Q By whom are you employed?*
A The Department of Energy, the Energy Information Administration.
*Q What is your title?*
A I am currently director of the Petroleum Division within the Office of Oil and Gas.
*Q Are you located in Washington, D.C.?*
A Yes.
*Q Can you state what your educational background is, please?*
A I have a Ph.D. in economics and Master's Degrees in both economics and mathematics.
*Q Can you elaborate on your experience following your Ph.D.?*
A I spent three years teaching graduate-level



economics courses at the University of South Carolina; five years at the Bureau of Labor Statistics, first as an economist and then as a Branch Chief, doing research on service industry pricing; and then the last 18 years at the Department and the Energy Information Administration with petroleum statistics.
*Q All right. Can you describe your responsibilities in your current position?*
A Okay. Basically, we do petroleum analyses and short-term forecasting functions. We collect a lot of data on crude oil and refined products, supplies, and prices, and we publish them in the PMM.
THE COURT: What is PMM?
THE WITNESS: I'm sorry. That's the Petroleum Marketing Monthly.
THE COURT: It is your own publication?
THE WITNESS: It's our own publication. It comes out monthly. It has average prices for crude oil and gasoline, distillates, those kinds of things. We publish them at the state level and at regional levels, like the East Coast and national-level figures.
THE COURT: Okay.
BY MS. FLOYD:
*Q Can you describe, also, what the Energy Information Administration is?*



A Basically, it does two things. For all the energy sources, including coal, electricity, and natural gas, as well as petroleum, we do analyses, special studies for Congress and other interested parties, short-term and long-term forecasting and collect and publish data on coal, electricity, the various energy sources.
THE COURT: Does that satisfy some statutory duty?
THE WITNESS: Yes. The Agency was formed in '77 by the Department of Energy Act. The data programs themselves are required by the Federal Energy Emergency Act. There are a number of other statutes that require a centralized energy data base for prices and supplies, and so these programs are all in response to those legislative mandates.
THE COURT: Well, who is your primary customer or client for that data?
THE WITNESS: Virtually, every sector of the market uses the data. State energy offices are a key user, given that the data are at the state level. They not only use it to forecast and to track the market, but, for example, they work with Health and Human Services to assist the poor in paying their energy bills. You get a price spike like we saw in heating oil in 1996, and a lot of the low-income families can't pay their bills.
Congress will pass a supplementary appropriation,

Page 621

and these price data are used, along with others, to allocate out the extra funding to the various states. Most – know, the heating oil is consumed in the Northeast, which is also where the higher prices are, so those states, in using those data, qualify for a larger share of the allocation.

A lot of other examples – the Bureau of Economic Analysis uses the price data as input to various tables that they do in preparing the gross domestic product. BLS themselves uses the data in putting out their International Pricing Index.

GAO, like us, has used the price data on a number of occasions to analyze the factors driving prices up, like in '96, when we had gasoline spikes.

The Northeast Congressional Coalition, some 200 state Congressional offices, are very attune to the data, again, because they tend to be the consuming states in the Northeast and pay the higher prices. So they have a number of programs that they watch, including the Low-Income Energy Assistance Program, the Weatherization Programs, and Energy Efficiency Programs, where the data are used to help them formulate legislation and what not.

THE COURT: Is it just retail prices you track, or –

THE WITNESS: No, both wholesale and resale –

Page 622

retail. For example, in gasoline, you got it all. It's broken out by the type of gasoline we formulated – conventional, what have you, bulk transactions at the wholesale level, spot – in other words, transactions – Rack transactions and dealer tank wagons are all identified.

The retail level, you have, basically, just two categories. Sales – pump sales, through company outlets, and other end-user sales.

The distillate market is broken out into the various standard end-use categories – residential, industrial, commercial, and what have you.

The wholesale transactions are basically just A-category.

THE COURT: Such as what?

THE WITNESS: It includes all types of transactions, spots, and contracts, but they're not broken out. The wholesale market, basically, is only broken out into bulk, rack, what have you, in the gasoline for the gasoline –

THE COURT: By product?

THE WITNESS: – price. The other products are not as detailed at the wholesale level. Gasoline is, but not the distillates and resids. There's more detail in the retail end of the distillates then there is for gasoline, primarily because of the, the consumer – or the customer

Page 623

use.

Again, the states and various energy committees and staffers – the Northeast Midwest Coalition – are heavy users of the data and were involved in developing the forms, and these seem to be the categories that they were most interested in.

THE COURT: We are talking about actual purchasers using the data, or Governmental entities that are not doing purchasing?

THE WITNESS: More Governmental users.

THE COURT: Is there some statutory duty on the part of the sellers or the buyers to make – report the data?

THE WITNESS: Yes, Your Honor, it is mandatory. Again, the FEA Act makes it mandatory that all energy firms report these kinds of data to the Department. There are –

THE COURT: Is it data at the microscopic level, or is it – is their lumping together of sales, or how does that work?

THE WITNESS: Well, a refiner, again for gasoline, will have to – for each state that they do business in, report for each of these categories the total amount of monthly sales, bulk transactions, for example, or retail outlet transactions, and the average price of all those transactions that occurred in that month.

Page 624

So they will have to keep detailed accounting, computerized accounting records, to report that data to us. And once the data comes in, their, their process – aggregated, averaged up to the state level across all the companies that report to us, and then averaged further to regional levels and national levels.

THE COURT: What actually gets printed in your report?

THE WITNESS: Okay. For gasoline, again, you'll have – for the State of Virginia, you'll have an average price for reformulated gasoline –

THE COURT: We are talking about at the wholesale level?

THE WITNESS: Both. That's what –

THE COURT: All right.

THE WITNESS: – I was going to say. For reformulated gasoline, you'll have the pump price, the retail price. You'll also have the rack price. At the wholesale level, the bulk price, the dealer tank wagon price, and you'll have it split further for conventional gasoline.

Central Virginia uses conventional, so they'll be prices state level that aren't, per se, you know, Central Virginia, just not disaggragated that far. But, you know, it's a common use of the data since that's where that

Page 625

consumption occurs.
Heating oil -- on the retail side, you'd have for
Virginia residential prices, industrial prices, commercial
prices, agricultural prices, and then you would have the
wholesale price.
BY MS. FLOYD:
*Q I would like to have you turn to Defendant's*
*Exhibit 145, page 75, and that should be in a binder right*
*on your left, probably fourth binder in on 45, and then if*
*you could, turn to page 75 of Exhibit 145.*
A Page 75?
*Q I am sorry. Exhibit 145.*
A Okay. You lift it out of here, right? Okay.
*Q And page 75.*
A Okay.
*Q Okay. At page 76, can you identify what this*
*document is? It extends to page 89.*
A Okay. This is the form, the 782A that we collect
these data I was talking about on.
(The document referred to was
marked for identification as
Defendant's Exhibit 145.)
*Q Is this the track form that is used, to your*
*knowledge?*
A Yes. You can tell from the numbers in the right-

Page 626

hand corner.
*Q Can you explain how this form is used, with*
*particular attention to kerosene-based jet fuel?*
A Okay. Well, the form itself is mailed -- or
companies sometimes get them electronically now -- to the
various refiners that are expected to fill the forms out,
and within 20 to 30 days after the reference month, which,
for example, if it's January of this year, 1998, and they've
kept their records, they would simply report for all the
states that they do jet fuel business in. The total volume
on line 213 --
*Q And --*
A -- the average price --
*Q -- what page of the document are you referring to?*
A Well, I'm using -- I think it's 78.
*Q Okay. Can you --*
A Page 78.
*Q Where is 213?*
A That's the fourth line down for jet fuel.
*Q Under "Part 4, Monthly State Sales of Other*
*Petroleum Products"?*
A Right. They report any retail sales and wholesale
sales, for example.
*Q How would they report this?*
A Well, they can fill it out if it comes out of

Page 627

their computer records, depending on how automated they
are.
They get a printout, and they should have a system that
would give them this specific price, and they can transcribe
it over. Some of them actually have these forms
computerized, where they can take data directly out of their
data base and put it on the form and then e-mail it to us,
so that they don't have to even transcribe it any longer.
But, basically, they keep the totals and the
average prices, and they put them on these lines and mail
*them to us.*
*Q Okay.*
THE COURT: How much time do they have to get this
data in for any particular period?
THE WITNESS: It's due 30 days after the reference
month, so that'd be the end of February for January data.
If it isn't in by 10 days after that, they'll get a call to
remind them that the form is due.
THE COURT: Does that happen very often?
THE WITNESS: Yes. It's not unusual to have a
non-response, initial anyway, early in the cycle, especially
with downsizing going on in the industry and what not.
Resources are tight, and -- but they get them in. The
*response rate is pretty close to 100 percent -- 97 percent.*
THE COURT: When you get late data, do you plug it
in to the period that it originally belonged in, or --

Page 628

THE WITNESS: Yes. We have a preliminary and a
final publication system. The preliminary data for January
would come out, and 60 days later, the March/April time
frame, and we might not have full reporting by then, so we
would impute for the handful of missing jet fuel refiners,
but then by the following month, when the data are final,
we'd have virtually all of them, and those data would go in
for January and come out in April or May.
BY MS. FLOYD:
*Q Okay. This form that we have in front of us, has*
*this form been modified over the years?*
A Yes, it has. With the Clean Air Act and the
introduction of reformulated gasoline, that's when we de-
tail
the gasoline products to the degree that you now see them
on
the previous page.
*Q But in terms of the kerosene-type jet fuel, has*
*this form remained pretty much the same since the period,*
*say, 1991?*
A Yes, ma'am.
*Q Now, when the Energy Information Administration*
*reports this data, can you describe the manner in which it*
*reports the information that you've obtained from this group*
*of people.*
A Okay. It comes out in the Petroleum Marketing
Monthly, in hard copy, to a subscriber list. Respondents

Page 629

get it for free -- not for free since they had to supply the
data -- but, in return.
It goes out to many of the customers that I
mentioned earlier in hard copy, but it's also put on the
Internet, and we have electronic bulletin boards, where it's
made available.
THE COURT: Uh-huh.
THE WITNESS: -- for customers who want to pull it
in more quickly.
Company analysts, for example, will load the data
into their spread sheets for tracking markets, as quickly as
they can get it off the Internet, which is usually three
weeks earlier than the hard copy.
THE COURT: Is the term "price" defined anywhere
in your instructions?
THE WITNESS: Types of prices, but not the term
"price" itself. It is --
THE COURT: What I gather from what I have heard
is that people have different means of coming up with a net
price to a customer, in lieu of discounts and add-ons and
everything else. What are you asking for?
THE WITNESS: Yes, indeed. Any discounts or
premium that are charged for a given type of transaction are
to be included in the averages that are reported to us. So
in residential heating oil, if the sale is to a certain

Page 630

customer, cash or paid within seven days or something like
that, that would be one price.
That would be averaged up for that company,
compared to other customers that may be on a different
arrangement, a credit arrangement, or a capped fixed price
arrangement, or what have you, a full-service contract, or
whatever.
Lots of different types of residential prices to
their customers they might have for that state and that
month, and they're all averaged together and reported for
that month.
BY MS. FLOYD:
Q If, say, a company has a posted price with a
discount, what would you want to be reported to you?
A The actual average -- the actual transactions
price. If for that family -- that heating oil firm,
actually billed them for posted minus the discount, and, you
know, even if taxes were involved and what not, we would --
we'd want the taxes taken out, and that's the way we do
this. But we will want the actual average price for that
company over all of the transactions for that state for that
month, so for that customer, it would be what you said --
posted minus the discount today.
If they pay cash, that's the way it is. It's
posted minus some kind of discount for paying right away.

Page 631

Q Okay. I believe you indicated earlier that the
data is filed on a state-wide basis. Is that correct?
A Yes.
Q How is it reported to subscribers of the data
theory? Does it report on a state-wide basis, or is it
reported in groups? How do you report these?
A You mean in the publication, the Monthly?
Q Yes, the publication.
A It's state level. There are summary tables in the
front, 18 to 20 of them, that are national level and have a
time series for, say, gasoline retail prices. And in the
detail table or for each of these little individual gasoline
markets by state.
Q Now, have any changes in the processing or the
methodology been made in the collection of data or the
processing of data or the analysis of data or the recording
of data with respect to the Petroleum Marketing Monthly
since 1990?
A No, no methodological changes recognizing that we
-- we sample in heating oil, for example -- the bulk of that
residential market is conducted by small mom-and-pop-type
firms, and we have a sample of those wholesalers and
distributors, and we will resample from time to time. But
that's not a change, that's part of the program.
In jet fuel, we have a census of refiners only, so

Page 632

it's irrelevant in that case. It just goes every month, all
the refiners, and they do what I said, and we add them up,
and that's it. We've been doing that for 18 years.
MS. FLOYD: I have no further questions, Your
Honor.
CROSS-EXAMINATION
BY MR. BACHMAN:
Q In connection with your purpose at Department of
Energy for preparing this publication, do you believe it's
your responsibility to prepare the PMM to be used as a price
index for contracting purposes by industry in buying and
selling refined products? Do you publish the PMM for
purposes of using it as a price index, like OPIS or Platt's?
A We're not opposed to it being used for that
purpose. We don't, per se, collect the data and justify its
collection with OMB for that specific use.
We justify its collection on the basis of its
general value in measuring actual average prices, wholesale
and retail, for everything from crude oil from the wellhead
to the pump for state energy offices or various federal
agencies, and most especially for Congressional committees
for analysis purposes, forecasting, market tracking, all
those uses.
It's, it's, it happens to be useful, according to
oil companies and DFSC for indexing, as well, but we didn't

Page 633

specifically design it for that.
*Q Okay. Your statutory authorization, were you mandated to prepare it for that purpose, or is it for the purpose of, like, advising Congress on the fuel costs for the poor, heating oil cost?*
A It's more the latter.
*Q What is the latter? I –*
A Advising Congress on market conditions, state energy offices on market conditions, price behavior, in general.
*Q Okay. If there was an error in this index, could a refiner sue you?*
A Never had one sue me.
*Q Do you believe you have a fiduciary obligation to the refining industry in connection with the publication of this index, if it's even intended as an index?*
A No. I think I have a responsibility to protect their data, to keep it confidential. If they were going to sue me, it might be over that, that I had somehow leaked their proprietary data out, but they owe me the data for market tracking purposes, and they're supposed to make it accurate to me, and to the best of my knowledge, especially in jet fuel, it's a very accurate series.
*Q Do you track your data with OPIS and/or Platt's?*
A We compare it with a number of things, not just

Page 634

OPIS and Platt's, recognizing that there's a lot of products here. For gasoline, for example, we track our data – price data with BLS, the volume data with another EI series, we refer to as the Products Supplied Series.
We also track it with federal highway usage data. Heating oil, likewise – our prices are compared with BLS prices.
MR. BACHMAN: I have no further questions, Your Honor.
*MS. FLOYD: I have no redirect, Your Honor.*
THE COURT: All right. Thank you, sir. You can step down.
(Witness excused.)
MS. FLOYD: Your Honor, Mr. Larry Ervin will be our next witness, and Ms. Karen Schools will be examining him.
THE COURT: All right. All right.
Mr. Ervin, if you would raise your right hand.
Whereupon,
LAWRENCE CALVIN ERVIN
having been first duly sworn, was called as a witness herein and was examined and testified as follows:
THE COURT: Thank you, have a seat.
//
//

Page 635

DIRECT EXAMINATION
BY MS. SCHOOLS:
*Q Good afternoon. What is your full name?*
A Lawrence Calvin Ervin.
*Q What is your current position?*
A I'm the Acting Director of the Office of Market Research and Competition at the Defense Energy Support Center.
*Q What is your educational background?*
A I attended the University of Maryland in College Park, up the road here. I received a Bachelor's of Arts in economics in 1975, and a Master's of Science in Agricultural and Resource Economics in 1980.
*Q How long have you been employed by the Defense Fuel Supply Center?*
A Since September of 1980.
*Q What positions have you held at the Defense Fuel Supply Center?*
A I've been employed as a staff member in the office where I – which I currently direct, as – I've been employed as an industry economist, as a market research analyst, as the liaison officer and manager of the Center's Strategic Petroleum Reserve Program and also as Acting Director – I was also called Acting Chief during one period when our organization was slightly different.

Page 636

*Q What have your responsibilities been in these positions?*
A Analysis of industry information, pricing data, supply statistics, news, and current event-type analysis. Analyses of pricing material and provision of pricing-related material to other offices at the Field Center, mostly, our Comptroller and our Procurement Divisions, our buying divisions.
*Q As part of your responsibilities in the Office of Market Research, did you assist in developing the EPA clauses that appear in DFSC's contracts?*
A Yes, I did.
*Q Why was an EPA clause included in these contracts?*
A We wanted our prices to reflect, as closely as possible, market levels for the same or similar commercial fuels in the marketplace. We wanted our prices to – and I think the concern there is, at least partly, that they not be, you know, reflect too poorly on the upside, obviously, that we wanted the prices to go up and also down when market prices of the similar fuels went down.
So, it was mainly a case of risk sharing, I guess, with our contractors of the market price fluctuations.
*Q Was your office involved in the selection of escalators that were used in the EPA clause?*
A Yes.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - X
LA GLORIA OIL AND GAS :
COMPANY, :
Plaintiff, :
vs. : No. 02-465C
THE UNITED STATES, : (Judge Hewitt)
Defendant. :
\- - - - - - - - - - - - - - X Pages 1-50

Deposition of JACOB BOURNAZIAN
District of Columbia
Wednesday, December 3, 2003

Reported by: Marilyn Feldman, RPR
Job No. 156784

0



December 3, 2003
10:00 a.m.

the PMM back to the 1980s?
A. Yes.
Q. Are they all currently employed by EIA?
A. Yes.
Q. To your knowledge, none of the project managers from the PMM from the early 1980s to now have left the agency; is that correct?



A. Yes.
Q. Let's turn to the first request, request no. 17, which is on page 6 of Plaintiff's Exhibit 2. Request 17 reads: "All documents relating to communications between DESC and EIA concerning use of the PMM index to adjust prices in DESC's price adjustment clauses."
What efforts did you undertake to collect documents in response to that and what did you find?
A. First, in response to that request there was confusion in our organization on the use of the term "indices" because that's not a term we use and we don't -- an index is a ratio of two numbers with a baseline being in the denominator, but we only publish statistics prices. So my assumption is you meant just price data when you used the word index. Is that correct?
Q. I think that's a fair assumption.
A. Okay. So the efforts in responding to 17, everyone was asked to check if they have any

U.S. DEPARTMENT OF ENERGY
Energy Information Administration

Form Expires: 12/31/03

# EIA-782A:
# REFINERS'/GAS PLANT OPERATORS' MONTHLY PETROLEUM PRODUCT SALES REPORT

Schedule I

This report is mandatory under Public Law 93-275. Failure to comply may result in criminal fines, civil penalties and other sanctions as provided by law. *For the provisions concerning the confidentiality of information submitted on this form, see Section VI of the instructions. Public reporting* burden for this collection of information is estimated to average 14.4 hours per response, including the time of reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Energy Information Administration, Office of Statistical Standards EI-73, Mail Station: 2F-081 Forrestal, 1000 Independence Ave. SW, Washington, DC 20585; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

## PART I. IDENTIFICATION DATA

*Complete items 1 thru 7 for new respondents and corrections to label only.*

1. Name

2. Name of Contact Person

3. Contact's Telephone Number ( ) –

4. Street/Box/RFD

5. City 6. State 7. Zip Code

*For assistance in completing this form, call (800) 638-8812.*

8. Reference Month

| Mo | Yr |
|---|---|
| | |

9. Type of Report *(Check one)*

(1) ☐ Original
(2) ☐ Revision, to Report Dated:

| Mo | Day | Yr |
|---|---|---|
| | | |

10. The Number of States For Which You Are Reporting

11. Date of This Report

| Mo | Day | Yr |
|---|---|---|
| | | |

12. Type of Entity *(Check one)*

(1) ☐ Refiner/ Gas Plant Operator
(2) ☐ Reseller
(3) ☐ Reseller/Retailer
(4) ☐ Retailer

13. Which of the following best describes this firm at the end of this reference month?

(1) ☐ In operation
(2) ☐ Temporarily or seasonally inactive
(3) ☐ Sold or leased to another . . . See the Specific Instructions
(4) ☐ Permanently ceased operation . . . See the Specific Instructions

## PART II. CERTIFICATION

I certify that the information provided herein and appended hereto is true and accurate to the best of my knowledge.

14. Name

15. Title

16. Signature

17. Date of Signing

Title 18 USC 1001 makes it a criminal offense for any person knowingly and willingly to make to any Agency or Department of the United States any false, fictitious or fraudulent statements as to any matter within its jurisdiction.

FEB-21-2006 14:46 DESC-G COUNSEL 703 767 5022 P.03/13

# REFINERS'/GAS PLANT OPERATORS' MONTHLY PETROLEUM PRODUCT SALES REPORT

Schedule II

IDENTIFICATION DATA

Firm Name

2. DOE Identification Number

3. Page ___ of ___

Reference Month — Mo | Yr

5. Type of Report *(Check one)*
(1) ☐ Original
(2) ☐ Revision, to Report Dated — Mo | Da | Yr

6. Enter the abbreviation of the state for which this schedule is being filed.
A separate Schedule II should be filed for each state. *(See Appendix A for state abbreviations.)* STATE

PART III. MONTHLY STATE SALES OF FINISHED MOTOR GASOLINE *(Report volumes in thousands gal.; prices in $0.000 per gal.)*

| Line No. | Product *(Refer to definitions)* | RETAIL SALES *(Direct Sales to End-Users)* — SALES THROUGH COMPANY-OPERATED RETAIL OUTLETS (1) | | RETAIL SALES — SALES TO OTHER END-USERS (2) | | WHOLESALE SALES (Sales for Resale) (3) | |
|---|---|---|---|---|---|---|---|
| | Finished Motor Gasoline | Volume *(a)* | Unit Price *(b)* | Volume *(c)* | Unit Price *(d)* | Volume *(e)* | Unit Price *(f)* |
| 7 | Leaded Regular | | | | | | |
| 8.1 | Unleaded Regular | | | | | | |
| 8.2 | Unleaded Midgrade | | | | | | |
| 9 | Premium | | | | | | |

PART IV. MONTHLY STATE SALES OF NO. 2 DISTILLATES *(Report volumes in thousands gal.; prices in $0.000 per gal.)*

| | Product *(Refer to definitions)* | RETAIL SALES (Direct Sales to End-Users) — RESIDENTIAL SALES (1) | | COMMERCIAL/ INSTITUTIONAL SALES (2) | | INDUSTRIAL SALES (3) | | SALES THROUGH COMPANY-OPERATED RETAIL OUTLETS (4) | | SALES TO OTHER END-USERS (Includes Sales to Utilities and Agriculture) (5) | | WHOLESALE SALES (Sales for Resale) (6) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Volume *(a)* | Unit Price *(b)* | Volume *(c)* | Unit Price *(d)* | Volume *(e)* | Unit Price *(f)* | Volume *(g)* | Unit Price *(h)* | Volume *(i)* | Unit Price *(j)* | Volume *(k)* | Unit Price *(l)* |
| 10 | No. 2 Diesel Fuel | | | | | | | | | | | | |
| 11 | No. 2 Fuel Oil | | | | | | | | | | | | |

PART V. MONTHLY STATE SALES OF OTHER PETROLEUM PRODUCTS *(Report volumes in thousands gal.; prices in $0.000 per gal.)*

| Line No. | Product *(Refer to definitions)* | RETAIL SALES (Direct Sales to End-Users) (1) — Volume *(a)* | Unit Price *(b)* | WHOLESALE SALES (Sales for Resale) (2) — Volume *(c)* | Unit Price *(d)* |
|---|---|---|---|---|---|
| 12 | No. 1 Distillate | | | | |
| 13 | Kerosene | | | | |
| 14 | Aviation Gasoline (Finished) | | | | |
| 15 | Kerosene-type Jet Fuel | | | | |
| 16 | No. 4 Fuel Oil | | | | |
| 17 | Residual Fuel Oil with 1 percent or less Sulfur | | | | |
| 18 | Residual Fuel Oil with greater than 1 percent Sulfur | | | | |
| 19 | Propane, Consumer Grade | | | | |

EIA-782A (1-89) ☆ U.S.G.P.O., 1989-617-010/60755

U.S. DEPARTMENT OF ENERGY
Energy Information Administration

Form Expires: 12/31/93

# INSTRUCTIONS FOR FILING THE EIA-782A: REFINERS'/GAS PLANT OPERATORS' MONTHLY PETROLEUM PRODUCT SALES REPORT

## GENERAL INFORMATION

### I. Purpose

The EIA-782A is designed to provide data on the sales of selected petroleum products (volumes and prices) to various categories of end-users and resellers by type of seller at the State level.

These data are collected pursuant to the provisions of the Federal Energy Administration (FEA) Act of 1974, P.L. 93-275. The data are used by the Department of Energy (DOE) in reviewing petroleum product supply, demand and price changes.

### II. Who Must Submit

Any firm that directly or indirectly controls a refinery or gas plant must prepare and file the EIA-782A each month.

### III. What and Where to Submit

Submit a single Schedule I as a cover sheet, and a separate Schedule II for each State in which the respondent sells one or more of the listed products. Send the completed EIA-782A to:

U.S. Department of Energy
Energy Information Administration
EI-43
Mail Station: BG-094 Forrestal
Washington, D.C. 20585

Certified computer printouts that are generally in the format of the EIA-782A will be accepted. Request DOE approval in advance by calling the number below if you plan to submit computer printouts.

If you have any questions concerning any of the EIA-782A instructions, call toll free (800) 638-8812. Firms located in Maryland should call (301) 495-8440.

### IV. When to Submit

The EIA-782A must be submitted to DOE no later than 30 calendar days after the close of each reference month. For example, if the reference month is June 1990, the report must be submitted to DOE by July 30, 1990.

### V. Sanctions

This report is mandatory under Public Law 93-275. Failure to comply with reporting requirements may result in criminal fines, civil penalties, and other sanctions as provided by law.



11

## GENERAL INFORMATION (Continued)

VI. Provisions Regarding Confidentiality of Information

The information contained on this form will be kept confidential and not disclosed to the public to the extent that it satisfies the criteria for exemption under the Freedom of Information Act (FOIA), 5 U.S.C. §552, the DOE regulations, 10 C.F.R. §1004.11, implementing the FOIA, and the Trade Secrets Act, 18 U.S.C. §1905.

Upon receipt of a request for this information under the FOIA, the DOE shall make a final determination whether the information is exempt from disclosure in accordance with the procedures and criteria provided in the regulations. To assist us in this determination, respondents should demonstrate to the DOE that, for example, their information contains trade secrets or commercial or financial information whose release would be likely to cause substantial harm to their company's competitive position. A letter accompanying the submission that explains (on an element-by-element basis) the reasons why the information would be likely to cause the respondent substantial competitive harm if released to the public would aid in this determination. A new justification does not need to be provided each time information is submitted on the form, if the company has previously submitted a justification for that information and the justification has not changed.

Except as otherwise provided by law, the information may be made available in response to an order of a Court of competent jurisdiction, or, upon request, to other components of the DOE, to any Committee of Congress, the General Accounting Office, or other Congressional agencies authorized by law to receive such information. Detailed provisions of the restrictions on the disclosure of this information can be found in the Policy on the Disclosure of Individually Identifiable Energy Information in the Possession of the EIA (45 Federal Register 59812 (1980)).

## GENERAL INSTRUCTIONS

I. To avoid double counting, respondents are to exclude sales to other companies (and their subsidiaries) who also report on the EIA-782A. A list of these companies is provided periodically to all respondents. Additional copies are available upon request.

II. Report all volumes in **thousands of gallons**; e.g., report 6,500 gallons as 7, and 6,400 gallons as 6. Leave both volume and price blank if no volumes were sold. Enter 1 for volumes between 0 and 1,499. Note: One barrel is equal to 42 gallons.

III. Enter data reflecting sales made during the reference month only. Exclude from all calculations any **material** prior period adjustments for volumes and/or prices, and revise the report(s) for the appropriate prior period(s).

Revisions to prior month's reports are required if previously reported prices or volume data are in error by more than plus or minus five percent (5%). All revisions must be submitted within 120 days after the end of the reference month. However, EIA must be notified of significant changes discovered after this date and will determine if a late resubmission is required.

Do not report negative volumes or prices; resubmit earlier reports instead.

IV. Report unit prices in decimals of U.S. dollars, expressed to the nearest tenth of a cent (e.g., $1.065). Unit prices are to be determined by dividing the total revenues derived from the sales of the product during the reference month by the total number of gallons sold. The unit price is the same as the weighted average price for all sales of that particular product to a particular group of customers or class-of-trade. The reported unit price should exclude all taxes on the sale of the petroleum product such as Federal, State, and local excise or sales taxes. Taxes in obtaining, importing, or producing petroleum products (such as crude oil or product importation tariffs, domestic crude oil taxes, facilities taxes, etc.) should not be excluded from

## GENERAL INSTRUCTIONS (Continued)

sales prices for EIA reporting purposes. For example, even though upstream expenses such as the Superfund tax may be shown as a separate line item on invoices of product sales, they should not be excluded from the reported sales price. Transportation costs that are paid as part of the sales price at the point of sale should be included in the reported unit price. Do not calculate unit prices using rounded volumes.

V. Report only the data for the products listed: DOE is not seeking full coverage of all petroleum products sold.

VI. Exclude amounts supplied to exchange partners except where the amount given up exceeds the amount received and the imbalance is invoiced as a sale during the reference month.

VII. If firms do not maintain information sufficient to provide actual sales volumes and unit prices by the customer categories specified on the forms, estimates of sales volumes and unit prices may be provided. The basis for the estimates must be consistent with the standard accounting records maintained by the firm. The estimating procedure and data supporting the estimates should result in a reasonably accurate estimate which will be subject to review.

VIII. Report sales in the State where the transfer of title occurred. For FOB sales at a refinery/terminal, the State is the one in which the refinery/terminal is located. For delivered sales (by any mode of conveyance), the State is the one in which the buyer received the product (see Appendix A for a list of State abbreviations). If transfer of title occurs in the United States, volumes sold for export should be included under "Wholesale Sales." Residual fuel oil sales for vessel bunkering should be reported under "Retail Sales." No. 2 distillate sales for vessel bunkering should be reported under "Commercial/Institutional Sales."

IX. Report the entire firm's sales of the selected products. This includes sales made directly by the parent, affiliates, subsidiaries; or through commissioned agents. Exclude sales made among the parent firm, subsidiaries, and affiliates; i.e., intrafirm transfers/sales.

## SPECIFIC INSTRUCTIONS

**Schedule I**
**Part I**
**Identification Data**

| Item | Instruction |
|---|---|
| 1 thru 7 | Complete items 1 thru 7 if you are a new respondent, or if information shown on the label is incomplete or incorrect. If changes need to be made, cross out the inappropriate information on the label and enter the correct information in the space(s) to the right of the label. |
| 8 | Enter the month and year of the reference month. |
| 9 | Check the type of report that is being submitted. |
| 10 | Enter the number of Schedule II pages submitted with Schedule I. This will reflect the total number of States for which reports are being submitted. |
| 11 | Enter the date this report is being filed. |
| 12 | Mark the appropriate type of entity according to the definitions provided. Refiners operating in more than one capacity should mark "Refiner/Gas Plant Operator." Firms engaging in both |

## SPECIFIC INSTRUCTIONS (Continued)

reselling and retailing should mark "Reseller/Retailer." Firms which directly or indirectly control a refiner should mark "Refiner/Gas Plant Operator." Firms which directly or indirectly control a gas plant operator should mark "Refiner/Gas Plant Operator." The type of entity should not change from month to month but should reflect the activity of the firm throughout the year.

13 Enter the status of the firm at the end of the reference month. If the firm has been sold, leased, or permanently ceased operation, **submit a letter to DOE** stating the reason for the change in status. If the firm has been sold or leased, provide the name and address of the new company, and the date of the transfer. If the firm has permanently ceased operation, provide the date the firm ceased operation. You may include the letter with your monthly report or send it separately to the address shown on Page 1.

Schedule I
Part II
Certification

| Item | Instruction |
|---|---|
| 14 thru 17 | Enter the name and title of the individual designated by the company to sign the certification. The individual must sign in the space provided on the form and enter the date of the signing. |

Schedule II
Identification Data

| Item | Instruction |
|---|---|
| 1. | Enter the name of the reporting firm. |
| 2 | Enter the 10-digit identification number assigned to the reporting firm for this survey. This is the number printed in the upper left corner of the company identification labels which have been provided to you. |
| 3 | Sequentially assign a page number to each Schedule II page. Enter the total number of pages being submitted in item 10 on Schedule I. |
| 4 | Enter the month and year of the reference month for which this schedule is being submitted. |
| 5 | Check whether this is an original or revised report. |
| 6 | Enter the abbreviation for the State. See Appendix A for a list of State abbreviations. |

Schedule II
Part III
Monthly State Sales of
Finished Motor Gasoline

| Item | Instruction |
|---|---|
| 7 thru 9 | Include in the column headed "Sales to Other End-Users" all direct sales to end-users that were not made through company-operated retail outlets. Sales made to retail outlets other than those operated directly by the reporting company, its affiliates, or subsidiaries, should be included in the wholesale sales category (Sales for Resale). |

Report gasoline sales volumes and prices by grade in accordance with their classification at the time of sale. The intent of this form is to capture sales volumes and prices for gasoline sold as leaded regular, unleaded regular, premium (both leaded and unleaded), and a "midgrade" of unleaded gasoline that lies between unleaded regular and premium in both octane and price. For the majority of the United States, the octane ranges (R+M/2) below are appropriate for distinguishing among the four classes of gasoline to be reported:

**Leaded Regular** - Greater than or equal to 87, and less than or equal to 90 octane.

**Unleaded Regular** - Greater than or equal to 85, but less than 88 octane.

**Unleaded Midgrade** - Equal to, or greater than 88, but less than, or equal to 90 octane.

**Premium** - Greater than 90 octane, leaded or unleaded.

In general, automotive octane requirements are lower at high altitudes. Therefore, in some areas of the United States, such as the Rocky Mountain States, the octane ranges for the gasoline grades above may be 2 or more octane points lower. For other aspects of gasoline specifications, please see the Definitions section.

Blends of gasoline containing ethanol or other oxygenates should be reported according to the above criteria. Do not report ethanol (alcohol) sold separately for blending purposes.

Schedule II
Part IV
Monthly State Sales of
No. 2 Distillates

| Item | Instruction |
|---|---|
| 10 and 11 | Report volume and price data in accordance with **what the product was sold as, regardless of the actual specifications of that product.** If a No. 2 distillate was sold as a diesel fuel, report that volume and price in the category "No. 2 Diesel Fuel;" if a No. 2 distillate was sold as a heating or fuel oil, report that volume and price in the category "No. 2 Fuel Oil" even if that product conformed to the higher specifications of a diesel fuel. If sales of a No. 2 distillate were made for which no determination can be made as to whether the product was specifically sold as either a fuel oil or diesel fuel, sales volumes and prices should be classified in accordance with **your best estimate of the intended use** of the product regardless of the product specification; i.e., sales of No. 2 distillate that you believe will be used for heating purposes or as a boiler fuel should be reported under "No. 2 Fuel Oil," sales of No. 2 distillate that you believe will be used as transportation fuels should be reported as "No. 2 Diesel Fuel." |

Include under the category "Residential Sales" those sales of No. 2 fuel oil to individual customers or households (as opposed to businesses or institutions). Sales to apartment buildings/complexes or other multi-family dwellings should be excluded from the "Residential Sales" category but included in the "Commercial/Institutional Sales" category. For those sales to residential facilities for which the respondent is unsure as to where those sales are to be reported, respondents are asked to report those sales in the category that, in their best judgment, is more appropriate.

Include under the category "Commercial/Institutional Sales" those sales of either No. 2 fuel oil or No. 2 diesel fuel to firms engaged in transportation, wholesale or retail trade, finance, insurance and real estate. Also include sales to apartment buildings/complexes, and other multi-family dwellings, hotels and office buildings or complexes, sales to local, State or Federal

Governmental facilities or organizations, along with military sales including those directed to post exchanges. Sales to schools, hospitals, religious institutions, universities or other government-supported organizations are also to be included in this category.

Include under the category "Industrial Sales" those sales of either No. 2 fuel oil or No. 2 diesel fuel to public or private firms engaged in mining, construction, or manufacturing.

Include under the category "Sales Through Company-Operated Retail Outlets" those sales of No. 2 diesel fuel made through company-operated retail outlets which are subject to motor fuel gallonage taxes. Refer to the definition of company-operated retail outlets.

Include under the category "Sales to Other End-Users" (e.g., sales to agricultural customers or to utilities) sales of either No. 2 fuel oil or No. 2 diesel fuel to end-use customers not included in any of the above four categories.

Schedule II
Part V
Monthly State Sales of
Other Petroleum Products

| Item | Instruction |
| --- | --- |
| 12 thru 19 | Include under the category "Retail Sales" all direct sales to end-users. Include under the category "Wholesale Sales" all sales to resellers. |

## DEFINITIONS

1. Affiliate/Subsidiary - Entities directly or indirectly controlled by a parent.

2. *ASTM* - The acronym for the American Society for Testing and Materials.

3. *Aviation Gasoline (Finished)* - All special grades of gasoline for use in aviation reciprocating engines, as given in ASTM Specification D 910 and Military Specification MIL-G-5572. Excludes blending components which will be used in blending or compounding into finished aviation gasoline.

4. *Commercial/Institutional* - Firms engaged in transportation, wholesale or retail trade, finance, insurance, and real estate. Also included are apartment buildings/complexes and other multi-family dwellings, hotels, and office buildings or complexes, local, State or Federal facilities or organizations including the military, schools, hospitals, religious institutions, universities and all other government-supported organizations.

5. *Company-Operated Retail Outlet* - Any retail outlet (e.g., service station) selling gasoline or diesel fuel which is under the direct control of the firm filing this report by virtue of the ability to set the retail product price and directly collect all or part of the retail margin. This category includes retail outlets: (1) being operated by salaried employees of the company and/or its subsidiaries and affiliates, and/or (2) involving personnel services contracted by the firm.

6. *Distillate Fuel Oil* - A general classification for one of the petroleum fractions produced in conventional distillation operations. It is used primarily for space heating, on- and off-highway diesel engine fuel (including railroad engine fuel and fuel for agricultural machinery), and

electric power generation. Included are products known as No. 1, No. 2, and No. 4 fuel oils; and No. 1, No. 2, and No. 4 diesel fuels.

a. *No. 1 Distillate* - A petroleum distillate which meets the specifications for No. 1 Heating or Fuel Oil as defined in ASTM D 396 and/or the specifications for No. 1 Diesel Fuel as defined in ASTM Specification D 975.

(1) *No. 1 Diesel Fuel* - A volatile distillate fuel oil with a boiling range between 300-575°F and used in high-speed diesel engines generally operated under wide variations in speed and load. Includes type C-B diesel fuel used for city buses and similar operations. Properties are defined in ASTM Specification D 975.

(2) *No. 1 Fuel Oil* - A light distillate fuel oil intended for use in vaporizing pot-type burners. ASTM Specification D 396 specifies for this grade maximum distillation temperatures of 400°F at the 10-percent point and 550°F at the 90-percent point, and kinematic viscosities between 1.4 and 2.2 centistokes at 100°F.

b. *No. 2 Distillate* - A petroleum distillate which meets the specifications for No. 2 Heating or Fuel Oil as defined in ASTM D 396 and/or the specifications for No. 2 Diesel Fuel as defined in ASTM Specification D 975.

(1) *No. 2 Diesel Fuel* - A gas oil type distillate of lower volatility with distillation temperatures at the 90-percent point between 540-640°F for use in high-speed diesel engines generally operated under uniform speed and load conditions. Includes Type R-R diesel fuel used for railroad locomotive engines, and Type T-T for diesel-engine trucks. Properties are defined in ASTM Specification D 975.

(2) *No. 2 Fuel Oil* - A distillate fuel oil for use in atomizing type burners for domestic heating or for moderate capacity commercial-industrial burner units. ASTM Specification D 396 specifies for this grade distillation temperatures at the 90-percent point between 540°F and 640°F, and kinematic viscosities between 2.0 and 3.6 centistokes at 100°F.

c. *No. 4 Fuel* - A fuel oil for commercial burner installations not equipped with preheating facilities. It is used extensively in industrial plants. This grade is a blend of distillate fuel oil and residual fuel oil stocks that conforms to ASTM Specification D 396 or Federal Specification VV-F-815C; its kinematic viscosity is between 5.8 and 26.4 centistokes at 100°F. Also included is No. 4-D, a fuel oil for low- and medium-speed diesel engines that conforms to ASTM Specification D 975.

7. *Finished Motor Gasoline* - A complex mixture of relatively volatile hydrocarbons, with or without small quantities of additives, blended to form a fuel suitable for use in spark-ignition engines. Specification for motor gasoline, as given in ASTM Specification D 439-88 or Federal Specification VV-G-1690B, include a boiling range of 122° to 158°F at the 10-percent point to 365° to 374°F at the 90-percent point and a Reid vapor pressure range from 9 to 15 psi. "Motor gasoline" includes finished leaded gasoline, finished unleaded gasoline, and gasohol. Blendstock is excluded until blending has been completed. (Alcohol that is to be used in the blending of gasohol is also excluded.)

a. *Leaded Regular Gasoline* - Gasoline having an antiknock index (R+M/2) greater than or equal to 87 and less than or equal to 90, and containing more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

**DEFINITIONS (Continued)**

b. *Unleaded Regular Gasoline* - Gasoline having an antiknock index (R+M/2) greater than or equal to 85 and less than 88, and containing not more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

c. *Unleaded Midgrade Gasoline* - Gasoline having an antiknock index (R+M/2) greater than or equal to 88 and less than or equal to 90, and containing not more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

d. *Premium Gasoline* - Gasoline having an antiknock index (R+M/2) greater than 90. Includes both LEADED premium gasoline as well as UNLEADED premium gasoline.

(1) *Leaded Premium Gasoline* - Gasoline having an antiknock index (R+M/2) greater than 90, and containing more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

(2) *Unleaded Premium Gasoline* - Gasoline having an antiknock index (R+M/2) greater than 90, and containing not more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

Note: For this survey, gasoline sales should be reported by grade in accordance with their classification at the time of sale. In general, automotive octane requirements are lower at high altitudes. Therefore, in some areas of the United States, such as the Rocky Mountain States, the octane ranges for the gasoline grades above may be 2 or more octane points lower.

8. *Firm* - Any association, company, corporation, estate, individual, joint-venture, partnership, or sole proprietorship or any other entity, however organized, including charitable, educational, or other charitable institutions, and the Federal government including operations, departments, Federal agencies, and other instrumentalities, and State and local governments.

9. *Gas Plant Operator* - Any firm, including a gas plant owner, which operates a gas plant and keeps the gas plant records. A gas plant is a facility in which natural gas liquids are separated from natural gas, or in which natural gas liquids are fractionated or otherwise separated into natural gas liquid products or both.

10. *Gasohol* - A blend of finished motor gasoline (leaded or unleaded) and alcohol (generally ethanol but sometimes methanol), limited to 10 percent by volume of alcohol. For the purpose of this survey report gasohol in the grade of gasoline in which it was sold.

11. *Industrial* - Firms engaged in mining, construction, or manufacturing.

12. *Kerosene* - A petroleum distillate that has a maximum distillation temperature of 401 degrees F at the 10-percent recovery point, a final boiling point of 572 degrees F, and a minimum flash point of 100 degrees F. Included are the two classifications recognized by ASTM Specification D 3699: No. 1-K and No. 2-K, and all grades of kerosene called range or stove oil which have properties similar to No. 1 fuel oil, but with a gravity of about 43° API and a maximum endpoint of 625°F. Kerosene is used in space heaters, cook stoves, and water heaters and is suitable for use as an illuminant when burned in wick lamps.

DEFINITIONS (Continued)

13. *Kerosene-type Jet Fuel* - A quality kerosene product with a maximum distillation temperature of 400 degrees F at the 10-percent recovery point and a final maximum boiling point of 572 degrees F. The fuel is designated in ASTM Specification D1655 and Military Specification MIL-T-5624L (Grades JP-5 and JP-8). A relatively low-freezing point distillate of the kerosene type used primarily for commercial turbojet and turboprop aircraft engines.

14. *Parent* - A firm that directly or indirectly controls another entity.

15. *Propane, Consumer Grade* - A normally gaseous paraffinic compound ($C_3H_8$), which includes all products covered by Natural Gas Policy Act Specifications for commercial and HD-5 propane and ASTM Specification D 1835. EXCLUDES: feedstock propanes, which are propanes not classified as consumer grade propanes, including the propane portion of any natural gas liquid mixes, i.e., butane-propane mix.

16. *Reference Month* - The calendar month and year to which the reported cost, price, and volume information relates.

17. *Refiner* - A firm or the part of a firm that refines products or blends and substantially changes products, or refines liquid hydrocarbons from oil and gas field gases, or recovers liquefied petroleum gases incident to petroleum refining and sells those products to resellers, retailers, reseller/retailers or ultimate consumers. "Refiner" includes any owner of products which contracts to have those products refined and then sells the refined products to resellers, retailers, or ultimate consumers.

18. *Reseller* - A firm (other than a refiner) that carries on the trade or business of purchasing refined petroleum products and reselling them to purchasers other than ultimate consumers.

19. *Reseller/Retailer* - A firm (other than a refiner) that carries on the trade or business activities of both a reseller and a retailer; i.e., purchasing refined petroleum products and reselling them to purchasers who may be either ultimate or other than ultimate consumers.

20. *Residential* - In cases of sales of No. 2 Fuel Oil, includes individual customers or households (as opposed to businesses or institutions) who ostensibly use the fuel in a residence. Sales to apartment buildings/complexes or to other multi-family dwellings are excluded from the "Residential Sales" category and are included in the "Commercial/Institutional Sales" category.

21. *Residual Fuel Oils* - The topped crude of refinery operations, which includes No. 5 and No. 6 fuel oils as defined in ASTM Specification D 396 and Federal Specification VV-F-815C, Navy Special fuel oil as defined in Military Specification MIL-F-859E including Amendment 2 (NATO Symbol F-77), and Bunker C fuel oil. Residual fuel oil is used for the production of electric power, space heating, vessel bunkering, and various industrial purposes.

22. *Retailer* - A firm (other than a refiner, reseller, or reseller/retailer) that carries on the trade or business of purchasing refined petroleum products and reselling them to ultimate consumers.

23. *Sale* - The transfer of title from the seller to a buyer for a price. EXCLUDE: Intrafirm transfers, product consumed directly by the reporting firm, or sales of bonded fuel. Also exclude products delivered/loaned to exchange partners except where the amount given up exceeds the amount received and the differential is invoiced as a sale during the reference month.

24. *Unit Price* - Total revenue derived from the sale of product during the reference month divided by the total volume sold; also known as the weighted average price. Total revenue should exclude all taxes but include transportation costs that were paid as part of the purchase price.

25. *United States* - The 50 States and the District of Columbia.

## APPENDIX A

### LIST OF STANDARD STATE ABBREVIATIONS

AL ... Alabama
AK ... Alaska
AZ ... Arizona
AR ... Arkansas
CA ... California
CO ... Colorado
CT ... Connecticut
DE ... Delaware
DC ... District of Columbia
FL ... Florida
GA ... Georgia
HI ... Hawaii
ID ... Idaho
IL ... Illinois
IN ... Indiana
IA ... Iowa
KS ... Kansas
KY ... Kentucky
LA ... Louisiana
ME ... Maine
MD ... Maryland
MA ... Massachusetts
MI ... Michigan
MN ... Minnesota
MS ... Mississippi
MO ... Missouri
MT ... Montana
NE ... Nebraska
NV ... Nevada
NH ... New Hampshire
NJ ... New Jersey
NM ... New Mexico
NY ... New York
NC ... North Carolina
ND ... North Dakota
OH ... Ohio
OK ... Oklahoma
OR ... Oregon
PA ... Pennsylvania
RI ... Rhode Island
SC ... South Carolina
SD ... South Dakota
TN ... Tennessee
TX ... Texas
UT ... Utah
VT ... Vermont
VA ... Virginia
WA ... Washington
WV ... West Virginia
WI ... Wisconsin
WY ... Wyoming

# A Comparison of Selected EIA-782 Data with Data From Other Sources

by Jacob Bournazian

## Introduction

The Energy Information Administration (EIA) EIA-782 survey series collects data on petroleum markets to fulfill legislative mandates from Congress and to provide comprehensive information for evaluating market behavior. It includes three surveys: Form EIA-782A, "Refiners'/Gas Plant Operators' Monthly Petroleum Product Sales Report;" Form EIA-782B, "Resellers'/Retailers' Monthly Petroleum Product Sales Report;" and Form EIA-782C, "Monthly Report of Prime Supplier Sales of Petroleum Products Sold for Local Consumption." Any reference to the EIA-782 prices refers to the series that includes both the EIA-782A and EIA-782B surveys. Any reference to the EIA-782 volumes refers to the EIA-782C survey series. Any reference to the specific survey is identified as such. This article compares the data from the EIA-782 survey series with other sources to assess the quality of the EIA-782 data. Significant differences and trends among data series may indicate the need for changes in data collection and processing, the reporting population, survey or sample design, or may simply reflect conceptual differences across surveys.

The following data sources were used to compare with the EIA-782 series.
For prices:

- The Bureau of Labor Statistics (BLS) Office of Consumer Price Index (CPI) data for retail prices of motor gasoline and residential No. 2 fuel oil.
- The BLS Office of Producer Prices (PPI) data for wholesale prices of motor gasoline, No. 2 fuel oil and diesel fuel, and kerosene-type jet fuel.
- Oil Price Information Service (OPIS), a privately owned petroleum news and information source, for retail prices of on-highway diesel fuel.
- Form EIA-888, "On-Highway Diesel Fuel Price Survey," for retail prices of on-highway diesel fuel.
- Form EIA-878, "Motor Gasoline Price Survey," for retail pump prices of gasoline.

For volumes:

- Form EIA-821, "Annual Fuel Oil and Kerosene Sales Report," for retail volumes of distillate and residual fuel oil.

- EIA's *Petroleum Supply Annual (PSA)* product supplied for volumes of distillate fuel oil, residual fuel oil, and motor gasoline.

- Federal Highway Administration (FHWA) for retail volumes of motor gasoline.

A more detailed description of each data source is contained in the Notes section at the end of this article.

## Overview

The EIA-782 prices track closely with other EIA surveys and OPIS prices while the BLS prices are higher than EIA-782 prices. The EIA-782C volume data were compared with data from other EIA surveys and the FHWA data series. The EIA-782C volumes for motor gasoline and distillate fuel follow closely with the other data series. However, the EIA-782C residual fuel volumes are significantly below the levels shown by other EIA surveys. The following sections of this article discuss the differences among the price and volume data sources for No. 2 distillate fuel oil and diesel fuel, gasoline, kerosene-type jet fuel, and residual fuel.

## Price Comparisons

Tables FE1 – FE6 show that EIA-782 national prices are generally lower than the BLS, EIA-878, and EIA-888 price data series and follow OPIS prices closely. Retail EIA-782 prices include data from both the EIA-782A and EIA-782B surveys. Differences in the survey methodology across the surveys explain some of the price differences.

- The BLS, EIA-878, EIA-888, and OPIS prices include taxes, whereas EIA-782 prices exclude taxes. For Tables FE3 and FE5, a U.S.-total-weighted Federal and State tax provided by the FHWA is deducted from BLS, EIA-878, EIA-888, and OPIS retail prices. No adjustment was made to the BLS, EIA-878, EIA-888, and OPIS prices for local sales taxes and other State and local fuel taxes such as environmental taxes, underground storage tank taxes, and transportation use taxes because there were not sufficient data available for making adjustments at the U.S. level.

- BLS retail prices are collected from urban areas, whereas EIA-782, EIA-878, and EIA-888 prices are collected from both rural and urban areas across a region or state. The BLS wholesale prices used to calculate the Producer Price Index are collected from a sample of refiners and represent the refiners' selling price for the selected refined products. The EIA-782 gasoline, No. 2 fuel oil and diesel prices are collected from a census of refiners and a sample of resellers and retailers. EIA resale prices represent sales to a seller who will resell the product, i.e., sales by refiners that are not to the ultimate consumer. In most transactions, the wholesale price and resale price are the same. However, there are circumstances where a

refiner may make a wholesale sale to an ultimate consumer. EIA began using the term "Reseller" in 1983 to exclude wholesale transactions to ultimate consumers.

- The EIA-782 uses current period volume weights, while BLS, the EIA-878 and EIA-888 use fixed weights to compute weighted average prices.

- The EIA-782 prices represent all sales during the month, while BLS prices represent the average of outlet prices collected on different days across the first three weeks of the month. The EIA-878 and the EIA-888 weekly surveys also represent a point in time in the week. In this article, the annual EIA-878 and EIA-888 prices were calculated using simple arithmetic means of the published weekly prices.

### Residential No. 2 Fuel Oil

Table FE1 shows BLS prices are 3 to 5 percent higher than EIA-782 prices from 1995 through 2003. The difference between the two series widened from 3 to 5 percent after 1999 and then declined to the usual 3 percent level after 2001. BLS prices are obtained from urban areas only and do not reflect complete geographic coverage for this product. EIA-782 prices are volume weighted price estimates.

Table FE1. 'U.S. Residential No. 2 Distillate Prices, 1995-2003

| | (Cents per gallon) | | |
|---|---|---|---|
| Year | EIA-782 | BLS | Percentage BLS/EIA-782 |
| 1995 | 86.7 | 89.3 | 103.00% |
| 1996 | 98.9 | 101.9 | 103.03% |
| 1997 | 98.4 | 101.4 | 103.05% |
| 1998 | 85.2 | 88.0 | 103.29% |
| 1999 | 87.6 | 90.0 | 102.74% |
| 2000 | 131.1 | 136.0 | 103.74% |
| 2001 | 125.0 | 131.0 | 104.80% |
| 2002 | 112.9 | 116.2 | 102.88% |
| 2003 | 135.6 | 140.0 | 103.28% |

EIA Source: Table 18 Petroleum Marketing Monthly.

### No. 2 Fuel Oil Resale

Table FE2 shows BLS wholesale prices vary widely with EIA-782A resale prices between a range of 5 to 14 percent higher than EIA-782A. The differential between the series has decreased during the past 2 years. One possible reason is that the EIA-782A prices are current period volume weighted averages, and larger volume sales by refiners at lower prices receive greater

weight in calculating EIA-782A prices. The BLS prices are calculated using weights derived from other (non-current) time periods. BLS does adjust their weights on a monthly basis.

**Table FE2 U.S. Refiner Resale No. 2 Fuel Oil Prices, 1995-2003**

| Year | (Cents per gallon) EIA-782A | BLS | Percentage BLS/EIA-782A |
|---|---|---|---|
| 1995 | 51.1 | 56.6 | 110.80% |
| 1996 | 63.9 | 69.4 | 108.66% |
| 1997 | 59.0 | 64.9 | 110.04% |
| 1998 | 42.2 | 48.2 | 114.22% |
| 1999 | 49.3 | 55.9 | 113.32% |
| 2000 | 88.6 | 93.3 | 105.32% |
| 2001 | 75.6 | 84.5 | 111.79% |
| 2002 | 69.4 | 74.8 | 107.77% |
| 2003 | 87.9 | 95.6 | 108.75% |

EIA Source: Table 4 Petroleum Marketing Monthly.

**Diesel Fuel On-Highway**

Table FE3 shows the annual estimates for EIA-782, EIA-888, and OPIS retail on-highway diesel fuel prices from 1995-2003. EIA-782, EIA-888, and OPIS prices vary mostly by 1 to 2 percent and track closely over this time period. Although State and Federal diesel fuel taxes were subtracted from the OPIS and EIA-888 prices, no adjustment was made for local sales taxes, and additional State and/or local taxes relating for environmental regulations and transportation use.

**Table FE3. U.S. Retail On-Highway Diesel Fuel Prices, 1995-2003**

| | (Cents per gallon) | | | Percentage | |
|---|---|---|---|---|---|
| Year | EIA-782 | EIA-888 | OPIS | EIA-888/ EIA-782 | OPIS/ EIA-782 |
| 1995 | 67.0 | 67.5 | 66.0 | 100.72% | 98.53% |
| 1996 | 78.8 | 80.0 | 78.8 | 101.55% | 100.05% |
| 1997 | 74.5 | 75.8 | 74.7 | 101.79% | 100.24% |
| 1998 | 59.3 | 60.2 | 58.9 | 101.52% | 99.26% |
| 1999 | 68.5 | 67.7 | 66.5 | 98.83% | 97.10% |
| 2000 | 103.6 | 104.5 | 103.7 | 100.87% | 100.14% |
| 2001 | 94.3 | 95.4 | 94.4 | 101.20% | 100.15% |
| 2002 | 86.2 | 87.3 | 86.6 | 101.28% | 100.44% |
| 2003 | 104.4 | 105.6 | 104.6 | 101.12% | 100.19% |

EIA Source: Table 16 Petroleum Marketing Monthly for EIA-782 data.

OPIS prices are a compilation of different sources obtained from several credit card issuers and do not reflect complete sales coverage for this product. Outlets from leading truckstop chains, as well as outlets participating in a price and credit reporting service report daily retail prices to OPIS. Approximately 4,500 price quotes are reported daily. In this article, the annual OPIS prices at the U.S. level were calculated using simple arithmetic means based on an average of the prices reported as of Monday of each week of the year.

The EIA-888 prices are based on a sample of 350 outlets. The sample uses a probability proportional to size sampling technique. The U.S. average is calculated using a weighted average of the regional prices where the weights are volumes reported on another EIA survey at the time of sample selection.

### Diesel Fuel Resale

Table FE4 shows the annual estimates for EIA-782A resale and BLS wholesale prices for No. 2 diesel fuel. BLS prices are consistently higher with the difference doubling from 7% in 2002 to 14% in 2003. This product category contains prices for both low and high sulfur diesel fuel. The EIA-782A volume weighted averages reflect the relative importance of these two sulfur categories reported by refiners in the calculation of the average price.

Table FE4. U.S. Refiner Resale No. 2 Diesel Fuel Prices, 1994-2003

| | (Cents per gallon) | | Percentage |
|---|---|---|---|
| Year | EIA-782A | BLS | BLS/782A |
| 1994 | 52.9 | 56.0 | 105.94% |
| 1995 | 53.8 | 57.0 | 105.87% |
| 1996 | 65.9 | 69.9 | 106.06% |
| 1997 | 60.6 | 64.6 | 106.52% |
| 1998 | 44.4 | 47.4 | 106.83% |
| 1999 | 54.6 | 57.1 | 104.58% |
| 2000 | 89.8 | 93.1 | 103.69% |
| 2001 | 78.4 | 83.6 | 106.66% |
| 2002 | 72.4 | 77.7 | 107.35% |
| 2003 | 88.3 | 100.9 | 114.29% |

EIA Source: Table 4 Petroleum Marketing Monthly.

### Motor Gasoline - Retail

Table FE5 shows the annual estimates for EIA-782, EIA-878, and BLS retail prices from 1994-2003. This paper only discusses the prices for regular grade gasoline. BLS prices vary between 5 and 8 percent above the EIA-782 prices. EIA-878 prices vary between 1 and 6 percent above EIA-782 prices during the same time period. Even though both BLS and EIA-878 prices have been adjusted for federal and state taxes, these prices still contain additional taxes relating to local sales taxes and highway use taxes that could not be removed for this analysis. As a result, the EIA-782 prices should be lower than these other series.

Table FE5. U.S. Retail Motor Gasoline Prices, Regular Grade, 1994-2003

| | (Cents per gallon) | | | Percentage | |
|---|---|---|---|---|---|
| Year | EIA-782 | EIA-878 | BLS | EIA-878/EIA-782 | BLS/EIA-782 |
| 1994 | 69.4 | 70.1 | 73.9 | 101.01% | 106.48% |
| 1995 | 72.5 | 73.7 | 77.3 | 101.66% | 106.62% |
| 1996 | 81.2 | 85.0 | 85.7 | 104.68% | 105.54% |
| 1997 | 80.0 | 82.0 | 85.5 | 102.50% | 106.88% |
| 1998 | 62.5 | 64.4 | 67.4 | 103.04% | 107.84% |
| 1999 | 73.0 | 75.2 | 78.2 | 103.01% | 107.12% |
| 2000 | 106.6 | 109.6 | 112.2 | 102.81% | 105.28% |
| 2001 | 99.6 | 103.2 | 107.3 | 103.61% | 107.76% |
| 2002 | 91.6 | 96.1 | 97.4 | 104.91% | 106.33% |
| 2003 | 111.0 | 117.2 | 120.2 | 105.59% | 108.26% |

EIA Source: Table 31 Petroleum Marketing Annual for EIA-782 data.

The annual BLS prices were calculated using simple arithmetic mean of monthly prices. The BLS monthly prices are calculated based on approximately 900 price quotes. Approximately 25 to 35 prices are collected from outlets in each published geographic area. EIA-782 prices represent all sales transactions through company-operated outlets by all refiners and a sample of resellers/retailers throughout the U.S. There are limitations in comparing a simple average data series with a volume weighted average price series across months because of the effect of volume changes throughout the year on the annual price estimate.

The EIA-878 also uses fixed volume weights for calculating U.S. prices based on approximately 800 price quotes each week. Separate outlet weights are used based on the sampled outlet's number of pumps, a proxy for sales volume, to obtain weekly averages for the specific formulations, grades and geographic areas. The weights used in aggregating grades, formulations and geographic areas are derived using volume data from the EIA-782C "Monthly Report of Prime Suppliers Sales of Petroleum Products Sold for Local Consumption," and demographic data from the Bureau of the Census and Department of Transportation on population, number of gasoline stations and number of vehicles. A simple average of weekly prices was calculated to obtain the annual average price. The EIA-782 prices utilize all sales transactions throughout the reference month, whereas the EIA-878 prices are Monday morning prices as of 8:00 A.M.

### Motor Gasoline - Resale

Table FE6 shows the annual estimates for EIA-782A and BLS resale motor gasoline prices from 1994 – 2003. Except for 1994, the BLS prices vary between 1 and 3 percent from the EIA-782A during this ten-year period. The data track closely during 1998 – 2002 despite increased price volatility in the gasoline markets during this time period. The difference widened during 2003 when there were strong price increases in gasoline markets.

**Table FE6. U.S. Refiner Resale Motor Gasoline Prices, Regular Grade, 1994-2003**

| | (Cents per gallon) | | Percentage |
|---|---|---|---|
| Year | EIA-782A | BLS | BLS/EIA-782 |
| 1994 | 56.6 | 59.2 | 104.64% |
| 1995 | 59.3 | 60.9 | 102.68% |
| 1996 | 68.5 | 70.7 | 103.26% |
| 1997 | 67.3 | 69.6 | 103.41% |
| 1998 | 49.9 | 51.1 | 102.42% |
| 1999 | 62.0 | 62.3 | 100.51% |
| 2000 | 94.2 | 92.5 | 98.14% |
| 2001 | 86.5 | 87.9 | 101.58% |
| 2002 | 80.6 | 81.0 | 100.51% |
| 2003 | 98.1 | 100.6 | 102.54% |

EIA Source: Table 6 Petroleum Marketing Annual.

### Kerosene-Type Jet Fuel - Resale

Table FE7 shows the annual estimates for EIA-782A refiner resale kerosene-type jet fuel prices and BLS wholesale kerosene-type jet fuel prices from 1994 – 2003. The two price series vary between 1 and 5 percent during 1994 – 1998. The price differential narrows after 1998 and remains stable at approximately 1 percent. BLS wholesale prices are expected to be similar to EIA-782A resale prices since EIA kerosene-type jet fuel prices are collected from a census of refiners on Form EIA-782A and BLS collects from a sample of refiners.

**Table FE 7. U.S. Kerosene-Type Jet Fuel Resale Prices, 1994-2003**

| | (Cents per gallon) | | Percentage |
|---|---|---|---|
| Year | EIA-782A | BLS | BLS/EIA-782A |
| 1994 | 53.4 | 53.8 | 100.75% |
| 1995 | 53.9 | 55.1 | 102.23% |
| 1996 | 64.6 | 67.6 | 104.64% |
| 1997 | 61.3 | 64.0 | 104.40% |
| 1998 | 45.0 | 46.7 | 103.83% |
| 1999 | 53.3 | 53.9 | 101.16% |
| 2000 | 88.0 | 89.1 | 101.21% |
| 2001 | 76.3 | 78.2 | 102.52% |
| 2002 | 71.6 | 72.2 | 100.78% |
| 2003 | 87.2 | 87.3 | 100.08% |

EIA Source: Table 4 Petroleum Marketing Monthly.

## Volume Comparisons

EIA-782C volumes are compared with volumes reported in the EIA-821, the *PSA*, and the FHWA data series. Product supplied in the *PSA* is an estimate of the demand for petroleum products. It is calculated by adding and subtracting volumes as they move in and out of the primary distribution stream. Sales volume data from the EIA-821 reflect the transfer of product title from a seller to a buyer whereas the EIA-782C measures sales into the States where the products are ultimately consumed. FHWA doesn't collect actual sales data on gasoline and diesel fuel. States report their fuel volumes to FHWA based on the beginning inventory at the terminal facility minus exports plus shipments to the terminal during the reporting cycle. The difference in survey populations, concepts and methodology underlie some of the differences that exist between the EIA-821, the *PSA*, and the FHWA data series.

### Distillate Fuel Oil

Table FE8 shows volumes of distillate fuel oil for the EIA-782C, EIA-821, and *PSA* series from 1993 through 2002. EIA-782C volumes have been below EIA-821 volumes since 1993 and below *PSA* volumes since 1997. The differential continues to grow wider after 1999. Table FE8 also shows that the difference between the EIA-782C and EIA-821 volumes is greater than the difference between the EIA-782C and the *PSA* volumes.

**Table FE8. U.S. Distillate Fuel Oil Volumes, 1993-2002**

| | (Million Gallons) | | | Percentage | |
|---|---|---|---|---|---|
| Year | EIA-782C | EIA-821 | PSA | EIA-821/ EIA-782C | PSA / EIA-782C |
| 1993 | 48,029 | 48,290 | 46,622 | 100.54% | 97.07% |
| 1994 | 49,188 | 50,424 | 48,477 | 102.51% | 98.55% |
| 1995 | 49,332 | 51,469 | 49,158 | 104.33% | 99.65% |
| 1996 | 51,753 | 53,379 | 51,731 | 103.14% | 99.96% |
| 1997 | 51,903 | 54,366 | 52,665 | 104.75% | 101.47% |
| 1998 | 52,371 | 55,306 | 53,064 | 105.60% | 101.32% |
| 1999 | 54,614 | 57,573 | 54,759 | 105.42% | 100.27% |
| 2000 | 55,670 | 59,601 | 57,217 | 107.06% | 102.78% |
| 2001 | 57,344 | 59,911 | 58,971 | 104.48% | 102.84% |
| 2002 | 55,237 | 59,343 | 57,885 | 107.43% | 104.79% |

EIA Source: Table 50 Petroleum Marketing Annual for EIA-782C data.
Table S5 Petroleum Supply Annual for PSA data.
Table 1 Fuel Oil and Kerosense Sales, 2002 for EIA-821 data.

All three data series show a decline in volume from 2001 – 2002. Although Table FE8 shows total distillate volumes, a closer review of the energy use sector volumes in the EIA-821 data series (not shown in this table) provide some explanation for the variation between the data series. EIA-821 data show that sales of distillate fuel oil declined in the industrial, commercial and electric power sectors as moderate natural gas prices reduced the opportunities and need for fuel switching from natural gas to distillate. One possible source for the widening gap between EIA-821 and EIA-782C volumes is the sales reported for on-highway use, which comprised 58% of all distillate sales in 2002 in the EIA-821 data series. The EIA-821 on-highway energy use sector shows an increase of approximately 27% since 1996 and is the largest component contributing to the increase in distillate volumes for that survey during the past 7 years. The EIA-821 volumes for on-highway use are obtained from the Federal Highway Administration and used in place of data reported for this category. However, some EIA-821 respondents may report sales to commercial and institutional fleet vehicles in the commercial use category rather than in the on-highway use category. If the commercial category contains some on-highway use volumes, and exogenous data are used to replace the data for on-highway use, then some double counting of distillate volumes for transportation use on the EIA-821 may occur. If sales to fleet vehicles, which are reported in the commercial category, are increasing at approximately the same rate as other distillate sales for other on-highway use, then the amount of double counting of distillate sales in the EIA-821 survey may also be increasing over the past seven years, and may contribute to any differences between the EIA-782C and EIA-821 data series.

### Motor Gasoline

Table FE9 shows volumes of motor gasoline from the EIA-782C, *PSA*, and FHWA series from 1993 through 2002.

Table FE9. U.S. Motor Gasoline Volumes, 1993-2002

| | (Million Gallons) | | | Percentage | |
|---|---|---|---|---|---|
| Year | EIA-782C | PSA | FHWA | PSA / EIA-782C | FHWA / EIA-782C |
| 1993 | 117,886 | 114,607 | 116,614 | 97.22% | 98.92% |
| 1994 | 120,151 | 116,523 | 118,531 | 96.98% | 98.65% |
| 1995 | 122,582 | 119,405 | 120,876 | 97.41% | 98.61% |
| 1996 | 123,904 | 120,969 | 123,327 | 97.63% | 99.53% |
| 1997 | 125,632 | 122,901 | 125,045 | 97.83% | 99.53% |
| 1998 | 128,696 | 126,518 | 128,504 | 98.31% | 99.85% |
| 1999 | 131,066 | 129,247 | 132,261 | 98.61% | 100.91% |
| 2000 | 129,173 | 129,876 | 132,280 | 100.54% | 102.41% |
| 2001 | 132,029 | 131,991 | 134,110 | 99.97% | 101.58% |
| 2002 | 135,164 | 135,640 | 137,664 | 100.35% | 101.85% |

EIA Source: Table 48 Petroleum Marketing Annual for EIA-782C data.

Table S4 Petroleum Supply Annual for PSA data.

EIA-782C and *PSA*

Table FE9 shows the differential between the EIA-782C volumes and the *PSA* volumes narrowed during the past ten years with the difference being within 1% since 1999. One reason the differential narrowed during the 1990s was that the *PSA* improved its coverage of downstream blending of finished motor gasoline by including gasoline blenders in the survey reporting population. Blending of fuel ethanol, methanol, methyl tertiary butyl ether (MTBE), and other blend stock with gasoline often occurs downstream from the refineries.

EIA-782C and FHWA

Table FE9 also shows that EIA-782C volumes generally track closely with the FHWA motor gasoline volumes and the differential has remained at 2 percent since 2000. FHWA estimates the gasoline consumption by the federal, state, and local government since these volumes are not taxed. Also, FHWA has various models to estimate non-highway use in each state. FHWA estimates federal government highway gasoline use based on information obtained from federal agencies. State-reported federal use of gasoline in excess of the FHWA estimate is presumed to be either civilian non-highway or military use and is eliminated from the Federal figure reported by the State. The constant level of the difference in volumes between these two series may be due to some under coverage of the market by the EIA-782C or differences in how FHWA estimates gasoline sales for off-highway and government use.

## Residual Fuel Oil

Table FE10 shows volumes of residual fuel oil from the EIA-782C, EIA-821, and *PSA* from 1993 through 2002.

**Table FE10. U.S. Residual Fuel Oil Volumes, 1993-2002**

| | (Million Gallons) | | | Percentage | |
|---|---|---|---|---|---|
| Year | EIA-782C | EIA-821 | PSA | EIA-821/ EIA-782C | PSA / EIA-782C |
| 1993 | 13,555 | 15,064 | 16,559 | 111.13% | 122.16% |
| 1994 | 12,753 | 14,825 | 15,652 | 116.25% | 122.73% |
| 1995 | 9,623 | 12,318 | 13,061 | 128.01% | 135.73% |
| 1996 | 10,610 | 13,257 | 13,000 | 124.95% | 122.53% |
| 1997 | 10,583 | 12,504 | 12,218 | 118.15% | 115.45% |
| 1998 | 11,513 | 14,730 | 13,598 | 127.94% | 118.11% |
| 1999 | 10,259 | 13,328 | 12,724 | 129.92% | 124.03% |
| 2000 | 9,733 | 13,211 | 13,375 | 135.73% | 137.42% |
| 2001 | 10,285 | 13,609 | 13,508 | 132.32% | 131.34% |
| 2002 | 8,259 | 10,362 | 10,731 | 125.46% | 129.93% |

EIA Source: Table 49 Petroleum Marketing Annual for EIA-782C data.
Table S6 Petroleum Supply Annual for PSA data.
Table 2 Fuel Oil and Kerosene Sales, 2002 for EIA-821 data.

EIA-782C vs. *PSA* and EIA-821

Table FE10 shows the EIA-782C is significantly below the *PSA* and EIA-821 data series. The difference between the EIA-782C and the other two series is quite large and fluctuates relative to the EIA-782C from 11% in 1993 to a high of 37% in 2000. The gap between the EIA-782C and the EIA-821 has slightly declined since 2000 but there remains a significant gap of 25% in 2002. The gap between the EIA-782C and *PSA* data has remained at approximately 30% since 2001. The large and continuous divergence between the EIA-782C and the other two series indicates that the EIA-782C is missing some residual fuel oil sales.

Residual fuel oil sales plunged in 2002, with the EIA-782C volumes declining by 20%, EIA-821 declined by 24% and *PSA* declined by 21%. Although Table FE10 shows total residual fuel volumes, a closer review of the energy use sector volumes in the EIA-821 data series (not shown in this table) provide some explanation for the variation between the data series. Environmental regulations restricting fuel use, abundant supplies and moderate prices for natural gas prices all contributed to the sharp decline in residual fuel sales. The EIA-821 data series shows electric power and vessel bunkering, the largest categories for residual fuel, falling by 37% and 10% respectively,during 2002. The gap between the EIA-782C and the EIA-821 narrowed by 7% but the gap between the EIA-782C and PSA remained approximately the same between 2001 and 2002. The narrowing of the large gap between the EIA-782C and the EIA-821 from 2001 to 2002 suggests that the sales related to fuel switching from natural gas to residual fuel that occurred on a large scale during 2001 may contribute to the divergence between the EIA-782C and the EIA-821 and *PSA* data series.

**Table FE11. EIA-821 and EIA-782C U.S. Residual Fuel Oil Volumes by PADD, 2000-2002**

| | (Million Gallons) | | |
|---|---|---|---|
| | **2000** | **2001** | **2002** |
| EIA-782C US Residual Fuel Oil | 9,733 | 10,285 | 8,259 |
| EIA-821 US Residual Fuel Oil | 13,211 | 13,546 | 10,362 |
| Percentage EIA-782C/EIA-821 | 73.67% | 75.93% | 79.70% |
| | **Percentage Across PADDs EIA-782C/EIA-821** | | |
| PADD 1 | 73.75% | 73.63% | 76.62% |
| PAD Subdistrict 1A | 101.11% | 83.18% | 96.66% |
| PAD Subdistrict 1B | 87.42% | 87.84% | 86.02% |
| PAD Subdistrict 1C | 55.20% | 59.69% | 64.65% |
| PADD 2 | 48.20% | 48.47% | 60.40% |
| PADD 3 | 67.68% | 80.70% | 82.06% |
| PADD 4 | 328.57% | 332.71% | 297.10% |
| PADD 5 | 83.47% | 82.49% | 87.66% |

EIA Source: Table 49 Petroleum Marketing Annual for EIA-782C data.
Table 2 Fuel Oil and Kerosene Sales, 2002 for EIA-821 data.

Table FE11 compares the EIA-782C and EIA-821 volumes for 2000 – 2002 across the five PADD regions. The data show that during this time period, the 782C data are missing significant volumes in PAD Sub-district 1C and in PADDs 2 and 3. Although, the EIA-782C volumes are approximately 3 times as high as the EIA-821 volumes in PADD 4, PADD 4 is the smallest market with approximately 3% of total US residual fuel sales. Sub-district 1C comprises approximately 25% of U.S. residual fuel sales and PADD 3 constitutes approximately 15%. Additional research is needed, mainly in PAD Sub-district 1C and PADD 3, to determine the causes for the divergence between the EIA-782C and EIA-821 data series.

## Summary

The EIA-782 petroleum product prices were compared with alternative sources from other EIA surveys, BLS, and OPIS prices. The EIA-782 prices tracked closely with other EIA surveys and OPIS prices. BLS prices were higher than EIA-782 prices, and the price differences widened in 2003 across all products. Some difference was expected between these two series because EIA collects prices from a census of refiners and BLS collects prices from a sample of refiners. The EIA-782C volume data were compared with data from other EIA surveys and the FHWA series. The EIA-782C volumes for motor gasoline and distillate fuel track closely with the other data series. However, the EIA-782C residual fuel volumes are significantly below the levels shown by other EIA surveys. The large difference between the EIA-782C residual fuel volumes and the other data sources requires further investigation into the reporting practices of the EIA-782C respondents for this product. Other differences exist among the data sources because of different reporting populations, geographic and/or market coverage, survey design, methodology, reference period intervals, and product and energy-use sector definitions.

## Notes

### Data Sources

The Form EIA-782A, "Refiners'/Gas Plant Operators' Monthly Petroleum Product Sales Report," collects monthly price and volume data at the State level for 14 petroleum products for various retail and wholesale marketing categories. It is a census of refiners and gas plant operators. The frame is updated on an ongoing basis using respondent lists from surveys such as the Form EIA-810, "Monthly Refinery Report;" the Form EIA-816, "Monthly Natural Gas Liquids Report;" and industry trade publications. Currently, 110 companies respond to the EIA-782A survey.

The Form EIA-782B, "Resellers'/Retailers' Monthly Petroleum Product Sales Report," is sent to a sample of resellers and retailers of motor gasoline, distillate, propane, and residual fuel oil. Respondents to Form EIA-863, "Petroleum Product Sales Identification Survey," are used as the sampling frame of resellers and retailers for the EIA-782B. Firms having 5 percent or more of

sales in a State are selected with certainty. The remaining companies on the frame are sampled using probability proportional to size methodology by geographic area, product, and type of sale. The EIA-782B sample includes approximately 2,000 companies.

The Form EIA-782C, "Monthly Report of Prime Supplier Sales of Petroleum Products Sold for Local Consumption," collects volumes of prime supplier sales of selected petroleum products into States where they are locally sold and consumed. A prime supplier is a firm that produces, imports, or transports any of the selected petroleum products across State boundaries and local marketing areas and sells the product to local distributors, local retailers, or end users. This survey provides an accurate measure of consumption in most States. Currently, 183 firms respond to the EIA-782C survey.

Data collected on the Forms EIA-782A, EIA-782B, and EIA-782C are published in the *Petroleum Marketing Monthly (PMM)* and the *Petroleum Marketing Annual (PMA)*.

In addition, production, import, and export data collected by EIA's Petroleum Division are published in the *Petroleum Supply Monthly (PSM)* and the *Petroleum Supply Annual (PSA)*. The Petroleum Division uses the Petroleum Supply Reporting System (PSRS) for data collection. The PSRS is composed of a family of data collection survey forms, data processing systems, and publications systems. Detailed data on refinery and natural gas plant operations, bulk terminal and pipeline stocks, petroleum products imports, and movements of petroleum products among Petroleum Administration for Defense (PAD) districts are collected monthly. Figures for product supply originate from Forms EIA-810, "Monthly Refinery Report;" EIA-811, "Monthly Bulk Terminal Report;" EIA-812, "Monthly Product Pipeline Report;" EIA-813, "Monthly Crude Oil Report;" EIA-814, "Monthly Imports Report;" EIA-816, "Monthly Natural Gas Liquids Report;" and EIA-817, "Monthly Tanker and Barge Movement Report." Aggregate export data obtained from the Bureau of the Census are also included in computations for the *PSM* and *PSA*. The *PMA* and the *PSA* may contain revisions of the data published in the *PMM* and the *PSM*, respectively, due to late submissions or revisions to the monthly data.

The Form EIA-821, "Annual Fuel Oil and Kerosene Sales Report," collects data on the sales to end users of distillate fuel oil, residual fuel oil, and kerosene. The sample size is approximately 4,000 for 2002. The data are used to determine the level of sales by energy-use category and product at the State, regional, and national levels. The sampling frame for the EIA-821 is also derived from the respondents to Form EIA-863. The EIA-863 is a quadrennial census used to collect information on size, type, and geographic location of firms selling petroleum products. Data from the Federal Highway Administration (FHWA) of the U.S. Department of Transportation replace EIA-821 data reported as on-highway diesel sales.

The Highway Statistics Division of the FHWA collects information related to highway transportation. Sales volumes of motor gasoline are published on a calendar year basis and are a

cumulative tabulation of gross gallons of gasoline reported by wholesale distributors to State motor fuel tax agencies. The FHWA collects information on finished motor gasoline, with no distinction made among motor gasoline grades. The data include gasoline for both highway and non-highway use. The FHWA includes gasohol but excludes exports, fuels for military use, and dealer transfers.

The Bureau of Labor Statistics (BLS) publishes the aggregate index for household fuels and its component indexes for motor fuels. Retail prices are collected monthly by BLS representatives in the urban areas, and support the estimation of the Consumer Price Index (CPI). Wholesale prices are collected monthly and support the estimation of the Producer Price Index (PPI).

The CPI and PPI use fixed volume weights to measure the change in price over time. The CPI measures the change in prices for a defined market basket of goods and services and the PPI measures the change in prices received by domestic producers for their output. Approximately 900 retail prices are collected for regular grade gasoline in approximately 87 urban areas across the country and include all taxes directly associated with the purchase and the use of the items. The 87 areas cover 39 States and the District of Columbia. The PPI collects prices from a sample of domestic refiners. Although most PPI prices are collected on one particular day of the month, the prices for refined petroleum products are commonly an average of prices during the first 10 working days of the month, or the prices received by oil refineries on the 10th working day of each month.

Westlaw.

1988 WL 227932 (Comp.Gen.), B- 230,556

**(Cite as: 1988 WL 227932 (Comp.Gen.))**

COMPTROLLER GENERAL

*1 Subject: Defense Fuel Supply Center's Small Business Set-Aside Procurements (B-230556; Code 396917)
September 6, 1988

To: Group Director, NSIAD--John Rinko
Thru: Senior Attorney, OGC--A.R. Kasdan

DIGEST

The Defense Fuel Supply Center's (DFSC) small business partial set-aside procedures for the acquisition of its fuel supplies, comply and are consistent with the Small Business Act, 15 U.S.C. 631 et.seq., as well as other applicable Federal procurement laws and regulations. The DFSC procedures have been approved as deviations from applicable procurement regulations for over 20 years, and we previously considered these procedures as a reasonable exercise of DFSC's discretion. See B-168576(2), April 28, 1971 and B-171289, April 28, 1971.

This responds to your request for our views on the legality of the Defense Fuel Supply Center's (DFSC) small business set-aside practices (procedures) for the acquisition of its fuel supplies. In his letter of January 11, 1988, to GAO requesting this review, Senator Max Baucus questioned whether DFSC's small business set-aside procedures afford small business a fair opportunity to compete for these fuel acquisitions. He has asked GAO to determine whether DFSC's procurement procedures are consistent with the Small Business Act, as well as other applicable Federal procurement laws and regulations. For the reasons given below, we believe that DFSC's small business set-aside procurement procedures comply and are consistent with those laws and regulations.

Background

The DFSC purchases its bulk fuel supplies for the Department of Defense's (DOD) domestic requirements in a non-traditional way. It makes two major buys of bulk fuels with multiple contract awards based on a geographical division of the country: Inland/West and East/Gulf. It uses a bid evaluation model developed in the 1960's and 70's which allows it to select the particular combination of contract awards for a specific buy which will fulfill the government's requirement at the overall lowest cost (product plus transportation cost). Under this model, multiple awards are needed at many locations so that each individual requirement or location can be completely supplied. Usual procedures of awarding contracts to the lowest sources do not provide the least total cost pattern of awards.

DFSC solicitations request offers from all suppliers, including both large and small business firms, for needs of all DOD locations in the particular geographic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

area. Using the model developed and taking into account quantities reserved for qualified minority small business firms and small business set-asides, prices for bulk fuels at the various locations in the region are established. DFSC must assure that the small business firms eligible for set-asides are offered an opportunity to receive contracts at a particular location at prices which are not higher than the maximum unit price DFSC would otherwise have to pay. It uses one of three methods--the balanced price, the step price and the matched price--depending on the pattern of bids received to determine the set-aside price. This price is then offered to small business and they have an opportunity to accept or reject it. If it is rejected, the amount set-aside is offered to other sellers at that location to avoid any resolicitation.

*2 Since 1960 DFSC procedures have been approved as a deviation or exception from procurement regulations applicable to small business partial set-asides. The most recent extension of this exception occurred in May 1987 when the DFSC procedures were approved as a deviation from the applicable provisions of the Federal Acquisition Regulation (FAR 19.507, and 19.508(d) ) and of the Defense Supplement to the FAR (DFAR 19.508(d) and 19.508(70) ). DFSC believes that these procedures are necessary to assure awards to small business concerns at prices that are fair and reasonable to the government and to the concerns. DFSC also argues that its procedure results in small business receiving an equal to or higher price for their fuel than they would have received if the standard FAR small business partial set-aside procedures were used. Under the FAR, the price for a partial set-aside is "... the highest unit price(s) in the contract(s) for the non-set-aside portion...." FAR 52.219.7

In his January 11 letter, Senator Baucus expressed concern that the DFSC's partial set-aside procedure may not be consistent with the spirit of the Small Business Set-Aside Program. He stated that in DFSC procurements small businesses do not engage in price competition with other small businesses. Since the "match price" for the fuel is largely set by the prices submitted by large fuel suppliers, small businesses are forced to compete with the cost of production of large suppliers. He therefore contends that DFSC's procedure does not offer small businesses the "maximum practical opportunity to participate in the performance of contracts let by any Federal agency," referring to the Small Business Act, 15 U.S.C. 637. [FN1]

Question: Does the DFSC small business partial set-aside procedure comply with the Small Business Act and other federal procurement laws and regulations?

Answer: Yes. Although the DFSC small business set-aside procedure is an approved deviation from FAR and DFAR provisions, it reserves for small business a portion of a particular acquisition as long as the price does not exceed the market price. The deviation from FAR and DFAR set aside procedures is required because of the nature of DFSC's acquisition of bulk fuel supplies. No provision of the Small Business Act or the FAR or DFAR require that small business compete only against each other in setting the price for the small business set-asides. GAO has previously found substantially similar DFSC procedures to be reasonable.

Explanation: The Small Business Act, 15 U.S.C. 631 et. seq., is designed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

protect the economic interests of small business concerns, and "... to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the government be placed with small business enterprises ..." 15 U.S.C. 631(a). (Emphasis added.) Identical policy objectives are stated in the Armed Services Procurement Act (ASPA), 10 U.S.C. 2301(b), and the Federal Property and Administrative Services Act (FPASA), 41 U.S.C. 252(b), which respectively govern military and civilian acquisitions. Part 19 of the FAR implements the small business acquisition-related provisions of the Small Business Act and the applicable provisions of the ASPA and FPASA. Also, provisions of the DFAR apply to small business set-aside in DOD acquisitions.

*3 To achieve the Small Business Act's "fair proportion policy", both the Act and the FAR give federal agencies broad authority to award contracts to small business, including on a total or partial set-aside basis. 15 U.S.C. 644(a) and FAR 19.5. An agency may not award a contract to a small business firm if the agency's cost would exceed a fair market price, 15 U.S.C. 644(a). [FN2] Relatedly, the FAR set-aside procedures provide that in both total and partial procurement set-asides, the contracts awarded must be made only at reasonable prices. FAR 19.502-2 and 19.502-3. The FAR also requires that specific clauses be inserted for set-aside contracts, i.e., FAR 52.219-6 (total set-asides) and 52.219-7 (partial set-asides). [FN3]

For partial set-asides, FAR 19.502(3)(c) requires that the contracting officer must first award the non-set-aside portion using normal contracting procedures. Both large firms and businesses eligible for the set-aside submit offers on the non-set-aside portion. After the non-set-aside portion is awarded, the contracting officer negotiates with small business firms who have submitted responsive (acceptable) offers on the non-set-aside portion. The set aside portion will be awarded at the highest unit price(s) in the non-set-aside portion. FAR 52.219-7, part (b)(3) of the required contract clause. If a set-aside acquisition is not awarded, the supplies or services for which no award was made is recompeted. FAR 19.507(a).

The DFSC procedures differ from the FAR procedures in two substantial respects which are said by DFSC to be required to effectuate bulk fuel acquisitions. First, the award of set-aside quantities is made at prices which would have been paid without the set-aside. This can differ from the "highest unit price(s)" paid under the FAR. This variance is the result of the nature of the petroleum refining business. In most businesses, prices will often drop as more product is produced. In the petroleum refinery business, the contrary is the case. Since the refining process can produce many products, e.g., jet fuel, gasoline, diesel fuel, etc., increased quantities of one product are produced at the expense of others and the price of additional production rises.

The second difference is that in the event of set-aside failures, the set-aside portion is not recompeted. Under the DFSC procedures both large and small firms are required to submit offers on total quantities just as if there was no set-aside. In this way, in the event a set-aside acquisition cannot be filled, other offers can be considered.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 227932 (Comp.Gen.), B- 230,556

**(Cite as: 1988 WL 227932 (Comp.Gen.))**

Under both the FAR partial set-aside regulation and the DFSC deviation large and small business compete against each other. Under the former, the large and small firms submit offers on the non-set-aside portion which is awarded first. The set-aside portion is negotiated with qualified small business who have submitted responsive offers under the non-aside portion. Under the DFSC procedure, both large and small firms compete by submitting offers on total quantities.

*4 We have found no court cases or GAO decisions or opinions which have specifically addressed the issue whether the FAR partial set-aside procedures are a reasonable implementation of the requirements of the Small Business Act. However, GAO has considered DFSC procedures substantially similar to those in effect today as a reasonable exercise of an agency's discretion. In B-168576(2), April 28, 1971, a small business protested the reduction of the small business set-aside and proposed certain changes in DFSC's set-aside procedures. At that time, DFSC's procedures were a deviation from applicable ASPA regulations. The protestor proposed that the formula DFSC uses to calculate the prices paid for the quantities accepted be modified. Under this proposal, the price for the set-aside would be set on the basis of the prices and quantities remaining on each offeror's bid after subtracting the amount awarded on the non-set-aside portion.

DFSC pointed out that the proposed procedure would not only cost the government more money, but might actually result in lower prices for set-asides as the percentage of the total procurement which is set-aside increases. GAO stated that it would not substitute its judgment for that of DFSC "unless it [DFSC] has acted in an arbitrary or capricious manner." We concluded that based on the record, there was "substantial evidence to support DFSC decision not to revise its small business set-aside procedures," as suggested by the protestor. In B-171289 , also decided on April 28, 1971, GAO concluded that it failed to see how evaluation procedures--substantially similar to DFSC present procedures--would be contrary to the "congressional purpose and intent in establishing the small business set-aside procedure, 15 U.S.C. 631."

In conclusion, we find no reason to question our previous positions that DFSC procedures are in compliance with the Small Business Act and are a reasonable exercise of agency discretion to implement the policy of the act.

Substantially similar DFSC procedures have been approved as deviations from applicable procurement regulations for partial set-asides for over 20 years. Our view is reenforced by information DFSC has provided that shows that the DFSC set-aside procedure results in small businesses receiving an equal to or a higher price for their fuel than under the FAR set-aside procedure.

Finally, we note that Senator Baucus letter referenced the Small Business Act's requirement that small businesses "... shall have the maximum practical opportunity to participate in the performance of contracts let by any federal agency ..." 15 U.S.C. 637(a). However, this section is not applicable to the award of a federal contract, but to insure that small business receive subcontracts under prime contracts the government has already awarded.

Raymond J. Wyrsch

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 227932 (Comp.Gen.), B- 230,556

**(Cite as: 1988 WL 227932 (Comp.Gen.))**

Senior Attorney, OCG

FN1 Senator Baucus' request stemmed from a specific DFSC fuel acquisition in which one small business firm, the Wolf Point Refining Company, could not meet the offered "match price" for the delivery of JP-4 fuel to the Minot Air Force Base, because to do so would have resulted in a $900,000 loss to the company. The attorney representing the company believes that DFSC's small business set-aside procedure offers little opportunity for small businesses to compete against large firms. In view of the Senator's request for a general assessment of DFSC's procedure, and that Wolf Point did not file a bid protest concerning the Minot fuel acquisition, we will not address this case.

FN2 The Small Business Act also requires that the head of each agency shall establish goals for the participation by small business concerns in the award of its procurement contracts having a value of $25,000 or more, 15 U.S.C. 644(g).

FN3 The DFAR also requires that similar clauses be inserted in DOD contracts, i.e., DFAR 52.219-7003.

1988 WL 227932 (Comp.Gen.), B- 230,556

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.