# SECOND SUPPLEMENTAL APPENDIX

Page 506

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BARRETT REFINING CORPORATION, )
Plaintiff, )
v. ) No.: 96-15C
) 96-724C
THE UNITED STATES, ) 96-725C
) 96-726C
Defendant. ) 97-321C
*Courtroom 3*
National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Wednesday,
July 29, 1998

The parties met, pursuant to the notice of the Judge, at 9:07 a.m.

BEFORE: HON. ERIC G. BRUGGINK
Associate Judge

APPEARANCES:
For the Plaintiff:
JAMES D. BACHMAN, ESQ.
ALICE D'ONAFRIO
Doyle & Bachman
919 18th Street, N.W.
Washington, D.C. 20006
(202) 659-4740
JOHN A. BARRETT, JR.
President, Barrett Refining Corp.
1210 Gordon Cooper Drive
Shawnee, Oklahoma 74801

Page 507

*APPEARANCES: (continued)*
For the Defendant:
SHERRY L. FLOYD, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-8278
KAREN E. SCHOOLS, ESQ.
Defense Fuel Supply Center (DFSC-G)
8725 John J. Kingman Road, Suite 4950
Fort Belvoir, Virginia 22060-6222
(703) 767-5010
//
//
//
//
//
//
//
//

Page 508

C O N T E N T S
VOIR
*WITNESSES: DIRECT CROSS REDIRECT RECROSS DIRE*
For the Defendant:
Robert Myrben 514 524 531 532 –
Henry Steven Prime 533 556 564 – –
John Harold Ayers 568 588 – – –
Edith Duhaine 589 614 – – –
John S. Cook 618 632 – – –
Lawrence Calvin Ervin 634 656 668 670 –
George Roland Schink 671 – – – –
//
//
//
//

Page 509

*E X H I B I T S*
PLAINTIFF'S
EXHIBITS: IDENTIFIED RECEIVED DESCRIPTION
226 561 – Bid evaluation model
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

AFTERNOON SESSION
1:25 p.m.
THE CLERK: Court is back in session.
Whereupon,
EDITH DUHAINE
having been previously duly sworn, was recalled as a witness herein and was examined and testified further as follows:
THE COURT: All right, Mr. Bachman, are your ready to proceed?
MR. BACHMAN: Yes, Your Honor, I have no further questions of this witness.
THE COURT: All right.
Any redirect?
MS. SCHOOLS: No other questions, Your Honor.
THE COURT: Thank you very much. You may step down.
(Witness excused.)
THE COURT: Ready for your next witness?
MS. FLOYD: Yes, Your Honor. The Government calls Mr. John Cook as its next witness.
THE COURT: Mr. Cook, if you would raise your right hand.



Whereupon,
JOHN S. COOK
having been first duly sworn, was called as a witness herein and was examined and testified as follows:
THE COURT: Thank you. Have a seat.
DIRECT EXAMINATION
BY MS. FLOYD:
*Q Could you please state your full name for the record?*
A John S. Cook.
*Q By whom are you employed?*
A The Department of Energy, the Energy Information Administration.
*Q What is your title?*
A I am currently director of the Petroleum Division within the Office of Oil and Gas.
*Q Are you located in Washington, D.C.?*
A Yes.
*Q Can you state what your educational background is, please?*
A I have a Ph.D. in economics and Master's Degrees in both economics and mathematics.
*Q Can you elaborate on your experience following your Ph.D.?*
A I spent three years teaching graduate-level



economics courses at the University of South Carolina; five years at the Bureau of Labor Statistics, first as an economist and then as a Branch Chief, doing research on service industry pricing; and then the last 18 years at the Department and the Energy Information Administration with petroleum statistics.
*Q All right. Can you describe your responsibilities in your current position?*
A Okay. Basically, we do petroleum analyses and short-term forecasting functions. We collect a lot of data on crude oil and refined products, supplies, and prices, and we publish them in the PMM.
THE COURT: What is PMM?
THE WITNESS: I'm sorry. That's the Petroleum Marketing Monthly.
THE COURT: It is your own publication?
THE WITNESS: It's our own publication. It comes out monthly. It has average prices for crude oil and gasoline, distillates, those kinds of things. We publish them at the state level and at regional levels, like the East Coast and national-level figures.
THE COURT: Okay.
BY MS. FLOYD:
*Q Can you describe, also, what the Energy Information Administration is?*



A Basically, it does two things. For all the energy sources, including coal, electricity, and natural gas, as well as petroleum, we do analyses, special studies for Congress and other interested parties, short-term and long-term forecasting and collect and publish data on coal, electricity, the various energy sources.
THE COURT: Does that satisfy some statutory duty?
THE WITNESS: Yes. The Agency was formed in '77 by the Department of Energy Act. The data programs themselves are required by the Federal Energy Emergency Act. There are a number of other statutes that require a centralized energy data base for prices and supplies, and so these programs are all in response to those legislative mandates.
THE COURT: Well, who is your primary customer or client for that data?
THE WITNESS: Virtually, every sector of the market uses the data. State energy offices are a key user, given that the data are at the state level. They not only use it to forecast and to track the market, but, for example, they work with Health and Human Services to assist the poor in paying their energy bills. You get a price spike like we saw in heating oil in 1996, and a lot of the low-income families can't pay their bills.
Congress will pass a supplementary appropriation,



2

Page 621

and these price data are used, along with others, to allocate out the extra funding to the various states. Most – know, the heating oil is consumed in the Northeast, which is also where the higher prices are, so those states, in using those data, qualify for a larger share of the allocation.

A lot of other examples – the Bureau of Economic Analysis uses the price data as input to various tables that they do in preparing the gross domestic product. BLS themselves uses the data in putting out their International Pricing Index.

GAO, like us, has used the price data on a number of occasions to analyze the factors driving prices up, like in '96, when we had gasoline spikes.

The Northeast Congressional Coalition, some 200 state Congressional offices, are very attune to the data, again, because they tend to be the consuming states in the Northeast and pay the higher prices. So they have a number of programs that they watch, including the Low-Income Energy Assistance Program, the Weatherization Programs, and Energy Efficiency Programs, where the data are used to help them formulate legislation and what not.

THE COURT: Is it just retail prices you track, or –

THE WITNESS: No, both wholesale and resale –

Page 622

retail. For example, in gasoline, you got it all. It's broken out by the type of gasoline we formulated – conventional, what have you, bulk transactions at the wholesale level, spot – in other words, transactions – Rack transactions and dealer tank wagons are all identified.

The retail level, you have, basically, just two categories. Sales – pump sales, through company outlets, and other end-user sales.

The distillate market is broken out into the various standard end-use categories – residential, industrial, commercial, and what have you.

The wholesale transactions are basically just A-category.

THE COURT: Such as what?

THE WITNESS: It includes all types of transactions, spots, and contracts, but they're not broken out. The wholesale market, basically, is only broken out into bulk, rack, what have you, in the gasoline for the gasoline –

THE COURT: By product?

THE WITNESS: – price. The other products are not as detailed at the wholesale level. Gasoline is, but not the distillates and resids. There's more detail in the retail end of the distillates then there is for gasoline, primarily because of the, the consumer – or the customer

Page 623

use.

Again, the states and various energy committees and staffers – the Northeast Midwest Coalition – are heavy users of the data and were involved in developing the forms, and these seem to be the categories that they were most interested in.

THE COURT: We are talking about actual purchasers using the data, or Governmental entities that are not doing purchasing?

THE WITNESS: More Governmental users.

THE COURT: Is there some statutory duty on the part of the sellers or the buyers to make – report the data?

THE WITNESS: Yes, Your Honor, it is mandatory. Again, the FEA Act makes it mandatory that all energy firms report these kinds of data to the Department. There are –

THE COURT: Is it data at the microscopic level, or is it – is their lumping together of sales, or how does that work?

THE WITNESS: Well, a refiner, again for gasoline, will have to – for each state that they do business in, report for each of these categories the total amount of monthly sales, bulk transactions, for example, or retail outlet transactions, and the average price of all those transactions that occurred in that month.

Page 624

So they will have to keep detailed accounting, computerized accounting records, to report that data to us. And once the data comes in, their, their process – aggregated, averaged up to the state level across all the companies that report to us, and then averaged further to regional levels and national levels.

THE COURT: What actually gets printed in your report?

THE WITNESS: Okay. For gasoline, again, you'll have – for the State of Virginia, you'll have an average price for reformulated gasoline –

THE COURT: We are talking about at the wholesale level?

THE WITNESS: Both. That's what –

THE COURT: All right.

THE WITNESS: – I was going to say. For reformulated gasoline, you'll have the pump price, the retail price. You'll also have the rack price. At the wholesale level, the bulk price, the dealer tank wagon price, and you'll have it split further for conventional gasoline.

Central Virginia uses conventional, so they'll be prices state level that aren't, per se, you know, Central Virginia, just not disaggragated that far. But, you know, it's a common use of the data since that's where that

Page 625

consumption occurs.
Heating oil – on the retail side, you'd have for Virginia residential prices, industrial prices, commercial prices, agricultural prices, and then you would have the wholesale price.
BY MS. FLOYD:
*Q I would like to have you turn to Defendant's Exhibit 145, page 75, and that should be in a binder right on your left, probably fourth binder in on 45, and then if you could, turn to page 75 of Exhibit 145.*
A Page 75?
*Q I am sorry. Exhibit 145.*
A Okay. You lift it out of here, right? Okay.
*Q And page 75.*
A Okay.
*Q Okay. At page 76, can you identify what this document is? It extends to page 89.*
A Okay. This is the form, the 782A that we collect these data I was talking about on.
(The document referred to was marked for identification as Defendant's Exhibit 145.)
*Q Is this the track form that is used, to your knowledge?*
A Yes. You can tell from the numbers in the right-

Page 626

hand corner.
*Q Can you explain how this form is used, with particular attention to kerosene-based jet fuel?*
A Okay. Well, the form itself is mailed – or companies sometimes get them electronically now – to the various refiners that are expected to fill the forms out, and within 20 to 30 days after the reference month, which, for example, if it's January of this year, 1998, and they've kept their records, they would simply report for all the states that they do jet fuel business in. The total volume on line 213 –
*Q And –*
A – the average price –
*Q – what page of the document are you referring to?*
A Well, I'm using – I think it's 78.
*Q Okay. Can you –*
A Page 78.
*Q Where is 213?*
A That's the fourth line down for jet fuel.
*Q Under "Part 4, Monthly State Sales of Other Petroleum Products"?*
A Right. They report any retail sales and wholesale sales, for example.
*Q How would they report this?*
A Well, they can fill it out if it comes out of

Page 627

their computer records, depending on how automated they are.
They get a printout, and they should have a system that would give them this specific price, and they can transcribe it over. Some of them actually have these forms computerized, where they can take data directly out of their data base and put it on the form and then e-mail it to us, so that they don't have to even transcribe it any longer.
But, basically, they keep the totals and the average prices, and they put them on these lines and mail them to us.
*Q Okay.*
THE COURT: How much time do they have to get this data in for any particular period?
THE WITNESS: It's due 30 days after the reference month, so that'd be the end of February for January data. If it isn't in by 10 days after that, they'll get a call to remind them that the form is due.
THE COURT: Does that happen very often?
THE WITNESS: Yes. It's not unusual to have a non-response, initial anyway, early in the cycle, especially with downsizing going on in the industry and what not. Resources are tight, and – but they get them in. The response rate is pretty close to 100 percent – 97 percent.
THE COURT: When you get late data, do you plug it in to the period that it originally belonged in, or –

Page 628

THE WITNESS: Yes. We have a preliminary and a final publication system. The preliminary data for January would come out, and 60 days later, the March/April time frame, and we might not have full reporting by then, so we would impute for the handful of missing jet fuel refiners, but then by the following month, when the data are final, we'd have virtually all of them, and those data would go in for January and come out in April or May.
BY MS. FLOYD:
*Q Okay. This form that we have in front of us, has this form been modified over the years?*
A Yes, it has. With the Clean Air Act and the introduction of reformulated gasoline, that's when we detail the gasoline products to the degree that you now see them on the previous page.
*Q But in terms of the kerosene-type jet fuel, has this form remained pretty much the same since the period, say, 1991?*
A Yes, ma'am.
*Q Now, when the Energy Information Administration reports this data, can you describe the manner in which it reports the information that you've obtained from this group of people.*
A Okay. It comes out in the Petroleum Marketing Monthly, in hard copy, to a subscriber list. Respondents

Page 629

get it for free -- not for free since they had to supply the data -- but, in return.

It goes out to many of the customers that I mentioned earlier in hard copy, but it's also put on the Internet, and we have electronic bulletin boards, where it's made available.

THE COURT: Uh-huh.

THE WITNESS: -- for customers who want to pull it in more quickly.

Company analysts, for example, will load the data into their spread sheets for tracking markets, as quickly as they can get it off the Internet, which is usually three weeks earlier than the hard copy.

THE COURT: Is the term "price" defined anywhere in your instructions?

THE WITNESS: Types of prices, but not the term "price" itself. It is --

THE COURT: What I gather from what I have heard is that people have different means of coming up with a net price to a customer, in lieu of discounts and add-ons and everything else. What are you asking for?

THE WITNESS: Yes, indeed. Any discounts or premium that are charged for a given type of transaction are to be included in the averages that are reported to us. So in residential heating oil, if the sale is to a certain

Page 630

customer, cash or paid within seven days or something like that, that would be one price.

That would be averaged up for that company, compared to other customers that may be on a different arrangement, a credit arrangement, or a capped fixed price arrangement, or what have you, a full-service contract, or whatever.

Lots of different types of residential prices to their customers they might have for that state and that month, and they're all averaged together and reported for that month.

BY MS. FLOYD:

*Q If, say, a company has a posted price with a discount, what would you want to be reported to you?*

A The actual average -- the actual transactions price. If for that family -- that heating oil firm, actually billed them for posted minus the discount, and, you know, even if taxes were involved and what not, we would -- we'd want the taxes taken out, and that's the way we do this. But we will want the actual average price for that company over all of the transactions for that state for that month, so for that customer, it would be what you said -- posted minus the discount today.

If they pay cash, that's the way it is. It's posted minus some kind of discount for paying right away.

Page 631

*Q Okay. I believe you indicated earlier that the data is filed on a state-wide basis. Is that correct?*

A Yes.

*Q How is it reported to subscribers of the data theory? Does it report on a state-wide basis, or is it reported in groups? How do you report these?*

A You mean in the publication, the Monthly?

*Q Yes, the publication.*

A It's state level. There are summary tables in the front, 18 to 20 of them, that are national level and have a time series for, say, gasoline retail prices. And in the detail table or for each of these little individual gasoline markets by state.

*Q Now, have any changes in the processing or the methodology been made in the collection of data or the processing of data or the analysis of data or the recording of data with respect to the Petroleum Marketing Monthly since 1990?*

A No, no methodological changes recognizing that we -- we sample in heating oil, for example -- the bulk of that residential market is conducted by small mom-and-pop-type firms, and we have a sample of those wholesalers and distributors, and we will resample from time to time. But that's not a change, that's part of the program.

In jet fuel, we have a census of refiners only, so

Page 632

it's irrelevant in that case. It just goes every month, all the refiners, and they do what I said, and we add them up, and that's it. We've been doing that for 18 years.

MS. FLOYD: I have no further questions, Your Honor.

CROSS-EXAMINATION

BY MR. BACHMAN:

*Q In connection with your purpose at Department of Energy for preparing this publication, do you believe it's your responsibility to prepare the PMM to be used as a price index for contracting purposes by industry in buying and selling refined products? Do you publish the PMM for purposes of using it as a price index, like OPIS or Platt's?*

A We're not opposed to it being used for that purpose. We don't, per se, collect the data and justify its collection with OMB for that specific use.

We justify its collection on the basis of its general value in measuring actual average prices, wholesale and retail, for everything from crude oil from the wellhead to the pump for state energy offices or various federal agencies, and most especially for Congressional committees for analysis purposes, forecasting, market tracking, all those uses.

It's, it's, it happens to be useful, according to oil companies and DFSC for indexing, as well, but we didn't

Page 633

specifically design it for that.

*Q Okay. Your statutory authorization, were you mandated to prepare it for that purpose, or is it for the purpose of, like, advising Congress on the fuel costs for the poor, heating oil cost?*

A It's more the latter.

*Q What is the latter? I –*

A Advising Congress on market conditions, state energy offices on market conditions, price behavior, in general.

*Q Okay. If there was an error in this index, could a refiner sue you?*

A Never had one sue me.

*Q Do you believe you have a fiduciary obligation to the refining industry in connection with the publication of this index, if it's even intended as an index?*

A No. I think I have a responsibility to protect their data, to keep it confidential. If they were going to sue me, it might be over that, that I had somehow leaked their proprietary data out, but they owe me the data for market tracking purposes, and they're supposed to make it accurate to me, and to the best of my knowledge, especially in jet fuel, it's a very accurate series.

*Q Do you track your data with OPIS and/or Platt's?*

A We compare it with a number of things, not just

Page 634

OPIS and Platt's, recognizing that there's a lot of products here. For gasoline, for example, we track our data – price data with BLS, the volume data with another EI series, we refer to as the Products Supplied Series.

We also track it with federal highway usage data.

Heating oil, likewise – our prices are compared with BLS prices.

MR. BACHMAN: I have no further questions, Your Honor.

*MS. FLOYD: I have no redirect, Your Honor.*

THE COURT: All right. Thank you, sir. You can step down.

(Witness excused.)

MS. FLOYD: Your Honor, Mr. Larry Ervin will be our next witness, and Ms. Karen Schools will be examining him.

THE COURT: All right. All right.

Mr. Ervin, if you would raise your right hand.

Whereupon,

LAWRENCE CALVIN ERVIN

having been first duly sworn, was called as a witness herein *and was examined and testified as follows:*

THE COURT: Thank you, have a seat.

*//*

*//*

Page 635

DIRECT EXAMINATION

BY MS. SCHOOLS:

*Q Good afternoon. What is your full name?*

A Lawrence Calvin Ervin.

*Q What is your current position?*

A I'm the Acting Director of the Office of Market Research and Competition at the Defense Energy Support Center.

*Q What is your educational background?*

A I attended the University of Maryland in College Park, up the road here. I received a Bachelor's of Arts in economics in 1975, and a Master's of Science in Agricultural and Resource Economics in 1980.

*Q How long have you been employed by the Defense Fuel Supply Center?*

A Since September of 1980.

*Q What positions have you held at the Defense Fuel Supply Center?*

A I've been employed as a staff member in the office where I – which I currently direct, as – I've been employed as an industry economist, as a market research analyst, as the liaison officer and manager of the Center's Strategic Petroleum Reserve Program and also as Acting Director – I was also called Acting Chief during one period when our organization was slightly different.

Page 636

*Q What have your responsibilities been in these positions?*

A Analysis of industry information, pricing data, supply statistics, news, and current event-type analysis. Analyses of pricing material and provision of pricing-related material to other offices at the Field Center, mostly, our Comptroller and our Procurement Divisions, our buying divisions.

*Q As part of your responsibilities in the Office of Market Research, did you assist in developing the EPA clauses that appear in DFSC's contracts?*

A Yes, I did.

*Q Why was an EPA clause included in these contracts?*

A We wanted our prices to reflect, as closely as possible, market levels for the same or similar commercial fuels in the marketplace. We wanted our prices to – and I think the concern there is, at least partly, that they not be, you know, reflect too poorly on the upside, obviously, that we wanted the prices to go up and also down when market prices of the similar fuels went down.

So, it was mainly a case of risk sharing, I guess, with our contractors of the market price fluctuations.

*Q Was your office involved in the selection of escalators that were used in the EPA clause?*

A Yes.



6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - X
LA GLORIA OIL AND GAS :
COMPANY, :
Plaintiff, :
vs. : No. 02-465C
THE UNITED STATES, : (Judge Hewitt)
Defendant. :
\- - - - - - - - - - - - - - - X Pages 1-50

Deposition of JACOB BOURNAZIAN
District of Columbia
Wednesday, December 3, 2003

Reported by: Marilyn Feldman, RPR
Job No. 156784

0
2

December 3, 2003
10:00 a.m.



7

the PMM back to the 1980s?
A. Yes.
Q. Are they all currently employed by EIA?
A. Yes.
Q. To your knowledge, none of the project managers from the PMM from the early 1980s to now have left the agency; is that correct?



A. Yes.
Q. Let's turn to the first request, request no. 17, which is on page 6 of Plaintiff's Exhibit 2. Request 17 reads: "All documents relating to communications between DESC and EIA concerning use of the PMM index to adjust prices in DESC's price adjustment clauses."
What efforts did you undertake to collect documents in response to that and what did you find?
A. First, in response to that request there was confusion in our organization on the use of the term "indices" because that's not a term we use and we don't -- an index is a ratio of two numbers with a baseline being in the denominator, but we only publish statistics prices. So my assumption is you meant just price data when you used the word index. Is that correct?
Q. I think that's a fair assumption.
A. Okay. So the efforts in responding to 17, everyone was asked to check if they have any

U.S. DEPARTMENT OF ENERGY
Energy Information Administration

Form Expires: 12/31/03

# EIA-782A:
# REFINERS'/GAS PLANT OPERATORS' MONTHLY PETROLEUM PRODUCT SALES REPORT

Schedule I

This report is mandatory under Public Law 93-275. Failure to comply may result in criminal fines, civil penalties and other sanctions as provided by law. *For the provisions concerning the confidentiality of information submitted on this form, see Section VI of the instructions.* Public reporting burden for this collection of information is estimated to average 14.4 hours per response, including the time of reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Energy Information Administration, Office of Statistical Standards EI-73, Mail Station: 2F-081 Forrestal, 1000 Independence Ave. SW, Washington, DC 20585; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, DC 20503.

## PART I. IDENTIFICATION DATA

*Complete items 1 thru 7 for new respondents and corrections to label only.*

1. Name
2. Name of Contact Person
3. Contact's Telephone Number ( ) –
4. Street/Box/RFD
5. City 6. State 7. Zip Code

*For assistance in completing this form, call (800) 638-8812.*

8. Reference Month

| Mo | Yr |
|---|---|
| | |

9. Type of Report *(Check one)*

(1) ☐ Original
(2) ☐ Revision, to Report Dated:

| Mo | Day | Yr |
|---|---|---|
| | | |

10. The Number of States For Which You Are Reporting

11. Date of This Report

| Mo | Day | Yr |
|---|---|---|
| | | |

12. Type of Entity *(Check one)*

(1) ☐ Refiner/Gas Plant Operator
(2) ☐ Reseller
(3) ☐ Reseller/Retailer
(4) ☐ Retailer

13. Which of the following best describes this firm at the end of this reference month?

(1) ☐ In operation
(2) ☐ Temporarily or seasonally inactive
(3) ☐ Sold or leased to another . . . See the Specific Instructions
(4) ☐ Permanently ceased operation . . . See the Specific Instructions

## PART II. CERTIFICATION

I certify that the information provided herein and appended hereto is true and accurate to the best of my knowledge.

14. Name
15. Title
16. Signature
17. Date of Signing

Title 18 USC 1001 makes it a criminal offense for any person knowingly and willingly to make to any Agency or Department of the United States any false, fictitious or fraudulent statements as to any matter within its jurisdiction.

# REFINERS'/GAS PLANT OPERATORS' MONTHLY PETROLEUM PRODUCT SALES REPORT

**Schedule II**

**IDENTIFICATION DATA**

Firm Name

2. DOE Identification Number

3. Page ___ of ___

Reference Month: Mo __ Yr __

5. Type of Report *(Check one)*
(1) ☐ Original
(2) ☐ Revision, to Report Dated: Mo __ Da __ Yr __

6. Enter the abbreviation of the state for which this schedule is being filed.
A separate Schedule II should be filed for each state. *(See Appendix A for state abbreviations.)* STATE __

**PART III. MONTHLY STATE SALES OF FINISHED MOTOR GASOLINE** *(Report volumes in thousands gal.; prices in $0.000 per gal.)*

| Line No. | Product *(Refer to definitions)* | RETAIL SALES *(Direct Sales to End-Users)* | | | | WHOLESALE SALES (Sales for Resale) (3) | |
|---|---|---|---|---|---|---|---|
| | | SALES THROUGH COMPANY-OPERATED RETAIL OUTLETS (1) | | SALES TO OTHER END-USERS (2) | | | |
| | Finished Motor Gasoline | Volume *(a)* | Unit Price *(b)* | Volume *(c)* | Unit Price *(d)* | Volume *(e)* | Unit Price *(f)* |
| 7 | Leaded Regular | | | | | | |
| 8.1 | Unleaded Regular | | | | | | |
| 8.2 | Unleaded Midgrade | | | | | | |
| 9 | Premium | | | | | | |

**PART IV. MONTHLY STATE SALES OF NO. 2 DISTILLATES** *(Report volumes in thousands gal.; prices in $0.000 per gal.)*

| | Product *(Refer to definitions)* | RETAIL SALES (Direct Sales to End-Users) | | | | | | | | | | WHOLESALE SALES (Sales for Resale) (6) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | RESIDENTIAL SALES (1) | | COMMERCIAL/ INSTITUTIONAL SALES (2) | | INDUSTRIAL SALES (3) | | SALES THROUGH COMPANY-OPERATED RETAIL OUTLETS (4) | | SALES TO OTHER END-USERS (Includes Sales to Utilities and Agriculture) (5) | | | |
| | | Volume *(a)* | Unit Price *(b)* | Volume *(c)* | Unit Price *(d)* | Volume *(e)* | Unit Price *(f)* | Volume *(g)* | Unit Price *(h)* | Volume *(i)* | Unit Price *(j)* | Volume *(k)* | Unit Price *(l)* |
| 10 | No. 2 Diesel Fuel | | | | | | | | | | | | |
| 11 | No. 2 Fuel Oil | | | | | | | | | | | | |

**PART V. MONTHLY STATE SALES OF OTHER PETROLEUM PRODUCTS** *(Report volumes in thousands gal.; prices in $0.000 per gal.)*

| Line No. | Product *(Refer to definitions)* | RETAIL SALES (Direct Sales to End-Users) (1) | | WHOLESALE SALES (Sales for Resale) (2) | |
|---|---|---|---|---|---|
| | | Volume *(a)* | Unit Price *(b)* | Volume *(c)* | Unit Price *(d)* |
| 12 | No. 1 Distillate | | | | |
| 13 | Kerosene | | | | |
| 14 | Aviation Gasoline (Finished) | | | | |
| 15 | Kerosene-type Jet Fuel | | | | |
| 16 | No. 4 Fuel Oil | | | | |
| 17 | Residual Fuel Oil with 1 percent or less Sulfur | | | | |
| 18 | Residual Fuel Oil with greater than 1 percent Sulfur | | | | |
| 19 | Propane, Consumer Grade | | | | |

EIA-782A (1-89)

U.S.G.P.O.: 1989-617-010/00755

U.S. DEPARTMENT OF ENERGY
Energy Information Administration

Form Expires: 12/31/93

# INSTRUCTIONS FOR FILING THE EIA-782A: REFINERS'/GAS PLANT OPERATORS' MONTHLY PETROLEUM PRODUCT SALES REPORT

## GENERAL INFORMATION

### I. Purpose

The EIA-782A is designed to provide data on the sales of selected petroleum products (volumes and prices) to various categories of end-users and resellers by type of seller at the State level.

These data are collected pursuant to the provisions of the Federal Energy Administration (FEA) Act of 1974, P.L. 93-275. The data are used by the Department of Energy (DOE) in reviewing petroleum product supply, demand and price changes.

### II. Who Must Submit

Any firm that directly or indirectly controls a refinery or gas plant must prepare and file the EIA-782A each month.

### III. What and Where to Submit

Submit a single Schedule I as a cover sheet, and a separate Schedule II for each State in which the respondent sells one or more of the listed products. Send the completed EIA-782A to:

U.S. Department of Energy
Energy Information Administration
EI-43
Mail Station: BG-094 Forrestal
Washington, D.C. 20585

Certified computer printouts that are generally in the format of the EIA-782A will be accepted. Request DOE approval in advance by calling the number below if you plan to submit computer printouts.

If you have any questions concerning any of the EIA-782A instructions, call toll free (800) 638-8812. Firms located in Maryland should call (301) 495-8440.

### IV. When to Submit

The EIA-782A must be submitted to DOE no later than 30 calendar days after the close of each reference month. For example, if the reference month is June 1990, the report must be submitted to DOE by July 30, 1990.

### V. Sanctions

This report is mandatory under Public Law 93-275. Failure to comply with reporting requirements may result in criminal fines, civil penalties, and other sanctions as provided by law.

## GENERAL INFORMATION (Continued)

VI. Provisions Regarding Confidentiality of Information

The information contained on this form will be kept confidential and not disclosed to the public to the extent that it satisfies the criteria for exemption under the Freedom of Information Act (FOIA), 5 U.S.C. §552, the DOE regulations, 10 C.F.R. §1004.11, implementing the FOIA, and the Trade Secrets Act, 18 U.S.C. §1905.

Upon receipt of a request for this information under the FOIA, the DOE shall make a final determination whether the information is exempt from disclosure in accordance with the procedures and criteria provided in the regulations. To assist us in this determination, respondents should demonstrate to the DOE that, for example, their information contains trade secrets or commercial or financial information whose release would be likely to cause substantial harm to their company's competitive position. A letter accompanying the submission that explains (on an element-by-element basis) the reasons why the information would be likely to cause the respondent substantial competitive harm if released to the public would aid in this determination. A new justification does not need to be provided each time information is submitted on the form, if the company has previously submitted a justification for that information and the justification has not changed.

Except as otherwise provided by law, the information may be made available in response to an order of a Court of competent jurisdiction, or, upon request, to other components of the DOE, to any Committee of Congress, the General Accounting Office, or other Congressional agencies authorized by law to receive such information. Detailed provisions of the restrictions on the disclosure of this information can be found in the Policy on the Disclosure of Individually Identifiable Energy Information in the Possession of the EIA (45 Federal Register 59812 (1980)).

## GENERAL INSTRUCTIONS

I. To avoid double counting, respondents are to exclude sales to other companies (and their subsidiaries) who also report on the EIA-782A. A list of these companies is provided periodically to all respondents. Additional copies are available upon request.

II. Report all volumes in **thousands of gallons**; e.g., report 6,500 gallons as 7, and 6,400 gallons as 6. Leave both volume and price blank if no volumes were sold. Enter 1 for volumes between 0 and 1,499. Note: One barrel is equal to 42 gallons.

III. Enter data reflecting sales made during the reference month only. Exclude from all calculations any **material** prior period adjustments for volumes and/or prices, and revise the report(s) for the appropriate prior period(s).

Revisions to prior month's reports are required if previously reported prices or volume data are in error by more than plus or minus five percent (5%). All revisions must be submitted within 120 days after the end of the reference month. However, EIA must be notified of significant changes discovered after this date and will determine if a late resubmission is required.

Do not report negative volumes or prices; resubmit earlier reports instead.

IV. Report unit prices in decimals of U.S. dollars, expressed to the nearest tenth of a cent (e.g., $1.065). Unit prices are to be determined by dividing the total revenues derived from the sales of the product during the reference month by the total number of gallons sold. The unit price is the same as the weighted average price for all sales of that particular product to a particular group of customers or class-of-trade. The reported unit price should exclude all taxes on the sale of the petroleum product such as Federal, State, and local excise or sales taxes. Taxes in obtaining, importing, or producing petroleum products (such as crude oil or product importation tariffs, domestic crude oil taxes, facilities taxes, etc.) should not be excluded from

sales prices for EIA reporting purposes. For example, even though upstream expenses such as the Superfund tax may be shown as a separate line item on invoices of product sales, they should not be excluded from the reported sales price. Transportation costs that are paid as part of the sales price at the point of sale should be included in the reported unit price. Do not calculate unit prices using rounded volumes.

V. Report only the data for the products listed: DOE is not seeking full coverage of all petroleum products sold.

VI. Exclude amounts supplied to exchange partners except where the amount given up exceeds the amount received and the imbalance is invoiced as a sale during the reference month.

VII. If firms do not maintain information sufficient to provide actual sales volumes and unit prices by the customer categories specified on the forms, estimates of sales volumes and unit prices may be provided. The basis for the estimates must be consistent with the standard accounting records maintained by the firm. The estimating procedure and data supporting the estimates should result in a reasonably accurate estimate which will be subject to review.

VIII. Report sales in the State where the transfer of title occurred. For FOB sales at a refinery/terminal, the State is the one in which the refinery/terminal is located. For delivered sales (by any mode of conveyance), the State is the one in which the buyer received the product (see Appendix A for a list of State abbreviations). If transfer of title occurs in the United States, volumes sold for export should be included under "Wholesale Sales." Residual fuel oil sales for vessel bunkering should be reported under "Retail Sales." No. 2 distillate sales for vessel bunkering should be reported under "Commercial/Institutional Sales."

IX. Report the entire firm's sales of the selected products. This includes sales made directly by the parent, affiliates, subsidiaries; or through commissioned agents. Exclude sales made among the parent firm, subsidiaries, and affiliates; i.e., intrafirm transfers/sales.

## SPECIFIC INSTRUCTIONS

**Schedule I**
**Part I**
**Identification Data**

| Item | Instruction |
|---|---|
| 1 thru 7 | Complete items 1 thru 7 if you are a new respondent, or if information shown on the label is incomplete or incorrect. If changes need to be made, cross out the inappropriate information on the label and enter the correct information in the space(s) to the right of the label. |
| 8 | Enter the month and year of the reference month. |
| 9 | Check the type of report that is being submitted. |
| 10 | Enter the number of Schedule II pages submitted with Schedule I. This will reflect the total number of States for which reports are being submitted. |
| 11 | Enter the date this report is being filed. |
| 12 | Mark the appropriate type of entity according to the definitions provided. Refiners operating in more than one capacity should mark "Refiner/Gas Plant Operator." Firms engaging in both |

## SPECIFIC INSTRUCTIONS (Continued)

reselling and retailing should mark "Reseller/Retailer." Firms which directly or indirectly control a refiner should mark "Refiner/Gas Plant Operator." Firms which directly or indirectly control a gas plant operator should mark "Refiner/Gas Plant Operator." The type of entity should not change from month to month but should reflect the activity of the firm throughout the year.

13 Enter the status of the firm at the end of the reference month. If the firm has been sold, leased, or permanently ceased operation, **submit a letter to DOE** stating the reason for the change in status. If the firm has been sold or leased, provide the name and address of the new company, and the date of the transfer. If the firm has permanently ceased operation, provide the date the firm ceased operation. You may include the letter with your monthly report or send it separately to the address shown on Page 1.

### Schedule I
### Part II
### Certification

| Item | Instruction |
|---|---|
| 14 thru 17 | Enter the name and title of the individual designated by the company to sign the certification. The individual must sign in the space provided on the form and enter the date of the signing. |

### Schedule II
### Identification Data

| Item | Instruction |
|---|---|
| 1. | Enter the name of the reporting firm. |
| 2 | Enter the 10-digit identification number assigned to the reporting firm for this survey. This is the number printed in the upper left corner of the company identification labels which have been provided to you. |
| 3 | Sequentially assign a page number to each Schedule II page. Enter the total number of pages being submitted in item 10 on Schedule I. |
| 4 | Enter the month and year of the reference month for which this schedule is being submitted. |
| 5 | Check whether this is an original or revised report. |
| 6 | Enter the abbreviation for the State. See Appendix A for a list of State abbreviations. |

### Schedule II
### Part III
### Monthly State Sales of Finished Motor Gasoline

| Item | Instruction |
|---|---|
| 7 thru 9 | Include in the column headed "Sales to Other End-Users" all direct sales to end-users that were not made through company-operated retail outlets. Sales made to retail outlets other than those operated directly by the reporting company, its affiliates, or subsidiaries, should be included in the wholesale sales category (Sales for Resale). |

Report gasoline sales volumes and prices by grade in accordance with their classification at the time of sale. The intent of this form is to capture sales volumes and prices for gasoline sold as leaded regular, unleaded regular, premium (both leaded and unleaded), and a "midgrade" of unleaded gasoline that lies between unleaded regular and premium in both octane and price. For the majority of the United States, the octane ranges (R+M/2) below are appropriate for distinguishing among the four classes of gasoline to be reported:

**Leaded Regular** - Greater than or equal to 87, and less than or equal to 90 octane.

**Unleaded Regular** - Greater than or equal to 85, but less than 88 octane.

**Unleaded Midgrade** - Equal to, or greater than 88, but less than, or equal to 90 octane.

**Premium** - Greater than 90 octane, leaded or unleaded.

In general, automotive octane requirements are lower at high altitudes. Therefore, in some areas of the United States, such as the Rocky Mountain States, the octane ranges for the gasoline grades above may be 2 or more octane points lower. For other aspects of gasoline specifications, please see the Definitions section.

Blends of gasoline containing ethanol or other oxygenates should be reported according to the above criteria. Do not report ethanol (alcohol) sold separately for blending purposes.

Schedule II
Part IV
Monthly State Sales of
No. 2 Distillates

| Item | Instruction |
|---|---|
| 10 and 11 | Report volume and price data in accordance with **what the product was sold as, regardless of the actual specifications of that product.** If a No. 2 distillate was sold as a diesel fuel, report that volume and price in the category "No. 2 Diesel Fuel;" if a No. 2 distillate was sold as a heating or fuel oil, report that volume and price in the category "No. 2 Fuel Oil" even if that product conformed to the higher specifications of a diesel fuel. If sales of a No. 2 distillate were made for which no determination can be made as to whether the product was specifically sold as either a fuel oil or diesel fuel, sales volumes and prices should be classified in accordance with **your best estimate of the intended use** of the product regardless of the product specification; i.e., sales of No. 2 distillate that you believe will be used for heating purposes or as a boiler fuel should be reported under "No. 2 Fuel Oil," sales of No. 2 distillate that you believe will be used as transportation fuels should be reported as "No. 2 Diesel Fuel." |

Include under the category "Residential Sales" those sales of No. 2 fuel oil to individual customers or households (as opposed to businesses or institutions). Sales to apartment buildings/complexes or other multi-family dwellings should be excluded from the "Residential Sales" category but included in the "Commercial/Institutional Sales" category. For those sales to residential facilities for which the respondent is unsure as to where those sales are to be reported, respondents are asked to report those sales in the category that, in their best judgment, is more appropriate.

Include under the category "Commercial/Institutional Sales" those sales of either No. 2 fuel oil or No. 2 diesel fuel to firms engaged in transportation, wholesale or retail trade, finance, insurance and real estate. Also include sales to apartment buildings/complexes, and other multi-family dwellings, hotels and office buildings or complexes, sales to local, State or Federal

Governmental facilities or organizations, along with military sales including those directed to post exchanges. Sales to schools, hospitals, religious institutions, universities or other government-supported organizations are also to be included in this category.

Include under the category "Industrial Sales" those sales of either No. 2 fuel oil or No. 2 diesel fuel to public or private firms engaged in mining, construction, or manufacturing.

Include under the category "Sales Through Company-Operated Retail Outlets" those sales of No. 2 diesel fuel made through company-operated retail outlets which are subject to motor fuel gallonage taxes. Refer to the definition of company-operated retail outlets.

Include under the category "Sales to Other End-Users" (e.g., sales to agricultural customers or to utilities) sales of either No. 2 fuel oil or No. 2 diesel fuel to end-use customers not included in any of the above four categories.

Schedule II
Part V
Monthly State Sales of
Other Petroleum Products

| Item | Instruction |
| --- | --- |
| 12 thru 19 | Include under the category "Retail Sales" all direct sales to end-users.<br>Include under the category "Wholesale Sales" all sales to resellers. |

## DEFINITIONS

1. Affiliate/Subsidiary - Entities directly or indirectly controlled by a parent.

2. *ASTM* - The acronym for the American Society for Testing and Materials.

3. *Aviation Gasoline (Finished)* - All special grades of gasoline for use in aviation reciprocating engines, as given in ASTM Specification D 910 and Military Specification MIL-G-5572. Excludes blending components which will be used in blending or compounding into finished aviation gasoline.

4. *Commercial/Institutional* - Firms engaged in transportation, wholesale or retail trade, finance, insurance, and real estate. Also included are apartment buildings/complexes and other multi-family dwellings, hotels, and office buildings or complexes, local, State or Federal facilities or organizations including the military, schools, hospitals, religious institutions, universities and all other government-supported organizations.

5. *Company-Operated Retail Outlet* - Any retail outlet (e.g., service station) selling gasoline or diesel fuel which is under the direct control of the firm filing this report by virtue of the ability to set the retail product price and directly collect all or part of the retail margin. This category includes retail outlets: (1) being operated by salaried employees of the company and/or its subsidiaries and affiliates, and/or (2) involving personnel services contracted by the firm.

6. *Distillate Fuel Oil* - A general classification for one of the petroleum fractions produced in conventional distillation operations. It is used primarily for space heating, on- and off-highway diesel engine fuel (including railroad engine fuel and fuel for agricultural machinery), and

electric power generation. Included are products known as No. 1, No. 2, and No. 4 fuel oils; and No. 1, No. 2, and No. 4 diesel fuels.

a. *No. 1 Distillate* - A petroleum distillate which meets the specifications for No. 1 Heating or Fuel Oil as defined in ASTM D 396 and/or the specifications for No. 1 Diesel Fuel as defined in ASTM Specification D 975.

(1) *No. 1 Diesel Fuel* - A volatile distillate fuel oil with a boiling range between 300-575°F and used in high-speed diesel engines generally operated under wide variations in speed and load. Includes type C-B diesel fuel used for city buses and similar operations. Properties are defined in ASTM Specification D 975.

(2) *No. 1 Fuel Oil* - A light distillate fuel oil intended for use in vaporizing pot-type burners. ASTM Specification D 396 specifies for this grade maximum distillation temperatures of 400°F at the 10-percent point and 550°F at the 90-percent point, and kinematic viscosities between 1.4 and 2.2 centistokes at 100°F.

b. *No. 2 Distillate* - A petroleum distillate which meets the specifications for No. 2 Heating or Fuel Oil as defined in ASTM D 396 and/or the specifications for No. 2 Diesel Fuel as defined in ASTM Specification D 975.

(1) *No. 2 Diesel Fuel* - A gas oil type distillate of lower volatility with distillation temperatures at the 90-percent point between 540-640°F for use in high-speed diesel engines generally operated under uniform speed and load conditions. Includes Type R-R diesel fuel used for railroad locomotive engines, and Type T-T for diesel-engine trucks. Properties are defined in ASTM Specification D 975.

(2) *No. 2 Fuel Oil* - A distillate fuel oil for use in atomizing type burners for domestic heating or for moderate capacity commercial-industrial burner units. ASTM Specification D 396 specifies for this grade distillation temperatures at the 90-percent point between 540°F and 640°F, and kinematic viscosities between 2.0 and 3.6 centistokes at 100°F.

c. *No. 4 Fuel* - A fuel oil for commercial burner installations not equipped with preheating facilities. It is used extensively in industrial plants. This grade is a blend of distillate fuel oil and residual fuel oil stocks that conforms to ASTM Specification D 396 or Federal Specification VV-F-815C; its kinematic viscosity is between 5.8 and 26.4 centistokes at 100°F. Also included is No. 4-D, a fuel oil for low- and medium-speed diesel engines that conforms to ASTM Specification D 975.

7. *Finished Motor Gasoline* - A complex mixture of relatively volatile hydrocarbons, with or without small quantities of additives, blended to form a fuel suitable for use in spark-ignition engines. Specification for motor gasoline, as given in ASTM Specification D 439-88 or Federal Specification VV-G-1690B, include a boiling range of 122° to 158°F at the 10-percent point to 365° to 374°F at the 90-percent point and a Reid vapor pressure range from 9 to 15 psi. "Motor gasoline" includes finished leaded gasoline, finished unleaded gasoline, and gasohol. Blendstock is excluded until blending has been completed. (Alcohol that is to be used in the blending of gasohol is also excluded.)

a. *Leaded Regular Gasoline* - Gasoline having an antiknock index (R+M/2) greater than or equal to 87 and less than or equal to 90, and containing more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

**DEFINITIONS (Continued)**

b. *Unleaded Regular Gasoline* - Gasoline having an antiknock index (R+M/2) greater than or equal to 85 and less than 88, and containing not more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

c. *Unleaded Midgrade Gasoline* - Gasoline having an antiknock index (R+M/2) greater than or equal to 88 and less than or equal to 90, and containing not more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

d. *Premium Gasoline* - Gasoline having an antiknock index (R+M/2) greater than 90. Includes both LEADED premium gasoline as well as UNLEADED premium gasoline.

(1) *Leaded Premium Gasoline* - Gasoline having an antiknock index (R+M/2) greater than 90, and containing more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

(2) *Unleaded Premium Gasoline* - Gasoline having an antiknock index (R+M/2) greater than 90, and containing not more than 0.05 grams of lead or 0.005 grams of phosphorus per gallon.

Note: For this survey, gasoline sales should be reported by grade in accordance with their classification at the time of sale. In general, automotive octane requirements are lower at high altitudes. Therefore, in some areas of the United States, such as the Rocky Mountain States, the octane ranges for the gasoline grades above may be 2 or more octane points lower.

8. *Firm* - Any association, company, corporation, estate, individual, joint-venture, partnership, or sole proprietorship or any other entity, however organized, including charitable, educational, or other charitable institutions, and the Federal government including operations, departments, Federal agencies, and other instrumentalities, and State and local governments.

9. *Gas Plant Operator* - Any firm, including a gas plant owner, which operates a gas plant and keeps the gas plant records. A gas plant is a facility in which natural gas liquids are separated from natural gas, or in which natural gas liquids are fractionated or otherwise separated into natural gas liquid products or both.

10. *Gasohol* - A blend of finished motor gasoline (leaded or unleaded) and alcohol (generally ethanol but sometimes methanol), limited to 10 percent by volume of alcohol. For the purpose of this survey report gasohol in the grade of gasoline in which it was sold.

11. *Industrial* - Firms engaged in mining, construction, or manufacturing.

12. *Kerosene* - A petroleum distillate that has a maximum distillation temperature of 401 degrees F at the 10-percent recovery point, a final boiling point of 572 degrees F, and a minimum flash point of 100 degrees F. Included are the two classifications recognized by ASTM Specification D 3699: No. 1-K and No. 2-K, and all grades of kerosene called range or stove oil which have properties similar to No. 1 fuel oil, but with a gravity of about 43° API and a maximum endpoint of 625°F. Kerosene is used in space heaters, cook stoves, and water heaters and is suitable for use as an illuminant when burned in wick lamps.

**DEFINITIONS (Continued)**

13. *Kerosene-type Jet Fuel* - A quality kerosene product with a maximum distillation temperature of 400 degrees F at the 10-percent recovery point and a final maximum boiling point of 572 degrees F. The fuel is designated in ASTM Specification D1655 and Military Specification MIL-T-5624L (Grades JP-5 and JP-8). A relatively low-freezing point distillate of the kerosene type used primarily for commercial turbojet and turboprop aircraft engines.

14. *Parent* - A firm that directly or indirectly controls another entity.

15. *Propane, Consumer Grade* - A normally gaseous paraffinic compound ($C_3H_8$), which includes all products covered by Natural Gas Policy Act Specifications for commercial and HD-5 propane and ASTM Specification D 1835. EXCLUDES: feedstock propanes, which are propanes not classified as consumer grade propanes, including the propane portion of any natural gas liquid mixes, i.e., butane-propane mix.

16. *Reference Month* - The calendar month and year to which the reported cost, price, and volume information relates.

17. *Refiner* - A firm or the part of a firm that refines products or blends and substantially changes products, or refines liquid hydrocarbons from oil and gas field gases, or recovers liquefied petroleum gases incident to petroleum refining and sells those products to resellers, retailers, reseller/retailers or ultimate consumers. "Refiner" includes any owner of products which contracts to have those products refined and then sells the refined products to resellers, retailers, or ultimate consumers.

18. *Reseller* - A firm (other than a refiner) that carries on the trade or business of purchasing refined petroleum products and reselling them to purchasers other than ultimate consumers.

19. *Reseller/Retailer* - A firm (other than a refiner) that carries on the trade or business activities of both a reseller and a retailer; i.e., purchasing refined petroleum products and reselling them to purchasers who may be either ultimate or other than ultimate consumers.

20. *Residential* - In cases of sales of No. 2 Fuel Oil, includes individual customers or households (as opposed to businesses or institutions) who ostensibly use the fuel in a residence. Sales to apartment buildings/complexes or to other multi-family dwellings are excluded from the "Residential Sales" category and are included in the "Commercial/Institutional Sales" category.

21. *Residual Fuel Oils* - The topped crude of refinery operations, which includes No. 5 and No. 6 fuel oils as defined in ASTM Specification D 396 and Federal Specification VV-F-815C, Navy Special fuel oil as defined in Military Specification MIL-F-859E including Amendment 2 (NATO Symbol F-77), and Bunker C fuel oil. Residual fuel oil is used for the production of electric power, space heating, vessel bunkering, and various industrial purposes.

22. *Retailer* - A firm (other than a refiner, reseller, or reseller/retailer) that carries on the trade or business of purchasing refined petroleum products and reselling them to ultimate consumers.

23. *Sale* - The transfer of title from the seller to a buyer for a price. EXCLUDE: Intrafirm transfers, product consumed directly by the reporting firm, or sales of bonded fuel. Also exclude products delivered/loaned to exchange partners except where the amount given up exceeds the amount received and the differential is invoiced as a sale during the reference month.

24. *Unit Price* - Total revenue derived from the sale of product during the reference month divided by the total volume sold; also known as the weighted average price. Total revenue should exclude all taxes but include transportation costs that were paid as part of the purchase price.

25. *United States* - The 50 States and the District of Columbia.

## APPENDIX A

### LIST OF STANDARD STATE ABBREVIATIONS

AL ... Alabama
AK ... Alaska
AZ ... Arizona
AR ... Arkansas
CA ... California
CO ... Colorado
CT ... Connecticut
DE ... Delaware
DC ... District of Columbia
FL ... Florida
GA ... Georgia
HI ... Hawaii
ID ... Idaho
IL ... Illinois
IN ... Indiana
IA ... Iowa
KS ... Kansas
KY ... Kentucky
LA ... Louisiana
ME ... Maine
MD ... Maryland
MA ... Massachusetts
MI ... Michigan
MN ... Minnesota
MS ... Mississippi
MO ... Missouri
MT ... Montana
NE ... Nebraska
NV ... Nevada
NH ... New Hampshire
NJ ... New Jersey
NM ... New Mexico
NY ... New York
NC ... North Carolina
ND ... North Dakota
OH ... Ohio
OK ... Oklahoma
OR ... Oregon
PA ... Pennsylvania
RI ... Rhode Island
SC ... South Carolina
SD ... South Dakota
TN ... Tennessee
TX ... Texas
UT ... Utah
VT ... Vermont
VA ... Virginia
WA ... Washington
WV ... West Virginia
WI ... Wisconsin
WY ... Wyoming

# A Comparison of Selected EIA-782 Data with Data From Other Sources

by Jacob Bournazian

## Introduction

The Energy Information Administration (EIA) EIA-782 survey series collects data on petroleum markets to fulfill legislative mandates from Congress and to provide comprehensive information for evaluating market behavior. It includes three surveys: Form EIA-782A, "Refiners'/Gas Plant Operators' Monthly Petroleum Product Sales Report;" Form EIA-782B, "Resellers'/Retailers' Monthly Petroleum Product Sales Report;" and Form EIA-782C, "Monthly Report of Prime Supplier Sales of Petroleum Products Sold for Local Consumption." Any reference to the EIA-782 prices refers to the series that includes both the EIA-782A and EIA-782B surveys. Any reference to the EIA-782 volumes refers to the EIA-782C survey series. Any reference to the specific survey is identified as such. This article compares the data from the EIA-782 survey series with other sources to assess the quality of the EIA-782 data. Significant differences and trends among data series may indicate the need for changes in data collection and processing, the reporting population, survey or sample design, or may simply reflect conceptual differences across surveys.

The following data sources were used to compare with the EIA-782 series.
For prices:

- The Bureau of Labor Statistics (BLS) Office of Consumer Price Index (CPI) data for retail prices of motor gasoline and residential No. 2 fuel oil.

- The BLS Office of Producer Prices (PPI) data for wholesale prices of motor gasoline, No. 2 fuel oil and diesel fuel, and kerosene-type jet fuel.

- Oil Price Information Service (OPIS), a privately owned petroleum news and information source, for retail prices of on-highway diesel fuel.

- Form EIA-888, "On-Highway Diesel Fuel Price Survey," for retail prices of on-highway diesel fuel.

- Form EIA-878, "Motor Gasoline Price Survey," for retail pump prices of gasoline.

For volumes:

- Form EIA-821, "Annual Fuel Oil and Kerosene Sales Report," for retail volumes of distillate and residual fuel oil.

- EIA's *Petroleum Supply Annual (PSA)* product supplied for volumes of distillate fuel oil, residual fuel oil, and motor gasoline.

- Federal Highway Administration (FHWA) for retail volumes of motor gasoline.

A more detailed description of each data source is contained in the Notes section at the end of this article.

## Overview

The EIA-782 prices track closely with other EIA surveys and OPIS prices while the BLS prices are higher than EIA-782 prices. The EIA-782C volume data were compared with data from other EIA surveys and the FHWA data series. The EIA-782C volumes for motor gasoline and distillate fuel follow closely with the other data series. However, the EIA-782C residual fuel volumes are significantly below the levels shown by other EIA surveys. The following sections of this article discuss the differences among the price and volume data sources for No. 2 distillate fuel oil and diesel fuel, gasoline, kerosene-type jet fuel, and residual fuel.

## Price Comparisons

Tables FE1 – FE6 show that EIA-782 national prices are generally lower than the BLS, EIA-878, and EIA-888 price data series and follow OPIS prices closely. Retail EIA-782 prices include data from both the EIA-782A and EIA-782B surveys. Differences in the survey methodology across the surveys explain some of the price differences.

- The BLS, EIA-878, EIA-888, and OPIS prices include taxes, whereas EIA-782 prices exclude taxes. For Tables FE3 and FE5, a U.S.-total-weighted Federal and State tax provided by the FHWA is deducted from BLS, EIA-878, EIA-888, and OPIS retail prices. No adjustment was made to the BLS, EIA-878, EIA-888, and OPIS prices for local sales taxes and other State and local fuel taxes such as environmental taxes, underground storage tank taxes, and transportation use taxes because there were not sufficient data available for making adjustments at the U.S. level.

- BLS retail prices are collected from urban areas, whereas EIA-782, EIA-878, and EIA-888 prices are collected from both rural and urban areas across a region or state. The BLS wholesale prices used to calculate the Producer Price Index are collected from a sample of refiners and represent the refiners' selling price for the selected refined products. The EIA-782 gasoline, No. 2 fuel oil and diesel prices are collected from a census of refiners and a sample of resellers and retailers. EIA resale prices represent sales to a seller who will resell the product, i.e., sales by refiners that are not to the ultimate consumer. In most transactions, the wholesale price and resale price are the same. However, there are circumstances where a

refiner may make a wholesale sale to an ultimate consumer. EIA began using the term "Reseller" in 1983 to exclude wholesale transactions to ultimate consumers.

- The EIA-782 uses current period volume weights, while BLS, the EIA-878 and EIA-888 use fixed weights to compute weighted average prices.

- The EIA-782 prices represent all sales during the month, while BLS prices represent the average of outlet prices collected on different days across the first three weeks of the month. The EIA-878 and the EIA-888 weekly surveys also represent a point in time in the week. In this article, the annual EIA-878 and EIA-888 prices were calculated using simple arithmetic means of the published weekly prices.

### Residential No. 2 Fuel Oil

Table FE1 shows BLS prices are 3 to 5 percent higher than EIA-782 prices from 1995 through 2003. The difference between the two series widened from 3 to 5 percent after 1999 and then declined to the usual 3 percent level after 2001. BLS prices are obtained from urban areas only and do not reflect complete geographic coverage for this product. EIA-782 prices are volume weighted price estimates.

Table FE1. 'U.S. Residential No. 2 Distillate Prices, 1995-2003

| | (Cents per gallon) | | Percentage |
|---|---|---|---|
| Year | EIA-782 | BLS | BLS/EIA-782 |
| 1995 | 86.7 | 89.3 | 103.00% |
| 1996 | 98.9 | 101.9 | 103.03% |
| 1997 | 98.4 | 101.4 | 103.05% |
| 1998 | 85.2 | 88.0 | 103.29% |
| 1999 | 87.6 | 90.0 | 102.74% |
| 2000 | 131.1 | 136.0 | 103.74% |
| 2001 | 125.0 | 131.0 | 104.80% |
| 2002 | 112.9 | 116.2 | 102.88% |
| 2003 | 135.6 | 140.0 | 103.28% |

EIA Source: Table 18 Petroleum Marketing Monthly.

### No. 2 Fuel Oil Resale

Table FE2 shows BLS wholesale prices vary widely with EIA-782A resale prices between a range of 5 to 14 percent higher than EIA-782A. The differential between the series has decreased during the past 2 years. One possible reason is that the EIA-782A prices are current period volume weighted averages, and larger volume sales by refiners at lower prices receive greater

weight in calculating EIA-782A prices. The BLS prices are calculated using weights derived from other (non-current) time periods. BLS does adjust their weights on a monthly basis.

**Table FE2 U.S. Refiner Resale No. 2 Fuel Oil Prices, 1995-2003**

| | (Cents per gallon) | | Percentage |
|---|---|---|---|
| Year | EIA-782A | BLS | BLS/EIA-782A |
| 1995 | 51.1 | 56.6 | 110.80% |
| 1996 | 63.9 | 69.4 | 108.66% |
| 1997 | 59.0 | 64.9 | 110.04% |
| 1998 | 42.2 | 48.2 | 114.22% |
| 1999 | 49.3 | 55.9 | 113.32% |
| 2000 | 88.6 | 93.3 | 105.32% |
| 2001 | 75.6 | 84.5 | 111.79% |
| 2002 | 69.4 | 74.8 | 107.77% |
| 2003 | 87.9 | 95.6 | 108.75% |

EIA Source: Table 4 Petroleum Marketing Monthly.

### Diesel Fuel On-Highway

Table FE3 shows the annual estimates for EIA-782, EIA-888, and OPIS retail on-highway diesel fuel prices from 1995-2003. EIA-782, EIA-888, and OPIS prices vary mostly by 1 to 2 percent and track closely over this time period. Although State and Federal diesel fuel taxes were subtracted from the OPIS and EIA-888 prices, no adjustment was made for local sales taxes, and additional State and/or local taxes relating for environmental regulations and transportation use.

**Table FE3. U.S. Retail On-Highway Diesel Fuel Prices, 1995-2003**

| | (Cents per gallon) | | | Percentage | |
|---|---|---|---|---|---|
| Year | EIA-782 | EIA-888 | OPIS | EIA-888/ EIA-782 | OPIS/ EIA-782 |
| 1995 | 67.0 | 67.5 | 66.0 | 100.72% | 98.53% |
| 1996 | 78.8 | 80.0 | 78.8 | 101.55% | 100.05% |
| 1997 | 74.5 | 75.8 | 74.7 | 101.79% | 100.24% |
| 1998 | 59.3 | 60.2 | 58.9 | 101.52% | 99.26% |
| 1999 | 68.5 | 67.7 | 66.5 | 98.83% | 97.10% |
| 2000 | 103.6 | 104.5 | 103.7 | 100.87% | 100.14% |
| 2001 | 94.3 | 95.4 | 94.4 | 101.20% | 100.15% |
| 2002 | 86.2 | 87.3 | 86.6 | 101.28% | 100.44% |
| 2003 | 104.4 | 105.6 | 104.6 | 101.12% | 100.19% |

EIA Source: Table 16 Petroleum Marketing Monthly for EIA-782 data.

OPIS prices are a compilation of different sources obtained from several credit card issuers and do not reflect complete sales coverage for this product. Outlets from leading truckstop chains, as well as outlets participating in a price and credit reporting service report daily retail prices to OPIS. Approximately 4,500 price quotes are reported daily. In this article, the annual OPIS prices at the U.S. level were calculated using simple arithmetic means based on an average of the prices reported as of Monday of each week of the year.

The EIA-888 prices are based on a sample of 350 outlets. The sample uses a probability proportional to size sampling technique. The U.S. average is calculated using a weighted average of the regional prices where the weights are volumes reported on another EIA survey at the time of sample selection.

### Diesel Fuel Resale

Table FE4 shows the annual estimates for EIA-782A resale and BLS wholesale prices for No. 2 diesel fuel. BLS prices are consistently higher with the difference doubling from 7% in 2002 to 14% in 2003. This product category contains prices for both low and high sulfur diesel fuel. The EIA-782A volume weighted averages reflect the relative importance of these two sulfur categories reported by refiners in the calculation of the average price.

Table FE4. U.S. Refiner Resale No. 2 Diesel Fuel Prices, 1994-2003

| | (Cents per gallon) | | Percentage |
|---|---|---|---|
| Year | EIA-782A | BLS | BLS/782A |
| 1994 | 52.9 | 56.0 | 105.94% |
| 1995 | 53.8 | 57.0 | 105.87% |
| 1996 | 65.9 | 69.9 | 106.06% |
| 1997 | 60.6 | 64.6 | 106.52% |
| 1998 | 44.4 | 47.4 | 106.83% |
| 1999 | 54.6 | 57.1 | 104.58% |
| 2000 | 89.8 | 93.1 | 103.69% |
| 2001 | 78.4 | 83.6 | 106.66% |
| 2002 | 72.4 | 77.7 | 107.35% |
| 2003 | 88.3 | 100.9 | 114.29% |

EIA Source: Table 4 Petroleum Marketing Monthly.

### Motor Gasoline - Retail

Table FE5 shows the annual estimates for EIA-782, EIA-878, and BLS retail prices from 1994-2003. This paper only discusses the prices for regular grade gasoline. BLS prices vary between 5 and 8 percent above the EIA-782 prices. EIA-878 prices vary between 1 and 6 percent above EIA-782 prices during the same time period. Even though both BLS and EIA-878 prices have been adjusted for federal and state taxes, these prices still contain additional taxes relating to local sales taxes and highway use taxes that could not be removed for this analysis. As a result, the EIA-782 prices should be lower than these other series.

**Table FE5. U.S. Retail Motor Gasoline Prices, Regular Grade, 1994-2003**

| Year | (Cents per gallon) EIA-782 | EIA-878 | BLS | Percentage EIA-878/EIA-782 | BLS/EIA-782 |
|---|---|---|---|---|---|
| 1994 | 69.4 | 70.1 | 73.9 | 101.01% | 106.48% |
| 1995 | 72.5 | 73.7 | 77.3 | 101.66% | 106.62% |
| 1996 | 81.2 | 85.0 | 85.7 | 104.68% | 105.54% |
| 1997 | 80.0 | 82.0 | 85.5 | 102.50% | 106.88% |
| 1998 | 62.5 | 64.4 | 67.4 | 103.04% | 107.84% |
| 1999 | 73.0 | 75.2 | 78.2 | 103.01% | 107.12% |
| 2000 | 106.6 | 109.6 | 112.2 | 102.81% | 105.28% |
| 2001 | 99.6 | 103.2 | 107.3 | 103.61% | 107.76% |
| 2002 | 91.6 | 96.1 | 97.4 | 104.91% | 106.33% |
| 2003 | 111.0 | 117.2 | 120.2 | 105.59% | 108.26% |

EIA Source: Table 31 Petroleum Marketing Annual for EIA-782 data.

The annual BLS prices were calculated using simple arithmetic mean of monthly prices. The BLS monthly prices are calculated based on approximately 900 price quotes. Approximately 25 to 35 prices are collected from outlets in each published geographic area. EIA-782 prices represent all sales transactions through company-operated outlets by all refiners and a sample of resellers/retailers throughout the U.S. There are limitations in comparing a simple average data series with a volume weighted average price series across months because of the effect of volume changes throughout the year on the annual price estimate.

The EIA-878 also uses fixed volume weights for calculating U.S. prices based on approximately 800 price quotes each week. Separate outlet weights are used based on the sampled outlet's number of pumps, a proxy for sales volume, to obtain weekly averages for the specific formulations, grades and geographic areas. The weights used in aggregating grades, formulations and geographic areas are derived using volume data from the EIA-782C "Monthly Report of Prime Suppliers Sales of Petroleum Products Sold for Local Consumption," and demographic data from the Bureau of the Census and Department of Transportation on population, number of gasoline stations and number of vehicles. A simple average of weekly prices was calculated to obtain the annual average price. The EIA-782 prices utilize all sales transactions throughout the reference month, whereas the EIA-878 prices are Monday morning prices as of 8:00 A.M.

### Motor Gasoline - Resale

Table FE6 shows the annual estimates for EIA-782A and BLS resale motor gasoline prices from 1994 – 2003. Except for 1994, the BLS prices vary between 1 and 3 percent from the EIA-782A during this ten-year period. The data track closely during 1998 – 2002 despite increased price volatility in the gasoline markets during this time period. The difference widened during 2003 when there were strong price increases in gasoline markets.

Table FE6. U.S. Refiner Resale Motor Gasoline Prices, Regular Grade, 1994-2003

| | (Cents per gallon) | | Percentage |
|---|---|---|---|
| Year | EIA-782A | BLS | BLS/EIA-782 |
| 1994 | 56.6 | 59.2 | 104.64% |
| 1995 | 59.3 | 60.9 | 102.68% |
| 1996 | 68.5 | 70.7 | 103.26% |
| 1997 | 67.3 | 69.6 | 103.41% |
| 1998 | 49.9 | 51.1 | 102.42% |
| 1999 | 62.0 | 62.3 | 100.51% |
| 2000 | 94.2 | 92.5 | 98.14% |
| 2001 | 86.5 | 87.9 | 101.58% |
| 2002 | 80.6 | 81.0 | 100.51% |
| 2003 | 98.1 | 100.6 | 102.54% |

EIA Source: Table 6 Petroleum Marketing Annual.

## Kerosene-Type Jet Fuel - Resale

Table FE7 shows the annual estimates for EIA-782A refiner resale kerosene-type jet fuel prices and BLS wholesale kerosene-type jet fuel prices from 1994 – 2003. The two price series vary between 1 and 5 percent during 1994 – 1998. The price differential narrows after 1998 and remains stable at approximately 1 percent. BLS wholesale prices are expected to be similar to EIA-782A resale prices since EIA kerosene-type jet fuel prices are collected from a census of refiners on Form EIA-782A and BLS collects from a sample of refiners.

Table FE 7. U.S. Kerosene-Type Jet Fuel Resale Prices, 1994-2003

| | (Cents per gallon) | | Percentage |
|---|---|---|---|
| Year | EIA-782A | BLS | BLS/EIA-782A |
| 1994 | 53.4 | 53.8 | 100.75% |
| 1995 | 53.9 | 55.1 | 102.23% |
| 1996 | 64.6 | 67.6 | 104.64% |
| 1997 | 61.3 | 64.0 | 104.40% |
| 1998 | 45.0 | 46.7 | 103.83% |
| 1999 | 53.3 | 53.9 | 101.16% |
| 2000 | 88.0 | 89.1 | 101.21% |
| 2001 | 76.3 | 78.2 | 102.52% |
| 2002 | 71.6 | 72.2 | 100.78% |
| 2003 | 87.2 | 87.3 | 100.08% |

EIA Source: Table 4 Petroleum Marketing Monthly.

## Volume Comparisons

EIA-782C volumes are compared with volumes reported in the EIA-821, the *PSA*, and the FHWA data series. Product supplied in the *PSA* is an estimate of the demand for petroleum products. It is calculated by adding and subtracting volumes as they move in and out of the primary distribution stream. Sales volume data from the EIA-821 reflect the transfer of product title from a seller to a buyer whereas the EIA-782C measures sales into the States where the products are ultimately consumed. FHWA doesn't collect actual sales data on gasoline and diesel fuel. States report their fuel volumes to FHWA based on the beginning inventory at the terminal facility minus exports plus shipments to the terminal during the reporting cycle. The difference in survey populations, concepts and methodology underlie some of the differences that exist between the EIA-821, the *PSA*, and the FHWA data series.

### Distillate Fuel Oil

Table FE8 shows volumes of distillate fuel oil for the EIA-782C, EIA-821, and *PSA* series from 1993 through 2002. EIA-782C volumes have been below EIA-821 volumes since 1993 and below *PSA* volumes since 1997. The differential continues to grow wider after 1999. Table FE8 also shows that the difference between the EIA-782C and EIA-821 volumes is greater than the difference between the EIA-782C and the *PSA* volumes.

**Table FE8. U.S. Distillate Fuel Oil Volumes, 1993-2002**

| | (Million Gallons) | | | Percentage | |
|---|---|---|---|---|---|
| Year | EIA-782C | EIA-821 | PSA | EIA-821/ EIA-782C | PSA / EIA-782C |
| 1993 | 48,029 | 48,290 | 46,622 | 100.54% | 97.07% |
| 1994 | 49,188 | 50,424 | 48,477 | 102.51% | 98.55% |
| 1995 | 49,332 | 51,469 | 49,158 | 104.33% | 99.65% |
| 1996 | 51,753 | 53,379 | 51,731 | 103.14% | 99.96% |
| 1997 | 51,903 | 54,366 | 52,665 | 104.75% | 101.47% |
| 1998 | 52,371 | 55,306 | 53,064 | 105.60% | 101.32% |
| 1999 | 54,614 | 57,573 | 54,759 | 105.42% | 100.27% |
| 2000 | 55,670 | 59,601 | 57,217 | 107.06% | 102.78% |
| 2001 | 57,344 | 59,911 | 58,971 | 104.48% | 102.84% |
| 2002 | 55,237 | 59,343 | 57,885 | 107.43% | 104.79% |

EIA Source: Table 50 Petroleum Marketing Annual for EIA-782C data.
Table S5 Petroleum Supply Annual for PSA data.
Table 1 Fuel Oil and Kerosense Sales, 2002 for EIA-821 data.

All three data series show a decline in volume from 2001 – 2002. Although Table FE8 shows total distillate volumes, a closer review of the energy use sector volumes in the EIA-821 data series (not shown in this table) provide some explanation for the variation between the data series. EIA-821 data show that sales of distillate fuel oil declined in the industrial, commercial and electric power sectors as moderate natural gas prices reduced the opportunities and need for fuel switching from natural gas to distillate. One possible source for the widening gap between EIA-821 and EIA-782C volumes is the sales reported for on-highway use, which comprised 58% of all distillate sales in 2002 in the EIA-821 data series. The EIA-821 on-highway energy use sector shows an increase of approximately 27% since 1996 and is the largest component contributing to the increase in distillate volumes for that survey during the past 7 years. The EIA-821 volumes for on-highway use are obtained from the Federal Highway Administration and used in place of data reported for this category. However, some EIA-821 respondents may report sales to commercial and institutional fleet vehicles in the commercial use category rather than in the on-highway use category. If the commercial category contains some on-highway use volumes, and exogenous data are used to replace the data for on-highway use, then some double counting of distillate volumes for transportation use on the EIA-821 may occur. If sales to fleet vehicles, which are reported in the commercial category, are increasing at approximately the same rate as other distillate sales for other on-highway use, then the amount of double counting of distillate sales in the EIA-821 survey may also be increasing over the past seven years, and may contribute to any differences between the EIA-782C and EIA-821 data series.

### Motor Gasoline

Table FE9 shows volumes of motor gasoline from the EIA-782C, *PSA*, and FHWA series from 1993 through 2002.

**Table FE9. U.S. Motor Gasoline Volumes, 1993-2002**

| | (Million Gallons) | | | Percentage | |
|---|---|---|---|---|---|
| Year | EIA-782C | PSA | FHWA | PSA / EIA-782C | FHWA / EIA-782C |
| 1993 | 117,886 | 114,607 | 116,614 | 97.22% | 98.92% |
| 1994 | 120,151 | 116,523 | 118,531 | 96.98% | 98.65% |
| 1995 | 122,582 | 119,405 | 120,876 | 97.41% | 98.61% |
| 1996 | 123,904 | 120,969 | 123,327 | 97.63% | 99.53% |
| 1997 | 125,632 | 122,901 | 125,045 | 97.83% | 99.53% |
| 1998 | 128,696 | 126,518 | 128,504 | 98.31% | 99.85% |
| 1999 | 131,066 | 129,247 | 132,261 | 98.61% | 100.91% |
| 2000 | 129,173 | 129,876 | 132,280 | 100.54% | 102.41% |
| 2001 | 132,029 | 131,991 | 134,110 | 99.97% | 101.58% |
| 2002 | 135,164 | 135,640 | 137,664 | 100.35% | 101.85% |

EIA Source: Table 48 Petroleum Marketing Annual for EIA-782C data.
Table S4 Petroleum Supply Annual for PSA data.

EIA-782C and *PSA*

Table FE9 shows the differential between the EIA-782C volumes and the *PSA* volumes narrowed during the past ten years with the difference being within 1% since 1999. One reason the differential narrowed during the 1990s was that the *PSA* improved its coverage of downstream blending of finished motor gasoline by including gasoline blenders in the survey reporting population. Blending of fuel ethanol, methanol, methyl tertiary butyl ether (MTBE), and other blend stock with gasoline often occurs downstream from the refineries.

EIA-782C and FHWA

Table FE9 also shows that EIA-782C volumes generally track closely with the FHWA motor gasoline volumes and the differential has remained at 2 percent since 2000. FHWA estimates the gasoline consumption by the federal, state, and local government since these volumes are not taxed. Also, FHWA has various models to estimate non-highway use in each state. FHWA estimates federal government highway gasoline use based on information obtained from federal agencies. State-reported federal use of gasoline in excess of the FHWA estimate is presumed to be either civilian non-highway or military use and is eliminated from the Federal figure reported by the State. The constant level of the difference in volumes between these two series may be due to some under coverage of the market by the EIA-782C or differences in how FHWA estimates gasoline sales for off-highway and government use.

### Residual Fuel Oil

Table FE10 shows volumes of residual fuel oil from the EIA-782C, EIA-821, and *PSA* from 1993 through 2002.

**Table FE10. U.S. Residual Fuel Oil Volumes, 1993-2002**

| | (Million Gallons) | | | Percentage | |
|---|---|---|---|---|---|
| Year | EIA-782C | EIA-821 | PSA | EIA-821/ EIA-782C | PSA / EIA-782C |
| 1993 | 13,555 | 15,064 | 16,559 | 111.13% | 122.16% |
| 1994 | 12,753 | 14,825 | 15,652 | 116.25% | 122.73% |
| 1995 | 9,623 | 12,318 | 13,061 | 128.01% | 135.73% |
| 1996 | 10,610 | 13,257 | 13,000 | 124.95% | 122.53% |
| 1997 | 10,583 | 12,504 | 12,218 | 118.15% | 115.45% |
| 1998 | 11,513 | 14,730 | 13,598 | 127.94% | 118.11% |
| 1999 | 10,259 | 13,328 | 12,724 | 129.92% | 124.03% |
| 2000 | 9,733 | 13,211 | 13,375 | 135.73% | 137.42% |
| 2001 | 10,285 | 13,609 | 13,508 | 132.32% | 131.34% |
| 2002 | 8,259 | 10,362 | 10,731 | 125.46% | 129.93% |

EIA Source: Table 49 Petroleum Marketing Annual for EIA-782C data.
Table S6 Petroleum Supply Annual for PSA data.
Table 2 Fuel Oil and Kerosene Sales, 2002 for EIA-821 data.

EIA-782C vs. *PSA* and EIA-821

Table FE10 shows the EIA-782C is significantly below the *PSA* and EIA-821 data series. The difference between the EIA-782C and the other two series is quite large and fluctuates relative to the EIA-782C from 11% in 1993 to a high of 37% in 2000. The gap between the EIA-782C and the EIA-821 has slightly declined since 2000 but there remains a significant gap of 25% in 2002. The gap between the EIA-782C and *PSA* data has remained at approximately 30% since 2001. The large and continuous divergence between the EIA-782C and the other two series indicates that the EIA-782C is missing some residual fuel oil sales.

Residual fuel oil sales plunged in 2002, with the EIA-782C volumes declining by 20%, EIA-821 declined by 24% and *PSA* declined by 21%. Although Table FE10 shows total residual fuel volumes, a closer review of the energy use sector volumes in the EIA-821 data series (not shown in this table) provide some explanation for the variation between the data series. Environmental regulations restricting fuel use, abundant supplies and moderate prices for natural gas prices all contributed to the sharp decline in residual fuel sales. The EIA-821 data series shows electric power and vessel bunkering, the largest categories for residual fuel, falling by 37% and 10% respectively,during 2002. The gap between the EIA-782C and the EIA-821 narrowed by 7% but the gap between the EIA-782C and PSA remained approximately the same between 2001 and 2002. The narrowing of the large gap between the EIA-782C and the EIA-821 from 2001 to 2002 suggests that the sales related to fuel switching from natural gas to residual fuel that occurred on a large scale during 2001 may contribute to the divergence between the EIA-782C and the EIA-821 and *PSA* data series.

**Table FE11. EIA-821 and EIA-782C U.S. Residual Fuel Oil Volumes by PADD, 2000-2002**

| | (Million Gallons) | | |
|---|---|---|---|
| | **2000** | **2001** | **2002** |
| EIA-782C US Residual Fuel Oil | 9,733 | 10,285 | 8,259 |
| EIA-821 US Residual Fuel Oil | 13,211 | 13,546 | 10,362 |
| Percentage EIA-782C/EIA-821 | 73.67% | 75.93% | 79.70% |
| | **Percentage Across PADDs EIA-782C/EIA-821** | | |
| PADD 1 | 73.75% | 73.63% | 76.62% |
| PAD Subdistrict 1A | 101.11% | 83.18% | 96.66% |
| PAD Subdistrict 1B | 87.42% | 87.84% | 86.02% |
| PAD Subdistrict 1C | 55.20% | 59.69% | 64.65% |
| PADD 2 | 48.20% | 48.47% | 60.40% |
| PADD 3 | 67.68% | 80.70% | 82.06% |
| PADD 4 | 328.57% | 332.71% | 297.10% |
| PADD 5 | 83.47% | 82.49% | 87.66% |

EIA Source: Table 49 Petroleum Marketing Annual for EIA-782C data.
Table 2 Fuel Oil and Kerosene Sales, 2002 for EIA-821 data.

Table FE11 compares the EIA-782C and EIA-821 volumes for 2000 – 2002 across the five PADD regions. The data show that during this time period, the 782C data are missing significant volumes in PAD Sub-district 1C and in PADDs 2 and 3. Although, the EIA-782C volumes are approximately 3 times as high as the EIA-821 volumes in PADD 4, PADD 4 is the smallest market with approximately 3% of total US residual fuel sales. Sub-district 1C comprises approximately 25% of U.S. residual fuel sales and PADD 3 constitutes approximately 15%. Additional research is needed, mainly in PAD Sub-district 1C and PADD 3, to determine the causes for the divergence between the EIA-782C and EIA-821 data series.

## Summary

The EIA-782 petroleum product prices were compared with alternative sources from other EIA surveys, BLS, and OPIS prices. The EIA-782 prices tracked closely with other EIA surveys and OPIS prices. BLS prices were higher than EIA-782 prices, and the price differences widened in 2003 across all products. Some difference was expected between these two series because EIA collects prices from a census of refiners and BLS collects prices from a sample of refiners. The EIA-782C volume data were compared with data from other EIA surveys and the FHWA series. The EIA-782C volumes for motor gasoline and distillate fuel track closely with the other data series. However, the EIA-782C residual fuel volumes are significantly below the levels shown by other EIA surveys. The large difference between the EIA-782C residual fuel volumes and the other data sources requires further investigation into the reporting practices of the EIA-782C respondents for this product. Other differences exist among the data sources because of different reporting populations, geographic and/or market coverage, survey design, methodology, reference period intervals, and product and energy-use sector definitions.

## Notes

### Data Sources

The Form EIA-782A, "Refiners'/Gas Plant Operators' Monthly Petroleum Product Sales Report," collects monthly price and volume data at the State level for 14 petroleum products for various retail and wholesale marketing categories. It is a census of refiners and gas plant operators. The frame is updated on an ongoing basis using respondent lists from surveys such as the Form EIA-810, "Monthly Refinery Report;" the Form EIA-816, "Monthly Natural Gas Liquids Report;" and industry trade publications. Currently, 110 companies respond to the EIA-782A survey.

The Form EIA-782B, "Resellers'/Retailers' Monthly Petroleum Product Sales Report," is sent to a sample of resellers and retailers of motor gasoline, distillate, propane, and residual fuel oil. Respondents to Form EIA-863, "Petroleum Product Sales Identification Survey," are used as the sampling frame of resellers and retailers for the EIA-782B. Firms having 5 percent or more of

sales in a State are selected with certainty. The remaining companies on the frame are sampled using probability proportional to size methodology by geographic area, product, and type of sale. The EIA-782B sample includes approximately 2,000 companies.

The Form EIA-782C, "Monthly Report of Prime Supplier Sales of Petroleum Products Sold for Local Consumption," collects volumes of prime supplier sales of selected petroleum products into States where they are locally sold and consumed. A prime supplier is a firm that produces, imports, or transports any of the selected petroleum products across State boundaries and local marketing areas and sells the product to local distributors, local retailers, or end users. This survey provides an accurate measure of consumption in most States. Currently, 183 firms respond to the EIA-782C survey.

Data collected on the Forms EIA-782A, EIA-782B, and EIA-782C are published in the *Petroleum Marketing Monthly (PMM)* and the *Petroleum Marketing Annual (PMA)*.

In addition, production, import, and export data collected by EIA's Petroleum Division are published in the *Petroleum Supply Monthly (PSM)* and the *Petroleum Supply Annual (PSA)*. The Petroleum Division uses the Petroleum Supply Reporting System (PSRS) for data collection. The PSRS is composed of a family of data collection survey forms, data processing systems, and publications systems. Detailed data on refinery and natural gas plant operations, bulk terminal and pipeline stocks, petroleum products imports, and movements of petroleum products among Petroleum Administration for Defense (PAD) districts are collected monthly. Figures for product supply originate from Forms EIA-810, "Monthly Refinery Report;" EIA-811, "Monthly Bulk Terminal Report;" EIA-812, "Monthly Product Pipeline Report;" EIA-813, "Monthly Crude Oil Report;" EIA-814, "Monthly Imports Report;" EIA-816, "Monthly Natural Gas Liquids Report;" and EIA-817, "Monthly Tanker and Barge Movement Report." Aggregate export data obtained from the Bureau of the Census are also included in computations for the *PSM* and *PSA*. The *PMA* and the *PSA* may contain revisions of the data published in the *PMM* and the *PSM*, respectively, due to late submissions or revisions to the monthly data.

The Form EIA-821, "Annual Fuel Oil and Kerosene Sales Report," collects data on the sales to end users of distillate fuel oil, residual fuel oil, and kerosene. The sample size is approximately 4,000 for 2002. The data are used to determine the level of sales by energy-use category and product at the State, regional, and national levels. The sampling frame for the EIA-821 is also derived from the respondents to Form EIA-863. The EIA-863 is a quadrennial census used to collect information on size, type, and geographic location of firms selling petroleum products. Data from the Federal Highway Administration (FHWA) of the U.S. Department of Transportation replace EIA-821 data reported as on-highway diesel sales.

The Highway Statistics Division of the FHWA collects information related to highway transportation. Sales volumes of motor gasoline are published on a calendar year basis and are a

cumulative tabulation of gross gallons of gasoline reported by wholesale distributors to State motor fuel tax agencies. The FHWA collects information on finished motor gasoline, with no distinction made among motor gasoline grades. The data include gasoline for both highway and non-highway use. The FHWA includes gasohol but excludes exports, fuels for military use, and dealer transfers.

The Bureau of Labor Statistics (BLS) publishes the aggregate index for household fuels and its component indexes for motor fuels. Retail prices are collected monthly by BLS representatives in the urban areas, and support the estimation of the Consumer Price Index (CPI). Wholesale prices are collected monthly and support the estimation of the Producer Price Index (PPI).

The CPI and PPI use fixed volume weights to measure the change in price over time. The CPI measures the change in prices for a defined market basket of goods and services and the PPI measures the change in prices received by domestic producers for their output. Approximately 900 retail prices are collected for regular grade gasoline in approximately 87 urban areas across the country and include all taxes directly associated with the purchase and the use of the items. The 87 areas cover 39 States and the District of Columbia. The PPI collects prices from a sample of domestic refiners. Although most PPI prices are collected on one particular day of the month, the prices for refined petroleum products are commonly an average of prices during the first 10 working days of the month, or the prices received by oil refineries on the 10th working day of each month.

Westlaw.

1988 WL 227932 (Comp.Gen.), B- 230,556

**(Cite as: 1988 WL 227932 (Comp.Gen.))**

COMPTROLLER GENERAL

*1 Subject: Defense Fuel Supply Center's Small Business Set-Aside Procurements (B-230556; Code 396917)
September 6, 1988

To: Group Director, NSIAD--John Rinko
Thru: Senior Attorney, OGC--A.R. Kasdan

DIGEST

The Defense Fuel Supply Center's (DFSC) small business partial set-aside procedures for the acquisition of its fuel supplies, comply and are consistent with the Small Business Act, 15 U.S.C. 631 et.seq., as well as other applicable Federal procurement laws and regulations. The DFSC procedures have been approved as deviations from applicable procurement regulations for over 20 years, and we previously considered these procedures as a reasonable exercise of DFSC's discretion. See B-168576(2), April 28, 1971 and B-171289, April 28, 1971.

This responds to your request for our views on the legality of the Defense Fuel Supply Center's (DFSC) small business set-aside practices (procedures) for the acquisition of its fuel supplies. In his letter of January 11, 1988, to GAO requesting this review, Senator Max Baucus questioned whether DFSC's small business set-aside procedures afford small business a fair opportunity to compete for these fuel acquisitions. He has asked GAO to determine whether DFSC's procurement procedures are consistent with the Small Business Act, as well as other applicable Federal procurement laws and regulations. For the reasons given below, we believe that DFSC's small business set-aside procurement procedures comply and are consistent with those laws and regulations.

Background

The DFSC purchases its bulk fuel supplies for the Department of Defense's (DOD) domestic requirements in a non-traditional way. It makes two major buys of bulk fuels with multiple contract awards based on a geographical division of the country: Inland/West and East/Gulf. It uses a bid evaluation model developed in the 1960's and 70's which allows it to select the particular combination of contract awards for a specific buy which will fulfill the government's requirement at the overall lowest cost (product plus transportation cost). Under this model, multiple awards are needed at many locations so that each individual requirement or location can be completely supplied. Usual procedures of awarding contracts to the lowest sources do not provide the least total cost pattern of awards.

DFSC solicitations request offers from all suppliers, including both large and small business firms, for needs of all DOD locations in the particular geographic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

area. Using the model developed and taking into account quantities reserved for qualified minority small business firms and small business set-asides, prices for bulk fuels at the various locations in the region are established. DFSC must assure that the small business firms eligible for set-asides are offered an opportunity to receive contracts at a particular location at prices which are not higher than the maximum unit price DFSC would otherwise have to pay. It uses one of three methods--the balanced price, the step price and the matched price--depending on the pattern of bids received to determine the set-aside price. This price is then offered to small business and they have an opportunity to accept or reject it. If it is rejected, the amount set-aside is offered to other sellers at that location to avoid any resolicitation.

*2 Since 1960 DFSC procedures have been approved as a deviation or exception from procurement regulations applicable to small business partial set-asides. The most recent extension of this exception occurred in May 1987 when the DFSC procedures were approved as a deviation from the applicable provisions of the Federal Acquisition Regulation (FAR 19.507, and 19.508(d) ) and of the Defense Supplement to the FAR (DFAR 19.508(d) and 19.508(70) ). DFSC believes that these procedures are necessary to assure awards to small business concerns at prices that are fair and reasonable to the government and to the concerns. DFSC also argues that its procedure results in small business receiving an equal to or higher price for their fuel than they would have received if the standard FAR small business partial set-aside procedures were used. Under the FAR, the price for a partial set-aside is "... the highest unit price(s) in the contract(s) for the non-set-aside portion...." FAR 52.219.7

In his January 11 letter, Senator Baucus expressed concern that the DFSC's partial set-aside procedure may not be consistent with the spirit of the Small Business Set-Aside Program. He stated that in DFSC procurements small businesses do not engage in price competition with other small businesses. Since the "match price" for the fuel is largely set by the prices submitted by large fuel suppliers, small businesses are forced to compete with the cost of production of large suppliers. He therefore contends that DFSC's procedure does not offer small businesses the "maximum practical opportunity to participate in the performance of contracts let by any Federal agency," referring to the Small Business Act, 15 U.S.C. 637. [FN1]

Question: Does the DFSC small business partial set-aside procedure comply with the Small Business Act and other federal procurement laws and regulations?

Answer: Yes. Although the DFSC small business set-aside procedure is an approved deviation from FAR and DFAR provisions, it reserves for small business a portion of a particular acquisition as long as the price does not exceed the market price. The deviation from FAR and DFAR set aside procedures is required because of the nature of DFSC's acquisition of bulk fuel supplies. No provision of the Small Business Act or the FAR or DFAR require that small business compete only against each other in setting the price for the small business set-asides. GAO has previously found substantially similar DFSC procedures to be reasonable.

Explanation: The Small Business Act, 15 U.S.C. 631 et. seq., is designed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

protect the economic interests of small business concerns, and "... to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the government be placed with small business enterprises ..." 15 U.S.C. 631(a). (Emphasis added.) Identical policy objectives are stated in the Armed Services Procurement Act (ASPA), 10 U.S.C. 2301(b), and the Federal Property and Administrative Services Act (FPASA), 41 U.S.C. 252(b), which respectively govern military and civilian acquisitions. Part 19 of the FAR implements the small business acquisition-related provisions of the Small Business Act and the applicable provisions of the ASPA and FPASA. Also, provisions of the DFAR apply to small business set-aside in DOD acquisitions.

*3 To achieve the Small Business Act's "fair proportion policy", both the Act and the FAR give federal agencies broad authority to award contracts to small business, including on a total or partial set-aside basis. 15 U.S.C. 644(a) and FAR 19.5. An agency may not award a contract to a small business firm if the agency's cost would exceed a fair market price, 15 U.S.C. 644(a). [FN2] Relatedly, the FAR set-aside procedures provide that in both total and partial procurement set-asides, the contracts awarded must be made only at reasonable prices. FAR 19.502-2 and 19.502-3. The FAR also requires that specific clauses be inserted for set-aside contracts, i.e., FAR 52.219-6 (total set-asides) and 52.219-7 (partial set-asides). [FN3]

For partial set-asides, FAR 19.502(3)(c) requires that the contracting officer must first award the non-set-aside portion using normal contracting procedures. Both large firms and businesses eligible for the set-aside submit offers on the non-set-aside portion. After the non-set-aside portion is awarded, the contracting officer negotiates with small business firms who have submitted responsive (acceptable) offers on the non-set-aside portion. The set aside portion will be awarded at the highest unit price(s) in the non-set-aside portion. FAR 52.219-7, part (b)(3) of the required contract clause. If a set-aside acquisition is not awarded, the supplies or services for which no award was made is recompeted. FAR 19.507(a).

The DFSC procedures differ from the FAR procedures in two substantial respects which are said by DFSC to be required to effectuate bulk fuel acquisitions. First, the award of set-aside quantities is made at prices which would have been paid without the set-aside. This can differ from the "highest unit price(s)" paid under the FAR. This variance is the result of the nature of the petroleum refining business. In most businesses, prices will often drop as more product is produced. In the petroleum refinery business, the contrary is the case. Since the refining process can produce many products, e.g., jet fuel, gasoline, diesel fuel, etc., increased quantities of one product are produced at the expense of others and the price of additional production rises.

The second difference is that in the event of set-aside failures, the set-aside portion is not recompeted. Under the DFSC procedures both large and small firms are required to submit offers on total quantities just as if there was no set-aside. In this way, in the event a set-aside acquisition cannot be filled, other offers can be considered.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Under both the FAR partial set-aside regulation and the DFSC deviation large and small business compete against each other. Under the former, the large and small firms submit offers on the non-set-aside portion which is awarded first. The set-aside portion is negotiated with qualified small business who have submitted responsive offers under the non-aside portion. Under the DFSC procedure, both large and small firms compete by submitting offers on total quantities.

*4 We have found no court cases or GAO decisions or opinions which have specifically addressed the issue whether the FAR partial set-aside procedures are a reasonable implementation of the requirements of the Small Business Act. However, GAO has considered DFSC procedures substantially similar to those in effect today as a reasonable exercise of an agency's discretion. In B-168576(2), April 28, 1971, a small business protested the reduction of the small business set-aside and proposed certain changes in DFSC's set-aside procedures. At that time, DFSC's procedures were a deviation from applicable ASPA regulations. The protestor proposed that the formula DFSC uses to calculate the prices paid for the quantities accepted be modified. Under this proposal, the price for the set-aside would be set on the basis of the prices and quantities remaining on each offeror's bid after subtracting the amount awarded on the non-set-aside portion.

DFSC pointed out that the proposed procedure would not only cost the government more money, but might actually result in lower prices for set-asides as the percentage of the total procurement which is set-aside increases. GAO stated that it would not substitute its judgment for that of DFSC "unless it [DFSC] has acted in an arbitrary or capricious manner." We concluded that based on the record, there was "substantial evidence to support DFSC decision not to revise its small business set-aside procedures," as suggested by the protestor. In B-171289 , also decided on April 28, 1971, GAO concluded that it failed to see how evaluation procedures--substantially similar to DFSC present procedures--would be contrary to the "congressional purpose and intent in establishing the small business set-aside procedure, 15 U.S.C. 631."

In conclusion, we find no reason to question our previous positions that DFSC procedures are in compliance with the Small Business Act and are a reasonable exercise of agency discretion to implement the policy of the act.

Substantially similar DFSC procedures have been approved as deviations from applicable procurement regulations for partial set-asides for over 20 years. Our view is reenforced by information DFSC has provided that shows that the DFSC set-aside procedure results in small businesses receiving an equal to or a higher price for their fuel than under the FAR set-aside procedure.

Finally, we note that Senator Baucus letter referenced the Small Business Act's requirement that small businesses "... shall have the maximum practical opportunity to participate in the performance of contracts let by any federal agency ..." 15 U.S.C. 637(a). However, this section is not applicable to the award of a federal contract, but to insure that small business receive subcontracts under prime contracts the government has already awarded.

Raymond J. Wyrsch

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Senior Attorney, OCG

FN1 Senator Baucus' request stemmed from a specific DFSC fuel acquisition in which one small business firm, the Wolf Point Refining Company, could not meet the offered "match price" for the delivery of JP-4 fuel to the Minot Air Force Base, because to do so would have resulted in a $900,000 loss to the company. The attorney representing the company believes that DFSC's small business set-aside procedure offers little opportunity for small businesses to compete against large firms. In view of the Senator's request for a general assessment of DFSC's procedure, and that Wolf Point did not file a bid protest concerning the Minot fuel acquisition, we will not address this case.

FN2 The Small Business Act also requires that the head of each agency shall establish goals for the participation by small business concerns in the award of its procurement contracts having a value of $25,000 or more, 15 U.S.C. 644(g).

FN3 The DFAR also requires that similar clauses be inserted in DOD contracts, i.e., DFAR 52.219-7003.

1988 WL 227932 (Comp.Gen.), B- 230,556

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.